APPEAL,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00051-ABJ

Holtmeier et al v. Kappa Kappa Gamma Fraternity et al
Assigned to: Honorable Alan B Johnson
Referred to: US Magistrate Judge Stephanie A Hambrick
Case in other court: USCA, 23-08065
                USCA 10th Circuit, 25-08058
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 03/27/2023
Date Terminated: 08/22/2025
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 03/27/2023 | 1 | VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES WITH JURY DEMAND filed by Jane Doe IV, Jane Doe III, Jane Doe I, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII. (Filing fee $402 Receipt #CHY 2-1291) (Attachments: # 1 Continuation of Document #1 (Complaint and Attachments), # 2 Civil Cover Sheet, # 3 Consent to Proceed Before US Magistrate Judge) (Court Staff, szf) (Entered: 03/28/2023) |
| 03/27/2023 | 2 | Motion Referred to Magistrate Judge MOTION to Proceed Anonymously filed by Plaintiffs Jane Doe I, Jane Doe II, Jane Doe III, Jane Doe IV, Jane Doe V, Jane Doe VI, Jane Doe VII. (Court Staff, szf) Modified docket text on 3/28/2023 (Court Staff, szf). Modified docket text on 3/29/2023 (Court Staff, szf). Modified on 3/29/2023 to unrefer motion (Court Staff, ssw). Modified on 3/29/2023 (Court Staff, sbh). (Entered: 03/28/2023) |
| 03/29/2023 | | Motions No Longer Referred: 2 MOTION for Order Proceed Anonymously (Court Staff, ssw) (Entered: 03/29/2023) |
| 04/06/2023 | 3 | ORDER by the Honorable Alan B. Johnson denying 2 Motion to Proceed Anonymously. The Court grants Plaintiffs leave until April 20, 2023, to file an amended complaint that substitutes Plaintiffs' real names. (Court Staff, sbh) (Entered: 04/06/2023) |
| 04/07/2023 | 4 | Renewed MOTION to Proceed Anonymously filed by Plaintiffs Jane Doe IV, Jane Doe III, Jane Doe I, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII (Craven, Casandra) (Additional attachment(s) added on 4/7/2023: # 2 Proposed Order) (Court Staff, sbh). Removed restriction and modified event and text on 4/7/2023 (Court Staff, sbh). (Additional attachment(s) added on 4/7/2023: # 1 Replaced Document - Renewed Motion) (Court Staff, stmo). (Unable to open original pleading. Pleading replaced on on 4/7/2023 and Modified text on 4/7/2023. (Court Staff, stmo). Attachments renamed on 4/7/2023. (Court Staff, szf) Modified text on 4/7/2023 (Court Staff, stmo). (Entered: 04/07/2023) |
| 04/14/2023 | 5 | ORDER by the Honorable Alan B. Johnson denying 4 Renewed Motion to Proceed Anonymously. In accordance with this Court's prior Order, the Court grants Plaintiffs leave until April 20, 2023, to file an amended complaint that substitutes Plaintiffs' real names. (Court Staff, sbh) (Entered: 04/14/2023) |
| 04/20/2023 | 6 | AMENDED COMPLAINT with Jury Demand *Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar and Megan Kosar on behalf of themselves and derivatively on behalf of Kappa Kappa Gamma Fraternity* against Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President, Terry Smith filed by Jane Doe IV, Jane Doe |

| | | III, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII. (Attachments: # 1 Exhibit Attachments) (Knepper, John) (Entered: 04/20/2023) |
|---|---|---|
| 04/21/2023 | 7 | Praecipes for Summons filed by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek, 4 issued (Court Staff, sbh) (Entered: 04/21/2023) |
| 04/21/2023 | 8 | WAIVER OF SERVICE Returned Executed by Grace Choate, Jaylyn Westenbroek, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Artemis Langford 4/21/2023, answer due 6/20/2023 (Knepper, John) (Entered: 04/21/2023) |
| 04/25/2023 | 9 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Fraternity 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 04/25/2023 | 10 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Fraternity Council President 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 04/25/2023 | 11 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Building Co 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 06/05/2023 | 12 | NOTICE of Attorney Appearance by Scott P Klosterman on behalf of Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 13 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Natalie M. McLaughlin to appear pro hac vice; Check not tendered; filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 14 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Brian W. Dressel to appear pro hac vice; Check not tendered; filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 15 | ORDER by the Honorable Kelly H. Rankin granting 13 , 14 MOTIONS for Natalie M. McLaughlin and Brian W. Dressel to appear pro hac vice on behalf of Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Fraternity (Order emailed to phv counsel on this date) (Court Staff, sbh) (Entered: 06/05/2023) |
| 06/07/2023 | 16 | Notice of Pro Hac Vice Attorney Appearance by Natalie Marie McLaughlin, I on behalf of Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (McLaughlin, Natalie) (Entered: 06/07/2023) |
| 06/08/2023 | 17 | Notice of Pro Hac Vice Attorney Appearance by Natalie Marie McLaughlin, I on behalf of Kappa Kappa Gamma Building Co (McLaughlin, Natalie) (Entered: 06/08/2023) |

A-004

Appellate Case: 25-8058    Document: 21-2    Date Filed: 11/25/2025    Page: 3

| | | |
|---|---|---|
| 06/08/2023 | | FINANCIAL ENTRY: $100 PRO HAC VICE FEES PAID ON BEHALF OF NATALIE M. MCLAUGHLIN AND BRIAN W. DRESSEL ($200 RECEIVED RECEIPT NO. 2-1633) (Court Staff, stmo) (Entered: 06/08/2023) |
| 06/09/2023 | 18 | NOTICE of Pro Hac Vice Attorney Appearance by Brian W. Dressel on behalf of Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (Dressel, Brian) Modified text on 6/9/2023 (Court Staff, stmo). (Entered: 06/09/2023) |
| 06/20/2023 | 19 | MOTION to Dismiss filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (McLaughlin, Natalie) (Entered: 06/20/2023) |
| 06/20/2023 | 20 | MEMORANDUM in Support of 19 Motion to Dismiss filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (McLaughlin, Natalie) (Entered: 06/20/2023) |
| 06/20/2023 | 21 | NOTICE of Attorney Appearance by Rachel M Berkness on behalf of Artemis Langford (Berkness, Rachel) (Entered: 06/20/2023) |
| 06/20/2023 | 22 | MOTION to Dismiss Party Artemis Langford filed by Defendant Artemis Langford. (Berkness, Rachel) (Entered: 06/20/2023) |
| 06/20/2023 | 23 | MEMORANDUM in Support of 22 Motion to Dismiss Party filed by Defendant Artemis Langford. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Supplement, # 4 Supplement) (Berkness, Rachel) (Attachment 1 and Attachment 2 flattened and replaced on 6/21/2023) (Court Staff, stmo). Modified text on 6/21/2023 (Court Staff, stmo). (Entered: 06/20/2023) |
| 07/05/2023 | 24 | First RESPONSE in Opposition re 19 MOTION to Dismiss filed by Plaintiffs Jaylyn Westenbroek, Madeline Ramar, Megan Kosar, Hannah Holtmeier, Allison Coghan and Grace Choate. (Knepper, John) Modified text and filers on 7/6/2023 (Court Staff, sjlg). (Entered: 07/05/2023) |
| 07/05/2023 | 25 | First RESPONSE in Opposition re 22 MOTION to Dismiss Party Artemis Langford filed by Plaintiffs Jaylyn Westenbroek, Madeline Ramar, Megan Kosar, Hannah Holtmeier, Allison Coghan and Grace Choate. (Knepper, John) Modified filers and text on 7/6/2023 (Court Staff, sjlg). (Entered: 07/05/2023) |
| 07/12/2023 | 26 | REPLY to 24 Response in Opposition to Motion filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Dressel, Brian) (Entered: 07/12/2023) |
| 07/12/2023 | 27 | REPLY to 25 Response in Opposition to Motion *to Dismiss with Prejudice* filed by Defendant Artemis Langford. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Berkness, Rachel) (Entered: 07/12/2023) |
| 07/27/2023 | 28 | Notice requiring Defendants Kappa Kappa Gamma Fraternity to Submit a Disclosure Statement in accordance with Fed.R.Civ.P. 7.1(b). Disclosure Statement Due: July 31, 2023. (Court Staff, szf) (Entered: 07/27/2023) |
| 07/28/2023 | 29 | CORPORATE DISCLOSURE filed by Kappa Kappa Gamma Building Co. (McLaughlin, Natalie) (Entered: 07/28/2023) |
| 07/28/2023 | 30 | CORPORATE DISCLOSURE filed by Kappa Kappa Gamma Fraternity. (McLaughlin, Natalie) (Entered: 07/28/2023) |
| 08/25/2023 | 31 | ORDER by the Honorable Alan B. Johnson granting 19 Motion to Dismiss, dismissing without prejudice 6 Amended Complaint, dismissing as moot 22 Motion to Dismiss Party. Plaintiffs' claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co is |

A-005

| | | |
|---|---|---|
| | | dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice. (Court Staff, sbh) Modified text on 8/25/2023 (Court Staff, sbh). Modified to Opinion document type on 8/28/2023 (Court Staff, sbh). (Entered: 08/25/2023) |
| 09/25/2023 | [32](#) | NOTICE OF APPEAL as to [31](#) Order on Motion to Dismiss, Order on Motion to Dismiss Party filed by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek. (Attachments: # 1 Exhibit 1) (Craven, Casandra) (Additional attachment(s) added due to corrupt document on 9/26/2023: # [2](#) Exhibit 1) (Court Staff, stbd). Modified on 9/26/2023 (Court Staff, stbd). (Entered: 09/25/2023) |
| 09/26/2023 | [33](#) | Preliminary Record of appeal sent to USCA and counsel re [32](#) Notice of Appeal (Attorney). **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # [1](#) Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 09/26/2023) |
| 09/26/2023 | [34](#) | Appeal Number **23-8065** received from USCA for [32](#) Notice of Appeal (Attorney) filed by Jaylyn Westenbroek, Grace Choate, Megan Kosar, Allison Coghan, Hannah Holtmeier, Madeline Ramar. Civil case docketed. Preliminary record filed. DATE RECEIVED: 09/26/2023. Fee is due by 10/10/2023 for Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar and Jaylyn Westenbroek. Docketing statement due 10/10/2023 for Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar and Jaylyn Westenbroek. Transcript order form due 10/10/2023 for Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar and Jaylyn Westenbroek. Notice of appearance due on 10/10/2023 for Grace Choate, Allison Coghan, Hannah Holtmeier, KAPPA KAPPA GAMMA BUILDING CO., Kappa Kappa Gamma Fraternity, Megan Kosar, Artemis Langford, Madeline Ramar, Mary Pat Rooney and Jaylyn Westenbroek. Disclosure statement due on 10/10/2023 for KAPPA KAPPA GAMMA BUILDING CO. and Kappa Kappa Gamma Fraternity [23-8065] (Court Staff, stbd) (Entered: 09/27/2023) |
| 10/02/2023 | 35 | USCA Appeal Fees received $505 receipt number 2-2129 re [32](#) Notice of Appeal (Attorney) filed by Jaylyn Westenbroek, Grace Choate, Megan Kosar, Allison Coghan, Hannah Holtmeier, Madeline Ramar. (Court Staff, sjk) (Entered: 10/03/2023) |
| 10/06/2023 | [36](#) | TRANSCRIPT REQUEST (No Transcripts Necessary) re [32](#) Notice of Appeal by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek (Knepper, John) Modified text on 10/6/2023 (Court Staff, sbh). (Entered: 10/06/2023) |
| 10/10/2023 | 37 | (TEXT-ONLY) APPEAL ORDER from USCA as to [32](#) Notice of Appeal filed by Jaylyn Westenbroek, Grace Choate, Megan Kosar, Allison Coghan, Hannah Holtmeier, Madeline Ramar. **Record on Appeal/Notice due 10/17/2023**. Minute order filed - Notice due that record is complete by 10/17/2023 for Margaret Botkins. (Text Only - No Attachment) [23-8065] (Court Staff, sbh) (Entered: 10/10/2023) |
| 10/11/2023 | [38](#) | Transcript Letter transmitted to USCA re [32](#) Notice of Appeal. No transcripts have been ordered for this appeal. For purpose of appeal, the record is now ready. (Court Staff, sbh) (Entered: 10/11/2023) |
| 07/08/2024 | [39](#) | MANDATE of USCA DISMISSING [32](#) Notice of Appeal filed by Jaylyn Westenbroek, Grace Choate, Megan Kosar, Allison Coghan, Hannah Holtmeier, Madeline Ramar. Dismissed; Terminated on the merits after oral hearing; Written, signed, unpublished; Judges McHugh (authoring), Murphy and Federico. [23-8065] (Attachments: # [1](#) Order and Judgment) (Court Staff, sbh) (Entered: 07/08/2024) |
| 12/10/2024 | 40 | (TEXT-ONLY) NOTICE of Hearing VIA ZOOM - |

| | | |
|---|---|---|
| | | NOTE: |
| | | 1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely;the Zoom ID and Passcode will be provided separately to the participants email address of record. |
| | | 2. Participants should connect to the proceeding 15 minutes prior to its scheduled start time to allow for troubleshooting of any connectivity issues. |
| | | 3. To ensure the record is of the best quality, participants are encouraged to utilize a headset to reduce static and background noise. If not using a headset, participants must ensure the audio feed at their location is muted when not speaking. |
| | | ***REMINDER: Recording or broadcasting of this hearing is prohibited. *** |
| | | **Status Conference set for 1/7/2025 at 10:30 AM before Honorable Alan B Johnson.** (Court Staff, ssw) (Entered: 12/10/2024) |
| 12/18/2024 | 41 | MOTION REFERRED TO Judge Stephanie A Hambrick. MOTION to Substitute Attorney filed by Defendants Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Fraternity. (Attachments: # 1 Proposed Order)(Day, Stuart) (Entered: 12/18/2024) |
| 12/19/2024 | 42 | ORDER by the US Magistrate Judge Stephanie A Hambrick granting 41 Motion to Substitute Attorney. Added attorney Stuart R Day for Kappa Kappa Gamma Fraternity, Stuart R Day for Kappa Kappa Gamma Fraternity Council President. Attorney Scott P Klosterman terminated. (Court Staff, scat) (Entered: 12/19/2024) |
| 01/07/2025 | 43 | MINUTES for proceedings held before Honorable Alan B. Johnson: Status Conference held on 1/7/2025 (Court Reporter: Melanie Sonntag) (Court Staff, sbh) (Entered: 01/07/2025) |
| 01/07/2025 | 44 | (TEXT-ONLY) NOTICE of Hearing VIA ZOOM - |
| | | NOTE: |
| | | 1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; the Zoom ID and Passcode will be provided separately to the participants email address of record. |
| | | 2. Participants should connect to the proceeding 15 minutes prior to its scheduled start time to allow for troubleshooting of any connectivity issues. |
| | | 3. To ensure the record is of the best quality, participants are encouraged to utilize a headset to reduce static and background noise. If not using a headset, participants must ensure the audio feed at their location is muted when not speaking. |
| | | ***REMINDER: Recording or broadcasting of this hearing is prohibited*** |
| | | **Status Conference set for 1/29/2025 at 9:30 AM before Honorable Alan B. Johnson.** (Court Staff, sbh) (Entered: 01/07/2025) |
| 01/29/2025 | 45 | MINUTES for proceedings held before Honorable Alan B. Johnson: Status Conference held on 1/29/2025 (Court Reporter: Melanie Sonntag) (Court Staff, sbh) (Entered: 01/29/2025) |

Appellate Case: 25-8058     Document: 21-2     Date Filed: 11/25/2025     Page: 6

| | | |
|---|---|---|
| 01/29/2025 | 46 | (TEXT-ONLY) NOTICE of Hearing VIA ZOOM -<br><br>NOTE:<br><br>1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; the Zoom ID and Passcode will be provided separately to the participants email address of record.<br><br>2. Participants should connect to the proceeding 15 minutes prior to its scheduled start time to allow for troubleshooting of any connectivity issues.<br><br>3. To ensure the record is of the best quality, participants are encouraged to utilize a headset to reduce static and background noise. If not using a headset, participants must ensure the audio feed at their location is muted when not speaking.<br><br>***REMINDER: Recording or broadcasting of this hearing is prohibited***<br><br>**Status Conference set for 3/24/2025 at 9:30 AM before Honorable Alan B. Johnson.** (Court Staff, sbh) (Entered: 01/29/2025) |
| 02/28/2025 | 47 | ~~MOTION REFERRED TO Judge Stephanie A Hambrick~~ MOTION for Deadline for Plaintiffs to Amend Complaint or MOTION to Convert to Dismissal With Prejudice filed by Defendant Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Proposed Order) (McLaughlin, Natalie) Modified to add filer and text on 3/3/2025 (Court Staff, stmo). Modified text on 3/3/2025 (Court Staff, sbh). Added MOTION for Order on 3/3/2025 (Court Staff, sbh). Modified on 3/3/2025 (Court Staff, ssw). (Entered: 02/28/2025) |
| 02/28/2025 | 48 | DISREGARD. Filing error. Counsel to refile. ~~MOTION to Dismiss Party Artemis Langford filed by Defendant Artemis Langford. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Supplement, # 65 Proposed Order)(Berkness, Rachel)~~ Modified text. Termed on 3/3/2025 (Court Staff, stmo). (Entered: 02/28/2025) |
| 03/03/2025 | | Motions No Longer Referred: 47 MOTION for Deadline for Plaintiffs to Amend Complaint MOTION to Convert to Dismissal With Prejudice (Court Staff, ssw) (Entered: 03/03/2025) |
| 03/03/2025 | 49 | MOTION to Dismiss Party Artemis Langford filed by Defendant Artemis Langford. (Attachments: # 1 Supplement, # 2 Affidavit, # 3 Errata, # 4 Proposed Order, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 |

Appellate Case: 25-8058     Document: 21-2     Date Filed: 11/25/2025     Page: 7

| | | |
|---|---|---|
| | | Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit, # 66 Exhibit, # 67 Exhibit)(Berkness, Rachel) (Attachment 56 removed blank page 8 and replaced on 3/4/2025) (Court Staff, stmo). Modified text on 3/4/2025 (Court Staff, stmo). (Entered: 03/03/2025) |
| 03/14/2025 | 50 | RESPONSE in Opposition re 47 MOTION for Deadline for Plaintiffs to Amend Complaint, MOTION to Convert to Dismissal With Prejudice filed by Plaintiffs Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, Megan Kosar. (Knepper, John) Modified text on 3/17/2025 (Court Staff, stmo). (Entered: 03/14/2025) |
| 03/14/2025 | 51 | RESPONSE in Opposition re 49 MOTION to Dismiss Party Artemis Langford filed by Plaintiffs Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, Megan Kosar. (Knepper, John) (Entered: 03/14/2025) |
| 03/21/2025 | 52 | REPLY to 50 Response in Opposition to Motion filed by Defendants Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity. (Dressel, Brian) (Entered: 03/21/2025) |
| 03/24/2025 | 53 | MINUTES for proceedings held before Honorable Alan B. Johnson: Status Conference/Oral Argument on Pending Motions held on 3/24/2025 (Court Reporter: Melanie Sonntag) (Court Staff, sbh) (Entered: 03/24/2025) |
| 03/24/2025 | 54 | (TEXT-ONLY) NOTICE of Hearing VIA ZOOM -<br><br>NOTE:<br><br>1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; the Zoom ID and Passcode will be provided separately to the participants email address of record.<br><br>2. Participants should connect to the proceeding 15 minutes prior to its scheduled start time to allow for troubleshooting of any connectivity issues.<br><br>3. To ensure the record is of the best quality, participants are encouraged to utilize a headset to reduce static and background noise. If not using a headset, participants must ensure the audio feed at their location is muted when not speaking.<br><br>***REMINDER: Recording or broadcasting of this hearing is prohibited. ***<br><br>**Status Conference set for 5/23/2025 at 9:30 AM before Honorable Alan B Johnson.** (Court Staff, ssw) (Entered: 03/24/2025) |
| 03/27/2025 | 55 | NOTICE by Defendant Artemis Langford re 49 MOTION to Dismiss Party Artemis Langford *OF ONGOING ATTACKS BY PLAINTIFFS* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit) (Berkness, Rachel) (Entered: 03/27/2025) |
| 03/28/2025 | 56 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Status Conference Proceedings and Argument on Pending Motions held on 3/24/2025 before Judge Alan B. Johnson. To purchase a copy of this transcript, please contact Court Reporter Melanie Sonntag, phone (307)433-2169 or email MelanieSonntagCRR@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without |

| | | |
|---|---|---|
| | | redaction.<br><br>**THIS TRANSCRIPT MUST NOT BE ATTACHED AS AN EXHIBIT OR MADE PART OF AN APPENDIX. See Local Rule 30.1(g).**<br><br>Notice of Intent to Redact due 4/4/2025. Notice of Redaction Request due 4/18/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 6/26/2025. (Humphrey-Sonntag, Melanie) (Entered: 03/28/2025) |
| 05/09/2025 | 57 | ORDER by the Honorable Alan B. Johnson granting 47 Motion for Deadline for Plaintiffs to Amend Complaint. Plaintiffs have 30 days to file a Second Amended Complaint. If no amended complaint is filed, the Court's earlier order of dismissal without prejudice will convert to a dismissal on the merits. (Court Staff, sbh) (Entered: 05/09/2025) |
| 05/14/2025 | 58 | ORDER by the Honorable Alan B. Johnson denying 49 Defendant Langford's Motion to Dismiss (Court Staff, sbh) (Entered: 05/14/2025) |
| 05/23/2025 | 59 | MINUTES for proceedings held before Honorable Alan B Johnson: Status Conference held on 5/23/2025. (Court Reporter Melanie Sonntag.) (Court Staff, sbrr) (Entered: 05/23/2025) |
| 06/09/2025 | 60 | MOTION REFERRED TO Judge Stephanie A Hambrick. MOTION to Amend 6 Amended Complaint filed by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek. (Attachments: # 1 Exhibit, # 2 Exhibit) (Knepper, John) Modified text on 6/10/2024 (Court Staff, sbh). Modified text on 6/17/2025 (Court Staff, sjlg). (Entered: 06/09/2025) |
| 06/10/2025 | 61 | (TEXT-ONLY) ORDER by US Magistrate Judge Stephanie A Hambrick regarding Plaintiffs' 60 Motion for Leave to File Second Amended Complaint. The Court ORDERS that if the Defendants do not intend to object to the Motion, please file that Response by tomorrow, June 11, 2025. If Defendants do intend to file an objection to the Motion, that Response is due by Monday, June 23, 2025. (Court Staff, sbjk) (Entered: 06/10/2025) |
| 06/11/2025 | 62 | NOTICE *Intention with Regard to Plaintiffs' Motion for Leave to File a Second Amended Complaint* re (61) Order by Defendants Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (Dressel, Brian) (Entered: 06/11/2025) |
| 06/12/2025 | 63 | NOTICE *of No Objection* by Defendant Artemis Langford (Berkness, Rachel) (Entered: 06/12/2025) |
| 06/12/2025 | 64 | ORDER by the US Magistrate Judge Stephanie A Hambrick GRANTING Plaintiffs' 60 Motion for Leave to File Second Amended Complaint. Accordingly, Plaintiffs' must file the Second Amended Complaint on or before Tuesday, June 17, 2025. (Court Staff, sbjk) Modified text on 6/13/2025 (Court Staff, sbh). (Entered: 06/12/2025) |
| 06/12/2025 | 65 | SECOND AMENDED COMPLAINT with Jury Demand against Defendants filed by Allison Coghan, Hannah Holtmeier, Haley Rutsch (Knepper, John) Modified filers and text on 6/13/2025 (Court Staff, sbh). (Entered: 06/12/2025) |
| 06/26/2025 | 66 | MOTION to Dismiss *Second Amended Complaint* filed by Defendants Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Fraternity Council Treasurer, Kappa Kappa Gamma Fraternity Council Vice President Brown, Kappa Kappa Gamma Fraternity Council Vice President Campbell, Kappa Kappa Gamma Fraternity Council Vice President Goettelman, Kappa Kappa Gamma Fraternity Council Vice President Wong, Kappa Kappa Gamma Panhellenic Delegate. (Attachments: # 1 Proposed Order)(Dressel, Brian) (Entered: 06/26/2025) |
| 06/26/2025 | 67 | MEMORANDUM in Support of 66 Motion to Dismiss filed by Defendants Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President, Kappa Kappa |

A-010

| | | |
|---|---|---|
| | | Gamma Fraternity Council Treasurer, Kappa Kappa Gamma Fraternity Council Vice President Brown, Kappa Kappa Gamma Fraternity Council Vice President Campbell, Kappa Kappa Gamma Fraternity Council Vice President Goettelman, Kappa Kappa Gamma Fraternity Council Vice President Wong, Kappa Kappa Gamma Panhellenic Delegate. (Dressel, Brian) (Entered: 06/26/2025) |
| 07/10/2025 | 68 | RESPONSE in Opposition re 66 MOTION to Dismiss *Second Amended Complaint* filed by Plaintiffs Allison Coghan, Hannah Holtmeier, Haley Rutsch. (Knepper, John) (Entered: 07/10/2025) |
| 07/17/2025 | 69 | REPLY to 68 Response in Opposition to Motion filed by Defendants Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Fraternity Council Treasurer, Kappa Kappa Gamma Fraternity Council Vice President Brown, Kappa Kappa Gamma Fraternity Council Vice President Campbell, Kappa Kappa Gamma Fraternity Council Vice President Goettelman, Kappa Kappa Gamma Fraternity Council Vice President Wong, Kappa Kappa Gamma Panhellenic Delegate. (Dressel, Brian) (Entered: 07/17/2025) |
| 08/22/2025 | 70 | ORDER by the Honorable Alan B. Johnson granting 66 Motion to Dismiss (Court Staff, sbh) (Entered: 08/22/2025) |
| 08/22/2025 | 71 | JUDGMENT by the Honorable Alan B. Johnson. Plaintiffs' complaint is dismissed with prejudice. Case closed. (Court Staff, sbh) The AO133 Bill of Cost form is available at https://www.wyd.uscourts.gov/forms/bill-costs. (Entered: 08/22/2025) |
| 09/17/2025 | 72 | NOTICE of Attorney Appearance by Rick L Koehmstedt on behalf of Allison Coghan, Hannah Holtmeier, Haley Rutsch (Koehmstedt, Rick) (Entered: 09/17/2025) |
| 09/17/2025 | 73 | NOTICE OF APPEAL as to 70 Order on Motion to Dismiss, 71 Judgment filed by Plaintiffs Allison Coghan, Hannah Holtmeier, Haley Rutsch. (Attachments: # 1 Exhibit 1 - Order Granting Defendants' Motion to Dismiss) (Koehmstedt, Rick) (Entered: 09/17/2025) |
| 09/17/2025 | 74 | Preliminary Record of appeal sent to USCA and counsel re 73 Notice of Appeal (Attorney) **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 09/17/2025) |
| 09/17/2025 | 75 | USCA Appeal Fees received $605 receipt number 2-5139 re 73 Notice of Appeal filed by Haley Rutsch, Allison Coghan, Hannah Holtmeier (Court Staff, stmo) (Entered: 09/17/2025) |
| 09/18/2025 | 76 | Appeal Number **25-8058** received from USCA for 73 Notice of Appeal filed by Haley Rutsch, Allison Coghan, Hannah Holtmeier. Civil case docketed. Preliminary record filed. DATE RECEIVED: 09/17/2025 Docketing statement due 10/02/2025 for Allison Coghan, Hannah Holtmeier and Haley Rutsch. Transcript order form due 10/02/2025 for Allison Coghan, Hannah Holtmeier and Haley Rutsch. Notice of appearance due on 10/02/2025 for Beth Black, Maira Brown, Nancy Campbell, Allison Coghan, Kyle Donnelly, Barb Goettelman, Hannah Holtmeier, Kappa Kappa Gamma Fraternity, Mary Pat Rooney, Haley Rutsch and Liz Wong. Disclosure statement due on 10/02/2025 for Kappa Kappa Gamma Fraternity [25-8058] (Court Staff, sbh) (Entered: 09/18/2025) |
| 10/02/2025 | 77 | TRANSCRIPT REQUEST (Transcripts Needed) by Plaintiffs Allison Coghan, Hannah Holtmeier, Haley Rutsch for proceedings held on 03/24/25 before Judge Johnson re 73 Notice of Appeal (Attorney). (Koehmstedt, Rick) (Entered: 10/02/2025) |
| 10/02/2025 | 78 | (TEXT-ONLY) APPEAL ORDER from USCA as to 73 Notice of Appeal filed by Haley Rutsch, Allison Coghan, Hannah Holtmeier. Minute order filed - Transcript order form due 10/16/2025 for Melanie Sonntag, Court Reporter. Status conference/oral argument on |

A-011

| | | pending motions 3/24/25. (Text Only - No Attachment) [25-8058] (Court Staff, sbh) (Entered: 10/02/2025) |
|---|---|---|
| 10/10/2025 | 79 | TRANSCRIPT ORDER FORM by court reporter Melanie Sonntag. Transcripts due 10/17/2025. (Humphrey-Sonntag, Melanie) (Entered: 10/10/2025) |
| 10/14/2025 | 80 | (TEXT-ONLY) Transcript Notice transmitted to USCA re 73 Notice of Appeal (Attorney). All transcripts for this appeal ordered from this reporter are already on file with the Court. (Humphrey-Sonntag, Melanie) (Entered: 10/14/2025) |
| 10/14/2025 | 81 | (TEXT-ONLY) APPEAL ORDER from USCA as to 73 Notice of Appeal filed by Haley Rutsch, Allison Coghan, Hannah Holtmeier. **Record on Appeal/Notice due 10/17/2025**. (Court Staff, sbh) (Entered: 10/14/2025) |
| 10/15/2025 | 82 | Transcript Letter transmitted to USCA re 73 Notice of Appeal. All transcripts for this appeal are already on file with the Court. For purposes of appeal, the record is now ready. (Court Staff, sbh) (Entered: 10/15/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/17/2025 11:56:24 | | |
| **PACER Login:** | amlavin72 | **Client Code:** | 230221-00001 |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-00051-ABJ |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

    b. **House Board Fees:** Charged at the discretion of House Board.

    c. **Chapter Dues**: Should be prorated using the date the resignation letter was submitted so it only reflects the time within the term that the member was considered an active member on the roster regardless of participation in chapter events.

## 2.0 Operations

**2.1 Chapter Meetings.** Executive Board shall establish an annual calendar of regular chapter meetings.

    A. Meetings may occur on a virtual platform (if necessary). The chapter shall have a formal meeting at least once per month.

**2.2 Risk Prevention.** All Kappa-sponsored or co-sponsored events must abide by the Risk Prevention Procedures as established by the Fraternity.

    A. **Transportation.** For off-campus chapter events, transportation procedures must comply with the Fraternity Risk Prevention Procedures for all active and new members and their guests. Alcohol, drugs and other controlled substances are prohibited from being transported or used by members or their guests while traveling to and from chapter events.

    B. **Event Procedures**. The procedures for hosting a safe event will be determined by the officer or director responsible for risk prevention. The officer in charge of the event shall determine the method of transportation for any chapter event held off campus. Any chapter member failing to adhere to the established procedures shall be referred to the Standards Committee.

    C. **Expenses**. Transportation expenses shall be included in the chapter budget.

**2.3 Housing.**

    A. Management of chapter facilities shall be in accordance with the procedures set forth in the Fraternity resources and established by the Facility Team and House Board.

        1. Live-In Rule. It is the responsibility of each member to ensure the chapter facility is filled to capacity at all times defined as 52 women. No member will be eligible to live out of the facility until it is full to capacity.

            a. Establishment of Live-In Rule. The live-in rule shall be in accordance with the Fraternity resources and include the following:

                i. Timing

                ii. Procedure

                iii. Point System

                iv. Contracts

            b. Officer Live-In Requirement. At least two members of the chapter Emergency Committee are required to live in the facility. Those two are President and Vice President Operations. In addition, the following officers are required to live in: Vice President Standards,

**Kappa Kappa Gamma**

Vice President External Affairs, Facilities Director, and Risk Director.

   c. **Accommodations**. Members with medical disabilities requiring accommodation should utilize the Housing Accommodation Request Form.

2. **House Rules**. All chapter members shall be subject to the following rules as established by the Facility Team and approved by the chapter. The house rules shall include, but not be limited to, the following: closing hours, meal times, quiet hours, use of parking lot, lock-up procedures, procedures for chapter members to have a key to the facility, storage procedures, and vacation closing dates.

   a. No alcohol or illegal drugs are to be stored or consumed on Kappa property. This includes the chapter house, parking lot, and surrounding property.

   b. Members must adhere to conduct expectations as outlined in the housing policy.

   c. All members living in the house must complete their assigned duties as outlined in the Housing Policies.

   d. Members may not be in position of firearms in the chapter house or on the chapter property.

   e. Members are responsible for adherence to all required safety procedures as outlined in the housing policies.

   f. There shall be no animals in the chapter house in accordance with Fraternity Policies. House Board may grant exceptions for medical purposes in consultation with the designated Headquarters Staff.

3. **Room Assignments.** Room assignments should be determined through the chapter point system or a lottery while also taking into consideration roommate preference. Room assignments are subject to change at any time per the terms of the house contract.

   a. First priority shall be given to members with approved accommodations.

   b. Second priority shall be given to the President, Vice President Operations, Vice President Standards, and Vice President External Affairs.

   c. The remaining rooms shall be assigned based on the following criteria:

      a. Points system as outlined in the housing documents.

      b. Selection process as outlined in the housing documents.

4. **Roommate Assignments**. The Facility Team is responsible for roommate assignments. The Facility Team should determine a fair method for roommate selections that take into account member preference.

**Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

5. **Room and Board.** No member shall receive room and board for free or at a discounted rate due to potential tax implications.
6. **Facility Team**. The Facility Team shall be responsible for the enforcement of the house rules. The Facility Team shall consist of a chairman and the Vice President Operations. The Facility Director shall be the chairman of the Facility Team. After the first infraction, the member shall meet with the Facility Team. After the second infraction, the member may be referred to the Standards Committee. Members may be referred to the Standards Committee after a first infraction as determined by the Facility Team.

**2.4 Visitation.**
   A. **Visitation.** The chapter shall establish a visitation policy in accordance with Fraternity expectations. Nonmember guests must always be accompanied by a member or House Director. Nonmembers are not allowed in the basement without approval from the President, Vice President Operations, Facilities Director, or the House Director. Nonmembers visitation shall not exceed the facility's open hours. Open hours are defined as hours in which nonmembers are permitted in the facility.
   1. Chapter members are responsible for their guest(s) conduct in the house. The member who invited the guest who damages the facility will be required to pay the costs of the damage.
   2. Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from the House Director, President or Facility Director.
   3. Female guests may stay in the guest room if prior arrangements are made with the House Director, the housing policies are followed and a Guest Form is completed prior to the visit.
   4. Visitors whose relationship with a resident member is intimate in nature are prohibited from being overnight guests.
   B. **Procedures.**
   1. **Chapter Vote.** The visitation policy shall be approved by a three-fourths vote of the chapter members present and voting as well as a three-fourths vote of both Advisory Board and House Board.
   2. **Policy Reaffirmation**. The visitation policy must be reaffirmed annually by a three-fourths vote of the chapter members present and voting as well as a three-fourths vote of the Advisory Board and House Board.
   3. **Suspension**. The visitation policy may be suspended by a three-fourths vote of the chapter, House Board, and Advisory Board in the event of an emergency or violation(s).
   4. **Violations**. Violations of the policy or behavior by a member or member's guest(s) that is not in keeping with Kappa Kappa Gamma standards,

CS-021122.09

A-015

**Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

interferes with the rights of others, or results in the destruction or loss of property may result in the suspension or withdrawal of the policy by Advisory Board and House Board after conversations with the standards team (i.e., the Standards Specialist and Standards Director), Facilities Director, and the Housing Department at Kappa Kappa Gamma Headquarters.

**2.5 Public Relations.**

A. **Annual Chapter Update.** A chapter update shall be published annually. In accordance with the Fraternity Policies, solicitation of funds to publish and distribute the chapter update is prohibited. The name of the chapter update shall be *The Omicronian*.

B. **Requests for Information.** In accordance with the Fraternity *Policies*, requests for information of any nature or opinions relating to Kappa Kappa Gamma or its members, such as annual reports, questionnaires, evaluation surveys or relationship statements, shall be approved by the Fraternity President or National Panhellenic Conference Delegate before an answer, oral or written, is submitted. Award applications should be reviewed by the National Panhellenic Conference Delegate prior to submission.

C. **Endorsements, Promotions and National Publicity.** In accordance with the Fraternity *Policies*, requests for endorsements of products, participation in commercial or political promotions, or pictures and/or articles about the chapter or its members for use by the national media must be approved by Kappa Kappa Gamma Headquarters.

4. **Special Occasions.** The chapter shall celebrate Founders Day (October 13) in an appropriate manner.

**3.0 Finance**

**3.1 Member Accounts.** The chapter member's account is payable in full within 15 days of the date of the bill. The due date shall be stated on each bill.

**3.2 Payment Plan.**

A. **Request for Payment Plan.** The committee or officer in charge of finance and/or Finance Adviser shall approve requests for payment plans with the member's understanding that all money due shall be paid in full within the term.

B. **Terms.** Payment plan terms shall be established as follows:
1. **Payment 1.** One-third of the total is due within 15 days of the first bill.
2. **Payment 2.** One-third of the total is due within 15 days of the second bill.
3. **Payment 3.** One-third of the total is due within 15 days of the third bill. Note: Billhighway divides each itemized fee into equal monthly installment amounts.

C. **Exceptions.** The Finance Adviser shall approve exceptions to the established payments. The member must sign a promissory note if the agreed-upon payment plan differs from the standing rules. Although the member may be paying on

**Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

time for a specialized payment plan, the Billhighway late fee may still apply to the balance if the installments are not paid in full within the allotted grace period.

### 3.3 Delinquent Accounts.

A. **Past-Due Accounts**. If an account is one day past due, the Vice President Finance shall send notice to the member and establish a deadline for payment that is five days from the due date of the bill or establish an alternative payment schedule. If an account becomes more than five days past due, the member shall be referred to the Standards Committee. Members are responsible for payment of incurred Billhighway fees.

B. **Failure to Meet Financial Obligations**. If the deadline for payment is not met, the member shall be referred to the Standards Committee. Failure to pay the delinquency or maintain the payment plan agreement may result in Social Probation, loss of chapter voting privileges, removal from chapter office, prohibition from initiating due to broken pledge to membership, or removal/loss of membership. Once a member is no longer active due to transfer, graduation, removal/loss of membership or disenrollment from the university, the chapter may refer the debt to a collection agency or pursuance through small claims court.

### 3.4 Chapter Purchases.

A. **Reimbursement**. Any member seeking reimbursement for items purchased for chapter activities must submit a fully completed Reimbursement Voucher form. The member shall not be reimbursed unless this form is received with an itemized receipt.

B. **Prepaid Cards**. Any administrator with a prepaid card must turn over all itemized receipts immediately to the Vice President Finance. Failure to do so may result in loss of prepaid card privileges.

C. **Officer Overspending**. If an officer anticipates the department will go over budget, the situation shall be discussed with Executive Board. The officer must create a plan to address how the overage will be offset elsewhere in the budget. The proposed plan shall be voted on by Executive Board. A majority vote shall approve. If the officer fails to address the budget overage with Executive Board, they may be referred to the Standards Committee where a possible consequence may include removal from office.

D. **Repayment of Unauthorized Purchases.**

1. Any member who is suspected of making an unauthorized purchase will be referred to the Standards Committee. The Vice President Finance shall notify the Standards Committee of any suspected misuse of funds.

2. Officers are responsible for overseeing and managing the budget.

3. Members are responsible for reimbursement to the chapter for inappropriate spending, such as failing to produce receipts for purchases, use of chapter funds for personal expenditures, or failure to obtain proper pre-approval for purchases.

Kappa Kappa Gamma

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

4.  Members are responsible for refunding any undocumented or
    unauthorized purchases occurring as a result of misusing the prepaid
    card. An undocumented or unauthorized expense may include but is not
    limited to: purchases made without explicit approval, late or incorrect
    documentation, and/or failure to comply with university policy.
5.  If misuse of the prepaid card occurs, repayment to the chapter shall not
    be classified as a fine or assessment.

**4.0 Amendments.**

**4.1** The chapter Standing Rules may be amended or rescinded by a majority vote of
those present and voting after at least seven days advance notice or by a two-thirds vote
of those present and voting without prior notice. A two-thirds vote of the members
present and voting shall suspend the chapter Standing Rules.

CS-021422.09

A-018

# ATTACHMENT 14

 **Kappa Kappa Gamma**
GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**BYLAWS**
**of**
**GAMMA OMICRON CHAPTER**
**KAPPA KAPPA GAMMA FRATERNITY**

[Insert date adopted or amended]

**ARTICLE I**
**NAME**

In accordance with the wording of the charter of Kappa Kappa Gamma Fraternity, this chapter, located in Laramie, Wyoming and founded on February 25, 1927, shall be known as Gamma Omicron Chapter of Kappa Kappa Gamma Fraternity.

**ARTICLE II**
**PURPOSE**

The purpose of a chapter shall be:

to advance the mission and purpose of Kappa Kappa Gamma Fraternity;

to unite women through membership in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness;

to properly maintain the organization and operation of the chapter;

to cooperate with the host institution to advance academic interest and promote higher standards of social conduct; and

to cooperate with other campus organizations in solving mutual problems and building higher standards of womanhood.

**ARTICLE III**
**MEMBERS**

**Section 1. Membership.** Membership in this chapter of Kappa Kappa Gamma Fraternity shall be in accordance with the provisions of the Fraternity *Bylaws*. The classifications of chapter members are active, associate, and new member.

A.  To be considered for membership, the potential member shall meet the minimum GPA.
1. First-semester freshmen. A freshman shall have at least a B+/3.3 GPA average or its equivalent under any other grading system from high school.

CS-01122.09

A-020

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

  2.Other potential members. Other potential members shall have at least a B-/2.7 GPA average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university.

B. **Exceptions**. In extraordinary cases, the chapter may petition the Membership Specialist for an exception to the GPA requirement.

**Section 2. Participation.** Members who are unable to participate in chapter activities because of school-related, job, or personal responsibilities may be granted Special Status in accordance with Section 1.5 in the chapter Standing Rules.

**Section 3. Standards.** Chapter members shall adhere to all member responsibilities, rules, policies, and procedures established by the Fraternity and the chapter.

**Section 4. Academic Excellence.** Chapter members shall meet and maintain the chapter-established GPA and shall submit verification of grades for each term to the officer in charge of academic excellence.

**Section 5. Active Member Rights.** Active members in good standing as established by the Fraternity have the right to vote, represent the chapter as a delegate, and hold office within the chapter.

**ARTICLE IV**
**CHAPTER ORGANIZATION**

Chapters may choose to assign directors to functional areas within a department. The vice president shall assume the duties of the functional area if a director is not assigned. With the approval of the Leadership Development Specialist in consultation with the District Director, the chapter shall determine which functional areas are assigned directors.

**Section 1. Departments.** The departments of the chapter shall be external affairs, finance, internal affairs, member development, membership, operations, and standards. Within each department, a director may be assigned to a functional area.

A. **External Affairs.** The External Affairs Department serves the chapter in the functional areas of events, risk prevention, Panhellenic affairs, philanthropy, and public relations.

B. **Finance**. The Finance Department serves the chapter in the area of finance.

C. **Internal Affairs.** The Internal Affairs Department serves the chapter in the functional areas of member engagement, ritual and history, and academic excellence.

D. **Member Development**. The Member Development Department serves the chapter in the functional areas of the New Member Experience, Senior Member Experience, All-Member Experience, and diversity, equity and inclusion.

E. **Membership**. The Membership Department serves the chapter in the functional areas of Primary Recruitment and Continuous Open Bidding.

F. **Operations**. The Operations Department serves the chapter in the functional areas of administration and facility.

G. **Standards**. The Standards Department serves the chapter in the area of standards.

CS-01222.09

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**Section 2. Department Meetings.** Department meetings shall be held at least biweekly during the academic year unless otherwise designated by the vice president of the department.

CS-01322.09

A-022

 **KappaKappaGamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

## ARTICLE V
## OFFICERS AND DIRECTORS

**Section 1. Officers and Directors.** The officers of the chapter shall be elected and they shall be the chapter President, Vice President External Affairs, Vice President Finance, Vice President Internal Affairs, Vice President Member Development, Vice President Membership, Vice President Operations, and Vice President Standards. The directors for the chapter shall be elected and shall be Events Director, Philanthropy Director, Risk Prevention Director, Academic Excellence Director, New Member Experience Director, and Facilities Director. The chapter shall annually review the officer and director structure. Changes must be approved by the Leadership Development Specialist in consultation with the District Director. Each vice president shall be responsible for a department of the chapter.

**Section 2. Qualifications of Officers and Directors.**

A. **Qualifications**. Only members in good standing as established by the Fraternity, and attaining at least a B-minus average for members other than first-semester freshmen or a B-plus average or its equivalent under any other grading system from high school for first-semester freshmen for the previous term shall be eligible to be nominated for or hold office unless the relevant Content Specialist (Academic Excellence Specialist or Standards Specialist), in consultation with the District Director, grants an exception.

B. **Maintaining Qualification**. If an officer or director fails to maintain the qualification to hold office, they shall become ineligible to remain in office unless the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director, grants an exception. If an exception is not granted, the officer or director will be given a chance to resign. If the officer or director refuses to resign, removal proceedings shall commence.

**Section 3. Duties.**

A. **Duties of Officers.** The duties of the officers shall include the following:
   1. To act in the best interest of the chapter.
   2. To assume fiduciary responsibility of the chapter.
   3. To serve on Executive Board.
   4. To oversee the department and functional areas within the department.
   5. To hold biweekly meetings with their departments.
   6. To perform duties as outlined by the Fraternity.
   7. To make reports as required by the Fraternity or as requested.

B. **Duties of Directors.** The duties of the directors shall include the following:
   1. To act in the best interest of the chapter.
   2. To oversee their functional area.
   3. To meet as necessary.
   4. To perform duties as outlined by the Fraternity.

CS-01422.09

A-023

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**Section 4. Removal From Office.** Executive Board, in consultation with the District Director and the adviser to Executive Board, may recommend to the chapter the removal of any officer or director failing to adequately perform the duties of office, failing to maintain Fraternity standards, or falling below academic requirements. The officer or director shall be given the opportunity to defend herself. A two-thirds vote of the active chapter members at any regular or special meeting shall be required to remove an officer or director.

**Section 5. Vacancies.**

A. After a nomination is made by Executive Board, a majority vote of the active chapter members present at the meeting and voting shall fill a vacancy. Nominations from the floor shall be in order prior to voting.

B. In the event an officer or director is temporarily unable to perform the duties of office, Executive Board shall assign the duties to another member of the chapter who, if filling in for an Executive Board member, shall have the right to vote in place of the officer.

C. In the event the chapter President is permanently unable to perform the duties of office, Executive Board shall assign the President's duties to a vice president until a new chapter President is elected.

**ARTICLE VI**
**NOMINATIONS AND ELECTIONS**

**Section 1. Nominations.**

A. The Nominating Committee shall consist of a chairman appointed by Executive Board and a number of initiated members appropriate to the size and academic classes represented within the chapter. Four members, one from each academic class, shall be elected four weeks in advance of the chapter election. A member of Advisory Board shall act as an adviser to the committee without a vote.

B. All members interested in being considered for an elected position shall submit an application.

C. The committee shall select, from the list of members who submitted applications, candidates who are eligible and qualified to fill a position. They will conduct individual interviews with each selected candidate.

D. After all eligible candidates have been interviewed, the committee, by majority vote, shall slate one candidate for each position. The Nominating Committee Adviser shall be present during the meeting(s) at which the slate is developed and finalized. Only members in good standing as established by the Fraternity are eligible to be placed on the slate. Exceptions may be granted by the Academic Excellence Specialist, Standards Specialist, or Finance Specialist.

E. The committee shall report the slate of nominees, including their qualifications for office, electronically within 24 hours of the committee meeting at which the slate was finalized and at least 72 hours prior to the chapter meeting at which elections shall be held.

CS-01522.09

A-024

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**F.** Nominations from the floor shall be in order on the night of elections and shall be called for after the report of the Nominating Committee has been submitted. If a nomination is made from the floor, the member making the nomination shall make a brief statement, no longer than one minute, of the nominated candidate's qualifications. No other discussion or comments are allowed.

**Section 2. Election.** The election of chapter officers and directors shall be held annually in accordance with Fraternity expectations unless the District Director grants an exception. Officers and directors shall be elected by ballot for a term of one year or until their successors are elected. A majority vote shall elect. Prior to the election date, the President shall decide if she will vote for each office or save her vote to break ties. The President's decision to vote or save her vote shall be announced to the chapter on the night of elections. If the President is voting, in the event of a tie, voting will continue until a clear majority has been reached. If the President is saving her vote to break ties, in the event of a tie, the President will vote to break the tie. In the event of no one receiving a majority vote, all candidates except the two with the highest number of votes will be removed and a revote will be taken. Proxy or absentee voting shall not be permitted.

**Section 3. Installation of Officers.** All chapter officers and department directors shall be installed at a formal meeting following a period of officer training in accordance with Fraternity expectations.

### ARTICLE VII
### CHAPTER MEETINGS

**Section 1. Chapter Meetings.** The chapter will meet regularly with a formal meeting being held at least once a month during the academic term. The officer or director responsible for communication shall notify all members of the meeting time and place.

**Section 2. Special Meetings.** A special chapter meeting may be called by the President or Executive Board or upon the written request of 50% of the members. The officer or director responsible for communication shall notify all members of the time, place and purpose of the meeting.

**Section 3. Quorum.** A majority of active chapter members shall constitute a quorum.

**Section 4. Voting.** A majority of active chapter members present at the meeting and voting shall determine all decisions except where otherwise specified.

### ARTICLE VIII
### EXECUTIVE BOARD

**Section 1. Composition.** Executive Board shall consist of the President and the vice presidents of each department.

**Section 2. Duties.** The duties of Executive Board shall be:

A. To be responsible for overseeing the business and the success of the chapter.

CS-01622.09

A-025

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

B. To be responsible for the proper functioning of the chapter.
C. To administer the chapter finance program according to the guidelines approved by and under the direction of the Finance Department at Kappa Kappa Gamma Headquarters.
D. To send representatives to the College Panhellenic organization in accordance with National Panhellenic Conference Unanimous Agreements and according to the structure of the respective College Panhellenic.
E. To ensure that the archives of the chapter are properly maintained, including an alphabetical roll and chronological index of chapter initiates, proxy initiates, and affiliates.
F. To review the Fraternity *Bylaws*, *Standing Rules* and *Policies*, along with the chapter Bylaws and Standing Rules, at the beginning of each term of office.
G. To establish an annual calendar of meetings after officers and directors are installed. The calendar shall include a formal meeting at least once a month. If necessary, the Executive Board shall determine changes in the calendar.

**Section 3. Executive Board Meetings.** Executive Board shall meet weekly during the academic year unless otherwise designated by the board. A special meeting of Executive Board may be called by the President or upon written request of three members of Executive Board with a minimum of 24 hours' notice. A majority of the members of Executive Board shall constitute a quorum.

### ARTICLE IX
### COMMITTEES AND TEAMS

**Section 1. Standing Committees and Teams.** The chapter standing committees shall be the Standards Committee, the Emergency Committee, and the Academic Excellence Team.
A. Standards Committee. The Standards Committee shall be responsible for the maintenance of fraternity standards and policies. The Standards Committee shall consist of a chairman, President, Vice President Member Development and one member-at-large elected by the chapter at the time of chapter elections. The chairman of the Standards Committee shall be the Vice President Standards.
B. Emergency Committee. The Emergency Committee shall be responsible for safety protocol in all emergencies. The Emergency Committee shall consist of a chairman, the Vice President Operations, the Facility Director and Vice President Standards. The chairman of the Emergency Committee shall be the chapter President.
C. Academic Excellence Team. The Academic Excellence Team shall be responsible for the maintenance of the chapter academic standards. The Academic Excellence Team shall consist of a chairman and the Vice President of Internal Affairs as the Academic Coordinator. The chairman of the Academic Excellence Team shall be the Academic Excellence Director.

**Section 2. Other Committees and President's Ex-Officio Committee Membership.** Such other committees, standing or special, may be established by the membership or Executive

CS-01722.09

A-026

 **Kappa Kappa Gamma**    GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

Board as may be deemed necessary from time to time. The President shall be a member *ex-officio* of all committees except the Nominating Committee.

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

## ARTICLE X
## ELECTRONIC MEETINGS

**Section 1. Electronic Meetings.** The membership; all committees, subcommittees, and teams; and any chapter subgroup may attend and participate in any meeting through any communications equipment that provides a transmission, including but not limited to by telephone, telecopy, or any electronic means from which it can be determined that the transmission was authorized by, and accurately reflects the intention of the participant involved and allows all persons participating in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means, such as audience response devices or computer software, shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

## ARTICLE XI
## COMMUNICATIONS

Unless a member indicates otherwise, all communication required in these bylaws, including meeting notices, may be sent electronically.

## ARTICLE XII
## CHAPTER ADVISERS AND ADVISORY BOARD

Advisory Board shall be composed of a chairman and alumna advisers to Executive Board and the vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director in consultation with the Leadership Development Director and Advisory Board Director.

Alumna members shall be selected annually to be advisers in accordance with the provisions of the Fraternity. Advisers shall serve in an advisory capacity without a vote.

## ARTICLE XIII
## FINANCE

**Section 1. Finance.** All matters pertaining to chapter finances shall be in accordance with the financial responsibilities, including chapter fees, as required by the Fraternity.

**Section 2. Dues.** Chapter dues include required fees and chapter operational expenses. The chapter shall review the budget annually. Chapter dues shall be determined by the budget and approved by chapter members annually. Once dues are approved by the chapter, they become a financial obligation of each member along with all required fees.

**Section 3. House Association Fee.**
   A. **Fees.** The chapter house association shall annually establish the house association fee. This shall be paid within one year of the date of pledging.

CS-01922.09

A-028

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

A. Affiliated Members. A member who has affiliated with the chapter shall pay 50% of the chapter's house association fee.
B. Transfers. A member who transfers to the campus and does not affiliate but lives in the facility shall pay 50% of the chapter's house association fee.

## ARTICLE XIV
## DELEGATES

**Section 1. General Convention.** The chapter's delegate to General Convention shall be the chapter President unless excused by the District Director. If the chapter President is excused, the chapter shall select another member to be the delegate.

**Section 2. Other Leadership Conferences.** The chapter shall send delegates as specified by the Fraternity to other leadership conferences that may be scheduled from time to time.

**Section 3. College Panhellenic Council.** The chapter shall be a member of the College Panhellenic Association and shall be represented by a delegate in the College Panhellenic Council.

## ARTICLE XV
## PARLIAMENTARY AUTHORITY

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the chapter in all cases in which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the chapter may adopt.

## ARTICLE XVI
## AMENDMENT OF THE BYLAWS

These bylaws may be amended at any business meeting of the chapter by a two-thirds vote, provided notice of any proposed amendments has been given at least seven days in advance. The chapter Bylaws shall be reviewed at least once each biennium and shall be approved by the Fraternity Bylaws Committee before being adopted by the chapter.

### # # #

CS-011022.09

A-029

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sday@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
          bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, <br><br> Plaintiffs, <br><br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, <br><br> Defendants. | Civil Action No.: 23-CV-00051-ABJ |

**DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION FOR COURT TO SET A DEADLINE FOR PLAINTIFFS TO AMEND COMPLAINT OR ELSE HAVE DISMISSAL CONVERTED TO DISMISSAL WITH PREJUDICE**

**COME NOW**, the Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney ("Rooney"), and Kappa Kappa Gamma Building Co. (the "Building Co.") (collectively, "Defendants") and hereby move this Court for an Order setting a deadline by which Plaintiffs must seek leave to file a Second Amended Complaint or else have the Court's August 25, 2023 Order dismissing Plaintiffs' First Amended Verified Complaint ("Amended Complaint") without prejudice to a dismissal with prejudice. Defendants propose a deadline of 21 days.

This relief is proper given the substantive decision the Court issued granting Defendants' Motion to Dismiss and subsequent representations by Plaintiffs that amendment would be futile. Moreover, the requested relief would prevent related parties from using the non-prejudicial nature of the Court's dismissal to assert duplicative derivative claims while contending this Court's decision on the same issues does not have a preclusive effect. Defendants submit the accompanying Memorandum of Law in support of this Motion.

Dated: February 28, 2025

Respectfully submitted,

/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin (Ohio Bar No. 0082203)*
Brian W. Dressel (Ohio Bar No. 0097163)*
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:        nmmclaughlin@vorys.com
              bwdressel@vorys.com
* -*Admitted Pro Hac Vice*

-2-

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:        sday@wpdn.net

*Attorneys for Defendants Kappa Kappa Gamma
Fraternity, Kappa Kappa Gamma Building Co., and
Mary Pat Rooney*

-3-

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 28th day of February, 2025.

| | |
|---|---|
| Cassie Craven (#7-5664)<br>LONGHORN LAW LIMITED LIABILITY COMPANY<br>109 East 17th Street, Suite 11<br>Cheyenne, WY 82001<br>Telephone: (307) 823-3062<br>E-Mail: cassie@longhornlawllc.com | ☒ CM/ECF Electronic Transmission<br>☐ U.S. Mail (Postage Prepaid)<br>☐ Fax<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☐ Email |
| John G. Knepper (#7-4608)<br>LAW OFFICE OF JOHN G. KNEPPER, LLC<br>P.O. Box 1512<br>Cheyenne, WY 82003<br>Telephone: (307) 632-2842<br>E-Mail: John@KnepperLLC.com | ☒ CM/ECF Electronic Transmission<br>☐ U.S. Mail (Postage Prepaid)<br>☐ Fax<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☐ Email |

/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin

-4-

A-033

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sday@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
          bwdressel@vorys.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY,<br><br>     Plaintiffs,<br><br>v.<br><br>KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 23-CV-00051-ABJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION FOR COURT TO SET A DEADLINE FOR PLAINTIFFS TO AMEND COMPLAINT OR ELSE HAVE DISMISSAL CONVERTED TO DISMISSAL WITH PREJUDICE**

---

## I.    INTRODUCTION

Defendants file this Motion for Court to Set Deadline for Plaintiffs to Amend Complaint or Else Have Dismissal Converted to Dismissal with Prejudice.  This lawsuit was filed almost two years ago.  After the Court dismissed Plaintiffs' claims on the merits but without prejudice on August 25, 2023, Plaintiffs appealed.  On June 12, 2024, the Tenth Circuit granted Defendants' motion to dismiss Plaintiffs' appeal for lack of appellate jurisdiction.  On July 5, 2024, the Tenth Circuit issued its mandate and transferred jurisdiction over the case to this Court.  (ECF No. 39.)

In almost eight months since jurisdiction transferred back to this Court, Plaintiffs have taken no action to either attempt to amend their Amended Complaint or finalize the Court's Order so they can perfect an appeal.  This has allowed the matter to remain pending without definitive preclusive effect while another case asserts derivative claims based on the same core issue of whether Kappa may admit transgender women consistent with its bylaws, Ohio law, and the First Amendment.  *See Levang, et al. v. Kappa Kappa Gamma Fraternity, et al.*, Southern District of Ohio Case No. 2:24-cv-316-MHW-KAJ and District of Wyoming Case No. 2:24-cv-267-ABJ ("Second Case").  Indeed, the Ohio federal court found that the shareholder derivative claims in the Second Case "are ***identical*** to the Westenbroek Derivative Claim." (*See* Second Case, Order Transferring Case, p. 15, attached as Ex. A (emphasis added).)

Requiring Plaintiffs to either amend their Amended Complaint by a set deadline or have their claims dismissed with prejudice is within this Court's authority.  Issuing such an order would move the case towards its resolution instead of keeping the parties in limbo for the duration of the statute of limitations on Plaintiffs' claims.  Moreover, this relief would not prejudice Plaintiffs, especially given that Plaintiffs have repeatedly represented that there is ***nothing*** they can do to amend their complaint to plead around the merits issues in this Court's dismissal order.

For the reasons that follow below, Defendants therefore request that the Court issue an order requiring Plaintiffs to file a Second Amended Complaint within 21 days and providing that if they do not do so within that timeframe, the Court's August 25, 2023 Order will automatically convert to a dismissal with prejudice.

## II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Plaintiffs filed this lawsuit on March 27, 2023.  On June 20, 2023, Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint, asking the Court to dismiss all of Plaintiffs' claims with prejudice.  The Court granted the Motion on August 25, 2023, but noted that Defendants had not advanced an argument that amendment of the Amended Complaint was futile, and therefore, declined to dismiss the Amended Complaint with prejudice.  On September 25, 2023, Plaintiffs appealed the Court's decision to the Tenth Circuit.

On October 9, 2023, Defendants moved the Tenth Circuit to dismiss Plaintiffs' appeal on the grounds that this Court's dismissal without prejudice was not a final appealable order.  In their Response to the Motion to Dismiss the Appeal, Plaintiffs contended:

> ***Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint through an amendment***; the opinion below makes this plain. The district court correctly observed that the "gravamen of Plaintiffs' lawsuit" is whether the term "woman," as used in Kappa's governing documents, includes male-born individuals. Order at 26 (ROA 39).  In ruling against Plaintiffs, the court concluded that "Plaintiffs cannot point the Court to the bylaw that defines 'woman' the way they wish."  Order at 31 (ROA 44) (emphasis added).  This is true—no superfluous bylaw defining "woman" exists, and no reiterations of the complaint could create it.  The district court also ruled that Defendants' decision to admit male-born members was "speech which th[e] Court may not impinge."  Order at 30 (ROA 43).  These conclusions guided every aspect of the court's order.  See id. at 38 (ROA 51) (relying on analysis from this section of the opinion).  In addition, despite Plaintiffs' allegations that admission of a male-born student into the sorority injured them personally and distinctly, the district court held that "any" injury caused by that admission "inured to all KKG [Kappa] members alike" and that the student's "behavior at the UW chapter house has no bearing on Plaintiffs' legal claims." Order at 39, 40 n.68 (ROA 52, 53).  ***None of those rulings identifies a defect Plaintiffs could cure with an amendment***."

(Appellants' Response to Motion to Dismiss Appeal, pp. 5-6, attached as Ex. B (emphasis added).)

Concerning the Court's suggestion in footnote 67 of its dismissal Order that Plaintiffs may seek to amend their Amended Complaint, Plaintiffs stated:

> [The District Court's] footnote [67] does not suggest—indeed, based on the district court's legal analysis, *could not suggest*—any amendment that could bring Plaintiffs' case to life. Nor does the footnote guarantee that Plaintiffs would be permitted to amend if they sought to engage in that *futile endeavor*. On the contrary, the district court merely discussed what might happen "if" plaintiffs were allowed to amend. As the rest of the order makes clear, however, *no amendment could cure the legal grounds for dismissal on which the district court relied*.

(*Id.*, p. 9 (citations omitted) (emphasis added).)

In their Appellate Brief, Plaintiffs' position that there was no way to cure the legal grounds for dismissal through an amendment to their complaint remained unchanged. They represented:

> *Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint through an amendment* because the district court's decision was based on "a matter going to the merits of appellant's complaint itself rather than a procedural problem which amendment of a complaint might rectify."

(Brief of Appellants, pp. 13-14, attached as Ex. C (citations omitted).)

At oral argument, Plaintiffs' counsel informed the panel that the *only* reason that this Court had stated it would not dismiss this case with prejudice was because Defendants had failed to argue futility, and therefore, it was never considered.

> **Ms. Mailman:** But here, the only reason the District Court said that they – that he wasn't going to grant this with prejudice is because the Defendants didn't argue that amended would be futile. So he didn't even consider it. He didn't say that you could re-file. He just said there isn't futility even alleged here, so I'm just not even going to consider it. It was not a basis for the decision.

(Second Case, Plaintiffs' Notice of Filing Transcript, pp. 8, attached as Ex. D.)

Plaintiffs' counsel's position that there was no way to cure the legal grounds for dismissal through an amendment to their Amended Complaint also remained unchanged:

> **Ms. Mailman:** [T]he problem here, and this goes to the practical consideration of is it on the merits, is that all of these contract claims, every single one of the claims, boils down to whether there's been a certain promise made in the bylaws, and whether that promise was broken. And so, we lose here, then in a sense, ***there'd be no way to get around that determination.***

(*Id.*, p. 9 (emphasis added).)

> **Hon Richard Federico:** What about counts one and four though? You have been granted leave to amend those as well.  Understand you'd argue to say there's nothing we can do to amend those claims to potentially make them viable, consistent with the District Court orders.  Or are you disclaiming any rights you may have to amendment?

> **Ms. Mailman:** Well, we haven't been given a right to amend that.  We've been – the claim has been dismissed, admittedly without prejudice.

> **Hon. Richard Federico:** Without prejudice, and Footnote 67 at the District Court order is pretty clear that if you want to amend, here are the guidelines that the District Court is offering to you.  A lifeline in how to do this.

> **Ms. Mailman:** Right, and so we could write it better.  I agree.  We could follow that footnote and write it better.  The problem is, ***we couldn't write it to get around the determination on the merits.***  So, we could write it cleaner and prettier and nicer.  Just not to fix the problem that exists here.  And so, that's what I really want to address, is what is that merits determination that we really can't get around?  And here, the District Court, instead of assessing the elements of a breach of fiduciary duty claim, said that he was unable to review that claim because of non – inner – noninterference principles.

(*Id*, p. 11 (emphasis added).)

The Court of Appeals ultimately disagreed with Plaintiffs.  On June 12, 2024, it held that because this Court's dismissal was without prejudice and indicated Plaintiffs could amend, it was not a final order.  Thus, the Court of Appeals granted Defendants' motion and dismissed the appeal for lack of jurisdiction.  *See Westenbroek v. Kappa Kappa Gamma Fraternity*, 2024 U.S. Dist. LEXIS 14237 (10th Cir. June 12, 2025).  The Court of Appeals stated, however, "[i]n the district court, Appellants may stand on their existing complaint and seek a dismissal with prejudice so that they may perfect an appeal, or they may amend the complaint and pursue further proceedings in

the district court." *Id.* at *8. On July 5, 2024, the Tenth Circuit issued its' mandate and transferred jurisdiction over the case back to this Court. (ECF No. 39.)

Following the Tenth Circuit's decision dismissing the appeal for lack of jurisdiction, lead appellate counsel for Plaintiffs made the following public statement:

> We disagree the court lacked appellate jurisdiction. As we explained in our brief, appellate courts consider district court decisions that go to the merits of the case, which the Wyoming decision certainly did. Women deserve the camaraderie and safety of sororities, but unfortunately, it also appears they first need courts brave enough to say so.

*See* Tenth Circuit Dodges Ruling in Sorority Case Argued by Independent Women's Law Center, https://www.iwf.org/2024/06/12/tenth-circuit-dodges-ruling-kappa-case/ (June 12, 2024). Despite this statement and eagerness to obtain an appellate ruling on the merits of the case, almost eight months since jurisdiction transferred back to this Court, Plaintiffs have taken no action.

While this case was proceeding, allies of Plaintiffs filed the Second Case in the Ohio federal court. The Second Case was brought by alumnae of Kappa and two former members of Kappa. Like this case, the Second Case alleges shareholder derivative claims against Kappa's Fraternity Council related to the admission of transgender women and challenges whether Fraternity Council has the authority to interpret their bylaws. In addition to the derivative claims, the Second Case alleges individual claims on behalf of two former Kappa members. The Complaint alleges that the dismissed members "became aware of facts underlying the litigation filed in the U.S. District Court for the District of Wyoming" and "openly supported the plaintiffs in the Lawsuit and challenged KKG's conduct that gave rise to the lawsuit." (Second Case, Compl., ¶¶ 6–7, attached as Ex. E.)

Like this case, the Second Case turns on "whether Kappa may admit transgender women consistent with its bylaws, Ohio law, and the First Amendment." (Transfer Order, Ex. A, p. 15.) The core issue in the Second Case, just like this case, is whether a court is required to defer to the

interpretation of the term "women" by the elected Fraternity Council of Kappa, an Ohio non-profit organization, or whether it can interfere with that interpretation and require Kappa to define "women" how plaintiffs desire.  (Second Case Motion to Dismiss, pp. 11-14; Second Case Reply in Support of Motion to Dismiss, pp. 9-14,  attached as Exs. F and G.)

Defendants in the Second Case filed a motion to dismiss, arguing that this Court's decision preluded the derivative claims and that all claims should otherwise be dismissed on the merits or stayed pending the resolution of this case.  In considering Defendants' motion to dismiss and in issuing its transfer order, the Ohio federal court determined that because this Court's dismissal was without prejudice, it was not final and therefore had no preclusive effect.  (Transfer Order, Ex. A, p. 20.)  The Ohio court considered other anti-duplicative-litigation doctrines and reasoned that the "first-to-file rule" supported transferring the case due to the overlap between the two cases.  (*Id.*)

## III.    LEGAL ARGUMENT

The Court's August 25, 2023 Order dismissing the Amended Complaint was based on the legal merits of the case, not a procedural problem that Plaintiffs could rectify through amendment. Although the Court declined to dismiss the case with prejudice due to the lack of an explicit argument concerning futility, Defendants submit that their motion to dismiss and reply briefing to this Court showed why any attempt at amendment would be futile and Plaintiffs have repeatedly conceded why amendment would be futile based on the Court's legal grounds for dismissal.  Now that the Tenth Circuit has returned jurisdiction of the case to this Court, the Court should set a deadline for Plaintiffs to file a Second Amended Complaint.  If Plaintiffs fail to do so, the Court should convert the dismissal of Plaintiffs' Amended Complaint into one with prejudice.

The Court should not permit Plaintiffs to hold this case in limbo as individuals who financially supported their claims and share legal counsel seek to have a different court[1] reach a different conclusion on the same derivative claim and legal issues this Court has already addressed without being bound by the preclusion doctrines that would attach to a final order. Granting this Motion would still allow Plaintiffs to seek appellate review of the Court's merits decision while also preventing duplicative litigation and forum shopping.

### A. The Court Should Set a Deadline for Plaintiffs to File a Second Amended Complaint and, if Plaintiffs Do Not Do So, Dismiss the Case with Prejudice

The Court should not permit Plaintiffs to hold this case in abeyance while allies who are also Kappa shareholders assert identical shareholder derivative claims against Kappa Fraternity Council members in other proceedings. As the Court has recognized, "dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile." *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)) (internal citation and brackets omitted) (emphasis in original). The Court has already held that Plaintiffs' Amended Complaint failed to state a claim, and Plaintiffs have now argued repeatedly that amendment would be futile.

Nevertheless, the Court can remove any doubt as to the question of whether any amendment could save Plaintiffs' claims by setting a firm deadline by which Plaintiffs must file a Second Amended Complaint and, if they do not do so, dismiss the case with prejudice. Federal courts in the Tenth Circuit and elsewhere have recognized the authority of district courts to set a deadline by which plaintiffs must amend a complaint dismissed without prejudice and convert the dismissal to one with prejudice in the absence of an amendment. *See Lipe v. Albuquerque Pub.*

---

[1] Plaintiffs in the Second Case have challenged the transfer in a mandamus proceeding in the Sixth Circuit and have indicated that they may ask this Court to transfer the case back to Ohio.

*Sch.*, No. 23-899, 2024 U.S. Dist. LEXIS 153986, at *13 (D.N.M. Aug. 27, 2024) (setting seven-day deadline for plaintiff to amend complaint or else have dismissal converted to a dismissal with prejudice); *Xirium v. U.S. Immigr. & Customs Enforcement*, No. 1:22-cv-801-TWP-KMB, 2023 U.S. Dist. LEXIS 54429, at *68–*69  (S.D. Ind. Mar. 29, 2023) (dismissing claims without prejudice and setting a 30-day window where plaintiff must amend complaint or else have dismissals converted to dismissals with prejudice); *Kraft v. Old Castle Precast, Inc.*, No. LA CV 15-701-VBF, 2015 U.S. Dist. LEXIS 103440, at *2 (C.D. Cal. Aug. 5, 2015) (setting deadline to amend and ordering that if amended complaint is not filed by deadline, case will be dismissed with prejudice "without further opportunity for argument").

Courts have also recognized the right of defendants to ask the court to set deadlines for amendment in cases where the court did not set one in its dismissal order.  *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1161 (10th Cir. 2023) (recognizing defendants can request that a district court impose a deadline to amend); *Britt v. DeJoy*, 45 F.4th 790, 798 (4th Cir. 2022) (en banc) ("[l]itigants on either side have the option of filing a motion requesting that the district court provide a specific deadline by which plaintiff must amend her complaint").

As the Court evaluates this Motion, it should consider the broader context related to Plaintiffs' decision to leave this case in abeyance.  The plaintiffs in the Second Case are asserting derivative claims that mirror those in this case. The Ohio federal court recognized that the Second Case is about whether Kappa "may allow transgender women to join its sisterhood," that "[a]ll parties agree that their dispute boils down to this issue," and that "this case duplicates Westenbroek." (Transfer Order, Ex. A, p. 1.) This Court already determined that a derivative claim does not lie under Ohio law based on a private organization's reasonable interpretation of an undefined term in its own governing documents.  *See Westenbroek v. Kappa Kappa Gamma*

*Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyo. Aug. 25, 2023). This

Court also already determined the specific legal issues that: (1) "[d]efining 'woman' is Kappa

Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade;"

and (2) Kappa's interpretation of the term "women" is "[a] "lawful interpretation – explicitly

authorized per the sorority's Standing Rules – of an otherwise-silent bylaw." *Id.* at *29, *34.

Therefore, the Ohio court held, "[b]ecause they are duplicative, these two cases should not proceed

simultaneously, for a plethora of prudential reasons." (Transfer Order, Ex. A, p. 1.) Nevertheless,

because this Court's Order was not a final order, the Ohio court found it had no preclusive effect.

The Ohio court weighed its discretionary options to transfer, stay, or dismiss the Second

Case on other anti-duplicative litigation grounds because it was duplicative of this case. (Transfer

Order, Ex. A, p. 2.) In transferring the Second Case to this Court pursuant to the first-to-file rule,

the Ohio court noted that "to not apply the first-to-file rule here would condone forum-shopping."

(*Id.* at 22.) In explaining that view, the court posed the following hypothetical:

> Six months have passed since the Tenth Circuit instructed the Westenbroek
> plaintiffs to either amend their complaint or move for a dismissal without prejudice.
> They have not done so. Why not? A plaintiff in the Westenbroek plaintiffs' shoes
> might respond to that question with one of their own: why would we proceed in a
> forum that dismissed our claim already when instead we can wait and see whether
> the Southern District of Ohio will be more receptive? Again, the Court insinuates
> nothing; the point is that dispensing with the first-to-file rule in cases like this one
> would, objectively, incentivize forum-shopping.

(*Id.* at pp. 22–23.)

Ultimately, whether Plaintiffs here are strategically delaying the filing of a Second

Amended Complaint or not is immaterial to the importance of finalizing the decision in this case

for Kappa, all of its shareholders, and all defendants. This Court's thorough determination on the

merits of the shareholder derivative claim is something Plaintiffs acknowledged they are unable to

cure; but without preclusive effect for this Court's Order, other Kappa shareholders may bring

identical derivative claims to seek a different result. To the extent Kappa shareholders do not agree with this Court's reasoning, their recourse is to finalize this Court's decision and seek appellate review, not leave in place a dismissal without prejudice and present the same shareholder derivative claim to another federal court and seek a contrary decision.

### B. The Requested Relief Will Advance the Conclusion of Litigation on These Issues While Preserving Plaintiffs' Rights to Seek Appellate Review

The relief Defendants request by this Motion does not prejudice Plaintiffs. Plaintiffs represented multiple times to the Tenth Circuit that amendment would be futile because there is no way to draft a Second Amended Complaint that addresses the merits issues in the Court's Order. There is, therefore, no reason to have this case sitting in limbo while Plaintiffs wait to see if the Second Case yields a better result on their derivative claims. If Plaintiffs have somehow changed their assessment on futility, providing them an opportunity to amend their Amended Complaint before the dismissal is converted will ensure they are not prejudiced in any way.

Assuming Plaintiffs do not file a Second Amended Complaint, Plaintiffs will have the opportunity to appeal the Court's decision dismissing the case once that decision is converted to one with prejudice. Conversely, allowing the case to remain pending on a dismissal without prejudice will likely subject the Kappa defendants in the Second Case to litigate the same derivative claim against Kappa shareholders on the same legal issues already decided by this Court. Kappa and its shareholders benefit in advancing this litigation to conclusion and avoiding duplication on legal claims and issues that have already been determined by a federal district court.

## IV.   CONCLUSION

Defendants respectfully request that the Court issue an order directing Plaintiffs to file a Second Amended Complaint within 21 days and further providing that if Plaintiffs do not do so by the deadline, the Court's August 25, 2023 Order will convert to a dismissal with prejudice.

Dated: February 28, 2025                    Respectfully submitted,

                                            /s/ *Natalie M. McLaughlin*
                                            Natalie M. McLaughlin (Ohio Bar No. 0082203)*
                                            Brian W. Dressel (Ohio Bar No. 0097163)*
                                            VORYS, SATER, SEYMOUR AND PEASE, LLP
                                            52 East Gay Street
                                            Columbus, OH 43215
                                            Telephone/Facsimile: (614) 464-5452
                                            Email:        nmmclaughlin@vorys.com
                                                          bwdressel@vorys.com
                                            * -Admitted Pro Hac Vice

                                            Stuart R. Day (#6-3081)
                                            WILLIAMS, PORTER, DAY & NEVILLE, P.C.
                                            159 North Wolcott, Suite 400
                                            P.O. Box 10700
                                            Casper, WY 82602-3902
                                            Telephone:     (307) 265-0700
                                            Facsimile:     (307) 266-2306
                                            E-Mail:        sday@wpdn.net

                                            *Attorneys for Defendants Kappa Kappa Gamma*
                                            *Fraternity, Kappa Kappa Gamma Building Co., and*
                                            *Mary Pat Rooney*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 28th day of February, 2025.

| | |
|---|---|
| Cassie Craven (#7-5664) | ☒ CM/ECF Electronic Transmission |
| LONGHORN LAW LLC | ☐ U.S. Mail (Postage Prepaid) |
| 109 East 17th Street, Suite 223 | ☐ Fax |
| Cheyenne, WY 82001 | ☐ Overnight Delivery |
| Telephone: (307) 823-3062 | ☐ Hand Delivery |
| E-Mail: ccraven.law@gmail.com | ☐ Email |

| | |
|---|---|
| John G. Knepper (#7-4608) | ☒ CM/ECF Electronic Transmission |
| LAW OFFICE OF JOHN G. KNEPPER, LLC | ☐ U.S. Mail (Postage Prepaid) |
| P.O. Box 1512 | ☐ Fax |
| Cheyenne, WY 82003 | ☐ Overnight Delivery |
| Telephone: (307) 632-2842 | ☐ Hand Delivery |
| E-Mail: john@knepperllc.com | ☐ Email |

/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin

A-046

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, et al., on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 2:23-cv-00051-ABJ |
| v. | ) ) | |
| KAPPA KAPPA GAMMA FRATERNITY, et al., | ) ) | |
| Defendants. | ) ) | |

<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO RULE 60(B)(6) MOTION FOR THE COURT TO SET A DEADLINE FOR PLAINTIFFS TO AMEND COMPLAINT OR ELSE HAVE DISMISSAL CONVERTED TO DISMISSAL WITH PREJUDICE</u>

On August 24, 2023, this Court dismissed the Westenbroek Plaintiffs' complaint without prejudice. (Dkt. No. 31 at 41). Kappa Kappa Gamma Fraternity now asks this Court to alter this judgment to direct the Plaintiffs to either amend their complaint within 21 days or else the Complaint will be dismissed with prejudice.

Kappa's motion does not identify a source for this Court's authority to grant its motion. Under the Federal Rules of Civil Procedure, only Rule 60(b)(6) provides this Court with authority to alter a prior judgment at this time. Such relief is strictly limited, however, and Kappa's motion does not identify any extraordinary circumstances such hat "it offends justice to deny" its requested order. *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999). Kappa's motion should be denied.

**BACKGROUND**

Following this Court's dismissal of the Westenbroek complaint, Kappa Kappa Gamma punished several Kappa alumnae who had supported the Plaintiffs. As alleged in the Levang

complaint, Kappa revoked the lifetime membership of women who had devoted years of service to the organization and defamed them. *See* Dkt. No. 47-6 (Complaint, *Levang v. Kappa Kappa Gamma*, No. 2:24-cv-00316 (filed S.D. Ohio Jan. 25, 2024). The Levang Plaintiffs brought suit in Ohio, where Kappa is incorporated as a non-profit corporation, to remedy the harms done to them.

In Ohio, Kappa asserted that this Court's dismissal of the Westenbroek complaint acts as res judicata or, alternatively, collateral estoppel, barring the Levang Plaintiffs from seeking relief. This is, of course, false, as a dismissal without prejudice has no preclusive effect. Now, rather than litigate the merits of the Ohio claim, the Kappa Defendants seek to revive the Westenbroek complaint and infuse it with preclusive effect to avoid the Levang suit.

Admittedly, the Westenbroek plaintiffs appealed this Court's order to the Tenth Circuit, arguing that the order should be treated as a final, appealable order. In early October 2023, Kappa filed a motion to dismiss the appeal, arguing this court's order was not final and the court of appeals lacked jurisdiction. *See* Appellees' Motion to Dismiss, No. 23-8065 (filed Oct. 9, 2023). The Tenth Circuit agreed. *Westenbroek v. Kappa Kappa Gamma Fraternity*, 2024 U.S. App. LEXIS 14237 (10th Cir. June 12, 2024) (dismissing appeal). The Westenbroek plaintiffs are bound by this decision.

Contrary to Kappa's assertion, however, the Westenbroek case does not "remain pending," Motion to Set Deadline at 2 (Dkt. No. 47-1 at 2). This Court has issued its judgment, and the case has been dismissed. Defendants must identify authority for this Court to reopen its prior judgment and amend it in their favor.

## JURISDICTION

Kappa's motion provides little discussion of the authority for its requested order. This case has been dismissed. The Federal Rules of Civil Procedure do not allow Defendants to revive the Westenbroek litigation just because they would prefer to litigate the complexities of Ohio corporate law in Wyoming rather than in their home state of Ohio.

Until two weeks ago, there was no authority at all to reopen this Court's order. On February 26, 2025, however, the Supreme Court reversed the Tenth Circuit and held that "Rule 60(b) permits a district court to reopen a case that was voluntarily dismissed without prejudice under Rule 41(a)." *Waetzig v. Halliburton Energy Servs.*, ___ S.Ct. ___, 2025 U.S. LEXIS 868, at *4 (Feb. 26, 2025). The Supreme Court's mandate has not yet issued, but its views on jurisdiction are clear. *Waetzig* holds that a voluntary dismissal under Rule 41(a) "counts as a 'final judgment, order, or proceeding,'" under Rule 60(b). If this is true, then this Court's August 2023 order is also sufficiently final for a Rule 60(b) motion.

## ARGUMENT

Rule 60(b)(6) is the only authority for this Court to amend its prior order. Kappa has not presented extraordinary, equitable concerns that merit the order's revision.

**I.    This Court can amend its prior judgment only if it has legal authority to do so under the Federal Rules of Civil Procedure.**

As Magistrate Judge Garza noted in the U.S. District Court for New Mexico, there is no default rule that "if a plaintiff's claims are dismissed without prejudice, the plaintiff is given leave to amend the complaint, and the plaintiff does not do so, a dismissal without prejudice becomes

A-049

one with prejudice." *Clark v. UnitedHealth Grp., Inc.*, 2018 U.S. Dist. LEXIS 37416, at *7 (D.N.M. Mar. 6, 2018).

Kappa cites three district court cases for the proposition that a court can impose a deadline on a plaintiff to amend its complaint. *See Memorandum in Support of Motion* at 8-9 (Dkt. No. 47-1 at 8-9). Each of these cases, however, establishes only that a court can impose conditions on a dismissal without prejudice *at the time it issues the order*. *Id.* None of the cases identify any inherent authority for a district court to amend an order of dismissal. Rule 60(b) itself, with its restrictions, is the expression of a court's inherent judicial power. *Plaut v. Spendthrift Farm*, 514 U.S. 211, 235 (1995).

Kappa also argues that two court of appeals authorize the relief it seeks, but neither case identifies any authority outside of Rule 59 or Rule 60. In *Hogan v. Pilgrim's Pride Corp.*, Defendants objected that the district court's dismissal without prejudice, which did not set a deadline to amend, unfairly created a "long delay until their entitlement to repose." 73 F.4th 1150, 1161 (10th Cir. 2023). The Tenth Circuit stated the Defendants "could have requested the court to impose a deadline." *Id.* This is the extent of the Court's discussion of the issue. There is nothing in *Hogan* to suggest that the Tench Circuit had identified inherent authority to modify prior judicial orders outside of the Federal Rules of Civil Procedure.

*Britt v. DeJoy*, a case cited both by *Hogan* and partially quoted by Kappa in its memorandum, is even more clear about the authority for modification. Kappa summarizes the *Britt* holding in a parenthetical: "[l]itigants on either side have the option of filing a motion requesting that the district court provide a specific deadline by which the plaintiff must amend her complaint."

*See* Dkt No. 47-1 at 9. The actual Fourth Circuit statement, however, is clear that such a request is governed by the rules of civil procedure. The Fourth Circuit said: "Litigants on either side have the option of filing a motion requesting that the district court provide a specific deadline by which the plaintiff must amend her complaint. ***See* Fed. R. Civ. P. 59**." *Britt v. Dejoy*, 45 F.4th 790, 798 (4th Cir. 2022) (en banc) (emphasis added).

If Kappa disagreed with this Court's ruling and wanted to set a deadline for an amended complaint, Kappa could have asked to alter or amend the judgment under Rule 59(e), as the Fourth Circuit suggested. Such a request, however, must be made within 28 days after entry of judgment, and Kappa is long past that deadline. This Court dismissed the Westenbroek complaint on August 25, 2023. If this is the date of entry of judgment, then the last day for a Rule 59(e) motion was September 22, 2023.[*]

An untimely motion to alter or amend a court's judgment must be made as a Rule 60(b) motion. *Brown v. Allstate Ins. Co.*, 2003 U.S. Dist. LEXIS 30344, at *2 (D.N.M. Jan. 8, 2003) (considering an untimely request to change dismissal without prejudice to dismissal with prejudice).

---

[*] Kappa has not made this argument, but one could argue that this Court's dismissal without prejudice was not an "entry of judgment" because the Court did not issue a "separate document" as required by Rule 58. This does not mean, however, that the Court has *never* entered a judgment that triggers the deadline to amend under Rule 59. Under Rule 58(e), judgment is automatically entered 150 days after the Court's ruling, which would have been on January 22, 2024. Under this logic, the last date to file to alter the judgment was February 19, 2024.

## II.    Kappa has not identified "extraordinary circumstances" that merit alteration of this Court's earlier order.

Rule 60(b) relief is "extraordinary and may only be granted in exceptional circumstances." *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437, 1440 (10th Cir. 1990).

Kappa does not provide any such basis for the order it seeks. Kappa has not identified any mistake, newly discovered evidence, fraud, a void judgment, or satisfaction of a prior judgment that would permit relief under the first five subsections of Rule 60. Fed. R. Civ. P. 60(b)(1)-(5). The only basis this Court could cite to amend its prior judgment is the catchall provision that permits vacatur or modification of an order for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Such relief is "even more difficult to attain [than relief under the other provisions of Rule 60(b)] and is only appropriate 'when it offends justice to deny such relief.'" *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999) (quoting *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 580 (10th Cir. 1996)).

Kappa's motion is simply a desire to create preclusive effect where there is currently none. Implementation of a litigation strategy is not a basis for extraordinary relief, especially with the complexities present here.

First, it is not clear that this Court's decision on an amended Westenbroek complaint would remain the same. This Court held that the Supreme Court's decision in *BSA v. Dale* means that the First Amendment prevents this court from interfering in "the internal decision-making of a private organization, including the criteria governing that entity's membership." *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *32. But since this decision, the U.S. Supreme Court considered whether restrictions on corporate ownership—*i.e.*, who is permitted to make decisions for a private for-

A-052

profit organization—raise First Amendment concerns. *TikTok Inc. v. Garland*, 604 U.S. ___, 220 L.Ed.2d 319, 328 (2025) (per curiam). The Supreme Court says it is not aware of "any case in which this Court has treated a regulation of corporate control as a *direct* regulation of expressive activity or semi-expressive conduct" protected by the First Amendment. *Id.* This survey presumably includes *Dale.* This is not to say that the *TikTok* ruling *requires* a different result if the Westenbroek plaintiffs refile, only that this Court's future ruling less certain than it might seem.

Also, the application of *res judicata* is not obvious, even if this Court were to dismiss the Westenbroek complaint with prejudice. With the exception of Kappa's president, Ms. Rooney, and Kappa itself, the parties in the two lawsuits are entirely different. In addition, the Levang Plaintiffs have named, and seek damages and equitable relief from, each member of Fraternity Council for breaches of fiduciary duty, ultra vires acts, fraud and civil conspiracy.

Turning to the concept of collateral estoppel, or issue preclusion, the fact or issue sought to be barred must have been actually and directly litigated and determined by a court of competent jurisdiction. Issue preclusion does not apply to matters that might have been litigated but were not. Kappa's argument on collateral estoppel is that this Court's decision that it could not interfere with Kappa's interpretation of its own bylaws resolves only one presented by both cases. While the definition of the term "woman" is relevant to the background, context and certain events giving rise to the Levang lawsuit, the Levang suit will not be decided based just on whether Kappa's leaders could unilaterally define that term. The Levang plaintiffs also challenge the scope of the Kappa Board's authority and its obligations to be transparent with, and make necessary disclosures to, the organization's members; the Board's obligation to grant members an

opportunity to be heard—without retaliation—on matters affecting the fundamental nature of the organization; and the Board's obligation to ensure that at all times that the Board's decisions are for the benefit of the organization.

Ultimately, Kappa's argument is that this Court should grant its motion because the Westenbroek plaintiffs are "strategically delaying" the filing of a second amended complaint, implying this delay reflects forum shopping. The Westenbroek plaintiffs, however, have much to consider when deciding whether to pursue their claim in this forum at this time.

First, while the Levang Plaintiffs have had their litigation transferred to this Court, it is unclear whether that *sua sponte* transfer order will be sustained by the Sixth Circuit. The Ohio federal court did not seek the views of the parties before ordering transfer. In the Tenth Circuit, such an order would be reviewed and reversed through a petition for a writ of mandamus like the one filed by the Levang Plaintiffs. *Hustler Magazine, Inc. v. United States Dist. Court*, 790 F.2d 69, 71 (10th Cir. 1986) (J. McKay, concurring) ("Mandamus review has been approved … when a change of venue is ordered without argument or opportunity for a hearing….").

Second, the citizenship of Artemis Langford raises complexities for this Court's jurisdiction that are not present in the Levang case. This Court has not yet ruled whether Langford is a Wyoming citizen and whether he is a necessary party. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44 n.68. In the Westenbroek Complaint, several Wyoming residents are identified as "non-party witnesses" because they cannot be plaintiffs without eliminating complete diversity. *See*, *e.g.*, Dkt. No. 6 at 47-48, ¶ 111.

Finally, this Court's in personam jurisdiction over Kappa and its President, Mary Pat Rooney, depends on specific jurisdiction. *Westenbroek v. Kappa Kappa Gamma Fraternity*, 2023 U.S. Dist. LEXIS 152458, at *20-21 (D. Wyo. Aug. 25, 2023). Kappa has not conceded such jurisdiction exists, so this is a potential issue for appeal. Further, none of the Defendants in the Levang litigation has consented to jurisdiction in Wyoming for the claims against them. In contrast, Kappa is an Ohio non-profit corporation, so it is subject to general jurisdiction for all claims brought in that forum. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358-59 (2021).

Plaintiffs are under no obligation to resolve these questions now. There is certainly no extraordinary reason to demand they do so.

CONCLUSION

The Court should deny Kappa's motion.

Dated this 14th day of March, 2025.

Respectfully submitted,

/s/ Cassie Craven
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

Page 9 of 10

A-055

## **CERTIFICATE OF SERVICE**

John G. Knepper, an attorney, hereby certifies that on the 14th day of March, 2025, he

caused the foregoing document to be electronically filed with the Clerk of the Court using the

CM/ECF system which will send notification of such filing upon all counsel of record.


/s/ John G. Knepper

**UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING**

JAYLYN WESTENBROEK, et al., on        )
behalf of themselves and derivatively on    )
behalf of KAPPA KAPPA GAMMA    )
FRATERNITY,                                        )
                                                            )
           Plaintiffs,                                )        CASE NO. 2:23-cv-00051-ABJ
                                                            )
                         v.                                )
                                                            )
KAPPA KAPPA GAMMA FRATERNITY, )
et al.,                                                    )
                                                            )
           Defendants.                            )

<u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO ARTEMIS LANGFORD'S MOTION
TO DISMISS WITH PREJUDICE FOR VIOLATION OF RULE 8**</u>

On August 24, 2023, this Court dismissed the Westenbroek Plaintiffs' complaint without prejudice. (Dkt. No. 31 at 41). Langford has now renewed part of an earlier motion to dismiss, asking this Court to dismiss the Plaintiffs' Complaint in its entirety as a sanction for violation of Rule 8. Dkt. No. 49. Langford does not attempt to describe the procedural basis for dismissing a complaint that has already been dismissed. As noted in the Plaintiffs' response to Kappa's motion, Rule 60(b)(6) provides the sole authority for this Court to modify its earlier order.

Langford's requested sanction, is "an extreme sanction appropriate only in cases of willful misconduct." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992). By making this request in the context of a Rule 60(b)(6) motion, Langford has layered the burden for relief. Langford must show not only that this "extreme sanction" of "last, rather than first, resort" is merited, *id.*, but also under Rule 60(b) that, beyond other examples of (alleged) sanctionable conduct, this instance is so "unusual or compelling" that it would "offend justice" to reach a different conclusion. *Cashner*

*v. Freedom Stores*, 98 F.3d 572, 579 (10th Cir. 1996). Langford does not surmount this extreme

threshold. The motion should be denied.

Rather than respond to Langford's arguments in the order presented, Plaintiffs will first

address Langford's repeated assertion that his personal conduct is irrelevant to this litigation.[1]

Because Langford believes his conduct is irrelevant, he asserts Plaintiffs' allegations were made

solely to embarrass or humiliate him. Langford's view about which facts are relevant, however, is

an assertion about Ohio law, and Langford is incorrect. The Westenbroek plaintiffs have brought

two distinct claims against the Kappa Kappa Gamma Fraternity. The first is a derivative claim.

The second is what Ohio courts describe as a "direct claim." Direct claims are available when

shareholders (here, the Westenbroek plaintiffs as members of the Gamma Omicron Chapter of

Kappa Kappa Gamma) are "injured in a way that is separate and distinct from an injury to the

corporation." *Carlson v. Rabkin*, 789 N.E.2d 1122, 1127 (Ohio Ct. App. 2003). *See also*

Complaint, Count IV, Dkt. No. 6 at 69-70 (¶¶ 176-79) (asserting direct claim). As discussed below,

Ohio case law does not clearly define the boundary between the derivative and direct claims. It is

inaccurate to state that Plaintiffs' assertions about Langford's behavior—assertions which are

verified under oath but admittedly not yet tested before a jury—are irrelevant to the direct claim

---

[1] This Court requires courtesy and civility, treating every participant with "professionalism, fairness and due consideration." L. R. Civ. P. 84.1. The parties' use of male and female pronouns to identify Langford, however, is not a disagreement about courtesy. The parties' disagreement is part of the broader "struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 785 n.12 (9th Cir. 2022) (quoting *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021)).

they made against Kappa. Just the opposite. Plaintiffs' assertions establish the existence and magnitude of their unique harm.

Further, Langford's motion is not a proper motion to dismiss. Langford has appended multiple documents without providing foundation for them. Langford then makes sweeping assertions about what this inadmissible evidence proves. Without reviewing all of these documents, several have been mischaracterized, and others are statements by individuals who are neither the Plaintiffs nor their agents.

Finally, Langford has not met the threshold for Rule 8 sanctions. As discussed in Plaintiffs' response to Langford's first motion to dismiss, Langford's motion does not identify specific passages that violate Rule 8. Langford's motion reflects anger at the allegations made about his conduct, not ambiguity about Plaintiffs' claims.

## ARGUMENT

### I.    This Court's authority to grant Langford's requested relief is limited to Rule 60(b).

This Court can amend its prior judgment only through its authority under the Federal Rules of Civil Procedure. *Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-34 (Rule 60(b) reflects the courts' "inherent and discretionary power."). Rule 60(b) permits this Court to alter its dismissal to a dismissal with prejudice, but Langford has not presented the extraordinary equitable concerns that merit such a revision. *Brown v. Allstate Ins. Co.*, 2003 U.S. Dist. LEXIS 30344, at *2 (D.N.M. Jan. 8, 2003) (considering an untimely request to change dismissal without prejudice to dismissal with prejudice).

Rule 60(b) relief is "extraordinary and may only be granted in exceptional circumstances." *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437, 1440 (10th Cir. 1990). Langford has not identified any mistake, newly discovered evidence, fraud, a void judgment, or satisfaction of a prior judgment that would permit relief under the first five subsections of Rule 60. Fed. R. Civ. P. 60(b)(1)-(5). The only basis for this Court to amend its prior judgment is Rule 60(b)(6) which permits vacatur or modification for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Such an order is "even more difficult to attain and is only appropriate 'when it offends justice to deny such relief.'" *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999) (quoting *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 580 (10th Cir. 1996)).

Langford makes no attempt to meet the Rule 60(b)(6) standard, and the Court should not supply arguments on his behalf. On this basis alone, Langford's motion should be denied.

## II. The verified allegations about Langford's behavior are not, as claimed by Langford, irrelevant to Plaintiffs' complaint.

The Plaintiffs understand the difficult position Langford is in. This Court has dismissed the complaint, so no jury will evaluate these verified allegations about Langford's behavior. Moreover, while the Plaintiffs have not made allegations about Langford's state-of-mind in their complaint, others have not hesitated to go far beyond what is in the complaint with their own opinions. Langford's motion, however, rests upon the argument that his behavior is utterly irrelevant to Plaintiffs' claims. This misunderstands Ohio law.

As noted in Plaintiffs' Complaint, *see* Dkt. No. 6 at 65 (¶ 160), Ohio law identifies two distinct types of shareholder suits. "A shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim. Such a suit is the exception to the

A-060

usual rule that a corporation's board of directors manages or supervises the management of a corporation. A derivative action allows a shareholder to circumvent a board's refusal to bring a suit on a claim." *Carlson v. Rabkin*, 789 N.E.2d 1122, 1126-27 (Ohio App. Ct. 2003).

If, however, "the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action." *Id.* Direct actions differ from derivative actions. In direct actions, for example, the plaintiff need not make a demand on the corporation's board prior to litigation.

Most relevant here, "[i]n analyzing whether the complaint states a derivative or representative claim, the court must look to the nature of the alleged wrong **rather than the designation used by plaintiffs**." *Boedeker v. Rogers*, 746 N.E.2d 625, 632 (Ohio Ct. App. 2000) (quoting Fletcher's Cyclopedia of Corporations § 5908 (1999 ed.)) (emphasis added). The Court "must preliminarily determine if the pleadings state an injury to the plaintiff upon an individual claim as distinguished from an injury that indirectly affects shareholders or affects them as a whole." *Id.* This Court, not the Plaintiffs, decides whether their injuries are a "special" harm to a smaller group of Kappa members or a broader harm to Kappa as a whole.

Langford has made much of this Court's offhand statement about "the irrelevancy of Langford's alleged behavior" and that such allegations are "[u]nbefitting in federal court." *Westenbroek v. Kappa Kappa Gamma Fraternity*, 2023 U.S. Dist. LEXIS 152458, at *44 n.68 (D. Wyo. Aug. 25, 2023). At the time the Westenbroek plaintiffs filed suit, however, it was (and to a large extent remains) unclear exactly which injury the Plaintiffs have suffered.

In March 2023, it was unclear whether Kappa's Board had ever redefined the term "woman" to include men. It was unclear when the Kappa Board altered its definition.[2] It is still unclear how the Board adopted this new definition. These are derivative claims.

Given the facts still unknown about Kappa's decisionmaking, however, it is also possible that Langford's admission represents a unique decision by Kappa officials and employees that has caused specific harm to the Westenbroek Plaintiffs in their chapter house rather than to all Kappa members. The Plaintiffs do not know whether other Kappa chapters have included men or whether the admission of these men involved similar violations of Kappa's rules on voting and other admission standards (such as the required minimum Grade Point Average). *See* Dkt. No. 6 at 54-57 (¶¶129-136). If Langford is the only man ever admitted to Kappa Kappa Gamma, as suggested by an article in the *UW Branding Iron* in October 2022, then Plaintiffs may have a direct claim instead.

At the outset of litigation, such legal and factual uncertainties create a dilemma. Do Plaintiffs have a derivative action or a direct claim? Under Ohio law, a court makes this decision only **after** the complaint is filed. But once the court issues its ruling (presumably on a motion to dismiss), a plaintiff cannot file an amended complaint as of right. Fed. R. Civ. P. 15(a). If a plaintiff brings only one type of claim, such as a derivative claim, the plaintiff risks being barred from bringing a direct claim. The Westenbroek Plaintiffs pled both.

---

[2] In Kappa's motion to dismiss the Levang lawsuit, Kappa suggests this change occurred much earlier than the Westenbroek Plaintiffs alleged. *See* Dkt. No. 47-7 at 6 (stating the new definition was adopted in 2015).

This Court's statement in footnote 68 that Langford's "unsubstantiated behavior at the UW chapter house has no bearing on Plaintiffs' legal claims" because "the crux of Plaintiffs' lawsuit is their derivative claim" could be this Court's holding that Plaintiffs' claims are all derivative injuries rather than direct ones. Alternatively, the Court may have only concluded the direct claims are secondary to "the crux" of the lawsuit. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44 n.68. But, as noted above, no plaintiff can know a court's determination until the court issues its opinion. If the Plaintiffs' allegations are properly direct claims, then the Plaintiffs must allege direct harm adequately, and Langford's behavior is relevant to show harm and damages.

Langford is incorrect. The allegations in Plaintiffs' Complaint are not immaterial under Ohio law. Langford therefore cannot reach the high bar under Rule 60(b)(6) to amend the Court's prior order to sanction the Westenbroek Plaintiffs for their complaint.

## III. Langford's Motion to Dismiss attaches numerous documents, without foundation, that are not part of the record before the Court.

If this Court is considering whether to revise its prior order and dismiss this matter with prejudice for violation of Rule 8, as Langford proposes, the court "should ordinarily evaluate [the *Ehrenhaus*] factors on the record." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). None of Langford's attachments, however, are in the record. Langford provides no foundation for the documents or recordings attached to his motion. Nor have any of these documents been entered into evidence. Some of Langford's statements about the documents are inaccurate. *See*, *e.g.*, Dkt. No. 49-1 at 4 n.7 (incorrectly identifying Ellie Renkert as a plaintiff). Some are misleading. *Compare* Dkt. 49-1 at 3-4 ("Plaintiffs have been repeating the allegations in this suit in press

A-063

conferences and before state legislatures…." *with* Dkt. 49-9 at 3-4 (Transcript of testimony by Plaintiff Hannah Holtmeier before a committee of the Nebraska Legislature that says nothing about Langford's behavior).

Rule 12(d) requires that, if matters outside the pleadings are presented to and not excluded by the court on a motion to dismiss, "the motion must be treated as one for summary judgment" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Tenth Circuit has held that, in such circumstances, "mere argument contained in a memorandum in opposition to a motion to dismiss" is not the same as "material made pertinent by Rule 56[, which] includes such things as depositions, answers to interrogatories, admissions on file, affidavits, and the like." *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 585 F.2d 454, 457 (10th Cir. 1978). Dismissal with prejudice, on the basis of documents outside the record and without opening this matter to discovery, would be improper.

The Court should decline to review the material attached to Langford's Memorandum or make a decision based on it. Without this new material, Langford's motion can be seen for what it is: an attempt to revive his prior sanctions motion. Rule 60(b)(6) is not a proper vehicle for this request.

## IV. Langford has not set forth a violation of Rule 8.

Langford continues to argue that Plaintiffs' complaint says too much; the allegations are not sufficiently "simple, concise and direct." Fed. R. Civ. P. 8(d). The Plaintiffs have not violated Rule 8. To the extent the Complaint includes significant information, this reflects the complexity

of the underlying issues. Indeed, the strictures of Rule 8 must take into account the requirements of Fed. R. Civ. P. 23.1 which require specificity in pleading.

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).

The purpose of Rule 8 is "to give opposing parties fair notice of the basis of the claim against them so that they may respond to the complaint, and to apprise the court of sufficient allegations to allow it to conclude, if the allegations are proved, that the claimant has a legal right to relief." *Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Assn. of Kansas*, 891 F.2d 1473, 1480 (10th Cir. 1989). Improper complaints are those which "consist of several pages of rambling, disjointed factual allegations, seemingly unrelated conclusory assertions of constitutional violations, and an exhaustive recital of statutes and administrative rules, which shed no light on the exact nature of [the Plaintiff's] claims." *Bishop v. Romer*, 172 F.3d 62 (10th Cir. 1999) (unpublished).

A motion to dismiss based on Rule 8 should "attempt to identify particular allegations as immaterial or unnecessary," "assert that the complaint fails to set forth cognizable causes of action" or that "the legal theories are incoherent" or that the defendant "cannot tell which causes of action are alleged against which Defendants." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1130 (9th Cir. 2008).

Langford's objection continues to be that the Complaint provides too much factual detail. But, as discussed above, this detail is relevant to the direct claims alleged by Plaintiffs against Kappa. Plaintiffs have had to personally swear to the truth of the factual allegations made therein, and there is no basis to sanction them because they have set forth allegations that describe the harm they have suffered.

**CONCLUSION**

The Court should deny Langford's motion.

Dated this 14th day of March, 2025.

Respectfully submitted,

/s/ Cassie Craven _____
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper _____
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

A-066

## CERTIFICATE OF SERVICE

John G. Knepper, an attorney, hereby certifies that on the 14th day of March, 2025, he

caused the foregoing document to be electronically filed with the Clerk of the Court using the

CM/ECF system which will send notification of such filing upon all counsel of record.


/s/ John G. Knepper

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sday@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
        bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**REPLY IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION FOR COURT TO SET A DEADLINE FOR PLAINTIFFS TO AMEND COMPLAINT OR ELSE HAVE DISMISSAL CONVERTED TO DISMISSAL WITH PREJUDICE**

## I.    INTRODUCTION

Plaintiffs' Response to Defendants' Motion does not dispute that Plaintiffs have delayed filing an amended complaint as a means to boost the chances of other plaintiffs to succeed in litigating the same derivative claims this Court dismissed, calling their case to do so a "litigation strategy." Instead, Plaintiffs misconstrue the Motion as one made under Rule 60(b)(6). Defendants, however, are not seeking relief from a ***final*** judgment or order.  Defendants are asking the Court to enter an order setting a deadline to amend the complaint and if they do not, then convert a ***non-final*** order to a final order. This Court has inherent authority, whether pursuant to motion or on its own accord, to modify or rescind an order at any point prior to a final judgment to achieve the orderly and expeditious disposition of a case. This well-established authority is rooted in common law, recognized by both the Supreme Court and Tenth Circuit, and Defendants presented factual and legal arguments supporting its specific requests to set a deadline to amend the complaint and to convert the dismissal without prejudice to a dismissal with prejudice. For the reasons set forth in its Motion and those below, that Motion should be granted.

## II.    DISCUSSION

### A. Plaintiffs Have Confirmed They Are Holding This Case in Limbo to Preserve the Non-Preclusive Status of the Court's Dismissal on the Merits

The Court should consider the legal merits of the pending Motion with the context that Plaintiffs freely admit they are attempting to play procedural games to maintain the non-preclusive status of the Court's August 25, 2023 merits-based dismissal of the Amended Complaint.  In asking the Court to deny Defendants' Motion, Plaintiffs contend that "[i]mplementation of a legal strategy is not a basis for extraordinary relief."  (Resp. at 6.)  The strategy Plaintiffs admit to deploying is to take advantage of the fact that this Court extended them the opportunity to seek leave to amend the Amended Complaint but did not set a deadline to do so, leaving that non-final order dismissing

their claims without prejudice non-preclusive.  Meanwhile, other shareholder-derivative plaintiffs financially supporting the Plaintiffs in this litigation have pursued identical shareholder-derivative claims in another federal court in an attempt to see if those claims will fare better under a different judge and in a different appellate circuit.[1]  As discussed below and in Defendants' Motion, this attempted manipulation of the litigation process to avoid the effect of an unfavorable court order on the merits is offensive to justice. Indeed, the Ohio court expressed its concerns about forum shopping in the transfer order.

### B. Defendants Do Not Make Their Motion Under Rule 60(b), but Instead, Pursuant to This Court's Inherent Power to Take Action and Modify Orders

Plaintiffs state that the Court can only grant the relief Defendants seek under Rule 60(b) of the Federal Rules of Civil Procedure. But a party cannot seek Rule 60(b) relief from an order dismissing a complaint without prejudice when the plaintiff may cure the deficiency and refile the complaint because that is **not** a final order under Rule 60(b).  *See, e.g., Hill v. AQ Textiles LLC*, 582 F. Supp. 3d 297, 307 (M.D. N.C. 2022); *Black Bear Energy Servs. v. Youngstown Pipe & Steel, LLC*, No. 15-50, 2017 U.S. Dist. LEXIS 108510, *8 (W.D. Pa. July 13, 2017); *Lihong Xia v. Kerry*, 2015 U.S. Dist. LEXIS 179092, *1 (D.D.C. Mar. 25 2015).  Even if this had been a final order, these would be circumstances that are unusual or compelling or that would offend justice to warrant Rule 60(b)(6) relief.  *See Cashner v. Freedom Stores*, 98 F.3d 572, 580 (10th Cir. 1996).[2]

---

[1] Plaintiffs also state that they have "much to consider" in deciding whether to pursue their claims in this Court.  (Resp. at 8.)  The first reason given is the status of the *Levang* case, emphasizing the interconnectedness of the two matters.  (*Id.*)  The second concerns the citizenship of Artemis Langford, a Defendant against whom Plaintiffs do not seek any relief.  (*Id.*)  The third concerns the Court's jurisdiction over Defendants Kappa and Rooney, even though the Court has already ruled that it has such jurisdiction.  None of these reasons presents a basis for Plaintiffs to delay filing a Second Amended Complaint.  It is apparent Plaintiffs are only forum shopping.

[2] Rule 60(b)(6) provides that courts can alter a prior judgment for "any . . . reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  This Rule is a "grand reservoir of equitable power to do justice in a particular case."  *Pierce v. Cook & Co.*, 518 F.2d 720, 722 (10th Cir. 1975).  Plaintiffs also

A-070

Rather, it is well-established that Courts have the "'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). A district court's "inherent power" to take the actions it needs to "achieve the orderly and expeditious disposition of cases" includes "the power to modify or rescind its orders at any point prior to final judgment in a civil case." *SEC v. Management Sols., Inc.*, 824 F. App'x 550, 553 (10th Cir. 2020) (citing *Dietz v. Bouldin*, 579 U.S. 40, 41 (2016)). This authority "is firmly rooted in the common law." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1380 (11th Cir. 2024). Courts have the power "acting on their own initiative, to clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link,* 370 U.S. at 630; *see Dietz*, 579 U.S. at 47 (recognizing district courts' inherent power to "manage their dockets . . . with a view toward the efficient and expedient resolution of cases").

Defendants' Motion was rooted in the Court's inherent power to manage its docket, not seeking relief from a final judgment or order under Rule 60(b). The Motion asked the Court to issue an order that sets a deadline to amend the complaint and if Plaintiffs choose not to so amend after expiration of that deadline, then the prior dismissal will be converted to a dismissal with prejudice. The Motion set forth the factual basis justifying the relief requested and provided legal support in case law to provide the relief requested. This Court plainly has the authority, whether

---

misstate the holding of *Britt v. Dejoy*, 45 F. 4th 790 (4th Cir. 2022), and strangely argue "Kappa could have asked to alter or amend the judgment under Rule 59(e), as the Fourth Circuit suggested." There was no "judgment" here, as all parties agree and the Tenth Circuit found. This was a non-final order. Rule 59(e) is clearly inapplicable. *Britt* does not hold that requests to amend complaints are governed by the rules of civil procedure. If there is a judgment, that may be government by Rule 59 or 60. As this was a ***non-final*** order, it is governed by this Court's inherent power to modify and rescind non-final orders that is well established in common law.

by granting a party's motion or on its own initiative, to take the actions it deems appropriate for the orderly and expeditious disposition of this case as there has been no final judgment.

### C.  Many of Plaintiffs' Arguments Are Irrelevant to the Pending Motion

Many of Plaintiffs arguments have no bearing on the pending Motion.  First, Plaintiffs argue that subsequent developments would change the Court's decision on Defendants' Motion to Dismiss.  If Plaintiffs believe this is so, the requested relief would allow them either the opportunity to file a Second Amended Complaint and make those same arguments or obtain a dismissal with prejudice that would allow them to make those arguments before the Tenth Circuit, which Plaintiffs eagerly attempted to do before their allies filed a duplicative case.

Similarly, arguments about the extent to which this Court's decision would preclude claims in the Second Case are better made in that proceeding.  The point of the instant Motion is that this Court's merits-based order should have preclusive effect to the extent that subsequent litigants attempt to assert the same derivative claims at issue here.  That issue is very real given the Second Case and the concerns expressed by the Ohio court that there are identical shareholder derivative claims and this has the appearance of forum shopping.  The extent to which future claims are ***in fact precluded*** is an issue for the court overseeing the Second Case.  But this Court may ensure that Plaintiffs cannot render its Order ineffective and seek to litigate the identical shareholder derivative claims before another court that this Court has already ruled upon.

Finally, Plaintiffs fault Defendants for not seeking this relief immediately following this Court's non-final order.  This argument ignores the procedural history of this case and the Second Case.  Plaintiffs chose to appeal this Court's non-final order instead of amending their complaint.  Only after appeal did Plaintiffs repeatedly declare their appeal should be allowed because their complaint could not be fixed.  The Tenth Circuit determined the order was not final and explicitly

-4-

returned jurisdiction to this Court when it issued its mandate on July 5, 2024.  (ECF No. 39.)[3] Meanwhile, while this case was on appeal, the Second Case was filed, and the defendants in that case filed a motion to dismiss.  In that case, defendants argued that one basis for dismissal of the shareholder derivative claims was that those claims had been dismissed by this Court and Plaintiffs' appealed that decision and it was pending with the Tenth Circuit, so that should be given preclusive effect.[4]  The Ohio court stayed that case pending the Tenth Circuit's decision. After the Tenth Circuit's decision, the Ohio court determined this Court's order had no preclusive effect on the Second Case and transferred the Second Case.

## III.    CONCLUSION

This case has remained dormant due to Plaintiffs' inaction and dilatoriness, and after multiple status conferences, Plaintiffs declare there is no plan for any action in this case.  Mary Pat Rooney is no longer the President, Artemis Langford is not an active member of the chapter, and the few remaining student Plaintiffs are seniors.  It is time to move forward to achieve an orderly and expeditious disposition of this case.  After sitting over eight months, either the complaint should be amended, or the dismissal should convert to a dismissal with prejudice.  For these reasons and those previously stated, Defendants request that the Court issue an order directing Plaintiffs to file a Second Amended Complaint within 21 days and further providing that if Plaintiffs do not do so by the deadline, the Court's August 25, 2023 Order will convert to a dismissal with prejudice.

---

[3] As with all appellate mandates, jurisdiction was reacquired by this Court with the issuance of the mandate.  *See Payne v. Clarendon Nat'l Ins. Co.*, 195 F.3d 568, 571, (10th Cir. 1999); *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992).  Plaintiffs' contention that this case is not pending in this Court or that this Court lacks jurisdiction is without any factual or legal basis and is illogical.
[4] Additional grounds for dismissal based on the statute of limitations and the merits were also argued before the Ohio court but not ruled upon because the court transferred the case instead.

-5-

Dated: March 21, 2025                     Respectfully submitted,

                                          /s/ *Natalie M. McLaughlin*
                                          Natalie M. McLaughlin (Ohio Bar No. 0082203)*
                                          Brian W. Dressel (Ohio Bar No. 0097163)*
                                          VORYS, SATER, SEYMOUR AND PEASE, LLP
                                          52 East Gay Street
                                          Columbus, OH 43215
                                          Telephone/Facsimile: (614) 464-5452
                                          Email:       nmmclaughlin@vorys.com
                                                       bwdressel@vorys.com
                                          * -*Admitted Pro Hac Vice*

                                          Stuart R. Day (#6-3081)
                                          WILLIAMS, PORTER, DAY & NEVILLE, P.C.
                                          159 North Wolcott, Suite 400
                                          P.O. Box 10700
                                          Casper, WY 82602-3902
                                          Telephone:   (307) 265-0700
                                          Facsimile:   (307) 266-2306
                                          E-Mail:      sday@wpdn.net

                                          *Attorneys for Defendants Kappa Kappa Gamma
                                          Fraternity, Kappa Kappa Gamma Building Co., and
                                          Mary Pat Rooney*

A-074

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 21st day of March, 2025.

Cassie Craven (#7-5664)                    ☒ CM/ECF Electronic Transmission
LONGHORN LAW LLC                          ☐ U.S. Mail (Postage Prepaid)
109 East 17th Street, Suite 223            ☐ Fax
Cheyenne, WY 82001                         ☐ Overnight Delivery
Telephone: (307) 823-3062                  ☐ Hand Delivery
E-Mail: ccraven.law@gmail.com              ☐ Email


John G. Knepper (#7-4608)                  ☒ CM/ECF Electronic Transmission
LAW OFFICE OF JOHN G. KNEPPER, LLC         ☐ U.S. Mail (Postage Prepaid)
P.O. Box 1512                              ☐ Fax
Cheyenne, WY 82003                         ☐ Overnight Delivery
Telephone: (307) 632-2842                  ☐ Hand Delivery
E-Mail: john@knepperllc.com                ☐ Email



/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin

A-075



**FILED**

*3:42 pm, 5/9/25*

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

|  |  |
|---|---|
| JAYLYN WESTENBROEK, HANNAH HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, |  |
| Plaintiffs, |  |
| VS. | Case No.  2:23-CV-51 |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity; KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation; and ARTEMIS LANGFORD, |  |
| Defendant, |  |

---

**ORDER GRANTING DEFENDANTS' MOTION FOR DEADLINE FOR
PLAINTIFFS TO AMEND COMPLAINT (ECF No. 47)**

THIS MATTER comes before us on Defendants' *Motion for Deadline for*

*Plaintiffs to Amend Complaint* (ECF No. 47), which they filed on February 28, 2025.

Plaintiffs responded in opposition (ECF No. 50) on March 14th, and Defendants replied

(ECF No. 52) seven days later. Upon a thorough investigation of the procedural

background of this case, we find that Defendants' *Motion* is best construed as a Rule

59(e) motion. We also find that the grounds for granting it are met: Plaintiffs would

otherwise have a seemingly unlimited amount of time to amend this claim, defying

Wyoming's statute of limitations for breaches of contract. We therefore **GRANT**

Defendants' *Motion* and allow Plaintiffs thirty days to file an amended complaint.

## BACKGROUND

The matter before us concerns a lawsuit that was filed in March of 2023 by six

women against their sorority[1] and against Artemis Langford, a member of that sorority

who had been admitted through normal procedures the previous fall. *Westenbroek v.*

*Fraternity*, No. 23-CV-51-ABJ, 2023 WL 5533307, at *1 (D. Wyo. Aug. 25, 2023).

Plaintiffs, upset by the fact that Ms. Langford is transgender, asked this Court to void her

admission, find that the President of Kappa Kappa Gamma (KKG) violated her fiduciary

obligations to the sorority, and prevent other transgender women from joining the

sorority nationwide. *Id.* We dismissed the complaint without prejudice in August of 2023,

holding, *inter alia*, that KKG's freedom of expressive association allows it to interpret

the word "woman" in its bylaws however it wishes. *Id*.

In June of 2024, Plaintiffs' appeal to the Tenth Circuit was also dismissed, on the

grounds that our dismissal without prejudice was not a final judgment because we

implicitly gave Plaintiffs leave to amend. *Westenbroek v. Kappa Kappa Gamma*

---

[1] As mentioned in our earlier orders, KKG considers itself a "fraternity" in its governing documents. E.g., ECF No.
6-1 at 5. However, emulating Plaintiffs and our national discourse, the Court refers to KKG as a "sorority".

*Fraternity*, No. 23-8065, 2024 WL 2954705, at *3 (10th Cir. June 12, 2024). The Tenth

Circuit clarified:

> This court has endorsed a process for appealing an otherwise non-final
> dismissal of a complaint, explaining that "where a district court dismisses but
> grants leave to amend, the plaintiff may notify the district court of his or her
> decision to stand on the original complaint and, once a final order or
> judgment is entered, appeal the grounds for dismissal." *Moya* [*v.
> Schollenbarger*], 465 F.3d [444] at 451 n.9 [(10th Cir. 2006)]. Because
> Appellants did not avail themselves of this process, we cannot conclude that
> this court has jurisdiction over this matter. In the district court, Appellants
> may stand on their existing complaint and seek a dismissal with prejudice so
> that they may perfect an appeal, or they may amend the complaint and pursue
> further proceedings in the district court.

*Id.* at *4.

Despite these instructions, Plaintiffs have taken no action: more than nine months

after the Tenth Circuit issued its decision, they have neither amended their complaint nor

notified us of their decision to "stand on the original complaint," which would allow

them to receive a final judgment that could be appealed.

Defendants, hoping for some form of resolution, have petitioned this Court to set a

deadline for Plaintiffs to amend their complaint. ECF No. 47. Plaintiffs argue that such a

motion can only be construed as a Rule 60(b) motion, which requires a burden that

Defendants have not met. ECF No. 50 at 1. We consider these arguments in deciding how

to move this case towards resolution.

## RELEVANT LAW

This case grapples with several Federal Rules of Civil Procedure, which we lay

out below.

The first, Rule 58, deals with entering judgment. It requires that "every judgment and amended judgment must be set out in a separate document," with certain exceptions that are not relevant here. Fed. R. Civ. P. 58(a). Part (c) of the Rule explains what happens if, as in this case, a separate document is never issued:

> (c) Time of Entry. For purposes of these rules, judgment is entered at the following times…
>> (2) if a separate document is required, when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs:
>>> (A) it is set out in a separate document; or
>>> (B) 150 days have run from the entry in the civil docket.

Fed. R. Civ. P. 58(c).

Rule 59 provides instructions on "altering or amending a judgment." Part (e) states that "a motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment. Fed. R. Civ. P. 59(e).

Finally, Rule 60(b) is titled "Grounds for Relief from a Final Judgment, Order, or Proceeding," and explains, in relevant part, that "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for… any other reason that justifies relief." Fed. R. Civ. Pro 60(b)(6). The Tenth Circuit has stated that this type of relief is "extraordinary and may only be granted in exceptional circumstances." *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437 1440 (10th Cir. 1990).

## DISCUSSION

Let us be the first to acknowledge that this case has ended up in a rather confusing procedural Neverland. To summarize, the Tenth Circuit determined that our dismissal

A-079

was not a final judgment because we intended for Plaintiffs to perfect their complaint.

Plaintiffs, however, have not done so; nor have they decided to stand on their original

complaint and appeal it. Consequently, the case remains in a Peter Pan-esque state of

immaturity, preventing any court from adjudicating on the merits.

Defendants frame their motion as a request that we use our inherent powers to

impose a deadline on Plaintiffs to amend their complaint. Plaintiffs argue that this case is

functionally, if not administratively, closed, because 150 days have passed from the entry

of our order. *See* Fed. R. Civ. P. 58(c). Accordingly, they interpret Defendants' motion as

a Rule 60(b) motion for "Relief from a Final Judgment, Order or Proceeding."

Ultimately, we find that Defendants' *Motion* is best construed as a timely filing under

Rule 59(e), and that providing a deadline by which Plaintiffs must amend their complaint

is an appropriate remedy in this matter. We assess the parties' arguments about how to

define Defendants' *Motion* procedurally, and whether to grant it, below.

I.    Rule 60(b)

Defendants' request for an amended-complaint deadline is not a Rule 60(b)

motion because our initial order is not a final judgment. Part (b) of the Rule refers

exclusively to "a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b)[2]. The Tenth

Circuit has expressly determined that our August 2023 order was a "non-final dismissal."

In a separate case, the Tenth Circuit also clarified that Rule 58(c) does not grant

---

[2] Rule 60 is entitled "Relief from a Judgment or Order." Under this headline, part (a) of the Rule outlines requirements for certain types of relief from a *non*-final "judgment, order, or other part of the record" for clerical mistakes or oversights. Fed. R. Civ. P. 60(a). By contrast, relief under part (b) is specifically constrained to "grounds for relief from a *final* judgment." Fed. R. Civ. P. 60(b) (emphasis added).

5

substantive finality to a decision that otherwise lacks it. *Murphy v. Schaible*, 108 F.4th

1257, 1271 (10th Cir. 2024). Therefore, our 2023 order remains non-final, and Rule 60(b)

does not apply here.

In *Murphy,* the court first "distinguish[ed] between what we can call *substantive*

and *technical* finality." *Id.* at 1272 (emphasis in original). Consistent with its instruction

in our current case, the court clarified that a judgment is not "*substantively* final… [until]

the court has disposed of all matters as to all parties and causes of action, leaving it

nothing but ministerial tasks to complete." *Id*. Separately, a judgment becomes

"*technically* final… when it is entered in a separate document or after 150 days have

elapsed since it was entered in the civil docket." *Id*.

Second, the court explains that Rule 58, while offering technical finality, cannot

bequeath substantive finality on a judgment that otherwise lacks it. Rule 58(c) only grants

finality if the judge's decision was already substantively final: "if the court fails to set out

an *otherwise final judgment* in a separate document, the judgment *becomes final* by

operation of law 150 days after its entry in the civil docket." *Id*. at 1271. Importantly,

"however, this Rule cannot cure lack of finality of the judgment." *Id*.

The application to this case is relatively simple: we and the Tenth Circuit agree

that our dismissal order was not a substantively final judgment. Rule 58(c) cannot grant

substantive finality where there is none. And a judgment or order cannot be final without

substantive finality. Therefore, Rule 60(b)'s instructions on final judgments and orders do

not apply here.

II.    Inherent Scheduling Power

Defendants suggest that we use our inherent scheduling power to set their proposed deadline for Plaintiffs. There is some support for this idea, although it is not the authority upon which we ultimately rest our decision.

A trial court's inherent power can be found in a few different forms that are relevant here. First, as recognized both by the Supreme Court and Rule 54(b), "the Court has recognized that a district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case." *Dietz v. Bouldin.*, 579 U.S. 40, 46 (2016) (citing Fed. Rule Civ. Proc. 54(b)[3]); *see also Marconi Wireless T. Co. of Am. v. United States,* 320 U.S. 1, 47 (1943) ("Hence the [district] court did not lack power at any time prior to entry of its final judgment… to reconsider any portion of its decision and reopen any part of the case.").

Second, "[t]his Court has held that district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz*, 579 U.S. at 46; *see also Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962) (recognizing a district court's "'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve orderly and expeditious disposition of cases."). Specifically, trial courts have the independent authority to recall a discharged jury, to stay proceedings while a parallel case proceeds, to stay the disbursement of funds until final adjudication, and to dismiss a case

---

[3] Rule 54(b) states that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicated all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

A-082

for failure to prosecute. *Dietz*, 579 U.S. at 47; *Link*, 370 U.S. at 630-31 (clarifying that the court's power is broader than what is provided by Federal Rule of Civil Procedure 41(b), which allows for the dismissal of an action if the plaintiff fails to prosecute or comply with a court order).

In *Jung v. K. D. Min. Co.*, the Court suggested that district courts could use this power to manage the disposition of an action when, as is the case here, the court has ordered a dismissal without prejudice and the case remains open, but plaintiffs have chosen not to act. In *Jung*, the district court dismissed a complaint with leave to amend within twenty days. 356 U.S. 335, 336 (1958). Plaintiffs did nothing for two years, at which point they filed a motion to stand on their complaint. *Id.* The district court accordingly changed the dismissal to one with prejudice, and the plaintiffs subsequently appealed. *Id.* The Supreme Court, in upholding the timeliness of the appeal, stated that

> the defendants… did not, as they so easily could have done, nor did the District Court *exercising power sua sponte over its own calendar*, take any step to put a definitive end to the case and thereby fix an unequivocal terminal date for appealability.

*Id*. at 337 (emphasis added).

The matter before us is slightly different. Unlike the trial court in *Jung,* we gave Plaintiffs no deadline to amend in our initial order, so Plaintiffs' amendment option cannot be said to have expired. The *Jung* Court may have been suggesting that the district court use its power, as defined in *Link,* to dismiss the case for lack of prosecution. However, that option – dismissal with prejudice – would be premature here, because we have not provided Plaintiffs with any advance notice. *See Woodroffe v. Fla. Dep't of Fin. Servs*., 774 F. App'x

553, 555 (11th Cir. 2019) ("As for notice, the district court did not provide [plaintiff] with advance notice that it intended to dismiss his complaint with prejudice or give him an opportunity to respond.").

An obvious solution, of course, would be to provide notice to Plaintiffs of the potential for dismissal with prejudice and allow an opportunity to respond. Functionally, that is what we have chosen to do. However, the support for doing so is stronger under Rule 59, and thus we turn our focus there instead.

III.    Rule 59(e)

The most logical interpretation of Defendants' *Motion* is under Rule 59(e). Rule 59(e) simply states that "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(e). "Rule 59(e) covers a broad range of motions, and the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008) (quoting 11 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure § 2810.1 (2d ed.2008)).

Both *Jung* and the Tenth Circuit in *Hogan* have recognized a defendant's right to bring a motion to impose a deadline. *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1161 (10th Cir. 2023) ("Defendants may feel put upon because of the long delay until their entitlement to repose. But it is not as if they had been without recourse to expedite the matter. For one thing, they could have requested the court to impose a deadline."); *Jung*, 356 U.S. at 337 ("defendants… did not, as they so easily could have done… take any step

9

to put a definitive end to the case."). Neither *Jung* nor *Hogan* specify what type of motion a defendant might bring, but *Hogan* does cite *Britt v. DeJoy*, a Fourth Circuit case that references Rule 59 specifically. In *Britt v. DeJoy*, the Fourth Circuit held that when a district court dismisses a complaint without prejudice, but remains silent as to a deadline, "litigants on either side have the option of filing a motion requesting that the district court provide a specific deadline by which the plaintiff must amend her complaint. *See* Fed. R. Civ. P. 59." 45 F.4th 790, 798 (4th Cir. 2022). It seems fairly definitive, from these holdings, that Defendants are within their rights to motion for such a deadline.

The fact that Defendants did not label their motion as a Rule 59(e) motion is not much of an obstacle. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1525 (11th Cir. 1987), *aff'd sub nom. Osterneck v. Ernst & Whinney*, 489 U.S. 169 (1989) (holding that a postjudgment motion for prejudgment interest could be characterized as a Rule 59(e) motion because it required the court to substantively reconsider its original judgment). Even Plaintiffs agree that such a motion is the appropriate method for requesting a deadline. ECF No. 50 at 5 ("If Kappa… wanted to set a deadline for an amended complaint, Kappa could have asked to alter or amend judgement under Rule 59(e), as the Fourth Circuit suggested."). Although Defendants are of the opposite view – "This was a non-final order. Rule 59(e) is clearly inapplicable" – it is because they have not applied the *Murphy* holdings, as discussed below, to this case. ECF No. 52 at 4. While both parties are somewhat misguided in their reasoning, Plaintiffs arrive at the correct conclusion on this point. Rule 59(e) is clearly applicable and is the only way to properly construe Defendant's motion.

10

While Plaintiffs acknowledge that a Rule 59(e) motion is a legitimate way to request a deadline, they argue that the Rule's twenty-eight-day post-judgment deadline means that the opportunity to file such a motion has expired. This conclusion is incorrect: in fact, the post-judgment clock has not yet started. The Tenth Circuit explicitly dealt with this issue in the aforementioned *Murphy* opinion: it held that only judgments that are both technically *and* substantively final start the clock for post-judgment motions. 108 F.4th at 1271. As the court explains, "The time at which final judgment is entered is consequential. Most importantly, it starts the clock running on the time for appeal. *But it also controls the time for filing post-judgment motions*." *Id.* (emphasis added). In *Murphy*, as is the case here, the court's judgment lacked substantive finality, despite gaining technical finality upon the expiration of Rule 58(c)'s 150 days. *Id.* As result, the court held that the clock had not yet started ticking on post-judgment motions such as those brought under Rule 59. *Id.* at 1273.

Applying *Murphy*, we also hold that the time to file a Rule 59(e) has not yet expired: our order in this case is only technically, not substantively final. Furthermore, *Murphy* and other Tenth Circuit cases clarify that Rule 59(e) motions may also be filed before judgments are final, as well as a maximum of 28 days afterwards. *Id.* at 1272-73; *Hilst v. Bowen*, 874 F.2d 725, 726 (10th Cir. 1989). Therefore, Rule 59(e) motions remain timely in this matter.

Having found that a Rule 59(e) motion was properly brought in this case, we embark on the next phase of our analysis, which takes us into somewhat murkier territory: whether these particular facts satisfy the standard by which the motion may be granted. The Rule itself does not provide much direction; thus, "the district court enjoys considerable

11

discretion in granting or denying the motion." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2810.1, pp. 127–28 (2d ed. 1995). Generally speaking, Rule 59 motions may be granted on four grounds: the correction of manifest errors of law or fact, the discovery of new evidence, the prevention of manifest injustice, or a change in controlling law. *Id.* The present motion logically falls into the third option: the prevention of manifest injustice. As the Defendants argue, "The Court should not permit Plaintiffs to hold this case in abeyance while allies who are also Kappa shareholders assert identical shareholder derivative claims against Kappa Fraternity Council members in other proceedings." ECF No. 47 at 8.

This Court has not uncovered any cases beyond *Britt* or *Hogan* that have dealt with, or even contemplated dealing with, Rule 59(e) motions like this one. However, the facts here are remarkably similar to those in *Hogan*: the court in that case also initially dismissed the plaintiff's complaint without providing a deadline to amend, and the case remained open on the docket for nearly two years. Because of this, the plaintiffs in *Hogan* were able to file an amended complaint that would have otherwise been barred by a statute of repose because it related back to the original complaint. *Hogan*, 73 F.4th at 1157. Here, we are also closing in on two years post-dismissal, and the non-final nature of our order could similarly allow Plaintiffs to bypass Wyoming's statute of limitations for contract claims and indefinitely extend their timeline to file this claim. *See* WY Stat. § 1-3-105. The *Hogan* court indirectly (by citing to *Britt*) suggested a Rule 59(e) motion by defendants would have been successful there; we therefore see no reason why it should not also be successful here.

A-087

## CONCLUSION

Having considered the written submissions, the applicable law, and being otherwise fully advised, the Court finds that Defendants' *Motion for Deadline for Plaintiffs to Amend Complaint* (ECF No. 47) is **GRANTED**. **IT IS HEREBY ORDERED** that Plaintiffs have thirty (30) days to file a Second Amended Complaint. **IT IS FURTHER ORDERED** that if no amended complaint is filed, the Court's earlier Order of dismissal without prejudice (ECF No. 31) will convert to a dismissal on the merits.

Dated this ___9ᵗʰ___ day of May, 2025.

_Alan B. Johnson_
Alan B. Johnson
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

HANNAH HOLTMEIER,
c/o Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003,

ALLISON COGHAN,
c/o Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003,

HALEY RUTSCH,
c/o Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003,

For themselves and derivatively on behalf
of KAPPA KAPPA GAMMA
FRATERNITY,

     Plaintiffs,

v.

KAPPA KAPPA GAMMA FRATERNITY,
an Ohio non-profit corporation, as a
Nominal Defendant and as a Direct
Defendant,

c/o Kari Kittrell, Statutory Agent
6640 Riverside Drive Suite 200
Dublin OH 43017,

MARY PAT ROONEY, President,
Kappa Kappa Gamma Fraternity Council,
c/o Kari Kittrell, Statutory Agent
6640 Riverside Drive Suite 200
Dublin OH 43017,

MARIA BROWN, Vice President,
Kappa Kappa Gamma Fraternity Council,
c/o Kari Kittrell, Statutory Agent
6640 Riverside Drive Suite 200
Dublin OH 43017,

Case No. 2:23-cv-00051-ABJ

Judge: Alan B. Johnson

**SECOND AMENDED VERIFIED
COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

NANCY CAMPBELL, Vice President              )
Kappa Kappa Gamma Fraternity Council,       )
c/o Kari Kittrell, Statutory Agent          )
6640 Riverside Drive Suite 200              )
Dublin OH 43017,                            )
                                            )
BARB GOETTELMAN, Vice President,            )
Kappa Kappa Gamma Fraternity Council,       )
c/o Kari Kittrell, Statutory Agent          )
6640 Riverside Drive Suite 200              )
Dublin OH 43017                             )
                                            )
LIZ WONG, Vice President,                   )
Kappa Kappa Gamma Fraternity Council,       )
c/o Kari Kittrell, Statutory Agent          )
6640 Riverside Drive Suite 200              )
Dublin OH 43017,                            )
                                            )
KYLE DONNELLY, Treasurer,                   )
Kappa Kappa Gamma Fraternity Council,       )
c/o Kari Kittrell, Statutory Agent          )
6640 Riverside Drive Suite 200              )
Dublin OH 43017,                            )
                                            )
BETH BLACK, Panhellenic Delegate            )
c/o Kari Kittrell, Statutory Agent          )
6640 Riverside Drive Suite 200              )
Dublin OH 43017,                            )
                                            )
and                                         )
                                            )
Jane Does 1-4                               )
Addresses unknown                           )
                                            )
Defendants.                                 )

     Hannah Holtmeier, Allison Coghan, and Haley Rutsch, for themselves and derivatively on

behalf of Kappa Kappa Gamma Fraternity ("Kappa", "the Fraternity", or, for ease of

understanding, "the Sorority")[1], by and through their attorneys and pursuant to this Court's Order

---

[1] Kappa Kappa Gamma was founded in 1870, approximately 30 years before the word "sorority" was first used to describe "[a] women's society in a college or university." Sorority, Oxford English Dictionary Online (Mar. 2023). Kappa's corporate documents refer to the entity as a "fraternity."

A-090

of May 9, 2025, hereby bring this Second Amended Complaint for relief against Defendants Kappa and Kappa Fraternity Council members Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettelman, Liz Wong, Kyle Donnelly, and Beth Black (collectively the "Fraternity Council") and the Jane Doe defendants. The Plaintiffs allege:

## INTRODUCTION

1.    The Plaintiffs were all student members of Kappa, living in the chapter house of Kappa's Gamma Omicron chapter at the University of Wyoming (the "Wyoming Chapter") at the time of the events giving rise to this lawsuit. Plaintiffs remain current members of Kappa.

2.    In 2022 and 2023, Kappa's leadership, including its Fraternity Council, District Director, and District membership advisor, disregarded established voting procedures and membership requirements and improperly coerced or influenced the student members at the Wyoming Chapter to admit a biological male student ("the Student"), who identifies as a woman, to membership in the Fraternity in violation of the Wyoming Chapter bylaws and Kappa's Articles of Incorporation, Bylaws and Standing Rules (Kappa's "Governing Documents").

3.    Student members of the Wyoming Chapter who opposed the male Student's membership were accused of bigotry, discrimination and violations of Kappa's policies and values. Further, at least one member was stripped of her leadership position within the Wyoming Chapter, and another suffered retaliation such that she eventually felt compelled to resign her membership in Kappa altogether. Plaintiff Holtmeier soured on her experience at the University of Wyoming and the Wyoming Chapter, and she transferred to the University of Nebraska.

4.    This case challenges whether an Ohio private, non-profit organization can disregard its mission, violate its Governing Documents, and improperly coerce Wyoming Chapter members to

A-091

pursue a social agenda that is contrary to the very principles upon which the organization was founded, ultimately causing the organization to lose its exempt status under Title IX.

## I.    PARTIES, JURISDICTION, AND VENUE

5.   Hannah Holtmeier was a citizen of Nebraska at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

6.   Allison Coghan was a citizen of Kansas at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

7.    Haley Rutsch was a citizen of Wyoming at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

8.   Kappa is a non-profit organization organized under the laws of the State of Ohio, with its principal place of business in Franklin County, Ohio.

9.   At the time of the initial filing in this case, Defendant Mary Pat Rooney was a resident of Chicago, Illinois; Maria Brown was a resident of Columbus, Ohio; Nancy Campbell was a resident of Cookeville, Tennessee; Barb Goettelman was a resident of Englewood, Colorado; Liz Wong was a resident of Toronto, Canada; and Kyle Donnelly was a resident of Falls Church, Virginia. These Defendants were elected members of Kappa's Fraternity Council at the time of the events giving rise to this lawsuit and its initial filing. Defendant Beth Black was a resident of Dublin, Ohio, and Black was appointed to Kappa's leadership team by the other members of the Fraternity Council as the delegate to the National Panhellenic Conference, serving as an ex-officio member of the Fraternity Council.

10. Jane Does 1-4 are national, regional or district level advisors and/or directors or employees who acted in concert with Fraternity Council to interfere with chapter elections by encouraging or instructing Wyoming Chapter officers to circumvent Kappa's established rules and procedures for the admission of new members and to improperly coerce and influence Wyoming Chapter members to ensure the admission of a biological male into the Fraternity.

11. Plaintiffs bring this action in the United States District for the District of Wyoming under 28 U.S.C. 1332(a)(1) as the parties are citizens of different states.

12. Plaintiffs assert that the amount in controversy exceeds $75,000.00, and Defendants' conduct has resulted and will result in injury to Plaintiffs in an amount in excess of $75,000.00.

13. Venue is proper in this judicial district under 28 U.S.C. 1391(b)(1) because a substantial part of the events giving rise to this lawsuit occurred in this District.

## STATEMENT OF FACTS

### I.    Kappa was established to unite *women* through membership.

A.    Kappa has always been an organization limited to women.

14. In 1870, six women at Monmouth College in western Illinois founded Kappa Kappa Gamma. The Sorority's founders saw that Greek-letter societies benefitted male students, and they wanted college women to have the same opportunities.

15. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

A-093

16. Louise Bennett Boyd, one of the six founding members of Kappa, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us."

17. Today, Kappa is one of the nation's oldest and largest sororities, with approximately 260,000 living alumnae, 140 collegiate chapters, and 370 alumnae associations according to Wikipedia.

18. Kappa's first Bylaws make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." *Kappa Kappa Gamma Fraternity, History: Kappa Kappa Gamma Through the Years* 126 (2000).

19. Early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as "new women" enjoying the privileges of fraternal life. *Id.*

20. In 1871, the Fraternity's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id.* at 27. "The [Kappa] Constitution at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id.* The first Kappa members affirmed their "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id.*

21. When the Fraternity filed its Articles of Incorporation with the Ohio Secretary of State in 1930, this first purpose was only slightly changed:

A-094

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

ECF 1, Attachment 4, Articles of Incorporation, at 126.[2] The Sorority's current first purpose explicitly links that original pledge of 150 years ago to the Fraternity's single-sex identity:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id*. at 123 (emphasis added).

22. The words woman and women, as used in Kappa's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Fraternity's 150 years, have always referred to adult female human beings. These words, as used by Kappa prior to Defendants' unlawful actions, have never referred to biological males who claim to be women.

23. Kappa's communications, throughout its history, use vocabulary that reinforces that the Fraternity uses the word "woman" with its traditional, immutable biological meaning based on sex, not gender identity. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood.").

24. The Sorority refers to members who have finished college as alumnae, the plural form of the Latin word "alumna." Alumna and alumnae are feminine case (gendered) Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning.").

---

[2] Page references refer to the ECF page numbers assigned to the Original Complaint in this case.

25. When Kappa published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity*, 1870–1930 at v (1932).

26. The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

27. Articles in the Fraternity's official magazine, The Key, reflect this traditional, biological meaning of the word "woman." Indeed, perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" include "Friendship/Sisterhood":

> Kappa Kappa Gamma is a ***single-sex*** haven in a mainly coed campus environment.

> Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.

> Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.

> Kappa Kappa Gamma sustains members in bad times, celebrates good times, and shares all times.

> Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

A-096

B.  <u>Kappa provides unique benefits to college women through the creation of an all-female environment subject to the Title IX exemption.</u>

28. Kappa and other Greek fraternities and sororities are not mere social clubs on campus. Sorority houses across the country provide school-sanctioned private single-sex housing for women. Sorority women share private living spaces with and build special supportive bonds with one another, due in part to this communal living. The Wyoming Chapter house, like many other sorority houses, has communal showers and same-sex communal bathrooms. Roommates share a single-room bedroom, and the bedrooms do not have locks on the doors. Even members who do not live in the sorority house have access to the private spaces of the house. For this reason, the importance of sororities was acknowledged by the US Congress in an amendment to Title IX that allows sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a).

29. After passage of Title IX in 1972, the Nixon administration took the position that fraternities and sororities could not continue as part of college life because they discriminated on the basis of sex. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this consequence. "Fraternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). Therefore, in 1974, Congress amended the text of Title IX to exempt Kappa and similar Greek organizations. 20 U.S.C. § 1681(a)(6).

30. Title IX's prohibition of discrimination based on sex does not apply to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id*. *See also* Pub. L. No. 93-568 § 3 (1974).

31. By this legislative amendment, Kappa is permitted to legally discriminate against men to provide a sex-segregated environment for college women. This discrimination has defined sororities for over 150 years and is part of what makes sororities special to the women who join them.

32. Social science research demonstrates that when young women learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures.

33. These benefits are not limited to the classroom. One study, for example, shows that strong female role models increase the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

34. Kappa was once a strong defender of the benefits of an all-female environment for college women. In 2016, Harvard University adopted a policy that punished students who joined single-sex groups, even if these groups were not officially recognized by the school. In 2018, Kappa sued Harvard to overturn this policy, arguing that that single-sex sororities are a traditional source of stability and community in college life for young women. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D. Mass.) (filed Dec. 3, 2018) (Kappa is the second named plaintiff.).

35. In its complaint, Kappa and other plaintiffs asserted that

93. Single-sex social organizations represent a traditional source of stability and community in college life. They meet many of the social and cultural needs of students. They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems,

A-098

and goals. Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

94. A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership. These students were more likely to be "thriving" in their well-being and engaged at work than college graduates who did not join a fraternity or sorority. The survey found that fraternity and sorority members were more likely than other students to find fulfillment in daily work and interactions, to have strong social relationships and access to the resources people need, to feel financially secure, to be physically healthy, and to take part in a true community.

95. Single-sex environments are associated with a myriad of developmental and other benefits, particularly for young women. Many educational researchers have found that single-sex education contributes to academic achievement at all levels for women. There "is a body of research carried out since the late 1960's which shows that graduates of women's colleges are more likely to become achievers than are the women graduates of coeducational institutions." As an example, in the 1970s, graduates of women's colleges were more than twice as likely than graduates of co-ed colleges to enter medical school or to obtain a natural science or other doctoral degree.

96. Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control. Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.

*Id.* at 31-33.

36. Kappa representatives made, and continue to make, these and similar assertions to Plaintiffs specifically and to other young women when they are considering whether to join Kappa. Sorority representatives make these same representations to donors and alumnae. Plaintiffs, other student members, and alumnae members and donors relied on these representations when they joined Kappa and agreed to undertake the financial obligations associated with their membership or made donations.

37. To date, Defendants have offered no research or other information to support that the benefits of a "single-sex" environment continue when men "who identify as women" are admitted to the Fraternity.

38. Kappa's view, for more than 150 years, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Fraternity's identity, and then claim, without evidence, that the Fraternity's benefits remain.

**II.    Kappa's governing documents restrict membership to women.**

39. Kappa is a non-profit corporation organized in and under the laws of the state of Ohio.

40. In Ohio, an organization's governing documents, including its articles of incorporation, constitution and bylaws serve as the contract between the organization and its members. *Ulliman v. Ohio High School Athletic Assn.,* 184 Ohio App. 3d 52, 2009 Ohio 3756, 919 NE2d 763, ¶50. When an organization fails to comply with its governing documents, it breaches its contract with its members. The Ohio courts regularly review and, when needed, enforce these bylaws against the boards of nonprofit corporations in lawsuits brought by members.

41. Kappa's governing documents establish the authority that members can exercise and set the limits within which the Fraternity Council can act.

42. Under Ohio law, a director must perform her duties in good faith; in a manner the director reasonably believes to be in, or not opposed to, the best interests of the corporation; and with the care that an ordinarily prudent person in a like position would use under similar circumstances. OH ST.§ 1702.30(B) (2024).

43. A director may be liable in damages for acting in bad faith or in reckless disregard for the best interests of the organization. OH ST.§ 1702.30(E) (2024).

44. Under Ohio law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such." OH ST.§ 1702.12(I) (2024).

A.  Kappa's Articles of Incorporation.

45. Kappa's Articles of Incorporation, dated July 28, 2004, restrict membership to women, an uncontroversial term that meant adult human females at that time. The Articles prohibit any college chapter from defying this restriction. The Fraternity's purposes in its Articles of Incorporation focus on supporting and uniting women:

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;
>
> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;
>
> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;
>
> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;
>
> To advocate for and seek to address issues of concern for members and women in general;
>
> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and
> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

ECF 1, Attachment 4, Articles of Incorporation, at 123.

46. While the Articles permit local chapters to recruit and vote on new members, the Articles also make clear they must do so "in accordance with [Sorority] standards and procedures." ECF 1, Attachment 4, Articles of Incorporation, at 123.

47. Kappa's Articles cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the [Sorority] Bylaws," *id.*, which require a two-thirds majority vote at the Fraternity's biennial convention. Moreover, under the Bylaws, the "exact content" of any amendments must be provided to the members at least three months before the convention. ECF 1, Attachment 1, Bylaws, Art. XXIV, Sec. 1, at 95.

    B.  <u>Kappa's Bylaws</u>

48. Kappa's Bylaws also restrict membership to women only: "New Member. A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated." ECF 1, Attachment 1, Bylaws, Art. III, Sec. 1, at 77.

49. Because the Bylaws expressly affirm Kappa's single-sex status and require that every new member be a woman, biological men who identify as women do not meet the criteria for membership:

> Section 2. Qualifications. A ***woman*** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
>     C.  Collegiate New Member and Alumna Candidate. To qualify as either a collegiate new member or an alumna candidate, **<u>a woman</u>** shall ***
>
>     D.  Collegiate New Member. To qualify as a collegiate new member, **<u>a woman</u>** shall also *** :
>
>     E.  Alumna Candidate. To qualify as an alumna candidate, **<u>a woman</u>** shall also ***

ECF 1, Attachment 1, Bylaws Art. III, Sec. 2, at 78 (emphasis added).

50. In June 2022 at the Biennial Convention, Kappa members approved a new Bylaw provision forbidding "Members, chapters and associations" of Kappa from engaging in discrimination, while recognizing that the Fraternity discriminates on the basis of sex:

> Discrimination. *** The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

ECF 1, Attachment 1, Bylaws Art. V, Sec. 2.D, at 84-85.

51. Based on the Bylaws' reference to and reliance on the "exemption" in Title IX of the Educational Amendments of 1972, which prohibits discrimination "on the basis of *sex*," the notion of a single-gender organization, as the phrase is used in the Bylaws, must be read as synonymous with "single-sex." 20 U.S.C. § 1681(a)(6) (emphasis added).

52. The Report of the Bylaws Committee related to this amendment makes no reference to any expansion of membership criteria to include "individuals who identify as women" which indicates that the provision was not intended to alter Kappa's criteria for membership. *Id.* at 2, ECF 1, Attachment 5, Report of the Bylaws Committee, at 129.

53. The Fraternity Council has, by its improper actions, ignored the meaning of this crucial membership limitation to women in Kappa's Bylaws without a representative vote[3] of the student membership or the hundreds of thousands of alumnae members on the issue of accepting men. Kappa women were shocked to learn of the unapproved admission of men into the Fraternity after the filing of the initial complaint in this case and the degree to which Fraternity Council has overstepped its role in Fraternity governance.

54. Indeed, less than two months before the Fraternity's Biennial Convention, Fraternity Council issued a document to members entitled, "Bylaws and Standing Rules Revisions 2022:

---

[3] Each alumnae association and collegiate chapter in good standing is allowed to have a representative vote on changes to Bylaws and Standing Rules.

FAQS [Frequently Asked Questions]." ECF 1-1, Attachment 6, at 32. This FAQs document was not subject to a vote or otherwise approved at the convention. It is not a Governing Document. It provides in relevant part:

> DIVERSITY, EQUITY AND INCLUSION
>
> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

*Id*. at 49.

55. The FAQs cannot operate as an amendment to Kappa's Bylaws or other Governing Documents. Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. ECF 1, Attachment 1, Bylaws, Art. XXIV, sec. 1 at 95. These FAQs were provided less than 60 days before the Convention and did not contain any language of the proposed amendments to the Bylaws. They were never voted on and cannot be considered to alter any part of the "exact content" of the proposed changes that were provided as required by the Bylaws and approved.

56. Under Ohio law, a corporation's bylaws cannot conflict with its Articles of Incorporation. OH ST. §1702.30(A). Kappa's Articles and its Bylaws make clear that the Fraternity is limited to biological women.

C.  Kappa's Standing Rules

57. Kappa has adopted "Standing Rules" to govern the conduct of the Fraternity.

58. The Standing Rules describe the processes that must be followed when selecting a new collegiate member of the Fraternity. ECF 1-1, Attachment 7, Standing Rules Revision, at 55. (Only collegiate chapter members vote when considering admission of a new collegiate member. Alumnae do not vote on the admission of collegiate members.) These "procedures" must be followed by every college chapter when selecting new members.

59. All chapter members of a particular chapter must vote on whether to admit a new member to its chapter, unless a chapter member is excused from voting, in writing, by the chapter's alumnae adviser. *Id.*

60. Standing Rules can be amended by a majority vote at the Fraternity's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. *Id.* at 25.

61. The Standing Rules do not include any language to support the expansion of Kappa membership to include a biological man who identifies as a woman.

D.  Kappa's Policies

62. The Sorority also has "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by Kappa's Articles of Incorporation, Bylaws and Standing Rules." ECF 1-1, Attachment 8, Fraternity Policies at 86.

63. Kappa's Policies are not voted on by members and are not considered as Governing Documents. These Policies also expressly restrict its membership to women. Policy III imposes requirements on the Fraternity's college chapters that make clear the Fraternity is a single-sex

organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Fraternity or a chapter. *Id.* at 88. Policy III also requires that Kappa members respect the human dignity of all individuals—whether members or not—a principle that is consistent with the Fraternity's historical, longstanding membership requirements. Policy III applies to members' conduct; it does not change Kappa membership requirements.

64. Policy VIII also explicitly prohibits men from participating in the Fraternity's recruitment events: "Men shall not participate in any Kappa recruitment events, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements." *Id.* at 98 (emphasis added).

65. Kappa's Policies also require that all chapter members vote on whether to accept a new member, unless excused in writing, and require that all membership voting use the Fraternity's designated electronic voting platform. *Id*. at 11 (§ 3) & 14 (§ 3.P). This approved voting platform, Omega Recruit, was required to be (but was not) used to conduct the illegal vote to admit the Student to the Wyoming Chapter.

66. Because the Polices are adopted by the Fraternity Council, not the membership, they cannot lawfully deviate from or undermine the Fraternity's Articles of Incorporation, Bylaws or Standing Rules.

### III.    Kappa's Organizational Structure is designed to ensure that all members honor the obligations set forth in its governing documents.

67. Kappa's Fraternity Council, not individual collegiate chapters of the Fraternity, has the final authority over chapter membership decisions. Plaintiffs, other members of the Wyoming Chapter, and other sorority members informed the Fraternity Council about the both the improper admission of the biological male Student and that Kappa's required standards and procedures were

A-106

not followed when the Student was offered membership in the Fraternity. The Fraternity Council considered whether to reject the Student entirely or to conduct another vote. The Fraternity Council chose to ignore the violations of Kappa's governing documents to pursue a social agenda that is contrary to the very principles upon which Kappa was founded. The Defendants are responsible for the Student's wrongful admission.

68. Kappa acts through its approximately 140 collegiate chapters. Kappa chapters are not distinct entities in any way. The Fraternity Council, District Directors, and the Fraternity's network of alumnae advisers provide direction to the student members of the Fraternity. Thus, the Student could not be admitted as a Kappa member of the Wyoming Chapter without the approval and support of the Fraternity Council and those members, officers and advisors acting at the Fraternity Council's direction.

69. Under the Standing Rules, no person can be initiated as a Kappa member without prior approval from headquarters:

6.2 Ritual.

*      *      *

Chapter Initiation of New Members.

*      *      *

At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Headquarters. If the requirements for initiation have been fulfilled, Kappa Headquarters shall issue the authorization for initiation.

ECF 1-1, Attachment 7, Standing Rules, at 64.

70. Fraternity officials regularly reject ineligible members for a variety of reasons, including but not limited to failure of the pledge to meet the grade requirements, even when a chapter has voted to admit the member. The Fraternity Council was aware of the unusual circumstances of the

invitation to membership of the Student (more fully described below) when he was a potential new member. Fraternity Council actively and wrongfully facilitated his initiation as a member of Kappa.

71. On the national level, the Fraternity Council has authority to approve, suspend or revoke the charter of a collegiate chapter. Fraternity Council also has authority to suspend or dismiss any chapter member. Below the Fraternity Council, the Fraternity has Content Specialists and Content Directors, who supervise all matters that relate to a specific aspect of the Fraternity's operation (such as the Fraternity's disciplinary process, called "Standards"). The Fraternity has District Directors who supervise the activities of the local chapters within a geographic area and administer discipline to individual chapters for rules violations. Finally, the Fraternity has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

72. The Standing Rules of the Fraternity permit national officials to place any individual member on probation, even if collegiate chapter members do not support this decision. The Fraternity Council (the Fraternity's board) can dismiss any member entirely. ECF 1-1, Attachment 7, Standing Rules, at 67-74.

73. Although every chapter must adopt its own bylaws and standing rules, they "must be approved by the Fraternity Bylaws Committee before becoming effective." Id. (art. iv, sec. 2.G.). All subsequent amendments must also be approved by the Fraternity's officials. *Id.*

74. For every collegiate chapter, Kappa has a network of appointed alumnae who supervise operation of the chapter and the actions of individual chapter officers. The Sorority's Bylaws require this supervision:

> J. Advisory Boards and Chapter Advisers. A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the

> chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

ECF 1, Attachment 1 at 82 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae with broad responsibility over every aspect of sorority life, such as chapter operations, housing, membership recruitment and retention, and discipline of sorority members. Appointed alumnae control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*, a party) without submitting an event form to the designated national Fraternity representative and receiving approval from the chapter's appointed alumnae adviser. Fraternity Council members informally refer to these appointed alumnae as part of the Fraternity's "workforce."

75. The President of each collegiate chapter must discuss matters with the chapter's alumnae adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics must work with an alumnae adviser. Alumnae advisers are selected by the Fraternity, not by chapter members. Chapter members have no authority over the alumnae advisers, and an adviser must be present for all chapter meetings of significance:

> Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

ECF 1-1, Attachment 8, Fraternity Policies, at 86-87 (Policy I, sec. 2.E.).

76. All Kappa members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be

responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." ECF 1, Attachment 1, Bylaws, at 84 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendants to uphold the Fraternity's mission and purpose.

**IV.    Kappa's unusual admission of the male Student to membership in the Fraternity.**

      A.  <u>The Recruitment Process</u>

77. The Student initially participated in sorority recruitment at the University of Wyoming in Spring 2022. At the time, the Student sought specifically to join the Delta Delta Delta sorority but was not invited to join the sorority.

78. Then, in August 2022, the Student participated in the formal Panhellenic recruitment process for sororities (formerly called "rush") at the University of Wyoming.

79. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five-minute intervals. After the meetings, the potential applicant and the sorority members rate the experience online using an app called "Omega Recruit." Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership.

80. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit the Student because he was a biological male. The Membership Chair also stated that all members would have to unanimously agree before the Student could live in the sorority house.

81. For the Wyoming chapter, the process of formal recruitment is intended to determine whether applicants have character traits that align with Kappa and the chapter. The Student did not complete the full recruitment week for Kappa and chose to attempt to join a different sorority, but was again unsuccessful.

82. After formal recruitment ended, Plaintiffs and other members of the Wyoming Chapter believed the issue of the Student's membership application was closed. But, unbeknownst to the Wyoming Chapter members, the Student had reached out to the Wyoming Chapter Membership Chair to pursue Kappa membership through the continuous open bidding process ("COB").

83. By way of background, from 2016 until Spring 2022, the Wyoming Chapter was under continuing review (probation) by Fraternity leadership due to low membership numbers. As a result, Kappa's alumnae advisers directed the chapter president and chapter officers to recruit the Student as doing so could raise the prominence of the Wyoming Chapter and garner the favor of the Fraternity Council if they recruited and admitted the Student as Kappa's first transgender member.[4]

84. COB allows women to become members of a sorority outside of formal recruitment. The Fraternity requires all chapters to use COB if the sorority house has additional capacity. ECF 1-1, Attachment 8, Fraternity Policies at 98 (Policy VIII, sec. 3.F).

85. During COB, it is customary for applicants to visit the chapter house for dinner or meet chapter members for coffee. The Membership Chair schedules these events and uses the chapter group chat to announce dinners and coffee dates to meet other prospective new members. Although

---

[4] Sometime after the initial filing in this case, it was learned that Kappa has admitted a biological male as an alumnae (alumni) member and may have admitted other men prior to admitting the Student. Fraternity Council actively conceals from the membership the admission of men as Kappas, so the number of biological men admitted to membership in Kappa and when they joined is currently uncertain.

the Wyoming Chapter followed this normal process for other applicants in the Fall of 2022, it did not do so for the Student.

86. Indeed, most chapter members did not know the Student was being considered for membership through COB.

87. Prior to the vote on the Student's membership, the only mention of his membership application occurred at a single chapter meeting well before the vote. At that meeting, the Membership Chair announced that the Student had asked to apply through continuous open bidding. The only notice to chapter members about the time and date of a dinner to meet the Student was a brief reference in the paper minutes from that chapter meeting.

88. When Ms. Holtmeier and Madeline Ramar asked about the Student's application, the Membership Chair admitted that the Chapter was required to permit the Student to apply but downplayed any possibility that the Student would become a Kappa member, claiming there was "a 99.9% chance" that he would not be offered membership.

B.  The Irregular Multiple Votes

89. The chapter leaders who were in office in September 2022,[5] with direction from alumnae advisers, implemented an unauthorized voting process that did not use Omega Recruit and that would ensure the Student's admission to Kappa.

90. All Chapter members are expected to attend the weekly Chapter meetings on Monday evenings. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Madeline Ramar and another sorority member attended the Chapter Council meeting on September 18, 2022, prior to the Chapter meeting the following evening on September 19, 2022.

---

[5] The chapter elects new officers each year in November, and the new officers take over at the end of the fall semester.

91. At the Chapter Council meeting, officers intentionally concealed the fact that the Student's candidacy would be presented for a vote that week, that the chapter officers intended to vote using a Google Poll (instead of Omega Recruit as required for membership selection), and that the officers would only permit those present at the Chapter meeting to vote on the Student's membership. Ms. Ramar and others would have attended the Chapter meeting if they had known a vote on the Student would occur. They would have voted against the Student's admission.

92. At the Chapter meeting on September 19, 2022, members were told that they would vote on the Student's membership the next day, September 20, 2022.

93. Fraternity rules prohibit discussion during the voting process, but this restriction was not followed for the Student. Several members of the chapter at the Chapter meeting, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each stated that members could only vote against the Student if they could articulate specific concerns about the Student's personality. They advised members that if they had not met the Student, a "no" vote was evidence of bigotry which is a basis for suspension or expulsion from the Fraternity. Plaintiffs believe these officers were told by the Fraternity Council, and those acting on its behalf, to convey this threat.

94. The Membership Chair intentionally provided limited notice of the only opportunity to meet the Student as part of a plan hatched by national Fraternity representatives to ensure that Wyoming Chapter members would not have a basis to vote against the Student's membership.

95. At the end of the Chapter meeting, the chapter officers described the irregular voting process that was to be used for the Student. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would

be emailed to all chapter members, the officers stated that only members who had attended the Chapter meeting could vote.

96. One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When members asked to respond to these statements, the chapter President answered, "No, no discussion." But for those who sought to advocate for the Student's membership, the chapter President allowed them to speak about why Kappa had to admit the Student. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [the Student] living in the house, you are thinking too far down the road."

97. As stated previously, Kappa's Standing Rules required "All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser." *See* ECF 1-1, Attachment 7, Standing Rules Revision, Section 1.1.A.1, at 55.

98. For the September 20, 2022 vote on the Student, however, the chapter officers forbade chapter members Grace Ann Choate, Madeline Ramar, and any others who were not present at the September 19, 2022 Chapter meeting from participating in the membership vote.

99. Contrary to the requirements in the Standing Rules, none of these members were excused in writing from participating in the vote by the chapter's alumnae adviser and none had asked to be excluded from the vote. Indeed, they wanted to vote on the Student's membership selection and were forbidden from voting. This was highly unusual and violated Kappa's Standing Rules.

100.    The Chapter then failed to conduct the vote in secret through use of the Fraternity-approved electronic voting system—a mobile phone application called "Omega Recruit"—despite requirements that the Chapter "shall" use the electronic voting system selected by the Fraternity and that the process be confidential. ECF 1-1, Attachment 7, Standing Rules, Section, 1.1.A. and 1.1.A.2, p.55; ECF 1-1, Attachment 8, Kappa Policies, Policy VIII, Sec. 3, p.96-97.

101.    While the Wyoming Chapter used Omega Recruit to select new members during continuous open bidding in Spring 2022 and during the formal recruitment in Fall 2022, they did not follow these procedures regarding the Student during the September 20, 2022 vote.

102.    Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with their email address.

103.    When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changes.

104.    In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for the Student's membership had been secured, the voting stopped. Nothing about this voting process on September 20, 2022, was normal. The results of the first vote should have ended the process. The second vote should not have occurred, but this error was multiplied when it was not confidential. This irregular process violated Kappa's Standing Rules and Policies in multiple ways.

105.    At least three members of the Wyoming Chapter voted against admitting the Student in the first Google Poll and changed their vote in the second poll. When these women were

told that they would have to vote again with an email address, they understood that the second vote would not be secret and they feared retribution.

106.    The Student was admitted by a narrow margin. Had the chapter conducted a lawful and normal voting process, according to the Fraternity's required procedures, the Student would not have been offered membership in Kappa.

C.    <u>After the Irregular Votes, the Defendants continued to refuse to honor Kappa's Bylaws, Standing Rules and Policies.</u>

1.    *Kappa, acting through Fraternity Council, disregarded membership requirements to accommodate the Student's membership.*

107.    National Fraternity representatives usually have little involvement in member selection until after chapter members have voted. After the vote, every prospective member must be reviewed and approved by Fraternity Council such that the chapter receives "permission to initiate" each candidate.

108.    Kappa's leadership evaluated the Student's membership application under a highly irregular and different standard than that of other female membership applicants.

109.    For instance, applicants to join the Wyoming Chapter must have at least a 2.7 GPA. ECF 1-1, Attachment 14, House Bylaws, Art. III, Sec. 1.A.1, 144-145. In fall 2022, however, the Student had a 1.9 cumulative grade point average. The Student was approved without a grade exception or placement on grade probation, despite the fact that the Student's low GPA would prohibit membership or, at a minimum, require probation as a condition of membership.

110.    Defendants have ultimate decision-making authority over membership decisions. They control the intake of new members, the decision to expel or suspend members, and the decision to discipline, suspend or revoke the charter of a chapter. Fraternity Council decisions are carried out by various representatives at the district, regional and chapter levels. Simply put, no

A-116

person may become a new Kappa member unless the Fraternity Council, in advance, has given "permission to initiate." They knew of the irregularities and violations of Governing Documents in the Student's application for membership and in the voting violations and irregularities that occurred on September 20, 2022. They approved the initiation of the Student into membership despite knowing that they were violating the Governing Documents in doing so.

> 2. *Kappa directed members who attempted to uphold Kappa's Mission and established rules to resign from membership.*

111.     After the vote, several members, including the Plaintiffs, objected to the Student's membership as a violation of Kappa's Governing Documents and made their objections known to the Defendants. In response, the Defendants, through their representatives, advised the Plaintiffs that, if they disagreed with the Student's membership, their values were inconsistent with Kappa's values and they should resign their membership.

112.     At the time Defendants urged these Kappa members to resign, Defendants knew that Plaintiffs would not ever be able to join another Sorority. (This is another factor that separates sororities from other campus clubs.)

113.     When the Plaintiffs and other chapter members, and in some cases the parents of these young women, reached out to Fraternity headquarters about the Student's admission, Kappa officials dismissed their concerns:

> a.     Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Fraternity, with concerns about the voting process and the Student's membership. Ms. Poole responded simply that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

b. Fraternity officials falsely stated that the sorority house is no different than a co-ed dorm at the University of Wyoming.

c. When Plaintiffs and their parents raised concerns about the Student's presence in intimate areas of the sorority house, Sorority officials told them not to use the same bathroom as the Student and "since [the Student] identifies as a woman you have no reason to feel uncomfortable."

114.    During the time between the chapter vote on the Student and before the student was initiated into Kappa as a member, Ryan O'Neil, the Dean of Students for the University of Wyoming at that time, visited the Wyoming Chapter house and held a special meeting with members in the living room. This meeting was arranged by the then chapter President, and it was described as due to the negative publicity about the admission of the Student into Kappa. The Dean of Students told Kappa members that she thought what they were doing (in admitting the Student) was great and that she was so proud of them. Dean O'Neil said that she has worked with the Student, who spent a lot of time in her office, and she knows the Student well. Dean O'Neil further stated that what they were doing was beautiful, and she was sorry they were going through this.  Plaintiffs and other chapter members who disagreed with the Student's initiation were uncomfortable with the inappropriate praise heaped on the Wyoming Chapter and endorsement of the Student's Kappa membership by a University of Wyoming official.

115.    Ultimately, Jaylyn Westenbroek, Grace Ann Choate, Meghan Kosar, and other chapter sorority members resigned from Kappa membership as a result of Defendants' conduct.

> 3. *The Defendants retaliated against chapter members who challenged the Fraternity's disregard for its governing documents.*

116.     Fraternity officials and Chapter leaders accused Wyoming Chapter members who objected to the Student's membership of not subscribing to Kappa's values of inclusion and diversity.

117.     After Ms. Holtmeier continued to raise concerns about the Student's membership, she was brought before a disciplinary hearing. Chapter officers read prepared statements that they had discussed with Fraternity officials and provided her with material, including Kappa's "Guide for Supporting our LGTBQIA+ Members," so Ms. Holtmeier could "educate" herself.

118.     Ms. Holtmeier was threatened with further discipline if she did not agree that the Student is a woman or continued to challenge the validity of the vote on his admission.

119.     When Ms. Holtmeier asked questions, she was told "that's what we are supposed to do now."

120.     Ms. Holtmeier later transferred to Nebraska and affiliated with the Kappa chapter there.

121.     Madeline Ramar was removed from her position as the Wyoming Chapter Finance Chair solely because of her opposition to the Student's admission and because she signed onto the First Amended Complaint as a Plaintiff.

122.     At least one other Chapter member was threatened with discipline if she did not agree that the Student is a woman.

## V.    Fraternity Council refused Plaintiffs' demands to prevent violation of the Fraternity's restrictions on membership.

123.    Kappa's Articles of Incorporation, Bylaws, and Standing Rules restrict membership in the Fraternity to women only. Defendants have not amended these corporate governance documents to permit membership for the Student, who is a man who claims to identify as a woman.

124.    Plaintiffs made numerous efforts to prevent the Student's initiation to membership on the grounds that it violated Kappa's Governing Documents. As stated above, in September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about the admission of the Student. At that time, the Student's membership had not yet been finalized. In response, Kari Kitrell Poole, the Executive Director of the Fraternity, told Plaintiffs that their request had been presented to the Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

125.    In November 2022, Plaintiffs, through counsel, wrote to the Fraternity, requesting that Kappa prevent the initiation of the Student until concerns about his membership were resolved. ECF 1-1, Attachment 11, Correspondence dated November 4, 2022, at 122.

126.    Fraternity Council, responding through Kappa's counsel, rejected Plaintiffs' request. ECF 1, Attachment 3, Correspondence dated November 15, 2022, at 116. The Fraternity claimed that Kappa is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id*. This statement disregards the Governing Documents and the actual meaning of the word "woman" as used by the Fraternity for 150 years, but it was presented as the official policy of the Fraternity.

127.    Kappa's counsel stated that the Fraternity leadership has concluded that a woman need not be "biologically born as female." *Id*. at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs' request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

128.    The futility of any further request by Plaintiffs is demonstrated by other language in the November 2022 letter from Kappa to the Plaintiffs' attorney. The letter states that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. This statement indicates that Kappa was not only unwilling to take action related to the Student, but it also had no intention to evaluate whether *any* prospective member complies with the requirement in the Fraternity's Articles of Incorporation that only women may be Kappa members. By stating that the Fraternity has no interest in objective evidence about a member's sex, Kappa's counsel indicated that the Fraternity Council would never enforce the membership restrictions that guided the Kappa for its first 150 years.

129.    The letter from Kappa's attorney also disclosed the Fraternity Council's efforts to undermine Kappa's required membership criteria. The attorney referred to "Position Statements" issued by the Fraternity and to a "Guide for Supporting our LGBTQIA+ Members (the "Guide"), neither of which were published in Kappa's national magazine for members—the Key.

130.    Position Statements are documents prepared by Fraternity staff, and they are never presented to Fraternity membership for approval or review. Position Statements are not Governing Documents and cannot alter the meaning of Governing Documents. The meaning of Governing Documents can only be changed through a vote of delegates at convention. Position Statements are not distributed to Kappa member; they are merely uploaded without notice to the private

A-121

member portal of the Kappa website along with hundreds (if not thousands) of other documents. Members cannot be imputed to know the contents of Position Statements.

131.      After receipt of the November letter from Kappa's counsel, a search of the member portal located the Position Statements from 2021 that the letter apparently referenced. These position statements restate language that was originally included in the Guide. ECF 1, Attachment 2, at 102. Upon information and belief, the Position Statements were prepared at the direction of the Fraternity Council.

132.      The Position Statements include, in relevant part, the following language that is inconsistent with Kappa's Governing Documents:

MEMBERSHIP SELECTION

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.

***

Each chapter of Kappa Kappa Gamma has the final choice of its own members.

SINGLE-GENDER ORGANIZATIONS

Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

ECF 1-1, Attachment 12, Kappa Position Statement, at 126-127 (emphasis added).

133.    Kappa "Position Statements" are not Bylaws, Standing Rules or even Policies of the Fraternity. These documents reflect that Fraternity Council is knowingly working to undermine the Fraternity's lawful membership criteria.

134.    Similarly, the Guide is not a Bylaw. While Kappa Bylaws constitute a contract between Kappa and its members under Ohio law, the Guide does not. The Guide is not a Standing Rule. The Guide is not even one of Kappa's official Policies. On information and belief, the Guide was not adopted by a vote of the Fraternity Council.

135.    The Guide was distributed to the Fraternity's 'workforce' (alumnae who direct chapter operations) in about 2018 as a "resource," but the document was not provided to all Kappa members. The Guide states that its purpose is to help fulfill the Fraternity's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." ECF 1, Attachment 2, at 103.

136.    Again, the Guide is not a Governing Document. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." ECF 1, Attachment 2, The Guide, at 103-104. Much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* ECF 1, Attachment 2 with "Greek Ally Kit" available at bit.ly/401gHhv (visited June 5, 2025).

137.    Although the Guide was disseminated by the Fraternity as a resource, once the admission of the Student into membership of the Wyoming chapter became an issue, the Fraternity Council pointed to the Guide as changing the Fraternity's membership criteria. Fraternity Council's active work to conceal its decision-making, when considered in combination with the Fraternity's *ultra vires* decision to permit men to become members of the Fraternity, demonstrates that the

Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Fraternity.

138.     Kappa's attempt to define "women" to include men ("individuals who identify as women") is contrary to law. In Executive Order 14168 entered on January 20, 2025, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," the terms "women," "woman," "girls," and "girl" are defined as "adult and juvenile human females, respectively." 2025-02090 (90 FR 8615). Further, "sex" is defined as a person's "immutable biological classification as male or female," and the term specifically excludes the concept of "gender identity." *Id.*

139.     Kappa's interpretation is inconsistent with its reliance on the exemptions for "single sex" organizations under Title IX. As the court in *Tennessee v. Cardona* explained, "discrimination on the basis of sex means discrimination on the basis of being a male or female" and "expanding the meaning of 'on the basis of sex' to include 'gender identity' turns Title IX on its head." 762 F. Supp. 3d 615 (E.D. Ky. Jan 9, 2025) *available at* 2025 U.S. Dist. LEXIS 6197 *10.

140.     Kappa's efforts to expand its membership to men who identify as women squarely violates the exemptions under Title IX. Indeed, in a press release issued on June 2, 2025, the U.S. Department of Education Office of Civil Rights announced that it has launched an investigation into the University of Wyoming after the university allowed a man to join Kappa, a campus sorority. The press release further stated, "A sorority that admits male students is no longer a sorority by definition and thus loses the Title IX statutory exemption for a sorority's single-sex membership practices." See "The Department's Office for Civil Rights Launches Two Investigations to Vindicate Women's Rights under Title IX" https://www.ed.gov/about/news/press-release/us-department-of-education-recognizes-june-title-ix-month (site last visited June 4, 2025)

A-124

**VI.    Kappa's Fraternity Council Cannot Rely on NPC Policies to support its disregard for Kappa's Governing Documents.**

141.      In the November 2022 letter to Plaintiffs, Kappa's counsel also referred to a policy issued by the National Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as support for Kappa's admission of the Student, stating that the NPC policy means that "all women" may join a sorority, including men who identify as women.

142.      Kappa counsel's letter, however, selectively quotes the NPC policy which, in its entirety, states as follows: "Panhellenic Recruitment Eligibility (2020) – POLICY For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures." It is clear on its face that this policy only applies to participation in recruitment (formerly known as "rush") and has no effect on who can join any particular sorority. The letter falsely suggests that the NPC policy has an effect on Kappa's membership requirements and the other sororities that belong to the NPC.

143.      Defendants cannot use the NPC policy to justify its efforts to disavow Kappa's long-standing membership requirements.

144.      The Unanimous Agreements of NPC also have more force than policies. Unanimous Agreements are unanimously approved by each of the 26 sororities that are members of NPC. Kappa is bound by its Bylaws to comply with the NPC Unanimous Agreements. ECF 1, Attachment 1, Bylaws Article XV Sec 2, at 93. Unlike the policies of NPC, each individual Kappa is bound by Kappa Policies to uphold the Unanimous Agreements. "All members of Kappa Kappa Gamma shall abide by and uphold the National Panhellenic Conference Unanimous Agreements as set forth in the current National Panhellenic Conference Manual of Information. All members

shall also support the policies of the National Panhellenic Conference." ECF 1-1, Attachment 9,

Policies at 99.

145.     The NPC Unanimous Agreement titled "PROTECTING THE RIGHT OF NPC

MEMBERS TO REMAIN WOMEN-ONLY ORGANIZATIONS" requires all 26 sororities to

"defend their right to exist as **single-sex** organizations." This Unanimous agreement states, in

pertinent part as follows:

> NPC member organizations exist as **women-only** private social organizations. We
> believe that the right to enforce such membership restrictions is rooted in the
> freedom of association protected by the First Amendment of the U.S. Constitution.
> The U.S. Congress has recognized that right by providing in Title IX of the
> Education Amendments of 1972 that the membership practices of social
> fraternities and sororities are excepted from the prohibition contained in Title IX
> against discrimination **on the basis of sex** in participation in educational programs
> or related activities (20 USC 1681) and in exempting "bona fide private
> membership clubs" from the general prohibition against **sex discrimination** in
> employment practice (26 USC 501(c)). To further protect the right to maintain our
> membership policies, NPC reaffirms its long-held beliefs and policies in the form
> of a Unanimous Agreement.
>
> 1.  The women's sororities of the National Panhellenic Conference have the right
>     to confine their membership to women and **shall defend their right to exist
>     as single-sex organizations**.
>
> 2.  Auxiliaries. Each College Panhellenic shall denounce the participation of
>     undergraduate Panhellenic women in auxiliary groups to men's fraternities.
>
> 3.  Men's recruitment. Each College Panhellenic shall denounce the participation
>     of Panhellenic women in men's fraternity events when or where the primary
>     purpose is recruitment.

NPC Manual of Information, 29th Ed., January 2025, at 21-22 https://npcwomen.org/login/

college-panhellenics/moi-resources/ (site last visited June 4, 2025) (emphasis added).

146.     Plaintiffs made every effort and are continuing to defend Kappa's "right to exist as

a single-sex organization." The Fraternity Council has improperly thwarted this effort at every

turn.

**VII.    Fraternity Council and those acting in concert with them have concealed their disavowal and betrayal of Kappa's promises and obligations to women to induce members to join the sorority and improperly retaliated against Wyoming Chapter members for attempting to uphold Kappa's mission and governing principles.**

147.    Prior to joining Kappa, Plaintiffs all participated in regular fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. During Kappa recruitment, Kappa members repeatedly described the Fraternity as a "sisterhood," a term universally understood to refer to women only.

148.    Kappa represents to students that even after they graduate from college, they will have a lifetime sisterhood in Kappa.

149.    Kappa did not disclose to Plaintiffs or other prospective new members that its definition of a "woman" includes men who identify as women.

150.    During the recruitment process, Plaintiffs and other Wyoming Chapter members learned that if they joined Kappa, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa if the Fraternity's recruiters or printed recruitment information had disclosed that the Fraternity also admits men who claim to identify as women.

151.    Before initiation, the Fraternity requires prospective new members (formerly "pledges") to attend meetings to learn about the Fraternity's history and values. The other fall 2022 Kappa pledges did not know a biological male would also be joining the Fraternity and were surprised when the Student joined an educational meeting for their pledge class. One pledge initially believed the Student was at the meeting to write an article for the campus newspaper. One prospective member wrote to national Fraternity officials about this surprise, noting that she and other prospective new members had not even received a "heads up" about the Student's potential membership. Fraternity leadership never responded to these concerns.

152.     Ultimately, of the twelve young women who were invited to become Kappa members in Fall 2022, four women dropped out before initiation because they did not want to live in a sorority house with a biological man having access to their private and intimate spaces—including sleeping quarters on the second floor.

153.     Notwithstanding the promises Kappa made to current and prospective members regarding its commitment to women and sisterhood, Fraternity Council and the Jane Doe defendants acting in concert with them actively pressured members of the Wyoming Chapter to support the Student's admission, ignoring Governing Documents that foreclose the Student's initiation.

154.     In an effort to "transform" Kappa, without member approval, the Defendants violated the Articles, Bylaws, Standing Rules, and Policies of the Fraternity.

155.     Since the Student's improper admission to Kappa, Defendants retaliated against Plaintiffs and other Wyoming Chapters members who raised concerns about Kappa's transformation from a women's sorority into a co-ed organization.

156.     Each Plaintiff joined Kappa with the promise that they would be able to live and socialize in a single-sex, all-female environment. Defendants repeatedly laud the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will never have the benefits of the sorority experience they were promised. Some of the damages to each Plaintiff are easily calculable, including their Kappa dues. Other damages are less calculable at the outset, including difficult interactions with the Student. Plaintiffs were shocked and anguished by the Defendants' conduct and the way the Defendants and some members of the Wyoming Chapter treated them for standing up for Kappa as a single-sex organization.

157.    For 150 years, Kappa has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa has stated that these benefits result from the single-sex experience.

158.    Kappa has also been damaged by Defendants' conduct. Their violations of fiduciary duty have caused the Wyoming Chapter to lose at least 4 pledges and other chapter members left the school entirely or resigned from Kappa as a result. Nationally, because the Fraternity Council kept the admission of men hidden from Kappa's general membership, other Kappa members were not aware that Kappa had admitted or could admit men. After the Plaintiffs made it known and filed this case, Kappas across the country were shocked and incensed by the Defendant's actions. Many withdrew financial support or stepped back from volunteer involvement. The Fraternity Council's actions have created a schism in the Kappa membership that persists to this day. These hundreds of thousands of alumnae members and collegiate members have no recourse except to the courts. Because all higher levels of leadership are appointed by Fraternity Council and because new Bylaws cannot be proposed without Fraternity Council pre-approval, this small group of women has silenced the rest of the Kappa members and continued to conceal their actions by not allowing discussion or debate on the issue of admitting men into Kappa.

159.    Kappa must be held to comply with its Governing Documents and must remain loyal to its mission and the promises the Fraternity has made to its members throughout its history.

160.    All attempts at dialogue have failed, so Plaintiffs seek relief from this Court. Plaintiffs seek to recover the costs the Fraternity has incurred in promoting this unlawful change in its membership criteria. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duties

and their contractual obligations to the Plaintiffs, by purporting to admit the Student into the Fraternity

## **COUNT ONE**

### **(Breach Of Fiduciary Duty on behalf of Kappa Kappa Gamma Fraternity)**

161.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

162.     Under Ohio law, the regulations of an organization may make provisions related to the "qualifications, admission,…and suspension of members, and the termination of membership." OH ST § 1702.11(A)(2).

163.     Under Ohio law, a corporation may "exercise all authority within the purposes stated in its articles or incidental to those purposes." OH ST § 1702.12(F)(9).

164.     A director shall perform her duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation…." OH ST §1702.30(B).

165.     The Fraternity Council has breached its fiduciary duties to Kappa and its members in the following ways:

      a.    encouraging, advocating for, attempting to unduly influence Wyoming chapter members to support, and approving the Student's membership in direct contravention to the rules and requirements in Articles, Bylaws, Standing Rules and Policies;

      b.    actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity;

    c.   unduly influencing Wyoming chapter officers to disregard mandatory voting procedures employed in the Student's selection process;

    d.   disregarding Kappa's duty, as an Ohio citizen, to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution by retaliating against members who challenged the validity of the Student's membership; and

    e.   undermining the obligations, set forth in its Bylaws, to "advocate for and seek to address issues of concern for members and women in general" and instead focusing on meeting the demands of men who seek to be treated as if they were women. ECF 1-1, Bylaws, Article II.

166.    Fraternity Council's conduct destroys the rights of members, including the members of the Wyoming chapter and other student chapters to participate in a single-sex, woman-only environment.

167.    Fraternity Council's conduct has caused the University of Wyoming to be the subject of a Title IX investigation by the United States Department of Education for allowing Kappa to admit the Student as a member of the Wyoming Chapter.

168.    Fraternity Council's conduct has rendered Kappa "no longer a sorority by definition" and has caused it to lose its Title IX statutory exemption for a sorority's single-sex membership practices.

169.    Fraternity Council blatantly and knowingly defied the warnings and concerns of the Plaintiffs and other members of the Wyoming Chapter, attempted to silence any member objections to the Student's admission. Fraternity Council acted in bad faith and has recklessly and willfully disregarded Kappa's best interests.

170.     As a result of Defendants' conduct, Kappa suffered and continues to suffer reputational harm and has been damaged in an amount in excess of $75,000 for which Defendants are liable.

## **COUNT TWO**

### **(Breach of Fiduciary Duty for ultra vires acts by Fraternity Council on behalf of Kappa Kappa Gamma Fraternity)**

171.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

172.     Plaintiffs are members of Kappa in satisfaction of Section 1702.12(I) of the Ohio Revised Code.

173.     Fraternity Council exceeded its authority to act as required under Ohio Revised Code Section 1702.12.

174.     Fraternity Council failed to conduct Kappa's affairs as set forth in its Bylaws, as in force and effect at the time.

175.     Fraternity Council cannot, as a matter of law, establish Policies or engage in conduct that is contrary to Ohio law.

176.     Plaintiffs made repeated requests to the Fraternity Council to enforce the membership requirements set forth in the governing documents, but the Fraternity Council has denied their requests.

177.     Fraternity Council must be enjoined from violating Kappa's Articles, Bylaws, and Standing Rules; retaliating against members who seek to hold Fraternity Council to their obligations to comply with Governing Documents; and ordered to rescind their actions taken in breach of their fiduciary duties to Kappa.

A-132

178.     As a result of the Fraternity Council's conduct, Kappa has been compelled to incur damages in excess of $75,000 for which Fraternity Council is liable.

## COUNT THREE

### (Breach of Contract)

179.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

180.     Kappa's Governing Documents, including its articles of incorporation, constitution and bylaws serve as the contract between the organization and its members. *Ulliman v. Ohio High School Athletic Assn.,* 184 Ohio App. 3d 52, 2009 Ohio 3756, 919 NE2d 763, ¶50

181.     The promises Kappa made to its members, including Plaintiffs, are memorialized in Kappa's Governing Documents.

182.     Plaintiffs, other Wyoming Chapter members, and other active student members agreed to join Kappa, pay membership dues and, if required, live in the Wyoming Chapter house in exchange for the promise of participating in a single-sex organization committed to uniting and supporting women throughout their lifetimes.

183.     Defendants, by and through their conduct, violated Kappa's Bylaws and Standing Rules to compel the Wyoming Chapter members to admit the Student, caused Kappa to breach its obligations under the Governing Documents and, therefore, breach its contract with the Plaintiffs.

184.     As a result of Defendants' conduct and Kappa's resulting breach, Kappa is liable to Plaintiffs in an amount equal to the dues paid throughout the term of their memberships when Kappa was in breach and for any consequential or other damages resulting from the breach.

A-133

## COUNT FOUR

**(Fraud in the Inducement to enter into the Contract by Joining Kappa)**

185.    Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

186.    At no time prior to consideration of admission of the Student into the Wyoming Chapter were Plaintiffs (or their parents) informed that men could become Kappas. Indeed, Kappa advertised and held itself out as an organization of women, for women, on social media and on its website. These misrepresentations continue to this day.

187.    Kappa, acting through the Fraternity Council, failed to disclose and actively concealed from Plaintiffs the fact that they had embarked on a concerted extralegal agenda to undermine the single sex nature of the organization and eviscerate the primary purpose of Kappa by admitting certain men.

188.    Fraternity Council continued to tout Kappa as a women's sorority when it knew that it had admitted at least one man prior to the Student (and possibly more), Kappa knew that stating that it was an "organization of women" was false (or at least misleading in concealing the crucial and material omission that it admitted men who identify as women). Kappa made these misrepresentations in purposeful or reckless disregard for the truth. The Plaintiffs reasonably relied on Kappas' false statements and misrepresentation and thought that they were joining a sorority for women – meaning it did not admit men.

189.    Had the Plaintiffs known that Fraternity Council was admitting men, they never would have joined Kappa. By joining Kappa, Plaintiffs lost the ability to ever join a different sorority instead.

190.     The Plaintiffs suffered other harm and damage as a result of their reliance on Kappa's material misrepresentations. Plaintiffs had to endure sharing their private intimate living spaces with the male Student. They were pressured to accept him as a sister. Plaintiffs felt humiliated, silenced, and demeaned as a result of the actions of Fraternity Council.

191.     As a result of Defendants' fraudulent conduct, the Defendants are liable to Plaintiffs in an amount equal to the dues paid throughout the term of their memberships and for consequential or other damages resulting from the fraud.

<h2 style="text-align:center">PRAYER FOR RELIEF</h2>

WHEREFORE, Plaintiffs Hannah Holtmeier, Allison Coghan, and Haley Rutsch pray for judgment against Defendants, as follows:

1.     As to Count One of the Complaint, Plaintiffs seek an order entering judgment in their favor, derivatively and on behalf of Kappa Kappa Gamma, and against the Defendants, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 together with (a) an order enjoining Kappa Kappa Gamma from violating KKG's Articles, Bylaws, Standing Rules and (b) an order to expel men from membership until such time as Kappa conducts a vote by the delegates of the membership in accordance with Kappa's Governing Documents, converting Kappa to a co-ed organization.

2.     As to Count Two of the Complaint, Plaintiffs seek an order in their favor, derivatively and on behalf of Kappa Kappa Gamma, (a) removing any members of the Fraternity Council, Directors or Advisors named as a Defendants in this matter, (b) entering judgment against the Defendants, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 and (c) expelling men from membership until such time as Kappa conducts a vote by the delegates of the

membership in accordance with Kappa's Governing Documents, converting Kappa to a co-ed organization.

3.     As to Count Three of the Complaint, Plaintiffs each seek an order entering judgment in their favor, and against Kappa Kappa Gamma in an amount equivalent to the dues they paid during the period in which Kappa violated its Governing Documents and for any consequential or other damages resulting from the breach in an amount exceeding $75,000.

4.     As to Count Four of the Complaint, Plaintiffs each seek an order entering judgment in their favor, and against Kappa Kappa Gamma and/or Fraternity Council, as may be determined by the Court, in an amount equivalent to the dues they paid during the period in which Kappa violated its Governing Documents and for any consequential or other damages, resulting from the fraud in an amount exceeding $75,000.

5.     An award of interest, attorneys' fees, all expenses, costs, and any such other and further legal or equitable relief, including punitive damages, in favor of Plaintiffs as the Court deems just and proper.

> Respectfully submitted,
>
> */s/ John Knepper*
> John Knepper
> Wyoming Bar No. 7-4608
> Law Office of John G. Knepper, LLC
> P.O. Box 1512
> Cheyenne, Wyoming 82003
> 307-632-2842
> John@KnepperLLC.com
>
> */s/ Cassie Craven*
> Cassie Craven
> Wyoming Bar No. 7-5664
> Longhorn Law Limited Liability Company
> 109 E. 17th St., Suite 11
> Cheyenne, Wyoming 82001
> 307-823-3062
> cassie@longhornlawllc.com

A-136

# VERIFICATION

I, Hannah Holtmeier, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____        Signed: /s/ Hannah Holtmeier _____


I, Allison Coghan, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____        Signed: /s/ Allison Coghan _____


I, Haley Rutsch, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____ _        Signed: /s/ Haley Rutsch _____

A-137

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sday@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
        bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, <br><br> Plaintiffs, <br><br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4 <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No.: 23-CV-00051-ABJ |

## DEFENDANTS' MOTION TO DISMISS

**COME NOW**, the Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettelman, Liz Wong, Kyle Donnelly, and Beth Black (collectively, "Defendants") and hereby move this Court for an Order dismissing Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Like the First Amended Complaint, the Second Amended Complaint fails to states a claim upon which the Court can grant relief. As such, the Court should dismiss the Second Amended

Complaint with prejudice.  Defendants submit the accompanying Memorandum of Law in support of this Motion.

Dated: June 26, 2025                          Respectfully submitted,


                                              /s/ *Natalie M. McLaughlin*
                                              Natalie M. McLaughlin (Ohio Bar No. 0082203)*
                                              Brian W. Dressel (Ohio Bar No. 0097163)*
                                              VORYS, SATER, SEYMOUR AND PEASE, LLP
                                              52 East Gay Street
                                              Columbus, OH 43215
                                              Telephone/Facsimile: (614) 464-5452
                                              Email:        nmmclaughlin@vorys.com
                                                            bwdressel@vorys.com
                                              * -Admitted Pro Hac Vice

                                              Stuart R. Day (#6-3081)
                                              WILLIAMS, PORTER, DAY & NEVILLE, P.C.
                                              159 North Wolcott, Suite 400
                                              P.O. Box 10700
                                              Casper, WY 82602-3902
                                              Telephone:    (307) 265-0700
                                              Facsimile:    (307) 266-2306
                                              E-Mail:       sday@wpdn.net

                                              *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 26th day of June, 2025.

Cassie Craven (#7-5664)
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
E-Mail: ccraven.law@gmail.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☐ Email

John G. Knepper (#7-4608)
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
E-Mail: john@knepperllc.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☐ Email

/s/ *Brian W. Dressel*
Brian W. Dressel

A-140

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, <br><br> Plaintiffs, <br><br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4 <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No.: 23-CV-00051-ABJ |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

THIS MATTER having come before the Court upon Defendants' *Motion to Dismiss Second Amended Complaint*, and the Court having reviewed the matter and being otherwise fully advised in the premises, hereby finds that the Second Amended Complaint fails to state a cause of action on which relief can be granted and that the *Motion* should be GRANTED. Therefore;

IT IS HEREBY ORDERED that Defendants' *Motion to Dismiss Second Amended Complaint* is hereby granted.

**DATED** this _____ day of _____, 2025.

_____

Hon. Alan B. Johnson
United States District Court Judge

Stuart R. Day (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:     (307) 265-0700
Facsimile:     (307) 266-2306
E-Mail:        sday@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:     (614) 464-5452
Email:         nmmclaughlin@vorys.com
               bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4 | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................... 1

II.   BACKGROUND ......................................................................................... 2

III.  DISCUSSION ............................................................................................. 3

    A.   Standard of Review.......................................................................... 4

    B.   Plaintiffs are Still Unable to Plausibly Allege a Derivative Claim........................ 5

        1.   Plaintiffs Fail to Allege that They Satisfy the Requirements of
             Rule 23.1 ............................................................................ 6

        2.   Judicial Non-Intervention Principles Dictate Dismissal of the
             Derivative Claims .................................................................. 7

             a.   Ohio Law Defers to Reasonable Interpretations by
                  Voluntary Organizations of Their Own Documents for
                  Breach of Fiduciary Duty Claims .................................... 8

             b.   Kappa's Interpretation of "Women" to Include Trans
                  Women Is Reasonable.................................................. 10

             c.   Deferring to Voluntary Organizations on Matters of
                  Internal Governance at the Pleading Stage Is the Only Way
                  to Maintain a Workable Status Quo for Both Courts and
                  Organizations .......................................................... 12

        3.   The Allegations Relating to the Chapter Membership Decision at
             Wyoming Do Not Support a Shareholder Derivative Claim Against
             Former Fraternity Council ...................................................... 12

        4.   Plaintiffs' Shareholder Derivative Claim for Breach of Fiduciary
             Duty for Ultra Vires Acts Duplicates the Shareholder Derivative
             Claim for Breach of Fiduciary Duty and Should Be Dismissed for
             the Same Reasons ............................................................... 14

        5.   The First Amendment Further Shields Kappa from Litigation over
             Its Own Membership Decisions.................................................. 15

    C.   Plaintiffs' Breach of Contract Claim Against Kappa Fails.................... 16

    B.   Plaintiffs' Fraud-in-the-Inducement Claim Fails............................... 17

    F.   All Dismissals Should Be with Prejudice ....................................... 21

    G.   Plaintiffs Have Failed to Serve or Attempt Service on All Defendants ..... 22

IV.   CONCLUSION............................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................... 4

*Barrash v. American Ass'n of Neurological Surgeons, Inc.*, 2013 U.S. Dist. LEXIS 114605 ..... 10

*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907 (N.D. Ohio Sept. 25, 2023) ........................................... 11

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ........................................... 15

*Brosz v. Fishman*, 99 F. Supp. 3d 776 (S.D. Ohio 2015) ........................................... 9

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999) ........................................... 9

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003) ........................................... 5

*Carr v. Acacia Country Club Co.*, 970 N.E.2d 1075 (Ohio Ct. App. 2012) ........................................... 14

*Elworthy v. First Tenn. Bank*, 391 P.3d 1113 (Wyo. 2017) ........................................... 18

*Finlay v. Duffy*, 94 N.E.2d 466 (Ohio Ct. App. 1950) ........................................... 10

*Flandro v. Salt Lake County Jail*, 53 F. App'x 499 (10th Cir. 2002) ........................................... 5

*Halling v. Yovanovich*, 391 P.3d 611 (Wyo. 2017) ........................................... 17

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) ........................................... 11, 12

*Howard v. Covenant Apostolic Church*, 705 N.E.2d 385 (Ohio Ct. App. 1997) ........................................... 5

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) ........................................... 11

*Levang, et al. v. Kappa Kappa Gamma, et al.*, U.S. District Court for the District of Wyoming, No. 2:24-cv-00267-ABJ ........................................... 7

*Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 216 N.E.3d 1 (Ohio Ct. App. 2023) ........................................... 17

*McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS 257239 (D. Wyo. Mar. 12, 2020) ........................................... 4

*Moore v. Christ's Christian Fellowship Church, Inc.*, 875 N.E.2d 121 (Ohio Ct. App. 2007) ........................................... 5

*Mortgage Elec. Registration Sys. v. Mosley*, 2010-Ohio-2886, 2010 Ohio App. LEXIS 2380 (Ohio Ct. App. 2010) ........................................... 18

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ........................................................ 15

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707 (S.D. Ohio Jul. 28, 2023) ................................ 11

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio Ct. App. 1991) .............. 8

*Qz'Etax v. Ortiz*, 170 F. App'x 551 (10th Cir. 2006) ................................................. 12

*Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822 (S.D. Ohio Jan. 6, 2010) ............................................................................ 8

*Roeber v. Gateway Found.*, No. 19-cv-200 ABJ, 2020 U.S. Dist. LEXIS 164907 (D. Wyo. Aug. 17, 2020) .......................................................................... 20

*Russell v. United Missionary Baptist Church*, 637 N.E.2d 82 (Ohio Ct. App. 1994) .................. 5

*Sandesara v. Peco II, Inc.*, 2010 Ohio Misc. LEXIS 565 (Ohio Ct. Common Pleas. 2010) .......... 6

*Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914 (Ohio Ct. App. Apr. 30, 2001) ........................................................................ 5, 6

*Seale v. Peacock*, 32 F.4th 1011 (10th Cir. 2022) ....................................................... 22

*Siltstone Servs., LLC v. Guernsey Cty. Cmty. Dev. Corp.*, 2020-Ohio-3878 (Ohio Ct. App. 2020) ........................................................................................ 15

*Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175 (Ohio Ct. App. 1989) ........... 9, 10

*Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165 (Ohio Ct. App. 1993) ........................ 9

*Tucker v. Young*, 790 N.E.2d 828, 148 Ohio App.3d 254 (Ohio Ct. App. 2003) ................... 9

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) .................................. 12

*United States v. Price*, 84 F.4th 738 (7th Cir. 2023) ................................................. 12

*Universal Drilling Co., LLC v. R&R Rig Serv., LLC*, 271 P.3d 987 (Wyo. 2012) ................ 18

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166 (Ohio App. 1988) ................................................... 10

*Westenbroek v. Kappa Kappa Gamma*, U.S. Court of Appeals for the Tenth Circuit, No. 23-8065 ........................................................................................ 7

*White v. Pitman*, 156 N.E.3d 1026 (Ohio Ct. App. 2020) ............................................ 19

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) .................................................... 12

*Zalvin v. Ayers*, 157 N.E.3d 256 (Ohio Ct. App. 2020) ............................................... 9

**Statutes**

R.C. § 1702.12(I) ....................................................................................................... 6

R.C. § 1702.12(I)(1)(c) ............................................................................................. 5

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 3

Fed. R. Civ. P. 23.1 ............................................................................................. 6, 7

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 23

## I.    INTRODUCTION

Much has changed in the more than two years since this case was initially filed.  The matter has bounced between this Court and the Tenth Circuit.  Four of the six named Plaintiffs have left the case and a new one has joined.  Each of the current and former Plaintiffs and the former student defendant who attended the University of Wyoming have graduated.  As is done every two years, a new Fraternity Council was elected in June 2024.  Since that election, Mary Pat Rooney, at whom Plaintiffs directed so much of their ire, has not been a member of Council.  Plaintiffs have abandoned their claims against some Defendants and added claims against new Defendants.  A duplicative derivative case was also filed in Ohio against all these same defendants and transferred to this Court.  But, through it all, this remains a case where Plaintiffs seek to have a federal court dictate to a *private organization* how inclusive it can be in *defining its own membership*.  As was the case when Defendants moved to dismiss this case two years ago, Plaintiffs have no legal right to have their sorority's leadership adopt their personal definition of who is and is not a "woman," and it is not the role of the courts to police the membership decisions of private organizations.  As such, the Second Amended Complaint does not cure the deficiencies that led to dismissal of the First Amended Complaint, and it is now clear any further attempts at amendment would be futile.

Moreover, the legal defects in the Second Amended Complaint extend beyond their failure to cure the defects identified in the Court's dismissal of the First Amended Complaint.  Plaintiffs fail to plausibly plead revised contractual claims and seek to maintain claims against unnamed "Jane Doe" defendants and Kappa's former Panhellenic Delegate without alleging any wrongdoing on those individuals' behavior.  For all of these reasons, as explained below, the Court should dismiss the Second Amended Complaint with prejudice as any further attempt at amendment would be futile.

## II.    BACKGROUND

By this point, the Court is familiar with the background of this case.  On March 27, 2023, seven then-current members of the Gamma Omicron chapter of the Kappa Kappa Gamma Fraternity ("Kappa") filed the Complaint alleging a derivative claim, breach-of-contract claim, tortious-interference claim, and direct cause of action against Kappa, Rooney (then Kappa's Fraternity Council President), the Kappa Kappa Gamma Building Co., and a trans woman who had been admitted to the chapter.  (*See* ECF No. 1.)  The initial Plaintiffs sought to proceed anonymously.

After the Court rejected Plaintiffs' attempt to proceed anonymously and motion for reconsideration of that decision, Plaintiffs filed the First Amended Complaint, which asserted functionally identical claims on behalf of six Plaintiffs, Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar, on April 20, 2023. (*See* ECF No. 6.)  The Court granted the Kappa Defendant's Motion to Dismiss on August 25, 2023.  (*See* ECF No. 31.)  Though the dismissal was without prejudice, Plaintiffs appealed the decision to the United States Court of Appeals for the Tenth Circuit.

After oral argument, the Tenth Circuit granted a motion by Defendants to dismiss the appeal for lack of appellate jurisdiction, agreeing that it did not have jurisdiction to consider an appeal of a dismissal without prejudice.  (*See* ECF No. 39.)  On May 9, 2025, this Court ordered Plaintiffs to either file a Second Amended Complaint within 30 days or else have the prior order converted to a dismissal with prejudice.  (ECF No. 57.)  On June 9, 2025, original Plaintiffs Holtmeier and Coghan, along with new Plaintiff Haley Rutsch, filed a Second Amended Complaint against original Defendants Kappa and Rooney and new Defendants Maria Brown, Nancy

Campbell, Barb Goettelman, Liz Wong, Kyle Donnelly, and Beth Black.[1]  Plaintiffs also sued four "Jane Doe" Defendants.  The Second Amended Complaint asserts two derivative claims, one breach-of-contract claim, and one claim for fraud in the inducement to enter a contract.[2]

As discussed below, the Second Amended Complaint does not cure the issues the Court identified in the First Amended Complaint, and it is apparent after Plaintiffs' repeated representations to the Tenth Circuit and two years of litigation that further amendments would be futile.  As such, the Court should dismiss the Second Amended Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## III.  DISCUSSION

Plaintiffs' Second Amended Complaint fails to state any claim on which the Court can grant relief.  Like those that preceded, the Second Amended Complaint depends entirely on the premise that the word "women" can only be defined to include people assigned the female gender at birth and must exclude trans women.  As the Court is already aware, Kappa's governing documents do not so define the term, and Kappa's governing documents explicitly grant Fraternity Council the duty to interpret Kappa's Bylaws.  Furthermore, a federal court entertaining purported

---

[1] Brown and Wong are listed as Vice Presidents and members of the Fraternity Council and Black is listed in the caption as the Panhellenic Delegate, though they have not held these roles since June 29, 2024.  Plaintiffs were aware of these facts.  They attended Kappa's national conference where new Fraternity Council was sworn in, and Plaintiffs' counsel was notified via email on May 2, 2025 that the leadership change had occurred in June 2024.

[2] As is the case with the prior Complaints, the Second Amended Complaint did not specify which claims were asserted against which Defendants, even though it would be legally impossible to assert all claims against all Defendants.  Plaintiffs fail to specifically identify the Defendants to each claim despite the Court's prior order that, in the case of a Second Amended Complaint, Plaintiffs should "highlight the Defendant(s) [they] sue under each count."  (Order, ECF No. 31 at 40.)  Despite inconsistencies in their pleadings that sometimes make it confusing to determine against whom Plaintiffs seek relief, Kappa has endeavored to identify the Defendants for each claim.

derivative claims and ordering a private organization to change its own interpretation of its bylaws and deny admission to members it would otherwise choose to admit oversteps the deference Ohio law affords to private voluntary organizations when they interpret their own bylaws and violates the associational rights of the organization under the First Amendment.  There is also a presumption under Ohio law that Kappa's Fraternity Council acted in good faith in accordance with their fiduciary obligations in interpreting Kappa's bylaws.

Plaintiffs' breach-of-contract claim fails for similar reasons.  Plaintiffs similarly premise the claim on the idea that when Kappa bylaws and other documents use the terms "woman" or "women," they can only refer to cisgender women.  As the Court has already recognized, that is not the case and the breach-of-contract claim fails.  Plaintiffs' final claim, for fraud in the inducement, fails because Plaintiffs have not alleged a false statement by any Defendant or that any Defendant concealed material information.

Finally, Plaintiffs are unable to maintain this action against the unnamed "Jane Doe" Defendants or Defendant Black, who was not a member of Fraternity Council, as Plaintiffs have not alleged claims or wrongdoing against any of them.

A.    **Standard of Review**

In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "should assume [the] veracity" of factual allegations and "then determine whether they plausibly give rise to an entitlement to relief."  *McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS 257239, at *5 (D. Wyo. Mar. 12, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  In making this assessment,

the Court is not bound to accept any legal conclusion or opinion alleged in the complaint as true. *Flandro v. Salt Lake County Jail*, 53 F. App'x 499, 500 (10th Cir. 2002) ("[w]e will accept the complainant's allegations of fact as true, but we will not accept assertions or opinions or conclusions where no facts are alleged to support them").

### B. Plaintiffs are Still Unable to Plausibly Allege a Derivative Claim

The first count of the Second Amended Complaint asserts a claim for breach of fiduciary duty on behalf of Kappa. Though it fails to invoke Ohio Revised Code 1702.12(I),[3] that type of claim can only be advanced under that non-profit shareholder derivative statute and is therefore presumably against the former members of Kappa's Fraternity Council named as Defendants in this case. The second count asserts a near identical claim for "breach of fiduciary duty by ultra vires acts" pursuant to 1702.12(I). It is not apparent what acts independent of the first cause of action constitute the "ultra vires" acts in the second cause of action.

Additionally, the Prayer for Relief in Count One and some of the Prayer for Relief in Count Two nonsensically seek relief not applicable in derivative claims because they seek an order enjoining Kappa from violating its governing documents, requiring removal of individuals who are not Defendants in this case, and expelling men from membership until Kappa conducts a vote by delegate of its membership converting Kappa to a co-ed organization. As those claims are only

---

[3] These claims are very rare. As far as cases Defendants have been able to locate, this Court's 2023 Order was only the sixth decision to issue in a shareholder derivative claim under Ohio Revised Code 1702.12(I)(1)(c), the statute that allows members of a non-profit to sue that organization derivatively. As to the other five cases, one was dismissed against the members because they had no standing, and the other four were dismissed for failing to satisfy the procedural prerequisites for a derivative action. *See Moore v. Christ's Christian Fellowship Church, Inc.*, 875 N.E.2d 121 (Ohio Ct. App. 2007); *Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003); *Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914 (Ohio Ct. App. Apr. 30, 2001); *Howard v. Covenant Apostolic Church*, 705 N.E.2d 385 (Ohio Ct. App. 1997); *Russell v. United Missionary Baptist Church*, 637 N.E.2d 82 (Ohio Ct. App. 1994).

against Fraternity Council, relief against Kappa would be unavailable even if Plaintiffs could prevail on the claims.

      1.      <u>Plaintiffs Fail to Allege that They Satisfy the Requirements of Rule 23.1</u>

Defendants first note that for both these claims under 1702.12(I), Plaintiffs must satisfy the requirements of Ohio Civil Rule 23.1 before they can pursue either claim because Plaintiffs are claiming to advance these claims on behalf of Kappa.  Plaintiffs must: "(1) spell out the efforts made to have [the Fraternity Council] take the action demanded; (2) explain why they failed in this effort or did not make it; and (3) show that they 'fairly and adequately' represent the interests of other shareholders 'similarly situated.'"  *Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914, at \*13-14, 2001 WL 433789 (Ohio Ct. App. 2001).

That Plaintiffs have delayed moving this case forward and that the composition of Fraternity Council changed one year ago becomes an issue on this point.  The Second Amended Complaint contains no evidence of efforts by Plaintiffs to discuss their derivative claims with Kappa's new Fraternity Council.  It also does not indicate why Plaintiffs have chosen to pursue litigation instead of attempting to address their issues internally.  Plaintiffs also do not make any attempt to show why they fairly and adequately represent the interests of other shareholders similarly situated, especially given their delay and chosen strategies, as well as the other pending duplicative litigation.  Ohio law presumes a board's decisions are made in the best interests of the organization and that those decisions are entitled to deference, so the requirements of Civil Rule 23.1 must be met to pursue a shareholder derivative claim or dismissal is warranted.  *See Sandesara v. Peco II, Inc.*, No. CV-720332, 2010 Ohio Misc. LEXIS 565, \*12 (Ohio Ct. Common Pleas 2010).

A-152

2.    Judicial Non-Intervention Principles Dictate Dismissal of the Derivative Claims

Ultimately, the Court can dispose of the two derivative claims on the same grounds upon which it relied to dismiss the derivative claim in the First Amended Complaint: the protection of Kappa's associational rights under the First Amendment and Ohio law's deference to Kappa in interpreting its own governing documents. The Court has already ruled on these issues, and the Second Amended Complaint does not offer a basis for the Court to depart from its prior ruling. Plaintiffs' derivative claims depend on a finding that Kappa's Bylaws and governing documents categorically exclude trans women from membership. In its 2023 Order, however, the Court held that the Bylaws do *not* limit the definition of the term "woman." (*See* Order, ECF No. 31 at 4 ("no bylaw defines 'woman'").) In dismissing the First Amended Complaint, the Court observed that Plaintiffs "cannot point the Court to the bylaw that defines 'woman' the way they wish." (*Id.* at 31.)[4] The Second Amended Complaint does not cure this issue, failing to identify any Bylaw that limits the term "woman" to only those who are cisgender.

The central issue in this case—what does it mean to be a woman—is one of great public interest. It is of no surprise that everyone in this large and diverse organization of over 210,000 individuals does not interpret "women" the same way. But, as it did not when considering whether to dismiss the First Amended Complaint, the Court need not "define 'woman'" to resolve this Motion. (*See id.* at 3.) Rather, the Court only needs to determine whether Kappa has a right to reach its own interpretation of the term as it is used in Kappa's governing documents. Kappa's

---

[4] Prior to the transfer to this Court, the Southern District of Ohio also probed on this issue, ordering the Levang Plaintiffs to file a notice with pin cites noting, "where in the Fraternity's articles of incorporation, bylaws, or rules the term 'women' is defined." (*Levang, et al. v. Kappa Kappa Gamma, et al.*, U.S. District Court for the District of Wyoming, No. 2:24-cv-00267-ABJ, ECF 28 at 2.) The Levang Plaintiffs were unable to provide any such pin cite where "women" is defined. (*Levang, et al. v. Kappa Kappa Gamma, et al.*, U.S. District Court for the District of Wyoming, No. 2:24-cv-00267-ABJ, ECF 31 at 3.)

Fraternity Council are the volunteers elected by the organization's members to serve as the Board and were explicitly given the duty under Kappa's Standing Rules of "[i]interpreting the Fraternity *Bylaws* and *Standing Rules*." (See Order, ECF No. 31 at 32.) Plaintiffs ask this Court to elevate their interpretation above that of Fraternity Council. But this Court must defer to Fraternity Council's interpretation because deference is required by Kappa's governing documents and Ohio law. As the Court has already held, Ohio law protects Kappa's right to interpret its governing documents without being subjected to extensive litigation.

> a.   *Ohio Law Defers to Reasonable Interpretations by Voluntary Organizations of Their Own Documents for Breach of Fiduciary Duty Claims*

Ohio law affords private organizations significant deference when they reasonably interpret their own governing documents. "Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991) (*see also* Order, ECF No. 31 at 26–28). Courts will only disturb a private organization's interpretation of its own bylaws "when there has been some palpable violation of the constitution or laws of the corporation." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at *14 (S.D. Ohio Jan. 6, 2010) (internal citation omitted). Conversely, courts do not serve as arbiters when members are simply arguing that their interpretation of a private organization's bylaws is correct and the organization's is incorrect. *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989).

Courts presume a non-profit organization's directors act in the best interests of the organization. When an aggrieved shareholder brings a derivative action alleging a breach of fiduciary duty, the shareholder must show that the alleged wrongdoers "have acted in bad faith or

without the requisite objectivity," and failure to do so can result in dismissal at the pleading stage. *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (Ohio Ct. App. 2020) (internal citations omitted). In assessing a derivative suit for breach of fiduciary duty, "it is presumed that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (internal citation omitted). "Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud." *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (internal citation omitted); *see also Tucker v. Young*, 790 N.E.2d 828, (Ohio Ct. App. 2003).

Judicial non-intervention in the decisions of a private organization is important because, "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility." *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted). As such, private organizations have the right to interpret their own governing documents:

> The right of a voluntary club or association to interpret its own organic agreements . . . is not inferior to its right to make and adopt them, and an individual, by becoming a member, subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules . . . the requirements for judicial review are more than a mere breach of [an association's] own policies.

*Barrash v. American Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *16 (internal citations omitted).

Allowing the pursuit of a derivative claim based on a challenge to any bylaw interpretation would lead to unending litigation where organizations would need to conduct discovery and litigate

over every interpretation of its bylaws and do so without any sort of deference. And, at the end of the litigation process, courts would be tasked with telling private organizations how to interpret their bylaws in the first instance, thus drastically expanding the rule of the judiciary in the lives of ordinary people. Ohio law precludes this result.

> b.    *Kappa's Interpretation of "Women" to Include Trans Women Is Reasonable*

A voluntary organization's right to interpret and administer its bylaws without direction or interference by the courts remains as sacred as the right to make them. *Stibora*, 577 N.E.2d at 1179. Therefore, "[C]ourts will not assume to act in place of those authorized to interpret the constitution and by-laws of a voluntary association unless those upon whom the duty is placed acted in an ***arbitrary and unreasonable*** manner. This is also true with respect to the determination of all questions of policy and internal management." *Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166, at *17 (Ohio Ct. App. 1988) (finding that the union's construction of its own governing documents was reasonable and court would defer to this interpretation) (citing *Finlay v. Duffy*, 94 N.E.2d 466, 469 (Ohio Ct. App. 1950)) (emphasis added). Plaintiffs' entire case depends on the conclusion that trans women are not women. But this is not a case where the Court needs to make an authoritative statement on that issue. Instead, this Court only needs only to determine if Kappa's interpretation that the term "woman" includes trans women is reasonable and non-arbitrary.

"Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older." *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023). As evidence that Kappa's interpretation of the word "woman" to include trans women is reasonable, the Court can look to courts across the country that have reached the same inclusive definition as Kappa. "A transgender woman ***is a woman*** who was

assigned male at birth." *Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio Sept. 25, 2023) (citation omitted) (emphasis added); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022) ("[t]ransgender men are men; transgender women are women").

One Ohio court recognized that "biological markers that compromise an individual's 'biological sex'" include "*inter alia* their organs, their chromosomes, their hormones, and their gender identity." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707, at *23 (S.D. Ohio Jul. 28, 2023). That court further explained:

> [B]iological sex is not quite as binary as that definition presumes. Instead, the concept of "biological sex" encompasses a multitude of biological components (including gender identity) that often diverge in the same individual; for any given person, some of their biological markers may align with maleness while other markers align with femaleness . . . Sometimes, that divergence manifests in obvious physical ways: for example, in intersex individuals whose reproductive or sexual anatomy [do not] fit into an exclusively male or female (binary) sex classification . . . In others, the divergence in their biological components is still physical, but in less obvious or outwardly apparent ways . . . Simply put, it is not so simple to define "biological sex" as just male or female.

*Id.* at *22–*23 (citations to court decisions and medical literature omitted).

Courts have also routinely referred to trans women using she/her pronouns, implicitly recognizing that trans women are women. *See, e.g., Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (using female pronouns to refer to party who was a transgender woman); *Hecox*, 79 F.4th 1009 (same); *United States v. Price*, 84 F.4th 738 (7th Cir. 2023) (same); *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) (same); *Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (same).

The Court need not conclude that any of these courts made the right decision or have approached trans or gender issues correctly.  *See B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820, at *14 (S.D. W. Va. Jan. 5, 2023) ("I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions").  But, at the very least, these courts demonstrate that it was ***reasonable*** for Kappa to determine that trans women are women.  And, as discussed above, that is enough to merit deference under Ohio law.

> c.    *Deferring to Voluntary Organizations on Matters of Internal Governance at the Pleading Stage Is the Only Way to Maintain a Workable Status Quo for Both Courts and Organizations*

Judicial deference for voluntary organizations is the threshold issue for this Court to rule upon.  Ohio law on non-interference would be rendered relatively toothless unless courts, as this Court did previously, enforce the doctrine at the pleading stage.  Allowing derivative claims by members of voluntary organizations like Kappa to proceed past the pleading stage would paralyze an organization (and that organization's resources) whenever a small portion of its members sought to reshape the internal politics of the organization using the power of the judiciary.  Those matters are best left resolved internally by organizations.

> 3.    <u>The Allegations Relating to the Chapter Membership Decision at Wyoming Do Not Support a Shareholder Derivative Claim Against Former Fraternity Council</u>

Most of the new factual allegations relate to specifics of what Plaintiffs think may have occurred with the voting process that their chapter members conducted.  Defendants dispute those allegations, but will briefly address their irrelevance.  Actions attributed to collegiate members or other unidentified leaders who are not Fraternity Council members cannot serve as a basis for derivative claims against any members of Fraternity Council.  There are no factual allegations of any action or knowledge by Fraternity Council of anything concerning the Gamma Omicron

chapter until *after* the chapter membership selection vote was over and the trans woman was voted in by the chapter.

Plaintiffs further allege that, after the election, the trans woman's membership selection by the chapter was raised with Fraternity Council, and Fraternity Council proceeded with inducting her. Plaintiffs, however, misunderstand Fraternity Council's limited role in membership decisions. Though the Kappa Defendants deny Plaintiffs' allegations concerning the chapter vote, those allegations are ultimately irrelevant to these legal claims. The Bylaws leave membership selection to the chapters, not to Fraternity Council.

> **Section 2(B)(2) Chapter Membership Selection**. Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures.

(Bylaws, ECF No. 6-1 at 10.)

Fraternity Council's role is limited to approving new members for more than 140 Kappa chapters when those members have fulfilled the requirements of initiation under the Bylaws, and there is no contention the student did not here. Even if Fraternity Council had known in advance of alleged irregularities at the chapter level, which Defendants dispute, the membership decision was made by the chapter. Though Plaintiffs may envision a more direct role where Fraternity Council overturns membership decisions with which Plaintiffs disagree, the governing documents do not call for Fraternity Council to do so.[5]

> **Article III - Section 3. Initiation.** A new member, upon fulfilling the requirements for Initiation, shall be initiated and become a member of the Fraternity. Each new initiate shall receive a certification of membership.

---

[5] If any chapter member who did not like their chapter's decision to admit a woman as a member or thought the vote had been unfair could demand Fraternity Council intervention and, if unsuccessful, sue Fraternity Council for failing to prevent initiation, Kappa would be buried in litigation from unhappy members seeking to exclude new members from their chapter of the sorority.

13

A-159

**A.    Requirements for Initiation.**

1.    A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated. In extraordinary cases.  Chapters may petition the Membership Director for an exception to these requirements.

(Bylaws, ECF No. 6-1 at 7.)

Plaintiffs do not make any factual allegation that Fraternity Council engaged in bad faith conduct when it followed the Bylaws to initiate the student for membership after the student was selected and submitted by the chapter and after the student fulfilled the requirements for initiation, nor is there any basis to make such an allegation.

4.    <u>Plaintiffs' Shareholder Derivative Claim for Breach of Fiduciary Duty for Ultra Vires Acts Duplicates the Shareholder Derivative Claim for Breach of Fiduciary Duty and Should Be Dismissed for the Same Reasons</u>

Plaintiffs' second cause of action is for "breach of fiduciary duty for ultra vires acts," pursuant to 1702.12, which is Ohio's non-profit shareholder derivative statute, is necessarily only advanced against Fraternity Council.  *See Carr v. Acacia Country Club Co.*, 970 N.E.2d 1075, 1090 (Ohio Ct. App. 2012) ("the notion of *ultra vires* acts by a corporation does not encompass a corporation's violation of its own regulations or bylaws").  Black's law Dictionary defines ultra vires as "[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law."  *Siltstone Servs., LLC v. Guernsey Cty. Cmty. Dev. Corp.*, No. 2020-Ohio-3878, 2020 Ohio App. LEXIS 2782, at *11 (Ohio Ct. App. 2020).  As another shareholder derivative claim for breach of fiduciary duty, this alleges actions taken in breach of fiduciary duty beyond the scope allowed by the corporate documents.  But Plaintiffs plead no allegations to support this claim.  And, as already noted by this Court, Kappa's Fraternity Council are given the duty of

"[i]nterpreting the Fraternity Bylaws and Standing Rules."  (See Order, ECF No. 31 at 32.)  The reasons stated above apply with equal force to the dismissal of the breach of fiduciary duty for ultra vires acts claim.

        5.      <u>The First Amendment Further Shields Kappa from Litigation over Its Own Membership Decisions</u>

In addition to noting Ohio's policy for deferring to voluntary organizations in terms of their internal governance, this Court dismissed the First Amended Complaint recognizing that it sought to have the Court infringe on Kappa's First Amendment rights.

In the absence of any Bylaw that prohibits Kappa from accepting transgender women as members, Plaintiffs ask the Court to issue an order "expel[ling] men from membership . . ." until Kappa is converted to a co-ed organization."  (Second Am. Compl. at Prayer for Relief, ¶ 1.) Allowing transgender women into membership does not equate to allowing men into membership. But, more to the point, the issue is that Plaintiffs are seeking court action to force Kappa to exclude transgender women from membership, and that would fundamentally alter Kappa's expressive message in violation of the First Amendment.  If this Court ordered Kappa to exclude transgender women, that could implicate the same First Amendment concerns the Supreme Court found when it ruled that the Boy Scouts of America could not be required to include gay scoutmasters.  (Order, ECF No. 31 at 28–31 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)).)[6]

The Second Amended Complaint does not identify any reason for the Court to alter its reasoned analysis of the First Amendment implications of this case.  When it comes to Plaintiffs'

---

[6] In *New York Times v. Sullivan*, 376 U.S. 254 (1964), a civil action arose between private parties and the Alabama court applied the common law in a constitutionally deficient manner that failed to provide the safeguards for freedom of speech the First Amendment requires.  The Supreme Court recognized that even with a lawsuit between private parties a violation can occur when a court takes action because, "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."  *Sullivan*, 376 U.S. at 265.

derivative claims, the Court should stand by its assessment that Kappa's associational rights further support dismissal of this case.

### C.    Plaintiffs' Breach of Contract Claim Against Kappa Fails

Plaintiffs' latest attempt to articulate a breach-of-contract claim also fails.  As previously, Plaintiffs fail to coherently or plausibly state their claim, pleading both that the breach-of-contract claim is based on the idea that the Kappa governing documents constitute a contract between Kappa and its members under Ohio corporate law and that Plaintiffs' individual membership contracts with Kappa were breached.  (*See* Second Am. Compl. at ¶ 180.)  The core allegation seems to be that Plaintiffs agreed to join Kappa, pay dues, and follow Kappa policies in exchange for a promise to provide a sorority environment that included only women, as Plaintiffs define the term.

In the second cause of action in the First Amended Complaint, Plaintiffs asserted a breach of contract claim that appeared to be pled against the Kappa Kappa Gamma Building Co., the entity that operates the Kappa chapter house at the University of Wyoming.  In their response to the Motion to Dismiss, however, Plaintiffs shifted and argued that their claim also addressed "the contract between Kappa and its members under Ohio corporate law."  As a result, the Court has already rejected the breach-of-contract theory Plaintiffs advance in the Second Amended Complaint.  (Order, ECF No. 31 at 33–34.)  The Court found that Plaintiffs had failed to identify contractual language that had been breached.  (*Id.* at 34.)  Further, upon reviewing Kappa's governing documents that Plaintiffs had put before the Court, the Court found that Kappa "undertook no contractual obligation to reject transgender women."  (*Id.*)

Despite this Court's prior ruling, once again, Plaintiffs simply allege that Kappa breached its governing documents.  Indeed, there is inconsistency in what constitutes the "governing

documents" they are intending to reference, as they refer at one point to the Wyoming Chapter bylaws (*see* Second Am. Compl. at ¶ 2) and refer at another point to a constitution (*see id.* at ¶ 180). Regardless, the claim fails because Plaintiffs fail to identify a specific contractual provision that Kappa breached. Both Ohio and Wyoming law require proof that the defendant failed to perform on a promise made in a contract as an element of a breach-of-contract claim. *See Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 216 N.E.3d 1, 4 (Ohio Ct. App. 2023); *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo. 2017). Even though the Court had specifically warned the failure to identify a breached provision as fatal to Plaintiffs' last attempt to sustain a breach-of-contract claim (Order, ECF No. 31 at 34), Plaintiffs make only general allegations of promises made without identifying any specific promise in the governing documents.

Therefore, the Court can dispose of this claim based on its prior reasoning. After having two opportunities to identify *any* term that was breached in any governing document and being unable to do so, it is evident that providing any further attempt to do so would be futile.

### D. Plaintiffs' Fraud-in-the-Inducement Claim Fails

Plaintiffs' final claim is for "fraudulent inducement to enter into the contract." Plaintiffs base this claim on both the "concealing" of the fact that Kappa admits trans women and the purported false statement that Kappa is an organization for women. The claim fails for several reasons. First, nothing about the admission of trans women is inconsistent with Kappa being an organization for women. Second, concealment of a fact cannot give rise to a fraudulent-inducement claim unless there existed a legal duty to disclose the fact. Third, neither Kappa nor

Fraternity Council concealed anything; as Plaintiffs allege elsewhere in the Complaint, Kappa published its interpretation that trans women could join.

Again, Plaintiffs do not specify whether their claim arises under Ohio or Wyoming law. Under Ohio law, a plaintiff succeeds in establishing a fraudulent-inducement claim by proving: "(1) a representation of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with utter disregard and recklessness, as to whether it is true or false, (4) with the intent of misleading another into relying upon the representation, (5) justifiable reliance upon the representation, (6) and a resulting injury proximately caused by the reliance." *Mortgage Elec. Registration Sys. v. Mosley*, 2010-Ohio-2886, 2010 Ohio App. LEXIS 2380, at *20 (Ohio Ct. App. 2010). In Wyoming, a Plaintiff must show "(1) the defendant made a false representation intending to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff suffered damages in relying on the false representation." *Elworthy v. First Tenn. Bank*, 391 P.3d 1113, 1124 (Wyo. 2017).

Like the rest of their claims, Plaintiffs' fraudulent-inducement claim proceeds from the faulty premise that an organization cannot be an organization for women and admit trans women as members. As noted throughout this and prior briefing, there is a divergence of opinion on this, and many, including other members of Kappa, accept and consider trans women to be women. It is Plaintiffs' prerogative to disagree with that viewpoint, but that they joined an organization that sees things differently is not legally actionable. *See Universal Drilling Co., LLC v. R&R Rig Serv., LLC*, 271 P.3d 987, 997 (Wyo. 2012) ("any false representation must relate to a matter of fact rather than of opinion") (citation omitted). It may be a different case if Kappa or any other Defendant had represented that Kappa did *not* admit trans women as members, but neither Kappa

18

A-164

nor any other Defendant has never made any statement to that effect. Kappa has always been an organization for women, and stating as much to Plaintiffs was not a fraudulent misrepresentation.

Kappa and Fraternity Council also did not conceal any material facts from Plaintiffs. Concealment can only form the basis of a fraudulent-inducement claim when there is a duty to disclose the fact concealed. *See White v. Pitman*, 156 N.E.3d 1026, 1033 (Ohio Ct. App. 2020). Plaintiffs have not identified any legal duty Kappa or the Fraternity Council had to make a disclosure to Plaintiffs that Kappa's policy allowed for admission of trans women as members. But even more crucially, the Second Amended Complaint concedes the policy was not concealed. As Plaintiffs allege, Kappa issued a position statement in 2021 and a guide in 2018 that both provided trans women could be accepted as members. (Second Am. Compl. at ¶¶ 131–37.) If Plaintiffs were as concerned about the possibility of joining the same sorority as a trans woman as they now purport to be, they should have researched to determine which sororities share their viewpoint by reviewing sororities' publicly available statements.[7] Their failure to do so is not fraudulent concealment by Kappa.

### E.    The Court Should Dismiss Claims Against the "Jane Doe" Defendants and Defendant Black

In addition to the named Defendants, Plaintiffs also sue four "Jane Doe" defendants in the Second Amended Complaint. Plaintiffs describe these Jane Does as "national, regional or district level advisors and/or directors or employees who acted in concert with Fraternity Council" with regard to the admission of a trans woman as a Kappa member at the University of Wyoming. (*Id.* at ¶ 10.) Plaintiffs' allegations as to these Jane Doe Defendants never get more specific than that.

As this Court has previously recognized, naming a Jane or John Doe defendant without factual allegations "does not rise to the level of pleading required to put a party on notice as to

---

[7] None of the 26 NPC sororities share Plaintiffs' viewpoint.

what actions they are alleged to have committed and against which they are expected to defend." *Roeber v. Gateway Found.*, No. 19-cv-200 ABJ, 2020 U.S. Dist. LEXIS 164907, at *31–32 (D. Wyo. Aug. 17, 2020). This failure warrants dismissal under Federal Rule of Civil Procedure 8(a)(2). *Id.* at *32.

Plaintiffs compound their failure to adequately state claims against the Jane Doe Defendants by not naming the Defendants at issue for each claim. None of the Jane Does are identified for *any* claim by name (no "Jane Doe" is alleged), title, or description. Indeed, as Plaintiffs plead their claims, the Jane Doe Defendants could not be a party to any claims. The shareholder derivative claims are only advanced against Fraternity Council members, the breach of contract claim is only advanced against Kappa, and the fraudulent inducement claim is only advanced against Kappa and Fraternity Council. Furthermore, for the breach of contract claim and fraudulent inducement claim, Plaintiffs do not allege any contract with a Jane Doe Defendant and the only actions alleged by the Jane Doe Defendants occurred *after* Plaintiffs joined Kappa, so they could not have breached a contract with Plaintiffs or fraudulently induced Plaintiffs to join Kappa. Indeed, there are only two allegations in the Second Amended Complaint referencing the "Jane Does." (Second Am. Compl. at ¶¶ 10, 153.) That does not remotely satisfy the pleading standard against any of the "Jane Does."

Additionally, Defendant Black was not a member of Fraternity Council, serving only as the Panhellenic Delegate. "The members of Fraternity Council shall be the officers of the Fraternity: The President, the four Vice Presidents, and the Treasurer." (Bylaws, ECF No. 6-1 at 18.) There is no allegation against the Panhellenic Delegate or against Black specifically and therefore, no basis for any claim against her.

For these additional reasons, the Court should dismiss the Jane Doe Defendants and Defendant Black from this case.

### F.    All Dismissals Should Be with Prejudice

The Second Amended Complaint is Plaintiffs' second substantive attempt to maintain these claims.  The Court declined to issue its prior dismissal with prejudice, giving Plaintiffs the opportunity to amend their Complaint.  Plaintiffs instead appealed, and represented to the Tenth Circuit that they had no way to cure the flaws the Court found in the First Amended Complaint.

In Plaintiff's Response to Defendants' Motion to Dismiss Plaintiffs' Appeal, Plaintiffs represented to the Tenth Circuit: "Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint through an amendment; the opinion below makes this plain." (*See* Kappa's Memorandum in Support of Motion to Set Deadline, ECF 47, Attachment B, pp. 5-6).  They told the Tenth Circuit that any amendment would be a "futile endeavor because "no amendment could cure the legal grounds for dismissal on which the district court relied." (*Id.* at p. 9).  In Plaintiffs' Appellate Brief to the Tenth Circuit, they again informed the Tenth Circuit:

> Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint through an amendment because the district court's decision was based on "a matter going to the merits of appellant's complaint itself rather than a procedural problem which amendment of a complaint might rectify."

(ECF 47, Attachment C, pp. 13-14 (citations omitted).)

And at oral argument to the Tenth Circuit, Plaintiffs explained to the Tenth Circuit why amendment of their complaint would be futile:

> We could follow that footnote and write it better.  The problem is, we couldn't write it to get around the determination on the merits. So, we could write it cleaner and prettier and nicer.  Just not to fix the problem that exists here.  And so, that's what I really want to address, is what is that merits determination that we really can't get around?  And here, the District Court, instead of assessing the

> elements of a breach of fiduciary duty claim, said that he was unable
> to review that claim because of non – inner – noninterference
> principles.

(ECF 47, Attachment D, p. 11 (emphasis added).)

Plaintiffs' Second Amended Complaint demonstrates the truth of Plaintiffs' numerous representations to the Tenth Circuit. Plaintiffs are unable to plead any actionable claim to get around this Court's prior decision, and the Court should now be satisfied that any further attempts at amendment would be futile and dismiss all claims with prejudice. *See Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022).

### G.    Plaintiffs Have Failed to Serve or Attempt Service on All Defendants

By this Motion, Defendants do not waive any defenses, including for failure to serve. Although Kappa and Rooney were Defendants in the First Amended Complaint, the remaining named Defendants were not. It does not appear that Plaintiffs have served or made any attempt to serve Defendants Brown, Campbell, Goettelman, Wong, Donnelly, or Black.

## IV.    CONCLUSION

The Kappa Defendants want to move Kappa forward and end this litigation. There is much good the organization and its Fraternity Council seek to do, and Plaintiffs' dragging out this litigation for over two years has not advanced the interests of any party. Every current and former individual student party has graduated and leadership has changed. In two years, Plaintiffs had their claims dismissed, advanced an appeal that had no jurisdictional basis, sat on the case for almost an entire year after the appellate court dismissed their appeal before filing the Second Amended Complaint, and now seek to advance claims that mostly rehash the claims that were dismissed. Plaintiffs have no legal claims, only disagreements. In an organization this large, that is to be expected. There are, however, much better ways of resolving disagreements than

continuously pursuing baseless litigation.  Defendants respectfully submit that the time has come

for the Court to put an end to Plaintiffs' attempts to use this Court to advance their preferred social

agenda within a private organization of more than 210,000 members.  For the foregoing reasons,

the Court should dismiss the Second Amended Complaint, with prejudice.

Dated: June 26, 2025                              Respectfully submitted,

                                                  /s/ *Natalie M. McLaughlin*
                                                  Natalie M. McLaughlin (Ohio Bar No. 0082203)*
                                                  Brian W. Dressel (Ohio Bar No. 0097163)*
                                                  VORYS, SATER, SEYMOUR AND PEASE LLP
                                                  52 East Gay Street
                                                  Columbus, OH 43215
                                                  Telephone/Facsimile: (614) 464-5452
                                                  Email:        nmmclaughlin@vorys.com
                                                                bwdressel@vorys.com
                                                  * -*Admitted Pro Hac Vice*

                                                  Stuart R. Day (#6-3081)
                                                  WILLIAMS, PORTER, DAY & NEVILLE, P.C.
                                                  159 North Wolcott, Suite 400
                                                  P.O. Box 10700
                                                  Casper, WY 82602-3902
                                                  Telephone:    (307) 265-0700
                                                  Facsimile:    (307) 266-2306
                                                  E-Mail:       sday@wpdn.net

                                                  *Attorneys for Defendants*

A-169

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 26th day of June, 2025.

| | |
|---|---|
| Cassie Craven (#7-5664) | ☒ CM/ECF Electronic Transmission |
| LONGHORN LAW LLC | ☐ U.S. Mail (Postage Prepaid) |
| 109 East 17th Street, Suite 223 | ☐ Fax |
| Cheyenne, WY 82001 | ☐ Overnight Delivery |
| Telephone: (307) 823-3062 | ☐ Hand Delivery |
| E-Mail: ccraven.law@gmail.com | ☐ Email |
| | |
| John G. Knepper (#7-4608) | ☒ CM/ECF Electronic Transmission |
| LAW OFFICE OF JOHN G. KNEPPER, LLC | ☐ U.S. Mail (Postage Prepaid) |
| P.O. Box 1512 | ☐ Fax |
| Cheyenne, WY 82003 | ☐ Overnight Delivery |
| Telephone: (307) 632-2842 | ☐ Hand Delivery |
| E-Mail: john@knepperllc.com | ☐ Email |

*/s/ Brian W. Dressel*
Brian W. Dressel

A-170

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

HANNAH HOLTMEIER, ALLISON COGHAN,    )
and HALEY RUTSCH, on behalf of themselves    )
and derivatively on behalf of KAPPA KAPPA    )
GAMMA FRATERNITY,    )
                                              )

      Plaintiffs,    )
                                              )

v.    )           Civil Action No.: 23-CV-00051-ABJ
                                              )

KAPPA KAPPA GAMMA FRATERNITY,    )
MARY PAT ROONEY, MARIA BROWN,    )
NANCY CAMPBELL, BARB GOETTELMAN,    )
LIZ WONG, KYLE DONNELLY, BETH BLACK,    )
and JANE DOES 1-4    )
                                              )

      Defendants.    )

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS

Plaintiffs Hannah Holtmeier, Allison Coghan, and Haley Rutsch, on behalf of themselves and derivatively on behalf of Kappa Kappa Gamma Fraternity, respectfully oppose Defendants' Motion to Dismiss the Second Amended Complaint.

## I.      INTRODUCTION

As the Court knows, Plaintiffs brought their lawsuit against Kappa Kappa Gamma more than two years ago to prevent the Fraternity's leadership from improperly circumventing the corporation's governing documents to transition the Fraternity away from its 150-year history as a single-sex organization to a co-ed organization.

In this Second Amended Complaint, Plaintiffs do not ask the Court to define what a woman is. Rather, as is expected under Ohio law, Plaintiffs ask this Court to resolve a dispute between the parties about how *Kappa and its members* defined the term "woman" when it was adopted as part of the Fraternity's Articles of Incorporation, Bylaws, and Standing Rules ("Governing

Documents"). Plaintiffs contend that when these documents were adopted, this word referred to an individual's biological sex, not gender identity, and Kappa's Fraternity Council is unlawfully ignoring the requirements of Kappa's corporate documents. In Ohio, as in Wyoming, articles of incorporation and corporate bylaws are a contract between the association and its members. The usual rules of contract interpretation apply, and when parties to a contract disagree about the meaning of a specific term, a court steps in to determine what definition the parties intended. If a term is ambiguous, then the Court looks to extrinsic evidence at the time the contract was adopted. Plaintiffs allege that—whatever rules of interpretation are applied—Kappa's governing documents have always and only used the term "woman" to refer to biological women. *See*, *e.g.*, Second Amended Complaint ¶ 22, ECF 65 at 7.

Plaintiffs do not ask this Court to hold that Kappa cannot, in its Governing Documents, define "woman" using whatever definition the organization desires. Kappa is free to alter its Governing Documents, including to adopt a different definition of the term "woman," but in doing so, Kappa must follow its own rules, comply with relevant law, and act in good faith and in the best interests of the organization. Kappa's Governing Documents include specific requirements that set forth how amendments must be presented to, and approved by, the full body of Kappa members. The Second Amended Complaint alleges that Defendants intentionally and willfully failed to follow these requirements and asks whether, and to what extent, the directors of an Ohio nonprofit corporation can disregard more than a century of tradition and—claiming that they have unilaterally re-interpreted the meaning of a long agreed-upon term—fundamentally alter an organization's articles of incorporation and bylaws without disclosing the change to the membership and without following the approval process set forth by the organization's governing documents.

Defendants argue that the Ohio courts' internal affairs rule, also called the noninterference rule, gives authority to Kappa's Fraternity Council to make this change and avoid the amendment process. Defendants believe that so long as their interpretation of a term is reasonable, then members have no recourse to the courts. Defendants misstate the scope and limitations of this doctrine. Ohio courts have never held the internal affairs rule allows the legislative re-interpretation that Defendants seek (a concept that harkens to the recently overruled concept of *Chevron* deference). Ohio's internal affairs doctrine protects only the quasi-judicial adjudications of voluntary membership organizations. The broader rule urged by Defendants, but not ever adopted by Ohio courts, would undermine the bargain at the heart of corporate law: articles of incorporation and bylaws are a contract between shareholders and those selected to lead the corporation. The internal affairs rule does not allow Kappa's governing body to avoid the procedural requirements of the organization's governing documents and supply new interpretations of terms when it chooses.

Plaintiffs' Second Amended Complaint has thoroughly pleaded factual allegations supporting both the derivative and direct claims in this case, and, therefore, has met the standards necessary to overcome a motion to dismiss.

## II.    FACTUAL BACKGROUND

Plaintiffs seek to hold Kappa's directors, individuals comprising the Fraternity Council, and others within the fraternity's leadership, accountable for their intentional violation of the corporation's governing documents. Specifically, Plaintiffs allege that the Fraternity leadership defendants—in pursuit of their own personal political and social agenda—violated the corporation's bylaws by unilaterally adding a new category of members (biological males), (ECF 65, ¶¶ 39-76); that they manipulated the membership elections at the Gamma Omicron Chapter in

order to secure the membership of a biological male student who identified as a woman, (ECF 65, ¶¶ 77-106); and that the organization's leadership intentionally hid this momentous change from the membership while continuing to solicit new student members on the representation that the organization was and remains a *single-sex*[1] organization. (ECF 65, ¶¶ 35-36, 149- 151, 186-188).

Several times, Kappa has pointed to various documents from its website as evidence that the organization has expanded its membership criteria to include "women ***and*** individuals who identify as women." (ECF 65, ¶¶ 131-132) None of these documents, however, have ever been approved through the rigorous process that Kappa requires before making changes to its Governing Documents. By their own terms, these documents may be amended only by a two-thirds majority vote of the membership. Moreover, at no time did Fraternity Council disclose to its membership or to prospective members that these documents altered the agreed-upon meaning of Kappa's Governing Documents. Fraternity Council worked to violate Kappa's membership criteria and take Kappa away from its mission and purpose, yet it continued to promote the organization to new members as an organization that supports and unites women and continued to receive the protections of Title IX. (*Id.* at ¶¶ 138-140.) Since the Governing Documents were never modified or amended to reflect the new category of members, and Fraternity Council never provided its "interpretation" of the term "woman" for a vote, members were left to believe that the various online statements did not upend membership criteria. (*Id.* at ¶ 59.) Members were entirely unaware that the Fraternity Council intended these documents to redefine the agreed-upon meaning of terms within Kappa's Governing Documents without seeking the required approval. (*Id.* at ¶ 60.)

---

[1] *See* ECF 65, Second Amended Complaint at ¶ 138. For consistency, terms defined in the Second Amended Complaint will have the same meaning here.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), Plaintiffs need not prove their case at the pleading stage. A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the sufficiency of the complaint. Thus, all well-pleaded allegations in the...complaint are accepted as true and viewed in the light most favorable to the nonmoving party.'" *Moffett v. Halliburton Energy Services, Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege that "enough factual matter, taken as true, [makes] his 'claim to relief...plausible on its face.'" *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] factual content [ ] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Am. Hallmark Ins. Co. of Texas v. Ctr. St. Real Estate, LLC*, 2012 WL 13024403, *3 (D. Wyo. June 21, 2012). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III. ARGUMENT

### A. As this Court Previously Found, Plaintiffs Have Satisfied Rule 23.1's Requirements.

Rule 23.1 of both the Ohio and Federal Rules of Civil Procedure require a plaintiff's complaint in a derivative action to state with particularity the plaintiff's effort to obtain the desired action from the directors and, if necessary, from the shareholders or members; and the reasons for either not obtaining the action or not making the effort. Ohio R. Civ. P. 23.1; Fed. R. Civ. P. 23.1(b)(3)(a).[2] Here, Plaintiffs not only made a pre-suit demand, but they have also demonstrated

---

[2] This Court has acknowledged that Ohio Civil Rule 23.1 applies to Plaintiffs' derivative claims here. (ECF 31 at 23).

that further demands to Defendants are futile.

Before initiating this lawsuit, Plaintiffs, some of their parents, the parents of other Kappa members, and Plaintiff's counsel made demands to Fraternity Counsel to comply with Kappa's governing documents and prevent the admission of a biological male to membership. (ECF 65, ¶¶ 124-125; ECF 6-1, Attachment 11, Correspondence dated November 4, 2022, at 122.) Kappa and its Fraternity Council flatly rejected these demands.[3] (ECF 65, ¶¶ 126-127.) This Court acknowledged futility in its earlier opinion. (ECF 31 at 25).

The allegations in the Second Amended Complaint further demonstrate the futility of these demands. Futility exists "where the directors are antagonistic, adversely interested, or involved in the transactions attacked." *Robinson Family Trust v. Greig,* 2013 WL 1943330, Case No. 5:12 CV1713 (N.D. Ohio May 10, 2013). Plaintiffs can demonstrate futility by pleading facts that show a corporate board of directors was dominated in its decision making by one or more members who opposed the actions desired by the plaintiff. *In re Lubrizol S'holders Litig.,* 2017-Ohio-622, ¶ 46, 79 N.E.3d 579, 588. One such instance where a demand is excused as futile is when all directors are named as wrongdoers and defendants in a suit. *Carlson v. Rabkin*, 789 N.E.2d 1122,1128-29, 2003 -Ohio- 2071 (Ohio App. 2003).

As this Court already held, to characterize Fraternity Council as antagonistic or adversely interested or involved in the transactions here would be an understatement. The Fraternity Council has insisted that, under their new interpretation of the governing documents, the term woman is not limited to those "biologically born as female." (ECF 65, ¶¶ 127-128). Since the original filings

---

[3] Plaintiffs renewed their demands by letter from undersigned counsel dated June 6, 2025. Kappa received the demand and responded on July 8, 2025, denying the requested relief.

in this action, Fraternity Council has followed up to enforce its views by punishing members for their participation in this litigation. (*Id.* at ¶¶ 115-122, 138-140). Kappa continues to disregard case law and Executive Orders that hold their new understanding of the term "woman" is not only contrary to law but also jeopardizes Kappa's claimed Title IX exemption. Kappa's conduct has resulted in an investigation of the University of Wyoming by the Office of Civil Rights at the U.S. Department of Education. *Id.* The Fraternity Council's persistence in defying Kappa's governing documents despite the clear and undisputed harm to the Fraternity demonstrates that the Board members have no intention of considering Plaintiffs' demand.

**B.    The Internal Affairs Rule Applied by the Ohio Courts Does Not Bar Plaintiffs' Claims.**

**1. Ohio Courts Apply the Internal Affairs Rule to Quasi-judicial Actions Only.**

In Ohio, the internal affairs rule, also called the noninterference rule, holds that courts "will not interfere with the quasi-judicial decisions of voluntary associations unless such decisions are alleged and shown to be the result of fraud, arbitrariness, or collusion." *Lough v. Varsity Bowl, Inc.*, 241 N.E. 61, 62 (Ohio Sup. Ct. 1968). Defendants' recitation of this rule omits this "quasi-judicial" qualification, making it seem that Ohio courts permit the governing body of an organization to reinterpret any provision in the governing documents so long as that interpretation is reasonable. (ECF 67 at 10).

Every case cited by Defendants—indeed every Ohio case that has ever relied on the noninterference rule—relates to a quasi-judicial determination, typically in the area of member discipline or expulsion. For example, in *Putka v. First Catholic Slovak Union*, the plaintiff challenged his expulsion from the organization, arguing he had been denied due process. 600 N.E.2d 797, 802 (Ohio Ct. App. 1991). The court, relying on the organization's bylaws, held that

Mr. Putka had received all process due to him. *Id*. The case did not involve an organization adopting a significant new, prospective rule through an interpretation of the bylaws, but rather actions by the board to enforce their bylaws as written and discipline a member for violating them. Likewise, *Redden v. Alpha Kappa Alpha Sorority* involved a quasi-judicial investigation into an officer that ended with the officer's expulsion. Again, the challenge related to due process for that specific member's expulsion, not contractual interpretation. 2010 WL 107015 (S.D. Ohio Jan. 6, 2010).

And in *Stibora v. Greater Cleveland Bowling Ass'n*, the plaintiff challenged his disciplinary suspension relating to the application of lane dressing (*i.e.,* oil) to bowling lanes. 63 Ohio App.3d 107 (Ohio Ct. App. 1989). Stibora argued that his interpretation of the lane dressing rules was the correct one and the association was in error, making "bare allegations in conclusory fashion" to challenge the suspension of his membership. The *Stibora* court, in reaching its decision, did not opine on the meaning of the lane dressing rules. Rather, the court looked to an Indiana decision which similarly roots the noninterference rule in an organization's interests in "questions of discipline, or internal policy and management":

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Id. (citing State ex rel. Givens, v. Superior Court of Marion Cnty.*, 117 N.E.2d 553, 555 (Ind. 1954). This understanding of the internal affairs rule—and its limitation to quasi-judicial determinations—comes directly from *Lough*, the 1968 case wherein the Ohio Supreme Court sets forth the doctrine. *Lough* reviewed an adjudication about who won a bowling competition and

8

specifically held that this rule applies to a voluntary organization's "quasi-judicial decisions." *Lough*, 243 N.E.2d at 63.

All of the cases in Ohio, including the Ohio Supreme Court's most recent decision, arise in the context of quasi-judicial actions by voluntary organizations. *See Ohio High School Athletic Assn. v. Ruehlman*, 2019-Ohio-2845, ¶ 34, (O'Connor, C.J., dissenting). Indeed, in a case decided just last month, Ohio's Fifth District Court of Appeals, citing *Putka*, explained that to the extent that courts defer to a voluntary organization's interpretation under this doctrine, it is in the context of due process claims relating "disciplinary actions taken by voluntary organizations." *Rutkowski v. United States Practical Shooting Ass'n*, 2025-Ohio-2182, ¶ 15-19 (5th Dist.).[4]

Here, Plaintiffs' derivative claims are not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process. Rather, Plaintiffs allege, with particularity, the requirements for a derivative suit and how they meet those requirements. (See e.g., ECF 65, ¶ 158-160, 171-178) Plaintiffs state that the Governing Documents of Kappa have always "limited membership to women only," and Defendants have not only refused to enforce this requirement, but they have disregarded the governing documents that set forth this requirement, resulting in the sorority losing its identity as an organization for women. (*Id*. at ¶¶ 156, 166, 168). In doing so, Defendants acted in bad faith. (*Id*. at ¶ 163).

In their Motion to Dismiss, Defendants argue for more than application of Ohio's internal affairs rule. They ask this Court to extend the Ohio rule in a manner that undoes the contractual bargain at the heart of corporate law. Under Ohio law, "[c]onstitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its

---

[4] Notably, the *Rukowski* court held that the plaintiff's allegations of bad faith conduct by the organization were sufficient to exempt his case from application of the internal affairs rule.

members." *Ulliman v. Ohio High School Athletic Assn.*, 2009-Ohio-3756, ¶¶ 50-51 (2nd Dist.) (citing *Int'l Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki* (2000), 139 Ohio App.3d 641, 646, 745 N.E.2d 449, and *Ahmed v. Univ. Hosps. Health Care Sys., Inc.* (Apr. 18, 2002), Cuyahoga App. No. 79016, 2002 WL 664026, at * 6, and fn. 11; *Rose v. Giamatti*, 1989 WL 111386, *5 (Ohio Com.Pl. June 19, 1989). When the members and the association disagree, Ohio courts regularly provide declaratory relief that interprets the corporate documents using the rules of contract interpretation. *See, e.g., Keltz v. Enchanted Hills Community Assn.,*, 2014-Ohio-866, ¶ 20 (4th Dist.) (issuing declaratory judgment preventing community association from exercising powers beyond those conferred to it in declarations); *Singh v. Guru Gobind Singh Sikh Soc. of Cleveland*, 2014-Ohio-4844, ¶ 22 (8th Dist.) (granting declaratory judgment interpreting organization's procedures for amending bylaws).

No Ohio court has ever recognized an organization's ability to make a legislative policy change to its governing documents through interpretation, and there is no reason for this Court to extend the internal affairs doctrine beyond the quasi-judicial situations in which Ohio courts have applied it. If this were the case, the voting and amendment procedures set forth in articles of incorporation would be superfluous, if not altogether a fraud upon organization members. For example, in *Buchanan v. Shack*, Ohio's Second District Court of Appeals recited the internal affairs rule and its exceptions, but made clear that any decision must still follow the separate requirements of the corporation's own governing documents:

> In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by such association ***in accord with its own charter and rules*** made by the governing body must be accepted by courts of law.

*Buchanan v. Shack*, 1995 WL 386938, *2 (2nd Dist. June 28, 1995) (*emphasis added*). Similarly, the Ohio Seventh District Court of Appeals has noted that where a voluntary organization "is

governed by a constitution and by-laws, [it] cannot visit punishment upon a member for any acts or conduct which were not violative of the constitution and by-laws at the time that such acts were committed." *Armstrong v. Duffy*, 103 N.E.2d 760, 766, (7th Dist. 1951). Ohio's Fourth District Court of Appeals, in the context of a due process complaint over member expulsion, treated the organization's compliance with its own constitution and bylaws as a necessary component of due process:

> A member of a private association may not be expelled without due process. This right is derived not from the constitution but rather from a theory of "Natural Justice." Due process in this respect is comprised of three basic elements: (1) absence of bad faith, (2) compliance with the constitution and bylaws of the association, and (3) natural justice."

*Browning v. Fraternal Order of Eagles, Ironton Aerie No. 895*, 1986 WL 9644, *1 (4th Dist. Aug. 22, 1986) (internal citations omitted). Again, these are disciplinary cases and highlight the factual context in which Ohio courts apply the internal affairs rule.

What Defendants promote in this Court is a vision of corporate law that is dangerous and new. Defendants promote a theory akin to the approach that prevailed for decades under *Chevron*: any interpretation of an ambiguous term by corporate leadership is reasonable, no matter what the original understanding might have been. But corporate law is based in contract, and the meaning of governing documents must be defined as *intended* by the parties. To the extent one finds ambiguity in a contract, the court must look more carefully, drawing in extrinsic evidence to resolve a question of fact. There is no place for the court simply to defer to one party or another before a factual inquiry investigation has even taken place.

**2. Plaintiffs Have Properly Alleged that Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior.**

Even assuming that Ohio's internal affairs rule does apply to the Plaintiffs' complaint, the allegations in the Second Amended Complaint fall within that rule's recognized exceptions. The internal affairs rule does not provide absolute immunity for the interpretations of an organization's directors. As *Lough* made clear, directors may not avail themselves of the internal affairs rule when the decisions "are alleged and shown to be the result of fraud, arbitrariness, or collusion." *Lough*, 243 N.E. at 62. Nor can directors rely on the rule when they act outside their authority. *See Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015 at *5 (N.D. Ohio Jan. 6, 2010)(citing *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074 (11th Dist. Ct. App. 1978).

Before giving deference to an interpretation under the internal affairs rule, the court must make (1) a factual determination regarding the absence of bad faith, (2) a legal review and construction of the associations' constitution and bylaws, and (3) a substantive due process inquiry into the fundamental fairness of the action or proceeding. Again, this approach reflects that a voluntary organization's governing documents are contracts. *BCI v. DeRycke*, 2003-Ohio-6321, ¶ 10 (9th Dist.); *Mace v. Carpenters & Joiners of America*, 1933 WL 2348, *14 (July 12, 1933) ("When one joins a voluntary organization such as the United Brotherhood, he agrees to be governed by its Constitution and rules as in the nature of a contract"). This means that courts review the association's governing documents de novo. *See BCI at* ¶ 10 ("[B]ecause the Code is

a contract between BCI and its shareholders, "the interpretation and construction of [it] is a matter of law, reserved to the court." )[5]

As a non-profit corporation incorporated in Ohio, Kappa has an obligation under Ohio law to comply with its Articles of Incorporation, Bylaws, and Standing Rules, all of which are contracts that limit membership to women. Ohio law grants shareholders in a non-profit organization the right to bring a derivative action to challenge actions taken by a board of directors that violate an organization's bylaws and governing directives. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127. That is because corporate board members who disregard or otherwise seek to circumvent a corporation's governing documents necessarily violate their duty of loyalty, duty of care, and duty of obedience (also called the duty of compliance). *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c).

Plaintiffs have alleged that the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was single-sex organization while cutting procedural corners and eligibility requirements in order to initiate a biological male into the organization. This is sufficient to withstand a motion to dismiss under Rule 12(b)(6). Simply put, the internal affairs rule does not, as Defendants argue, allow voluntary organizations to ignore the written rules they have made and allow directors to govern by whim.

### 3. Kappa's Governing Documents are Contracts and the Standard Rules of Contractual Interpretation Apply in this Litigation.

In Ohio, "[c]onstitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members." *Ulliman v. Ohio High School*

---

[5] These limitations respect that contractual obligations imposed by an organization's governing documents and the fiduciary duty that directors owe to the organization.

*Athletic Assn.*, 2009-Ohio-3756, ¶¶ 50-51. "The construction of contracts is a matter of law." *Jurenovich v. Trumbull Mem. Hosp.*, 2020-Ohio-2667, ¶¶ 12-13 (11th Dist.) (citing *Cent. Funding, Inc. v. CompuServe Interactive Servs.*, 10th Dist. No. 02AP-972, 2003-Ohio-5037, 2003 WL 22177226, ¶ 42, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus.). The court's principal objective in construing a contract "is to ascertain and give effect to the intent of the parties." *Id.* (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898 (1999)). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio Sup. Ct. 1987), paragraph one of the syllabus.). The Ohio Supreme Court has held that "[i]n interpreting a provision in a written contract, the words used should be read in context and given their usual and ordinary meaning." *Carroll Weir Funeral Home v. Miller,* 2 Ohio St.2d 189, 192, 207 N.E.2d 747, 749 (1965); *see also Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶ 10 (Courts should give the "words or terms in an agreement their plain and ordinary meaning unless such a reading results in a manifestly absurd outcome or if there is clear evidence of a different meaning upon reviewing the entire agreement. * * *." )

When conducting that de novo review, the courts' "primary role is to give effect to the intent of the parties," and they "presume that the intent of the parties to a contract is within the language used in the written instrument." *Id.* at 88. If the court can determine the parties' intent from the plain language of the agreement, "there is no need to interpret the contract." *Id.* A court will not go beyond the agreement itself to interpret the intent of the parties unless the language used is unclear and ambiguous. *Blosser v. Enderlin*, 148 N.E. 393, paragraph two of the syllabus (Ohio Ct. App. 1925); *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio Sup. Ct.

1992). And in determining whether a contract's terms are ambiguous, courts will give "common words appearing in a written instrument…their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Shifrin*, 597 N.E.2d at 501-02.

While times may have changed, the word "woman" in its plain and ordinary usage—the usage understood for 150 years—is still a biological female. *See*, *e.g.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/woman (defining "woman" as "an adult female person"). Plaintiffs, relying on Kappa's history, have alleged that all parties to this contract have always, as a factual matter, intended this term to mean biological women only. (ECF 65, ¶ 22). Indeed, in the context of a sorority intended to be a single-sex organization that lives together, reading woman to mean a biological female makes abundant sense. Kappa is, of course, free to amend its Governing Documents to expand membership to whomever it wants, provided it follows its own rules for the presentation of the proposed amendment and the voting procedures set forth in those documents. Kappa, however, has not done so.

Defendants argue their interpretation of "woman" is reasonable, but this is not the question before the Court. The meaning of "woman" to be determined by this Court is the meaning that Kappa's leadership and members intended the term to have when they drafted and ratified the Governing Documents. The Complaint alleges that Plaintiffs, like generations of Kappas before them, understood the term "woman" in their Articles of Incorporation and Bylaws (again, these are contracts) to mean biological females only. (ECF 65, ¶¶ 22-24) Defendants here put the cart before the horse. They wanted to change the Bylaws, and to avoid losing a vote to admit men who identified as women, they made the change anyway in a policy statement that had no force in the organization. Then, when members reacted to what Defendants had done, they claimed they were

interpreting an "ambiguous" term that was never before ambiguous and *THE* term that defines the organization. These allegations meet the definition of arbitrary, capricious and fraudulent actions.

Moreover, Defendants' assertion that "the question of who a woman is does not have a straightforward answer"[6] shows why the amendment process should have been followed. Indeed, failure to do so by the Fraternity Council is akin to evidence showing consciousness of guilt, whereby defendants concealed their actions and stifled any discussion about it. Assuming, *arguendo,* that Fraternity Council actually considered a "myriad" of sources defining that term, it had a duty to consider the impact of its ultimate decision on the future of the fraternity and its members. They also should have known that the term women is a material term in the Bylaws of a women's organization and that altering the meaning of that term required a vote of members. There can be no "meeting of the minds" to alter the Bylaws when a "myriad" of sources must be consulted to define the term. The "single sex" nature of the organization that has served as the foundation for the fraternity's mission and purpose to support and advocate for women, and, significantly, formed the basis for Kappa's protections under Title IX and its commitment under the NPC Unanimous Agreement IX. (*Id.* at ¶ 144-145). By altering that aspect of the Fraternity, without notice, debate or a vote by the membership, Fraternity Council interfered with the rights of its members and exceeded the scope of its authority. (*Id.* at ¶¶ 147,150-152.)

Defendants point out that some courts have opined, in contexts not applicable here, that a "transgender woman is a woman who was assigned male at birth." But the case they cite for that statement (*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio

---

[6] Plaintiffs and other women know exactly what the term "woman" means. Defendants' assertion that this term is difficult to interpret undermines and undervalues the experiences that are unique to, and shared only by, women from childhood to adulthood.

Sept. 25, 2023) internally referenced Wikipedia and went on to say that the court considered the prisoner, who asserted he was a "transgender woman," to be a male because he was housed in a male prison. Another case had its judgment vacated in June in light of the Supreme Court's decision in *U.S. v. Skrmetti,* 605 U.S. ___, 145 S.Ct. 1816 (2025). All of these cases are irrelevant red herrings and an attempt to obscure the question posed by Plaintiffs in this litigation. Plaintiffs are not asking the Court to settle the question of who is, and who is not, a woman. Instead, Plaintiffs are asking for a declaration about the meaning adopted by *Kappa itself* in its Governing Documents. They argue that the term has for over 150 years been understood by all Kappa members and officers to refer only to biological women. (ECF 65, ¶ 22). Defendants disagree, believing the term is ambiguous. But even if this Court decides the term is ambiguous, the Court's analysis cannot stop there. The Court must then use the well-established rules for construction of contracts and look to extrinsic evidence to decide what the parties intended the term to mean. Plaintiffs have alleged that this evidence also indicates that the term refers only to biological women. (*Id.*) Determinations made by other courts in other contexts are irrelevant unless they informed the parties at the time of contracting.

### C. The First Amendment Does Not Provide a Shield to Defendants.

Defendants claim that the First Amendment right to associate freely prevents this Court from providing Plaintiffs with their requested relief. This misstates the issue before this Court. Plaintiffs are not asking the Court to order Kappa "to exclude transgender women." (ECF 67 at 3). Plaintiffs contend that Kappa—through its Governing Documents—has already decided to limit its membership to biological women only. (ECF 65, ¶¶ 45, 48-49.) Plaintiffs ask merely that Kappa fulfill the commitment it has already made to its members. Plaintiffs seek a declaration that Kappa's governing documents—contracts under Ohio law—when read in context and giving words their usual and ordinary meaning do not permit the admission of biological males.

17

Defendants have not—and cannot—identify any cases under which the First Amendment's freedom of association means that corporate articles of incorporation and bylaws are unenforceable in a court of law.

Defendants' reliance on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), is misplaced. Those cases involved situations in which *the Government* attempted to use its authority to force an organization to accept a member (or participant) the organization wanted to exclude. *Dale*, 530 U.S. at 656 (holding that the state's public accommodations law, which would have forced the Boy Scouts to accept a gay scoutmaster, infringed upon the group's freedom of association); *Hurley*, 515 U.S. at 575-76 (holding that the state's public accommodations law that would have forced a private parade to allow pro-LGBT participants was unconstitutional).

Here, in contrast, *Defendants*, the nationwide leaders of the sorority, are attempting to force Kappa to accept individuals that Kappa's own Bylaws exclude. Plaintiffs are not citing Wyoming or Ohio public accommodations law in their complaint. Neither State requires Kappa to associate, or disassociate, with anyone. Because there is no state action at issue, the First Amendment is not implicated. Kappa has imposed limitations on itself through its Governing Documents. If the Court agrees with Plaintiffs, Kappa can amend these same Governing Documents following the processes spelled out for such amendment. Under Defendants' argument, a court's involvement in any lawsuit is potentially prohibited state action, making every private contractual dispute one that cannot be adjudicated if it potentially infringes on a party's associational freedoms. This is not and has never been the law.

Courts routinely resolve disputes over an organization's membership decisions and whether an organization's expulsion of a member is consistent with that organization's bylaws and

rules. *See, e.g.*, *Gromnicki*, 745 N.E.2d at 452–53 (explaining that "[t]o determine when the union-member relationship terminated, we turn to the union's constitution"); *Browning v. Fraternal Ord. of Eagles*, No. 1769, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986) (unreported) (Ohio courts review an expulsion of a member of a fraternal society for "compliance with the constitution and bylaws of the association"); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969) (invalidating a member's expulsion from professional association). In such circumstances, the court's role is to enforce the organization's contracts. *Gromnicki*, 745 N.E.2d at 452–53 ("according to the United States Supreme Court, '[t]he court's role is but to enforce the contract'") (quoting *Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182 (1967)); *Reyes v. Laborers' Int'l Union of N. Am.,* 464 F.2d 595, 597 (10th Cir. 1972) (affirming a member's suspension because the court was not "apprised of any provision of the Union constitution which was violated by [the plaintiff's] suspension.").

Judicial enforcement of corporate requirements does not infringe an organization's First Amendment rights of association. The Court should not dismiss Plaintiffs' complaint on this basis.

**D. Plaintiffs' Fraudulent Inducement Claim is Properly Supported.**

Defendants also claim that Plaintiffs have failed to plead an actionable claim for fraud in the inducement because "nothing about the admission of transgender women is inconsistent with Kappa being an organization for women" and Kappa had no legal duty to disclose the admission of transgender women to Plaintiffs. (ECF 67 at 17.) Defendants' arguments are wrong.

A claim of fraudulent inducement is premised on a misrepresentation of facts or other wrongful conduct that induce a party to enter into an agreement. *Am. Coal Sales Co. v. N.S. Power Inc.,* 2009 WL 467576, 2009 U.S. Dist. LEXIS 13550 (S.D.Ohio, Feb. 23, 2009) (citing *ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 502–3, 1998–Ohio–612, 692 N.E.2d 574 (Ohio 1998)).

This is precisely the case here.

As explained in the Second Amended Complaint, Kappa promises prospective members a lifetime of sisterhood, which commonly refers to women. (ECF 65, ¶¶ 147-149.) Defendants have also broadly promoted—to the public, to the courts, and to the Plaintiffs—that membership in this sisterhood will convey tangible benefits. (ECF 65, ¶¶ 32-38.) Plaintiffs relied upon Kappa's continued representations that it was and is an organization of women, for women, in making their decision to join the fraternity and be bound by Kappa's governing documents—all of which enforce the notion that Kappa is a single-sex organization. (*Id*. ¶¶45,49,186,188.) In choosing Kappa, Plaintiffs forever lost their ability to seek out and join a different sorority. (*Id*. ¶189.) Defendants are aware that if Plaintiffs resigned from Kappa after becoming members, they would be barred from joining another sorority. (*Id*. ¶112.)

Further, contrary to their assertions, Fraternity Council had a clear obligation to disclose their intent to change the nature of the organization. The fiduciary relationship between a corporation's directors and both the corporation and its shareholders includes a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Zalvin*, 157 N.E.3d at 265. To that end, Plaintiffs allege that Defendants had an obligation to carry out their duties "in good faith and in the best interests of KKG and its members." (ECF 65, ¶164.) *See also Kleemann v. Carriage Trace, Inc.,* Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43. By definition, "good faith" is "honesty in fact in the conduct or transaction concerned." *DiPasquale v. Costas*, 2010-Ohio-832, ¶126-127, 926 N.E.2d 682, 706-707, citing *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10 (citations omitted). As the Supreme Court of Ohio has explained,

A lack of good faith is the equivalent of bad faith, and bad faith, although not

> susceptible of concrete definition, embraces more than bad judgment or
> negligence. **It imports a *dishonest purpose*,** moral obliquity, conscious
> wrongdoing, breach of a known duty through some ulterior motive or ill will
> partaking of the nature of fraud. It also embraces actual intent to mislead or
> deceive another.

*Vontz v. Miller*, 2016-Ohio-8477, ¶ 33, 111 N.E.3d 452, 461 (Ohio App. Ct. 2016) (citations omitted) (emphasis added). This is precisely the conduct that Plaintiffs have pled in the Second Amended Complaint and for which Fraternity Council should be held to account.

### E. Plaintiffs' Ultra Vires Claim Properly Encompasses Fraternity Council's Conduct.

The Kappa Bylaws provide that all members are accountable for inappropriate conduct. (ECF 6-1, Exhibit 1, Bylaws, Art. V, Section 7.) Fraternity Council members are not exempt. Plaintiffs properly alleged that Fraternity Council exceeded its authority, failed to conduct its affairs in accordance with the Bylaws, and failed to follow mandatory notice and voting procedures. (ECF 65, ¶¶ 173-175.) These allegations are sufficient to overcome a motion to dismiss.

### F. Defendants Are Judicially Estopped From Arguing that Amending the Complaint is Futile.

Defendants argue that the Court should dismiss the complaint with prejudice because the Plaintiffs argued (unsuccessfully) at the Court of Appeals that this Court's prior decision dismissing the First Amended Complaint without prejudice should be treated as final and appealable. Plaintiffs argued, unsuccessfully, that any attempt to amend the complaint to cure its deficiencies would be futile. The Court of Appeals disagreed and granted Defendants' Motion to Dismiss. Having succeeded in arguing that the case should be dismissed because the earlier decision was not final, Defendants are judicially estopped from now arguing that any amendment would be futile.

The doctrine of judicial estoppel protects the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Bradford v. Wiggins,* 516 F.3d 1189, 1194 (10th Cir.2008) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001)). In deciding whether to apply judicial estoppel, courts look to such factors as whether "1) a party's later position is clearly inconsistent with its earlier position; 2) a party has persuaded a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled; and 3) the party seeking to assert the inconsistent position would derive an unfair advantage if not estopped." *Id.* (quotation omitted). Defendants successfully argued that amendment was possible—in fact required. Following the Court of Appeals' dismissal, Defendants moved this court for an order requiring that the Plaintiffs file an amended complaint. Arguments about futility should be ignored.[7]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

 Respectfully submitted,

/s/ John Knepper
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

---

[7] Defendants' argument regarding the failure to serve all Defendants with process is irrelevant. By entering an appearance in this Motion, all Defendants have consented to this Court's jurisdiction. Regardless, Plaintiffs have 90 days to perfect service of the amended complaint under Federal Rule of Civil Procedure 4(m).

*/s/ Cassie Craven*
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

## <u>CERTIFICATE OF SERVICE</u>

John G. Knepper, an attorney, hereby certifies that on the 10th day of July, 2025, he caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing upon all counsel of record.


/s/ John G. Knepper_____

Stuart R. Day (#6-3081)                      Natalie M. McLaughlin (*Pro Hac Vice*)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.        Brian W. Dressel (*Pro Hac Vice*)
159 North Wolcott, Suite 400                 VORYS, SATER, SEYMOUR AND PEASE, LLP
P.O. Box 10700                               52 East Gay Street
Casper, WY 82602-3902                        Columbus, OH 43215
Telephone:    (307) 265-0700                 Telephone:    (614) 464-5452
Facsimile:    (307) 266-2306                 Email:        nmmclaughlin@vorys.com
E-Mail:       sday@wpdn.net                                bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

HANNAH HOLTMEIER, ALLISON COGHAN,      )
and HALEY RUTSCH, on behalf of themselves )
and derivatively on behalf of KAPPA KAPPA )
GAMMA FRATERNITY,                        )
                                         )
        Plaintiffs,                      )
                                         )
v.                                       )        Civil Action No.: 23-CV-00051-ABJ
                                         )
KAPPA KAPPA GAMMA FRATERNITY, MARY )
PAT ROONEY, MARIA BROWN, NANCY           )
CAMPBELL, BARB GOETTELMAN, LIZ           )
WONG, KYLE DONNELLY, BETH BLACK,         )
and JANE DOES 1-4                        )
                                         )
        Defendants.                      )

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    DISCUSSION .................................................................................... 1

    A.    Plaintiffs Have Not Satisfied Rule 23.1 ................................... 1

    B.    As the Court Has Already Recognized, Ohio Law Defers to Voluntary Organizations' Interpretations of Their Own Bylaws ........................... 2

        1.    The Court's Prior Decision on Kappa's Interpretation of Its Bylaws Is Binding Under the Law-of-the-Case Doctrine ....................... 2

        2.    Ohio Law Requires Deference to Kappa's Interpretation .......................... 3

        3.    This Case Raises First Amendment Implications ....................... 6

    C.    Plaintiffs Fail to Demonstrate a Viable Breach-of-Contract Claim ...................... 7

    D.    Plaintiffs Fail to Demonstrate a Viable Fraudulent-Inducement Claim ................. 8

    E.    Defendants Are Not Estopped from Arguing that the Dismissal They Currently Seek Should Be with Prejudice ................................................. 9

III.    CONCLUSION ................................................................................ 10

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Nat'l Prop. & Cas. Co. v. Sam*, No. 16-CV-301-ABJ, 2019 U.S. Dist. LEXIS 235676, at *23–24 (D. Wyo. Sept. 5, 2019) ................................................................. 3

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F. 3d 1081, 1099 (10th Cir. 2017) .......................................................................................................................... 4

*Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992) .................................................... 8

*Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ........... 3

*Finley v. Duffy*, 94 N.E.2d 466, 469, 470 (Ohio Ct. App. 1950) .................................... 5

*New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) .................................................. 8

*Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914, at *13–14 (Ohio Ct. App. 2001) ..................................................................................................... 2

*Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948) ............................................................... 8

*Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989) ... 4, 5

*United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) .................................. 4

**Rules**

Ohio R. Civ. P. 23.1 ...................................................................................................... 1, 2

## I.    INTRODUCTION

Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss does not offer a basis for the Court to allow any of Plaintiffs' claims to survive.  First, Plaintiffs fail to articulate how they have satisfied the Rule 23.1 requirements to bring a derivative suit by presenting their grievances to Kappa's current leadership.  Second, the Opposition depends on the Court revisiting holdings of its prior Order granting Defendants' first Motion to Dismiss and reaching the opposite result, which is barred by the law-of-the-case doctrine.  Third, even if the Court had not already ruled on the central issues of this case, it could reject Plaintiffs' arguments because Ohio law affords significant deference to Fraternity Council's interpretation of Kappa's Bylaws, and the Opposition fails in its attempt to distinguish this case from that doctrine.  Fourth, Plaintiffs do not defend their breach-of-contract claim.  Fifth, Plaintiffs misunderstand the legal requirements of a fraudulent-inducement claim.  And, sixth, Plaintiffs' argument seeking to judicially estop Defendants from arguing that any future amendments would be futile is nonsensical.  As explained further below, the Court should grant Defendants' Motion and dismiss this case with prejudice.

## II.    DISCUSSION

### A.  Plaintiffs Have Not Satisfied Rule 23.1

Plaintiffs' response to Defendants' argument that they have not satisfied Rule 23.1 by presenting their grievances to Kappa's current leadership, the 2024–2026 Fraternity Council, for internal resolution is to refer the Court to its prior decision on Rule 23.1 when Plaintiffs were advancing the First Amended Complaint and Kappa's leadership was the 2022–2024 Fraternity Council.  Plaintiffs, in a footnote, indicate that they did make a renewed demand to current Fraternity Council on June 6, 2025—three days before they filed the Second Amended Complaint—and that Kappa responded through counsel.  It is not clear how this correspondence

that Plaintiffs only reference in their Opposition (and which Defendants can provide to the Court to the extent Plaintiffs intend to suggest this satisfies the Rule 23.1 requirements) could be a legitimate attempt to resolve disagreements internally when it was sent the Friday before filing the Second Amended Complaint on Monday.

Rule 23.1 is a requirement to asserting a derivative claim, and failure to follow its procedures mandates dismissal. *See Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914, at *13–14 (Ohio Ct. App. 2001). Indeed, as Defendants noted previously, the majority of the cases like the one Plaintiffs now bring under Ohio law were dismissed for failure to follow procedural requirements for a derivative claim. (*See* Mem. in Sup. Mot. to Dismiss, ECF No. 67 at 10 fn.3.) Kappa's leadership has changed from when Plaintiffs filed their lawsuit in 2023, and most current individual Defendants are not in a position to change Kappa's policies or practices on behalf of the organization. Failure to meet the Rule 23.1 requirements in asserting these derivative claims in the Second Amended Complaint is a sufficient basis to dismiss the case.

**B. As the Court Has Already Recognized, Ohio Law Defers to Voluntary Organizations' Interpretations of Their Own Bylaws**

Plaintiffs defend their derivative claim by arguing that Kappa's interpretation of its own Bylaws is not entitled to any deference or, alternatively, that deference is not appropriate under these circumstances. Ultimately, Plaintiffs urge the Court to analyze Kappa's Bylaws as it would a statute or constitutional provision. This Court has already rejected that position, and, even if it had not, Plaintiffs misapprehend the applicable law.

1. The Court's Prior Decision on Kappa's Interpretation of Its Bylaws Is Binding Under the Law-of-the-Case Doctrine

The Court has already ruled on the arguments central to Plaintiffs' defense of their derivative claims, and, under the law-of-the-case doctrine, the Court should not permit re-litigation

of the prior ruling. The law-of-the-case doctrine "precludes the re-litigation of issues expressly or implicitly resolved earlier in the same case." *Am. Nat'l Prop. & Cas. Co. v. Sam*, No. 16-CV-301-ABJ, 2019 U.S. Dist. LEXIS 235676, at *23–24 (D. Wyo. Sept. 5, 2019) (citing *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016)). Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F. 3d 1081, 1099 (10th Cir. 2017) (quoting *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991)).

Plaintiffs' derivative claims depend on a finding that Kappa's Fraternity Council did not have authority to interpret the Bylaws such that the term "women" includes trans women. The Court has already conclusively rejected that position. (*See* Order, ECF No. 31.) Specifically, the Court held that "defining 'woman' is Kappa Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade." (*Id.* at 26.) Even more directly, the Court held that Fraternity Council reading the Bylaws to include trans women was "a lawful interpretation." (*Id.* at 31.) Other than repackaging the same arguments, Plaintiffs do not engage with the Court's prior rulings of law or offer the Court any basis to depart from the law-of-the case doctrine, so the Court could dismiss the derivative claims on that basis alone.

### 2. Ohio Law Requires Deference to Kappa's Interpretation

Even if the Court were considering Plaintiffs' claims for the first time in this Motion, Ohio's deference to voluntary organizations in interpreting their own Bylaws would compel the same result the Court already reached. As the Court has found, Ohio law provides that "[a] voluntary organization may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is

as sacred as the right to make them." *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989) (quotation omitted).

Plaintiffs try to distinguish this doctrine by arguing that it only applies to "quasi-judicial" interpretations. This argument does not come from ***any*** case that says the judicial non-interference rule is limited to cases of quasi-judicial interpretations, but rather from the simple fact that most cases brought under this doctrine concern discipline of members.[1] But the cases explaining the non-interference rule plainly articulate a broader scope of deference to voluntary organizations. For instance, *Stibora* refers to the "sacred" right to interpret bylaws not only as to questions of discipline but also "internal policy and management." *Id.* Indeed, in a case involving bylaw interpretation related to an amendment voted on at an organization's convention, an Ohio court— in one of the earliest decisions applying this doctrine—held that the organization's officers had a "duty to construe and apply the provisions of the constitution to the best of their understanding and ability" and that "courts will not assume to act in place of those authorized to interpret the constitution and bylaws of a voluntary association unless those upon whom the duty is placed act in an arbitrary and unreasonable manner." *See Finley v. Duffy*, 94 N.E.2d 466, 469, 470 (Ohio Ct. App. 1950).

It would be illogical to draw a line between disciplinary interpretations impacting the addition or non-addition of members and membership interpretations impacting the addition or non-addition of members. The result would be that a court could interfere with an organization's membership decisions in admitting members through its bylaws interpretation of its membership policy but would have to defer to an organization's removal of its members through its bylaws

---

[1] That most litigation by members of voluntary organizations concerns individual discipline and does not challenge bylaw interpretations by the organizations' boards only proves the point that the judicial non-interference doctrine is intended to and in fact does deter these types of lawsuits.

interpretation of its removal policy. Plaintiffs' position that no deference is due to interpretations of membership qualifications would open the courthouse doors to anyone who was unhappy about a person their organization chose to admit or not admit. The point of the non-interference doctrine is that matters of internal policy and management like bylaws interpretations are inherent in the operation of voluntary organizations and are not matters for federal or state litigation.[2] Sometimes some members may be dissatisfied and disagree with the policy decisions of their leadership. There are internal procedures to seek redress for that dissatisfaction and disagreement, and sometimes members will have to accept that leadership may not align with their views on all matters. That does not mean there is a legal solution in the courts every time someone wishes to force their views onto the organization.

Plaintiffs' alternative argument that Fraternity Council's interpretation is not entitled to deference because Council "intentionally deceived" them is undercut by the Second Amended Complaint, which alleges the policy was publicly announced in 2018, before any Plaintiff sought to join Kappa. (Second Am. Compl. at ¶¶ 131–37.) The relevant facts about Kappa's policies were made available to Plaintiffs and the entire organization, so it is not clear how any "deception" occurred. Plaintiffs do not respond to Defendants' argument that they have failed to allege any *facts* that would support bad-faith conduct by Fraternity Council in the decision by the Gamma Omicron chapter to admit a trans woman as a member. Plaintiffs fail to plausibly allege bad-faith conduct by Council that would remove the deference otherwise owed to the interpretations.

Plaintiffs' contention that the Bylaws of Kappa, a voluntary organization, should be interpreted through some sort of originalist lens finds no support in applicable precedent. To the

---

[2] Even more so here when the Standing Rules explicitly grant Fraternity Council the right to interpret the Bylaws. Therefore, even under a strict contractual interpretation, Fraternity Council retains the right to interpret without judicial interference.

contrary, it is fundamentally incompatible with the Ohio line of cases providing that voluntary organizations have deference in interpreting their governing documents. After all, Plaintiffs' strict interpretation approach would also cover the "quasi-judicial" interpretations Plaintiffs acknowledge receive deference. Ohio law allows voluntary organizations to interpret their own bylaws and does not subject those interpretations to the same searching judicial inquiry that may be appropriate for questions of statutory interpretation.

Plaintiffs repeatedly invoke the argument that Kappa governing documents required some sort of presentation of Fraternity Council's interpretation of the term "woman" to the membership for a vote. Tellingly, Plaintiffs cite *no* provision in the governing documents that would require interpretations to be put up for membership vote based on a subjective assessment of what can be gleaned from tradition and history. To the contrary, the Standing Rules explicitly provide that Fraternity Council's duty is to interpret the governing documents, and they establish no requirement that those interpretations be put to a vote.

The Court should not lose sight of what is at the heart of this case. Plaintiffs object to Fraternity Council's *interpretation* of an *undefined* term in the Bylaws. Kappa's Standing Rules *require* Fraternity Council to make these interpretations. Its doing so aligns with Ohio law's judicial non-interference doctrine. Vague allegations that Fraternity Council in a different era would have read this term differently do not alter the validity of that interpretation.

### 3.  This Case Raises First Amendment Implications

Plaintiffs also contend that their position creates no conflict with the First Amendment. First, like the issue of deference, the Court has already ruled on this point. (Order, ECF No. 31 at 28–29.) Plaintiffs do not present a basis for the Court to depart from that ruling, and the Court can maintain its prior holding under the law-of-the-case doctrine.

Furthermore, court actions can constitute state action.  *See Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948); *see also Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992) (recognizing a court interferes with the First Amendment freedom of expression in "substitut[ing] its own judgment for that of the [p]arty").  Plaintiffs explicitly ask the Court to substitute its judgment for Kappa's leadership and hold that the Bylaws as currently drafted *must* be interpreted in accordance with Plaintiffs' preferred definition of the term "woman."  But, as discussed above, Kappa has a sacred right to interpret its own Bylaws, and this Court substituting a different interpretation of an undefined term would violate Kappa's First Amendment right to decide for itself with whom it wishes to associate.

State action can occur when a court rules against a private party in a civil action if the court violates a party's constitutional rights in taking that action.  In *New York Times v. Sullivan*, the Supreme Court protected First Amendment freedoms in a libel suit between private parties because, "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."  *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) (finding courts applied common law in a civil action between private parties and those court actions imposed invalid restrictions on private parties' First Amendment freedoms).

### C.  Plaintiffs Fail to Demonstrate a Viable Breach-of-Contract Claim

Plaintiffs do not clearly explain the theory for their individual breach of contract claims against Kappa.  They do not offer any response to Defendants' argument that Plaintiffs failed to plausibly allege a breach of their membership contracts, appearing to have abandoned that claim.  Their ***only*** discussion of contractual principles appears in their arguments on the derivative claims, where they argue that the Bylaws are a contract between Kappa and all members.  To the extent Plaintiffs assert individual contract claims based only on the Bylaws, those claims would fail.

7

First, allowing a breach-of-contract claim by an individual against the organization based on the interpretation of a term in the governing documents to proceed would, in practice, eliminate all deference owed to voluntary organizations in interpreting those documents by inserting courts as the ultimate interpreters of governing documents. And as explained repeatedly, the Standing Rules explicitly give the authority to Fraternity Council to interpret the Bylaws. Therefore, Kappa cannot breach a contract with Plaintiffs by allowing its Fraternity Council to do explicitly what its governing documents authorize them to do.

Second, the time period for interpretation of any alleged contract would begin when the Plaintiffs entered into their respective contracts with Kappa, not in 1870. When Plaintiffs joined Kappa, the term "women" was already interpreted by Fraternity Council to include trans women. Kappa had already publicized the membership policy and publicized the Guide indicating its allowance of trans women. Plaintiffs' complaint appears to be that either they did not look into Kappa's membership policies before joining or made incorrect assumptions about Kappa's membership policies before joining.[3] Essentially, they just presumed that the only way that "women" could be interpreted was to the exclusion of trans women, even though nothing from Kappa states this. That was their prerogative to join based on limited information and assumptions, but it does not mean that Kappa breached any contract.

### D. Plaintiffs Fail to Demonstrate a Viable Fraudulent-Inducement Claim

Defendants argued that the Court should dismiss Plaintiffs' fraudulent-inducement claim because (1) they did not allege a material misrepresentation of a ***fact***; and (2) did not allege that

---

[3] All 26 NPC sororities accept trans women into their memberships. Therefore, Plaintiffs could not have found a sorority that would have guaranteed no trans woman would be accepted into their chapter. As such, it is unlikely any additional information or correct assumption would have impacted Plaintiffs' decision to join Kappa if they actually wanted to be in a sorority at all.

any Defendant failed to disclose any information they were under a legal obligation to disclose. The Response does not offer a plausible argument against either point. Plaintiffs contend that advertising itself as an organization for women while admitting trans women as members amounts to a material misrepresentation of facts. This is not so, as Defendants have already recounted several sources that demonstrate that Plaintiffs' opinion of who is and is not a woman is not the same as a fact. Plaintiffs also do not identify any legal duty to disclose a ***fact*** that was not disclosed.

Instead, Plaintiffs use their argument to return to their points about the fiduciary duty of Fraternity Council. Those arguments fail in the context of the derivative claims, as discussed above. But they are not even relevant to the fraudulent-inducement claim, which is not a derivative claim at all. The only issues material to this claim are whether a Defendant made a material misrepresentation and whether a Defendant failed to disclose information the Defendant was under a legal obligation to disclose, as argued in Defendants' Motion. As Plaintiffs plausibly allege neither occurrence, the Court should dismiss the fraudulent-inducement claim.

### E. Defendants Are Not Estopped from Arguing that the Dismissal They Currently Seek Should Be with Prejudice

Plaintiffs argue that Defendants are judicially estopped from arguing that the Court should dismiss the case with prejudice because some Defendants argued that Plaintiffs' appeal should be dismissed for lack of appellate jurisdiction when Plaintiffs appealed a dismissal without prejudice. They characterize asking for final dismissal as "deliberately changing positions according to the exigencies of the moment." (Resp., ECF No. 68 at 22.) This argument is nonsensical.

Defendants who were named in the First Amended Complaint argued that the Court ***should*** dismiss the First Amended Complaint with prejudice. (*See* Mem. in Sup. of Mot. to Dismiss, ECF No. 20.) The Court denied that request and instead dismissed the case without prejudice to amend. Despite clear Tenth Circuit precedent holding that dismissals without prejudice are not final

appealable orders, Plaintiffs chose to appeal.  Asking the Court of Appeals to dismiss the appeal for a procedural flaw does not estop Defendants from arguing for dismissal with prejudice.

Defendants never contended that successfully amending the First Amended Complaint would be possible.  Defendants' argument was that this Court's first dismissal order was without prejudice, so Plaintiffs had no right to appeal.  Then once the case was back in this Court, Defendants argued Plaintiffs *could* seek to amend or perfect the appeal.  But Defendants never represented that any amendment could fix the errors that led to the first dismissal or that Defendants would not seek to dismiss any amendment with prejudice.

Notably, Plaintiffs do not rebut Defendants' argument that further amendment would be futile and do not dispute Defendants' contention that there is no other way for Plaintiffs to plead their claims that would survive a motion to dismiss. Therefore, for all the reasons stated in Defendants' Motion to Dismiss and in this Reply, dismissal of Plaintiffs' Second Amended Complaint with prejudice is warranted.

## III.    CONCLUSION

For the foregoing reasons and the arguments contained in prior pleadings, Defendants respectfully request that the Court dismiss this case with prejudice.

Dated: July 17, 2025                              Respectfully submitted,

/s/ *Natalie M. McLaughlin*                     Stuart R. Day (#6-3081)
Natalie M. McLaughlin (Ohio Bar No.             WILLIAMS, PORTER, DAY & NEVILLE, P.C.
0082203)*                                       159 North Wolcott, Suite 400
Brian W. Dressel (Ohio Bar No. 0097163)*        P.O. Box 10700
VORYS, SATER, SEYMOUR AND PEASE LLP             Casper, WY 82602-3902
52 East Gay Street                              Telephone:    (307) 265-0700
Columbus, OH 43215                              Facsimile:    (307) 266-2306
Telephone/Facsimile: (614) 464-5452            E-Mail:        sday@wpdn.net
Email:        nmmclaughlin@vorys.com
              bwdressel@vorys.com              *Attorneys for Defendants*
*Admitted Pro Hac Vice*

10

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 17th day of July, 2025.

Cassie Craven (#7-5664)          ☒ CM/ECF Electronic Transmission
LONGHORN LAW LLC                  ☐ U.S. Mail (Postage Prepaid)
109 East 17th Street, Suite 223   ☐ Fax
Cheyenne, WY 82001                ☐ Overnight Delivery
Telephone: (307) 823-3062         ☐ Hand Delivery
E-Mail: ccraven.law@gmail.com     ☐ Email


John G. Knepper (#7-4608)                  ☒ CM/ECF Electronic Transmission
LAW OFFICE OF JOHN G. KNEPPER, LLC          ☐ U.S. Mail (Postage Prepaid)
P.O. Box 1512                               ☐ Fax
Cheyenne, WY 82003                          ☐ Overnight Delivery
Telephone: (307) 632-2842                   ☐ Hand Delivery
E-Mail: john@knepperllc.com                 ☐ Email


/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin

A-208



IN THE UNITED STATES DISTRICT COURT

**FILED**

FOR THE DISTRICT OF WYOMING

4:07 pm, 8/22/25

**Margaret Botkins**
**Clerk of Court**

HANNAH HOLTMEIER, ALLISON
COGHAN, and HALEY RUTSCH, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

            Plaintiffs,

    VS.                                          Case No. 23-CV-51

KAPPA KAPPA GAMMA
FRATERNITY, MARY PAT ROONEY,
MARIA BROWN, NANCY
CAMPBELL, BARB GOETTELMAN,
LIZ WONG, KYLE DONNELLY, BETH
BLACK, and JANE DOES 1-4,

            Defendants,

---

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 66)

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss* (ECF

No. 66), filed on June 26, 2025. Plaintiffs responded in opposition on July 10th (ECF No.

68), and Defendants replied on July 17th (ECF No. 69). Having considered all of the

relevant materials, we hereby **GRANT** Defendants' motion.

### BACKGROUND

The facts of this case are well known to the parties at this point, almost two and a

half years after this suit was initially filed. In the fall of 2022, a chapter of the Kappa

1

Kappa Gamma Fraternity ("Kappa") located at the University of Wyoming voted to

accept, and later initiated, a transgender woman as a member of the sorority.[1] In March of

2023, seven then-current members of the sorority filed the original complaint in this case,

asserting a breach of contract claim, a tortious-interference claim, and a direct cause of

action against the admitted student, Kappa, and the Fraternity Council president. *See*

*generally* ECF No. 1. We dismissed that complaint without prejudice on the grounds that

the sorority was free, as a private organization, to define the word "woman" in its bylaws

however it wanted, and therefore the sorority was not contractually obligated to reject

transwomen members. ECF No. 31 at 26, 33. Plaintiffs appealed our dismissal to the

Tenth Circuit, which denied it on jurisdictional grounds. ECF No. 39. Plaintiffs

eventually filed this Second Amended Complaint (SAC) in June of this year. ECF No.

65.

The SAC recounts many of the same facts as the previous complaint, though this

time it alleges four slightly different claims. Plaintiffs first allege a set of derivative

claims against Kappa's Fraternity Council, who act as the organization's board of

directors[2], for various breaches of their fiduciary duties. They also directly allege that

---

[1] Parties use both the terms "sorority" and "fraternity" to refer to Kappa. For the sake of consistency and comprehensibility, will use the term "sorority" when referring to the organization, except where Kappa is referred to as a fraternity in Bylaws and other quoted text.
[2] Ohio nonprofit law states that "'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated." Ohio Rev. Code Ann. §§ 1702.0l(K). Article IX of Kappa's Bylaws states that

> all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.

ECF No. 1 at 146.

Kappa breached its contract with Plaintiffs and that the Fraternity Council fraudulently induced members to join the organization.

Having considered the issues presented (again), we find that the majority of the claims must be dismissed on the grounds that this Court still may not interfere with Kappa's contractually valid interpretation of its own Bylaws. Nothing in the Bylaws or the Standing Rules requires Kappa to narrowly define the words "women" or "woman" to include only those individuals born with a certain set of reproductive organs, particularly when even the dictionary cited by Plaintiffs offers a more expansive definition. Nor has Kappa or the Fraternity Council concealed this definition from its members: in fact, it has published and distributed multiple texts clarifying the issue. Finally, to the extent that Plaintiffs meant to articulate independent claims of breach of contract regarding the voting procedure used when the transgender woman was admitted, they have not shown that any resulting damages surpass the amount in controversy required to maintain federal jurisdiction.

## A. Relevant Governing Documents of Kappa

All of Plaintiffs' claims are based on Kappa's alleged violations of the contract between the organization and its members. We therefore begin by examining the basis and content of that contract. Kappa is a non-profit corporation organized in Ohio, and therefore it is subject to that state's laws. ECF No. 65 at 12. In Ohio, an organization's governing documents includes its constitution and bylaws, both of which serve as a contract between the organization and its members. *Ulliman v. Ohio High Sch. Athletic*

3

*Assn.*, 184 Ohio App. 3d 52, 62 (2009). We therefore turn to these documents to understand the basis of the contract.

We first identify the relevant portions of Kappa's Articles of Incorporation, which Plaintiffs implicitly argue is akin to a "constitution." Here, Kappa states that its "purpose" is to "unite women", "build[] higher standards of womanhood", "advocate for and seek to address issues of concern for members and women in general", and "provide opportunities for engagement throughout the lives of alumnae". ECF No. 65 at 13. The Articles permit local chapters to recruit and vote on new members "in accordance with [Sorority] standards and procedures." *Id.* at 14.

Next, we examine Kappa's Bylaws. The Bylaws state that a new member "shall be a woman", and the word "woman" is repeated several times in the "Qualifications" section. *Id.* Article IV also states that "Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures." ECF No. 1 at 81. Additionally, at the June 2022 Biennial Convention, Kappa members approved[3] a new Bylaw forbidding Kappa members from engaging in discrimination, while also recognizing that the "single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under… Title IX". ECF No. 65 at 15.

Although not officially a Bylaw, Kappa issued a document to members entitled "Bylaws and Standing Rules Revision 2022" about two months before the Convention.

---

[3] Bylaws may only be amended by a two-thirds majority vote at Kappa's biennial convention, and the exact content of any proposed amendment must be shared with members three months beforehand. ECF No. 65 at 14.

ECF No. 65 at 15. In the FAQs section, under "DIVERSITY, EQUITY AND

INCLUSION", it states:

> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

ECF No. 65 at 16. Plaintiffs assert that this statement cannot be considered a governing

document because it was not specifically voted on and it was only released two months

ahead of the convention. *Id.*

Kappa also has a set of "Standing Rules," which Plaintiffs implicitly argue are also

part of the governing documents because, like the Bylaws, the Rules can only be

amended by majority vote at a Biennial Convention. ECF No. 1-1 at 79. As relevant here,

the Rules provide guidance on membership selection. They state that (1) "All active

members of the chapter shall participate in membership selection unless excused in

writing by the designated chapter adviser"; (2) "All information concerning the

membership selection process is confidential and shall be kept within the chapter"; and

(3) "The electronic voting system selected by the Fraternity shall be used by the chapter"

ECF No. 1-1 at 55.

5

The Rules also provide an outline of the role of the Fraternity Council. The duties of the Council "shall include… Interpreting the Fraternity *Bylaws* and *Standing Rules*" as well as "Appointing Fraternity members to all volunteer positions within the Fraternity, filling vacancies that occur, and removing members from appointed positions, if deemed necessary, by a three-fourths vote", among other things. ECF No. 1-1 at 63. The Fraternity Council also has some role "authorizing" members for initiation:

> At least two weeks before initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

ECF No. 1-1 at 64.

Finally, there are various documents published by Kappa that Plaintiffs assert are *not* governing documents because they are not voted on by the members. Among these are Kappa "Policies," which, among other things, warn that "Any member who makes discriminatory, inflammatory or inappropriate actions based on… gender identity, [or] sexual orientation… shall be subject to dismissal or other disciplinary action." ECF No. 1-1 at 89. Kappa also publishes "Position Statements", which can be found on their "member portal." One such Statement clarifies Kappa's position on "individuals who identify as women":

> MEMBERSHIP SELECTION
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> SINGLE GENDER ORGANIZATIONS

> Kappa Kappa Gamma is a private, nonprofit organization for women
> founded in 1870. The single-gender nature of our organization is essential to
> the mission and purpose of Kappa Kappa Gamma and its chapters and
> alumnae associations. The right to limit membership in the Fraternity to
> women is protected by the U.S. Constitution.

ECF No. 1-1 at 127. Kappa also published and distributed a "Guide for Supporting Our

LGBTQIA+ Members" in 2018, which states that the organization does not discriminate

based on "gender identity", repeats the Membership Selection paragraph above, and

provides twelve pages of advice on how to be respectful of gay and transgender Kappa

members. ECF No. 1 at 103-114.

B. **Admission of the Student**

    Plaintiffs allege that several provisions of the governing documents were violated

when the Wyoming Chapter admitted a transgender woman (who we will subsequently

refer to as "the Student") as a member. The Student participated in formal sorority

recruitment at the University of Wyoming in August of 2022. ECF No. 65 at 22. During

this period, the Kappa Membership Chair for the Wyoming Chapter told sorority

members, including Plaintiffs, that Kappa rules did not permit them to refuse transgender

women. *Id.* at 22. The Student did not finish formal recruitment with Kappa, but

afterwards reached out to the Membership Chair to pursue membership through the

"continuous open bidding" process, which allows individuals to become members outside

of formal recruitment. *Id.* at 23.[4]

---

[4] Kappa requires all chapters with low membership to use the process. ECF No. 65 at 23. The Wyoming Chapter, which was on probation from 2016 until 2022 because of low membership numbers, used this system. *Id.*

7

Plaintiffs allege a few "irregularities" during the Student's pre-voting recruitment process, although they do not specify violations of any specific governing documents. First, they allege that Kappa's alumnae advisors directed the chapter president and officers to recruit the Student to raise the profile of the Wyoming chapter. *Id.* Second, Plaintiffs allege that members did not receive sufficient notice of the Student's application, although they admit that her application was mentioned at a chapter meeting "well before the vote" and that a dinner was set up to meet the Student, as was customary during the COB process. *Id.* at 24.

Plaintiffs also contend that several "irregularities" occurred during the voting process. The first has to do with notice. The chapter's vote on the Student's application took place on Tuesday, September 20, 2022. ECF No. 65 at 24. The Wyoming Chapter requires all members to attend weekly Monday-evening Chapter meetings, unless they attended a Chapter Council meeting the day before. *Id.* Plaintiffs contend that the officers intentionally concealed, at the Sunday Chapter Council meeting, that the Student's application would be voted on that week. *Id.* at 25. Plaintiffs admit that members were so informed during the regular Monday meeting, however. *Id.*

Second, Plaintiffs allege that although "Fraternity rules prohibit discussion during the voting process" (without citing a specific rule or bylaw), several officers spoke before the vote on the Student was held. ECF No. 65 at 25. They advised members that they should only vote "no" based on the Student's personality, and that a "no" vote without having met the student was evidence of bigotry. *Id.* Plaintiffs contend, without foundation, that The Fraternity Council required the Chapter officers to advocate for the

8

Student and "hatched" a "plan" with the officers to intentionally limit the other members' opportunity to meet the Student. *Id.*

Third, Plaintiffs state that the vote on the Student's admittance was conducted using the wrong voting software – a Google Poll link instead of a software called Omega Recruit. *Id.* at 25. Their primary issue with the use of Google Poll is that the vote was not conducted "in secret" because members had to use their emails when signing in to vote. *Id.* at 27. Additionally, two Google Poll links were sent out because the first one was faulty. ECF No. 1-1 at 123. Plaintiffs do not allege that the second vote had a different overall outcome than the first, or even that the first vote was completed – they claim that the second link was sent out within thirty minutes. ECF No. 65 at 27-28. However, they do claim that three members changed their votes between the first and second votes because they "understood that the second vote would not be secret and they feared retribution." *Id.* at 28. Plaintiffs do not cite a Bylaw or Standing Rule that requires anonymity.[5]

Finally, Plaintiffs allege that only people present at the Monday Chapter meeting the day before the vote were allowed to vote, in violation of the Standing Rule requiring that "all active members" participate. *Id.* at 24. Specifically, Plaintiffs allege that Chapter officers "forbade" two members, Madeline Ramar and Grace Ann Choate, from voting because they had not attended the previous day's meeting. *Id.* at 26. Plaintiffs also state

---

[5] Anonymity appears to be required, according to the Wyoming Chapter's bylaws, for "Electronic Meetings." ECF No. 1-1 at 152. However, Plaintiffs do not allege that the Chapter bylaws are governing documents, nor that this was an electronic meeting – it appears to have been in person.

that officers roamed the halls of the Chapter's house instructing "some (but not all)"

members to vote. *Id.* at 27.

Plaintiffs assert that had these inconsistencies not occurred, the Student would

have lost the vote and not been admitted. *Id.* at 28. They further contend that the

Fraternity Council knew about these "irregularities and violations of Governing

Documents" and still approved of the Student's membership, which further violated the

governing documents. *Id.* at 29.

### D. Parties' communication after the vote

Plaintiffs made several efforts to let Kappa know that they were displeased about a

transgender woman joining their ranks. They and their parents raised concerns about the

Student's admittance in September and early October to the Executive Director of Kappa.

ECF No. 65 at 29. The Director responded that she had reviewed Plaintiffs' concerns but

that the national officers "believe proceeding with initiation is the appropriate next step."

*Id.* Plaintiffs allege that sorority officials encouraged members who disagreed with the

Student's admittance to resign if "their values were inconsistent with Kappa's values." *Id.*

At least three members did ultimately resign, while Plaintiff Hannah Holtmeier

transferred to the University of Nebraska. *Id.* Another member, Madeline Ramar, was

removed from her position as Finance Chair. *Id.* at 31.

Plaintiffs also wrote to the Fraternity Council through their lawyers in November,

stating that the Student should not be admitted because she is a "non-woman" and that

the Chapter President "conducted an illegal voting procedure" involving a non-secret

Google Poll and public pressure. ECF No. 1-1 at 123. Kappa's counsel responded, stating

that a woman need not be "biologically born as female" to be a woman and a Kappa

member, and referred to Kappa's Position Statements and LGBTQIA+ Guide on the

issue. ECF No. 65 at 33.

Unable to resolve the dispute to their satisfaction, Plaintiffs first filed suit in

March of 2023. After two years of stop-and-start litigation, we now find ourselves

addressing Defendants' second motion to dismiss, based on Plaintiffs' second amended

complaint (SAC). We review each claim anew below.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, district courts follow a two-

pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court "can

choose to begin by identifying pleadings that, because they are no more than conclusions,

are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions[,]" and "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to

relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ANALYSIS

### I.   Count One & Two: Fraternity Council's Breach of Fiduciary Duty

Plaintiffs allege, derivatively, that the Fraternity Council Defendants breached

their fiduciary duty to Kappa in six ways: by (a) encouraging the Wyoming Chapter to

admit a transgender woman in contravention of the governing documents; (b) concealing

Kappa's efforts to admit a transgender woman; (c) unduly influencing Wyoming Chapter

officers to disregard mandatory voting procedures; (d) disregarding "Kappa's duty" to

"affirmatively protect" freedom of speech under the Ohio Constitution; (e) failing to

"advocate for and seek to address issues of concern for members and women in general",

per Kappa Bylaws; and (f) acting ultra vires. Each of these claims fail, though for

different reasons.

We begin by reviewing relevant Ohio law. First, the Ohio Supreme Court defines

a derivative claim as one that is:

> brought by a shareholder in the name of the corporation to enforce a
> corporate claim. Such a suit is the exception to the usual rule that a
> corporation's board of directors manages or supervises the management of a
> corporation. A derivative action allows a shareholder to circumvent a board's
> refusal to bring a suit on a claim.

*Crosby v. Beam*, 47 Ohio St. 3d 105, 107, 548 N.E.2d 217, 219 (1989). Nonprofit

members may file derivative claims under Ohio nonprofit-corporation law. *Carlson v.*

*Rabkin*, 2003-Ohio-2071, ¶ 10, 152 Ohio App. 3d 672, 679, 789 N.E.2d 1122, 1127.

Plaintiffs face several hurdles in getting a derivative claim past the motion-to-dismiss stage, however. First, they must satisfy a procedural requirement called "demand futility." *Carlson,* 152 Ohio App. 3d at 679. Complaining members must

> (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort… and (3) show that they 'fairly and adequately' represent the interests of other shareholders 'similarly situated.'

*Id.* at 680. Alternately, complaining members may demonstrate that "the demand would have been futile… that the directors' minds are closed to argument." *Id.* (internal quotation mark removed). Members cannot rely on the fact that the directors are the ones being sued to prove futility – they must show that the directors "were conflicted or otherwise incapable of exercising reasonable business judgment." *In re Lubrizol S'holders Litig.*, 2017-Ohio-622, ¶ 37, 79 N.E.3d 579, 587.

Second, Plaintiffs must overcome the presumption that the board of directors of the organization they are suing acted in good faith. Under Ohio law, members may not initiate litigation just because they believe a board of directors has made a bad decision. Instead, they must show that the directors – here, the Fraternity Council – "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (2020). Good faith is, by law, assumed. *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 25, 694 N.E.2d 479, 483 (1997) ("All acts of a board of directors of an Ohio corporation are presumed to have been taken in good faith."); Ohio Rev. Code § 1701.59(D)(1) ("A director shall not be found to have violated the director's duties… unless it is proved by clear and convincing evidence that the director has not acted in

13

good faith, in a manner the director reasonably believes to be in or not opposed to the

best interests of the corporation, or with the care that an ordinarily prudent person in a

like position would use under similar circumstances.")

Third, Plaintiffs must show that the Fraternity Council has broken their

constitution or bylaws, or committed fraud or colluded in some way. Ohio courts

generally leave non-profit organizations to manage themselves unless they have broken

their own internal laws. This is sometimes called the principle of judicial non-

intervention:

> Generally speaking, in matters of policy, discipline or internal economy of a
> voluntary association, wherein the members have mutually agreed upon a
> charter or rules, the decision of the association itself is supreme. *See,
> generally*, 60 Ohio Jurisprudence 3d (1985), Insurance, Section 1555. In the
> absence of mistake, fraud or management activity in excess of its corporate
> powers, a decision by such association in accord with its own charter and
> rules made by the governing body must be accepted by courts of law.

*Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748, 600 N.E.2d 797, 802

(1991); *see also Strah v. Lake Cty. Humane Soc.*, 90 Ohio App. 3d 822, 831 (1993)

("Courts will not interfere with the internal management of a corporation not for profit in

the absence of proof that the managing officers are acting in excess of their corporate

power, or that they are guilty of collusion or fraud.").

If Plaintiffs cannot satisfy each of these requirements, their derivative claims must

be dismissed.

### a. Demand Futility

Plaintiffs satisfied demand futility only for its dispute about Kappa's admittance of

transgender women. To the extent that they allege independent claims about the voting

14

procedure used to admit her, regardless of her gender, the procedural requirements have not been met, and the relevant claims must be dismissed.

As articulated above, nonprofit corporation members must satisfy the procedural requirement of demand futility before filing a derivative suit. It is therefore Plaintiffs' burden, as a threshold issue, to show that they either articulated their demands to the Fraternity Council and failed, or that such a demand was futile. We note, however, that Plaintiffs' demands are really twofold. First, they believe that Kappa wrongly admitted a student that does not qualify as a "woman" as defined by the Bylaws. This dispute undergirds the vast majority of their claims. Second, Plaintiffs believe the Wyoming Chapter violated its own voting procedures in admitting her, regardless of gender. These are two independent accusations. As such, in order to satisfy this procedural requirement, Plaintiffs must show that the Fraternity Council was informed about and rejected each demand or that both demands were independently futile.

In our previous order, we held that Plaintiffs had satisfied the demand requirement for the first issue, the dispute over Kappa's admission of a transgender woman, because Plaintiffs provided evidence of their extended exchange on that topic with then-members of the Fraternity Council/then-defendants "Rooney, Executive Director Poole, and other Fraternity Council members", who are "the same officers who purportedly approved [the Student]." ECF No. 31 at 26. Generally speaking, the law-of-the-case doctrine would require us to apply the same holding here. *See Fish v. Schwab,* 957 F.3d 1105, 1139 (10th Cir. 2020) ("when a court rules on an issue of law, the ruling should continue to govern the same issues in subsequent stages in the same case") (citations omitted).

15

However, a complication arises here from the fact that since Plaintiffs' original complaint was filed, multiple rounds of new Fraternity Council members have been elected; as a result, the new Defendants are not all "the same officers who purportedly approved" the Student. While Defendant Mary Pat Rooney appears to have maintained her position on both the Council and on the list of defendants, Plaintiffs have replaced the other original defendants with six new Fraternity Council members. Three of these, Defendants allege, have already completed their stints on the Council and are no longer members. ECF No. 67 at 3 n.1.[6] Although Plaintiffs state that they "renewed their demands by letter" on the Friday before the Monday that the Second Amended Complaint was due to be filed, and that Kappa rejected the request on that Sunday (ECF No. 68 at 6 n.3), Defendants contend that such a flimsy attempt does not satisfy the requirements of futility.

The issue, as we see it, is whether the plaintiffs in a derivative suit must prove demand futility each time new directors (or here, Fraternity Council members) are elected. We hold that, at least in this situation, with regard to the dispute over the admittance of transgender women, no such action was required. "The weight of authority establishes that the futility of demand must be determined by looking at the positions of the parties when the derivative suit is initially filed." *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 26, 694 N.E.2d 479, 483 (1997). Plaintiffs previously satisfied this requirement with the prior Council. This case has been ongoing (*see generally* ECF No.

---

[6] Because Maria Brown, Liz Wong, and Beth Black are no longer members of the Fraternity Council (and Plaintiffs have not refuted this fact), they do not have the authority to grant the relief sought by Plaintiffs and shall be dismissed from this suit.

57) since then, and thus we assume new Council members were made aware of the dispute. Plaintiffs' allegations in this amended complaint are not so different from their original complaint that new Defendant Council members did not have notice of them. Therefore, demand futility has been met with regard to the issue of who may be considered a woman.

We next consider the accusation of violations of Kappa's voting procedure, which our prior Order did not discuss. Plaintiffs spend eight pages of their SAC, and several more in their opposition brief, detailing the ways in which they notified Defendants and Defendants' counsel of their issues with Kappa's interpretation of the word "woman." ECF No. 65 at 29-36; ECF No. 68 at 6. Only the briefest mention is made of voting "irregularities." We therefore turn to the documents in the record, in particular the letters exchanged between parties' counsel.

Here again, Plaintiffs' counsel's letter from November 4, 2022, focuses on the debate over the word "woman". Only at the end of the second page is the voting process mentioned: "Further, our clients are concerned that the decision process which has led to this unfortunate position was deeply flawed. The Chapter President... conducted an illegal voting procedure." ECF No. 1-1. at 123. The reasons mentioned for "illegality" are that the President held a one-sided dialogue before the vote and that

> in a blatant violation of the requirement for a secret ballot, the chapter members voted through a Google Poll tracked by email. This public vote was only after a first vote, earlier that evening, was so close that officers approached individual women and pressured them to change their vote claiming a 'faulty voting system' in Google forms.

*Id*. The paragraph reiterates the lack of secrecy several times.

Defendants' counsel, in turn, responds in depth to the "woman" debate, and states it is "unaware" of any further rules that had been broken. ECF No. 1 at 117. It further requests that

> If there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions.

ECF No. 1 at 117. There is no evidence that Plaintiffs did so.

It is worth noting, in addition, that the allegations in Plaintiffs' SAC do not match those in Plaintiffs' pre-lawsuit notice to Defendants. The SAC drops Plaintiffs' claim that members were pressured into voting differently by the Chapter's officers. ECF No. 65 at 27 (stating instead that three members decided to change their votes when they realized their votes would not be anonymous[7]). Instead, the SAC claims that Kappa violated its Standing Rule that requires that all active members to participate in membership selection unless excused. *Id.* at 26. Additionally, the SAC states that the use of Google Poll was itself a violation of the Standing Rules because each chapter is required to use a Kappa-approved voting platform called Omega Recruit.[8] *Id.* at 27.

In other words, Plaintiffs do not appear to have given Defendants notice of the voting-related violations that form the basis of one of their claims. Nor can we find any portion of the SAC or Plaintiffs' brief that claims that any demand of the Fraternity

---

[7] Although the SAC still complains that the vote was not secret, secrecy is not, in fact, required by any governing document.

[8] Upon the Court's independent review, no governing document actually references "Omega Recruit" – the governing documents merely state that each chapter "shall" use the electronic voting system selected by Kappa. ECF No. 1-1 at 55. No document, governing or not, states what that system is.

Council on this matter would have been futile. Plaintiffs therefore have not satisfied the

demand futility requirement for their derivative claim based on the violations of Kappa's

voting procedure, and that claim must be dismissed.

Having found that Plaintiffs satisfied the procedural requirements for their dispute

about Kappa's definition of "woman", we spend the rest of this section evaluating those

claims on their merits.

> b. Breach accusations #1 and #5: "encouraging, advocating for, attempting to
> unduly influence the Wyoming chapter members to support, and approving
> the Student's membership in direct contravention to the… Articles, Bylaws,
> Standing Rules and Policies," and failing to "advocate for and seek to
> address issues of concern for members and women in general."

We dive immediately into the parties' central dispute: the debate over the

definition of the word "woman." Both the first and fifth allegations of breach of fiduciary

duty largely rest on Plaintiffs' assertion that the Fraternity Council admitted a transgender

woman in violation of Kappa's governing documents. When we ruled on this issue two

years ago, we held that we could not impinge on Kappa's First Amendment right of

expressive association to include transgender women, per *Boy Scouts of Am. V. Dale*, 530

U.S. 640 (2000). ECF No. 31 at 30. The law of the case doctrine dictates that we apply

the same holding here, but even if that were not the case, we reach the same conclusion,

independently, on the grounds that Ohio contract law allows Kappa to define "women" to

include individuals who identify as women.

Our previous ruling on Kappa's authority to interpret its own Bylaws is still

applicable here. As previously mentioned, the law-of-the-case doctrine holds that "when

a court rules on an issue of law, the ruling 'should continue to govern the same issues in

19

subsequent stages in the same case.'" *Fish*, 957 F.3d at 1139 (quoting *Bishop v. Smith*, 760 F.3d 1070, 1082 (10th Cir. 2014)). Courts only deviate when presented with new evidence, new and contrary controlling authority, or when their previous decision was clearly erroneous. *Id.*

Plaintiffs do not present new evidence in their SAC, but they do argue a possible new authority: Executive Order 14168, issued this year, states that "women… shall mean adult… human females" and "female… means a person belonging, at conception, to the sex that produces the large reproductive cell." 2025-02090 (90 FR 8615). We are not entirely sure what this definition means, not having a degree in biology.[9] But even assuming this definition aligned with Plaintiffs', it only applies to the Executive Branch's interpretation of federal laws and administration policy. It is not relevant in the world of private contracts, which is where we currently find ourselves.

This leaves only the "clearly erroneous" exception. The brunt of Plaintiffs' opposition brief, although not explicitly labeled as such, argues that our previous decision on this issue was erroneous. They argue that the First Amendment right to associate does not apply here because they are not asking the Court to force Kappa to exclude

---

[9] And even if we did, it might not help, since biologists seem to agree that no determination of biological sex can exist "at conception." *See* Karen K. Siu, et. al., The cell biology of fertilization: Gamete attachment and fusion, J. Cell Biol. 220 (2021). The article states, in relevant part:

> The cells produced by the first few divisions of the fertilized egg are totipotent and capable of differentiating into any cell type, including germ cells. PGCs [primordial germ cells] originate within the primary ectoderm of the embryo and then migrate into the yolk sac. Between weeks 4 and 6, the PGCs migrate back into the posterior body wall of the embryo, where they stimulate cells of the adjacent coelomic epithelium and mesonephros to form primitive sex cords and induce the formation of the genital ridges and gonads. The sex (gonadal) cords surround the PGCs and give rise to the tissue that will nourish and regulate the development of the maturing sex cells (ovarian follicles in the female and Sertoli cells in the male).

*Id.*

transgender women, but rather that the Court *en*force the existing private contract, which

in turn (they allege) forces the organization to exclude transgender women. ECF No. 68

at 17-18.

However, even when we adopt Plaintiffs' framing and apply Ohio contract law,

we come to the same conclusion: Kappa's Bylaws and Standing Rules do not require

Kappa to exclude transgender women. Kappa and its Fraternity Council have reasonably

interpreted an otherwise undefined term in the organization's Bylaws. Kappa's Bylaws

explicitly authorize the Fraternity Council to make these interpretations. Ohio law

explicitly authorizes organizations to govern themselves and interpret their own bylaws,

and it does not permit this Court to interfere with such organizations' internal policy

decisions unless they have broken their own bylaws or committed fraud or collusion. In

short, we are required to leave Kappa alone.

The parties' fundamental dispute is whether the undefined term "woman" in

Kappa's Bylaws *must* be interpreted to exclude transgender women. Both parties agree

that Kappa is an organization dedicated to women. Where they diverge is that Plaintiffs

argue that the word woman can *only* be defined as exclusive of transgender women. "The

words woman and women, as used in Kappa's Articles of Incorporation, Bylaws,

Standing Rules, Policies….have always referred to adult female human beings. These

words… have never referred to biological males who claim to be women", and therefore

any "change" to the definition requires an amendment. ECF No. 65 at 7, 15-16.

Plaintiffs cannot support this assertion. First, there is no definition of the term

anywhere in the governing documents. It is simply repeated a dozen times without further

clarification. Plaintiffs' next argument, that there is only one "ordinary meaning" of the term woman, is defied by Plaintiffs' own source. They point out, correctly, that courts must give "common words appearing in a written instrument… their ordinary meaning." ECF No. 68 at 15 (quoting *Shifrin v. Forest City Enterprises, Inc.,* 597 N.E.2d 499, 501 (Ohio Sup. Ct. 1992). They then cite Merriam-Webster's definition of woman as "an adult female person" as evidence that "woman" excludes transgender women. ECF No. 68 at 15. However, when we turned to the same source's definition of female, we find not one but seven definitions of the word. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/female. The first defines female as "of, relating to, or being the sex that typically has the capacity to bear young or produce eggs." *Id.* This would seem to conform to Plaintiffs' definition. However, the second definition is "having a gender identity that is the opposite of male" – which would include transgender women. *Id.* Plaintiffs' designated source does not appear to agree that only one common definition of "female", and therefore "woman", exists, and therefore we also remain unconvinced.

Third, Plaintiffs attempt to argue that the "intent of the parties" to limit "women" to only "biological females" is evident in various historical Kappa-produced texts, including Kappa songbooks referring to young maids, etc. The Court does not find any of the terms cited by Plaintiffs to show evidence of the intent of Kappa members to exclude transwomen. But even if it did, we could not consider it: external evidence of parties' intent is only admissible when "the language of a contract is unclear or ambiguous", and Plaintiffs rest their entire case on the argument that the term "woman" is not ambiguous –

22

that it can only have one, trans-exclusionary meaning. *DN Reynoldsburg, L.L.C. v. Maurices Inc.*, 2023-Ohio-3492, ¶ 26, 225 N.E.3d 454, 460. If we were to consider extrinsic evidence in this matter, it would conclusively show that *at the time Plaintiffs joined*, i.e. not in 1870, Kappa's well-publicized intent was to include transgender women. We discuss this in greater detail in the following section.

Independently, we find that within the governing documents themselves, there is more evidence that Kappa defines women by their gender and not their "biological sex." "Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enters., Inc.*, 1992-Ohio-28, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501. In June of 2022, at the Biennial Convention, Kappa members voted on and approved a new Bylaw provision that prohibits discrimination and explicitly used the term "single-gender", not "single-sex", to describe "Greek-letter social organizations."[10] ECF No. 1 at 84-85, 132. Arbitrarily, Plaintiffs assert that the reference to Title IX in this bylaw – the full sentence states "the single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under… Title IX" – somehow proves that the term "single-gender… must be read as synonymous with 'single-sex.'" ECF No. 65 at 15. This Court, however, must interpret a contract in a manner that "give[s] effect to the intent of the parties… [which] is presumed to reside in the language they chose to employ in the agreement." *Jurenovich v. Trumbull Mem'l Hosp.*, 2020-Ohio-2667, ¶ 13. We therefore

---

[10] Defendants note that "All 26 NPC [National Panhellenic Conference] sororities accept trans women into their memberships." ECF No. 69 at 11 n.3.

conclude Kappa meant exactly what it says, and that the sorority used "gender" instead of "sex" intentionally; to include all members whose gender identity is female.[11]

By contrast, Kappa's Bylaws do *not* reference a "single-sex" requirement. Plaintiffs try to convince this Court that such a phrase is implied, based on Kappa's previous advocacy for single-sex organizations. Plaintiffs point out that Article XV of Kappa's Bylaws state that "The Fraternity shall follow NPC [National Panhellenic Conference] Unanimous Agreements, policies, and procedures", and that one such Agreement states that "The women's sororities… shall defend their right to exist as single-sex organizations." ECF No. 1 at 93; ECF No. 68 at 38. However, Plaintiffs' argument that this would require Kappa to only admit "biological females" is defeated by a different NPC policy, which Kappa is also required by Bylaw to follow, and which unequivocally states that "woman is defined as an individual who consistently lives and self-identifies as a woman."[12] ECF No. 68 at 37. Read as a whole, this second policy more clearly indicates the intent of Kappa to include transgender women.

---

[11] We would reach the same conclusion if we considered the term ambiguous: analyzing parol evidence to evaluate the "intent of the parties" at the time that that amendment was passed, it is clear that Kappa intended it to include transgender members. The FAQs attached to this amendment, circulated among members two months before the Convention where the amendment passed, solidify that interpretation. ECF No. 1-1 at 49 ("Can nonbinary people join? Is this a chapter-by-chapter decision? Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection…").

[12] Plaintiffs' argument that because this policy is entitled "Panhellenic Recruitment Eligibility," it should only apply to recruitment, and not membership, is nonsensical. As Plaintiffs themselves note, "courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument." *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶10. The purpose of recruitment is to identify and vet new members. In this context, it would be "absurd" to read this policy as applying this definition of "woman" only to recruitment, but not membership.

Concluding, therefore, that at a minimum Kappa's governing documents do not require the exclusion of transgender women, we find that Kappa has not broken its Bylaws in admitting one such individual. Kappa Bylaws specifically authorize the Fraternity Council to "[i]nterpret… the Fraternity Bylaws and Standing Rules." ECF No. 6-1 at 119. The Fraternity Council issued several publications in advance of the fall 2022 recruitment season making its interpretation of the word woman – to include individuals who identify as women – abundantly clear. These include Position Statements "Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women"), FAQs ("woman is defined as an individual who consistently lives and self-identifies as a woman"), and a Guide for supporting LGBTQIA+ members. ECF No. 65 at 16, 34, 35.

Because Kappa has interpreted this term in accordance with its own governing documents, we have no authority to review the dispute. "As a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). The matter is not one open to judicial discretion:

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Stibora v. Greater Cleveland Bowling Assn.*, 63 Ohio App. 3d 107, 113, 577 N.E.2d 1175, 1179 (1989).

25

Exceptions to this rule are few, and none have been met here. "In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision… in accord with its own charter and rules made by the governing body must be accepted by the courts of law." *Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748 (1991); *see also Strah v. Lake Cty. Humane Soc.* 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud"). Plaintiffs argue that they have properly alleged that "Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior" because "the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was [a] single-sex organization…" (ECF No. 68 at 12-13).

These allegations are conclusory and contradicted by their own evidence. First, as is clear from the proceeding paragraphs, Defendants have not acted in excess of Kappa's corporate powers. Second, Defendants have not committed fraud because Plaintiffs cannot point to a concealment or false representation of a fact. *See Schmitz v. Natl. Collegiate Athletic Assn.*, 2016-Ohio-8041, ¶ 56, 67 N.E.3d 852, 868. The previously mentioned Position Statements, distributed LGBTQIA+ Guide, and sorority-wide vote and approval of the 2022 Bylaw amendment describing the Kappa as "single-gender", not "single-sex", show that Kappa never concealed the fact that transgender women for membership. Third, Plaintiffs' conclusory allegation that the Fraternity Council hatched a plan with the Wyoming Chapter to admit a transgender student is not evidence of collusion. In Ohio courts, the term generally refers to an agreement by multiple entities to

26

commit fraud or other misrepresentation. *See State ex rel. Dolle v. Miller*, 18 Ohio Dec. 218, 221 (Ohio Com. Pl. 1907), aff'd, 1907 WL 1152 (Ohio Cir. Ct. Dec. 28, 1907) (considering a charge of "collusion among bidders to distribute territory, to keep prices up and make the city pay more than it properly should"). As previously stated, none of the Defendants misrepresented that the sorority was open to admitting transgender women. Therefore, no collusion could have occurred based on these facts.

Finally, Plaintiffs' breach of fiduciary duty claim could also be interpreted as implicitly arguing that, whether or not Kappa's rules *allowed* it to admit transgender women, doing so was a "reckless" decision because it resulted in several women leaving the sorority. *See* ECF No. 65 at 41, 43. However, this is precisely the type of decision-making that has long been protected by the business-judgment rule: the decisions made by boards of directors are insulated from judicial review as long as they are made in good faith and with the best interests of the organization in mind. *Kleemann v. Carriage Trace, Inc.*, 2007-Ohio-4209, ¶ 51. While Plaintiffs certainly show that they and other Kappa members disagree with the Fraternity Council's decision to admit transgender women, they do not allege facts that show that the Fraternity Council took any actions for any reason other than what it believed was in the best interest of the organization. Plaintiffs simply disagree with the Fraternity Council's assessment of what those interests were. Nor have Plaintiffs shown that the Fraternity Council acted without "the care that ordinarily prudent persons in like positions would use under similar circumstances" or act with "reckless disregard." *Id*. at ¶ 56, 57. Indeed, the evidence provided *by Plaintiffs* clearly shows that great care went into the decision. *See, e.g.,* ECF No. 1-1 at 49

(regarding the explicit policy of allowing non-binary people and "individuals who identify as women" to join, the organization stated "We have conferred with legal counsel as well as NPC on DEI-related updates to Fraternity documents. We are confident that these changes would hold up if contested in a court of law."); *id.* ("Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued… We want to be as inclusive of all members as we can be.").

The reality is that Plaintiffs do have a remedy here – they are simply choosing not to use it. Plaintiffs could advocate for a new amendment to the Bylaws, defining the word "woman" as they wish, which would restrain Kappa from choosing between various reasonable definitions of the term. Such amendments may only be passed every other year, at Kappa's Biennial Convention, but one such Convention occurred over the course of this lawsuit and another hypothetically will occur next year. If as many Kappa members are upset about the admission of transgender women members as Plaintiffs claim, this internal remedy should be more than sufficient to achieve their aims.

Plaintiffs have not shown that Kappa violated its governing documents by admitting a transgender woman, and therefore this claim must be dismissed.

       c.  Breach accusation #2: "actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity."

Plaintiffs do not allege sufficient facts to show that the Fraternity Council concealed its efforts to admit transgender women. Plaintiffs contend at a very general

level that Fraternity Council "concealed their disavowal and betrayal of Kappa's promises and obligations to women" by not disclosing to Plaintiffs that Kappa's definition of a "woman" "includes men identifying as women." ECF No. 65 at 39. However, Plaintiffs admit that at least one publication was available on the Kappa website (ECF No. 65 at 34) that addressed the issue of gender. They also admit that the Guide for Supporting our LGBTQIA+ Members "was distributed to the Fraternity's 'workforce' (alumnae who direct chapter operations) in about 2018." *Id.* at 35. Finally, Kappa's Policies specifically prohibit discrimination based on "gender identity". ECF No. 1-1 at 89. These documents show that Kappa publicly and openly defined "women" to include all individuals who identify as women. It may be true that those publications are not governing documents, but they certainly contradict any claims of concealment.

Furthermore, Plaintiffs have pointed to no bylaw or statute that requires organizations to publicly clarify every term in every policy before a new member joins. Even if they could, Plaintiffs themselves admit that the Wyoming Chapter's Membership Chair notified members during recruitment in the fall of 2022 that transgender women were eligible to join Kappa. ECF No. 65 at 22. There is simply no evidence that Defendants concealed or misrepresented their position on the matter.

     d. <u>Breach accusation #3</u>: "unduly influencing Wyoming chapter officers to disregard mandatory voting procedures employed in the Student's selection process."

Plaintiffs do not provide any facts that support this allegation. As Plaintiffs themselves admit, "National Fraternity representatives usually have little involvement in member selection until after chapter members have voted." ECF No. 65 at 28. Plaintiffs

do not describe a single instance of any member of the Fraternity Council conversing with Chapter officers, on any topic, before the September 20th vote occurred. Instead, Plaintiffs make the conclusory claim that they "believe officers were told by the Fraternity Council" to advocate for the Student's admission. However, even this contention does not mention specific voting procedures. Additionally, Plaintiffs have not satisfied the demand futility requirement for this claim under Ohio law, as discussed earlier in this opinion. *See supra* Section I (a).

     e.  <u>Breach accusation #4</u>: "disregarding Kappa's duty, as an Ohio citizen, to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution by retaliating against members who challenged the validity of the Student's membership."

Plaintiffs' allegations of retaliation fail because, first and foremost, the Ohio Constitution only protects against state actors, and Plaintiffs have not alleged that Kappa is a state actor. *See Herring v. Adkins, 2008-Ohio-7082*, ¶ 9, 150 Ohio Misc. 2d 13, 19, 902 N.E.2d 93, 98 ("the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment") (citing *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222, 626 N.E.2d 59). Secondly, Plaintiffs' claim fails because, as previously mentioned, Ohio law holds that volunteer organizations may make their own disciplinary decisions, free of judicial review, as long as they do not violate due process and are not arbitrary, fraudulent, or the result of collusion.

Plaintiffs accuse the Fraternity Council of violating the Ohio Constitution's freedom of speech protections by "retaliating against members who challenged the validity of the Student's membership." ECF No. 65 at 43. Specifically, the SAC states

that Madeline Ramar was removed from her position as Wyoming Chapter Finance Chair

because of her opposition to the Student's admission and her decision to sign on to the

First Amended Complaint in this case. ECF No. 65 at 31.[13]

First, Ohio courts have specifically held that a voluntary organization's

disciplinary actions are not violative of the Ohio constitution's free speech provisions.

*See Putka*, 75 Ohio App. 3d at 746 (dismissing a claim that the Ohio Constitution's free

speech provision was violated when plaintiff was expelled from voluntary organization

for his speech).

Second, as Plaintiffs emphasize, the principle of judicial noninterference applies to

"an organization's interests in '*questions of discipline*, or internal policy and

management.'" ECF No. 68 at 8 (quoting *Stibora,* 63 Ohio App.3d at 113) (emphasis

added). Here, Article V, Section 4 of the Wyoming Chapter's bylaws[14] describe the

process of removing a chapter officer "for failing to adequately perform the duties of

office, [or] failing to maintain Fraternity standards." ECF No. 1-1 at 148. The record does

not provide the details of Kappa's decision to remove Ms. Ramar from her position, but

this Court notes at least one sorority-wide Policy she conceivably violated: Policy III,

Section C (2) states that "Any member who makes discriminatory, inflammatory, or

inappropriate actions based on… gender identity… shall be subject to dismissal or other

---

[13] The SAC also states that three Kappa members resigned of their own accord from the organization, a third member was "threatened with discipline", and a fourth, Plaintiff Hannah Holtmeier "continued to raise concerns about the Student's membership," for which she was "brought before a disciplinary hearing", provided with Kappa's "Guide for Supporting our LGBTQIA+ members" and "threatened with further discipline." ECF No. 65 at 31. None of these actions concluded in Kappa actually taking a disciplinary action – such as a probation or expulsion – so we do not consider them here. Even if we were to, however, the above principles would result in the same conclusion: dismissal of this claim.

[14] The Wyoming Chapter bylaws are distinct from Kappa Bylaws, which govern the organization as a whole.

disciplinary action." ECF No. 1-1 at 89. In any case, there are no allegations in the SAC
that Ms. Ramar's removal was "inconsistent with due process" or the result of
"arbitrariness, fraud, or collusion", and therefore it "will not be reviewed by the courts."
*Lough v. Varsity Bowl, Inc.*, 16 Ohio St. 2d 153, 155, 243 N.E.2d 61, 63 (1968). Nor have
Plaintiffs cited any caselaw to show that it is the Court's duty to review due process in
cases where a member is removed from an internal position but not ejected from the
organization as a whole.

 Plaintiffs have not sufficiently pled a breach of fiduciary duty based on the Ohio
Constitution. We therefore dismiss this claim.

  f. <u>Breach #6</u>: the Fraternity Council "exceeded its authority to act" and "failed
   to conduct Kappa's affairs as set forth in its Bylaws."

 This claim is duplicative of the above claims as it is based on Plaintiffs' assertion
that admitting a transgender woman was a violation of Kappa's commitment to only
admit "biological females." This limitation, we have held, does not exist, and therefore
this claim must also be dismissed.

## II. Count Three: Breach of Contract

 Plaintiffs' breach of contract claim is based on their assertion that "Plaintiffs…
agreed to join Kappa [and] pay membership dues… in exchange for the promise of
participating in a single-sex organization committed to uniting and supporting women
throughout their lifetimes." ECF No. 65 at 45. The Defendants allegedly breached the
"contract" created by Kappa's Bylaws and Standing Rules when it "compel[led] the
Wyoming Chapter members to admit the Student." *Id.*

Assuming the basis of the "breach" is that Kappa admitted a transgender woman, this claim must be dismissed. We first note that Plaintiffs did not specify *which* Bylaws and Standing Rules it was referring to in this claim. Because they did not, we conclude that the rules that Plaintiffs refer to are those that limit Fraternity membership to "women," based on the alleged promise of a single-sex organization. As we have previously stated, Kappa did not promise Plaintiffs a single-sex organization, nor did they violate any of their Bylaws or Standing Rules in admitting a transgender woman.

We also consider whether Plaintiffs could be referring to a violation of voting procedures. We find this unlikely because the remedy for such a breach would not align with Plaintiffs' requested relief (that Kappa expel all members that are not "biological women" on the basis that they are not women, etc.), and the matter is not mentioned in Plaintiffs' opposition brief or the breach allegation articulated at the end of their SAC. However, even if it was, the SAC does not contain sufficient facts to support the claim. The SAC alleges that Defendants encouraged the recruitment of the Student and advised Chapter officers on the discipline of members who opposed Kappa's inclusion of transgender women, but it does *not* allege that Defendants compelled – or even suggested – any violation of any voting Bylaw or Standing Rule. Based on the record, the vote appeared to be managed entirely by the Wyoming Chapter, without any involvement from the Fraternity Council or any other officer outside of the Chapter.

For all of these reasons, Plaintiffs have failed to articulate a claim for breach of contract that would survive in federal court. We therefore dismiss these claims.

### III.    Count Four: Fraud in the Inducement

Plaintiffs' claim for fraud in the inducement must be dismissed for failure to identify a false representation. Plaintiffs allege that Kappa fraudulently induced Plaintiffs to join the Fraternity by failing to disclose that "men could become Kappas" and holding "itself out as an organization of women." ECF No. 65 at 46. In order to state a claim for fraudulent inducement, Plaintiffs must show that Defendants made "a representation of fact… falsely, with knowledge of its falsity, or with utter disregard and recklessness[] as to whether it is true or false", among other things. *Mortg. Elec. Registration Sys., Inc. v. Mosley*, 2010-Ohio-2886, ¶ 31.  Plaintiffs' claim fails because they cannot point to any statement by Kappa that was false: Kappa has never asserted that it does *not* accept transgender women. As we previously stated and as Plaintiffs admit, Kappa and the Fraternity Council published multiple public documents defining "women" to include individuals who identify as women, as the Student does. Therefore, Kappa may hold itself has an organization of women because it *is* an organization of women, according to its own definition.

Plaintiffs have not identified any false representations made by Defendants; therefore, their claim for fraud in the inducement must be dismissed.[15]

---

[15] To the extent that Plaintiffs assert this claim against Kappa based on the actions of the Wyoming Chapter officers at the time of the vote, we also find that Plaintiffs do not provide sufficient evidence to state a claim. In their SAC, Plaintiffs state that the Wyoming Chapter's Membership Chair and other Chapter officers "intentionally concealed the fact that the Student's candidacy would be presented for vote" at the secondary, Sunday night Chapter meeting. ECF No. 65 at 24-25. However, the Student's application and the date of the vote was announced at the primary, Monday-night Chapter meeting. *Id.* at 25. Plaintiffs cannot point to any bylaw, rule, or policy that states that applicant votes must be announced at the Sunday night meeting, nor that doing so was irregular in any way. Nor have they identified a false statement made by any Wyoming Chapter official.

## CONCLUSION

Having considered the written submissions, the applicable law, and being otherwise fully advised, **IT IS HEREBY ORDERED** that Defendant's *Motion to Dismiss* (ECF No. 66) is **GRANTED**. **IT IS FURTHER ORDERED** that Plaintiffs' *Second Amended Complaint* (ECF No. 65) is **DISMISSED WITH PREJUDICE.** We have reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile.

Dated this _22__ day of August, 2025.

Alan B. Johnson
United States District Judge

A-243

**FILED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

4:24 pm, 8/22/25

**Margaret Botkins**
**Clerk of Court**

|  |  |
|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY,<br><br>         Plaintiffs,<br><br>     v.<br><br>KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4,<br><br>         Defendants, | Case No.  2:23-CV-51 |

---

## JUDGMENT

---

This matter comes before the Court on Defendants' *Motion to Dismiss* (ECF No. 66), filed on June 26, 2025. The Court has entered its *Order Granting Defendants' Motion to Dismiss* (ECF No. 70) finding that Plaintiffs' *Second Amended Complaint* (ECF No. 65) failed to adequately state a claim upon which relief could be granted.

The Court, therefore, **ORDERS, ADJUDGES, AND DECREES** that for the reasons stated in the Court's *Order*, Defendants' *Motion* is **GRANTED**. ECF No. 70. The Court further **ORDERS, ADJUDGES, AND DECREES** that for the reasons stated in the Court's *Order*, Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**. *Id.*

1

Dated this 22<sup>d</sup> day of August, 2025.

Alan B. Johnson
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) | |
|     Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4 | ) ) ) ) ) ) | |
|     Defendants. | ) | |

---

### NOTICE OF APPEAL

---

Now come Plaintiffs/Appellants Hannah Holtmeier, Alison Coghan, and Haley Rusch both individually and derivatively on behalf of Kappa Gamma Fraternity, and hereby give notice of their appeal to the Tenth Circuit Court of Appeals from the *Order Granting Defendants' Motion to Dismiss* ("Order") entered by the District Court on August 22, 2025 (ECF No. 70) along with the corresponding Judgment (ECF No. 71). A Copy of the Order is attached as Exhibit 1 and incorporated herein by reference.

Dated this 17th day of September, 2025.

/s/ Rick L. Koehmstedt
Rick L. Koehmstedt, Wyoming Bar No. 6-3101
KOEHMSTEDT LAW FIRM, LLC
1551 Three Crowns Drive, Suite 100
Casper, WY 82604
Telephone: (307) 333-1401
Facsimile:  (307) 333-1348 fax
rick@klflegalteam.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing *Notice of Appeal* was filed electronically with the Court this 17th day of September 2025.  Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. Mail. Parties may access this filing through the Court's system.

*/s/ Rick L. Koehmstedt*
Rick L. Koehmstedt

A-247



FILED
4:07 pm, 8/22/25
**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, |  |
| Plaintiffs, |  |
| VS. | Case No. 23-CV-51 |
| KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4, |  |
| Defendants, |  |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 66)

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss* (ECF No. 66), filed on June 26, 2025. Plaintiffs responded in opposition on July 10th (ECF No. 68), and Defendants replied on July 17th (ECF No. 69). Having considered all of the relevant materials, we hereby **GRANT** Defendants' motion.

### BACKGROUND

The facts of this case are well known to the parties at this point, almost two and a half years after this suit was initially filed. In the fall of 2022, a chapter of the Kappa

1

Kappa Gamma Fraternity ("Kappa") located at the University of Wyoming voted to

accept, and later initiated, a transgender woman as a member of the sorority.[1] In March of

2023, seven then-current members of the sorority filed the original complaint in this case,

asserting a breach of contract claim, a tortious-interference claim, and a direct cause of

action against the admitted student, Kappa, and the Fraternity Council president. *See*

*generally* ECF No. 1. We dismissed that complaint without prejudice on the grounds that

the sorority was free, as a private organization, to define the word "woman" in its bylaws

however it wanted, and therefore the sorority was not contractually obligated to reject

transwomen members. ECF No. 31 at 26, 33. Plaintiffs appealed our dismissal to the

Tenth Circuit, which denied it on jurisdictional grounds. ECF No. 39. Plaintiffs

eventually filed this Second Amended Complaint (SAC) in June of this year. ECF No.

65.

    The SAC recounts many of the same facts as the previous complaint, though this

time it alleges four slightly different claims. Plaintiffs first allege a set of derivative

claims against Kappa's Fraternity Council, who act as the organization's board of

directors[2], for various breaches of their fiduciary duties. They also directly allege that

---

[1] Parties use both the terms "sorority" and "fraternity" to refer to Kappa. For the sake of consistency and comprehensibility, will use the term "sorority" when referring to the organization, except where Kappa is referred to as a fraternity in Bylaws and other quoted text.

[2] Ohio nonprofit law states that "'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated." Ohio Rev. Code Ann. §§ 1702.0l(K). Article IX of Kappa's Bylaws states that

        all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving
        hereunder shall have the power, authority and responsibilities of and shall perform the functions provided
        for directors under the Ohio Nonprofit Corporation Law.

ECF No. 1 at 146.

Kappa breached its contract with Plaintiffs and that the Fraternity Council fraudulently induced members to join the organization.

Having considered the issues presented (again), we find that the majority of the claims must be dismissed on the grounds that this Court still may not interfere with Kappa's contractually valid interpretation of its own Bylaws. Nothing in the Bylaws or the Standing Rules requires Kappa to narrowly define the words "women" or "woman" to include only those individuals born with a certain set of reproductive organs, particularly when even the dictionary cited by Plaintiffs offers a more expansive definition. Nor has Kappa or the Fraternity Council concealed this definition from its members: in fact, it has published and distributed multiple texts clarifying the issue. Finally, to the extent that Plaintiffs meant to articulate independent claims of breach of contract regarding the voting procedure used when the transgender woman was admitted, they have not shown that any resulting damages surpass the amount in controversy required to maintain federal jurisdiction.

### A. Relevant Governing Documents of Kappa

All of Plaintiffs' claims are based on Kappa's alleged violations of the contract between the organization and its members. We therefore begin by examining the basis and content of that contract. Kappa is a non-profit corporation organized in Ohio, and therefore it is subject to that state's laws. ECF No. 65 at 12. In Ohio, an organization's governing documents includes its constitution and bylaws, both of which serve as a contract between the organization and its members. *Ulliman v. Ohio High Sch. Athletic*

3

*Assn.*, 184 Ohio App. 3d 52, 62 (2009). We therefore turn to these documents to understand the basis of the contract.

We first identify the relevant portions of Kappa's Articles of Incorporation, which Plaintiffs implicitly argue is akin to a "constitution." Here, Kappa states that its "purpose" is to "unite women", "build[] higher standards of womanhood", "advocate for and seek to address issues of concern for members and women in general", and "provide opportunities for engagement throughout the lives of alumnae". ECF No. 65 at 13. The Articles permit local chapters to recruit and vote on new members "in accordance with [Sorority] standards and procedures." *Id.* at 14.

Next, we examine Kappa's Bylaws. The Bylaws state that a new member "shall be a woman", and the word "woman" is repeated several times in the "Qualifications" section. *Id.* Article IV also states that "Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures." ECF No. 1 at 81. Additionally, at the June 2022 Biennial Convention, Kappa members approved[3] a new Bylaw forbidding Kappa members from engaging in discrimination, while also recognizing that the "single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under... Title IX". ECF No. 65 at 15.

Although not officially a Bylaw, Kappa issued a document to members entitled "Bylaws and Standing Rules Revision 2022" about two months before the Convention.

---

[3] Bylaws may only be amended by a two-thirds majority vote at Kappa's biennial convention, and the exact content of any proposed amendment must be shared with members three months beforehand. ECF No. 65 at 14.

ECF No. 65 at 15. In the FAQs section, under "DIVERSITY, EQUITY AND

INCLUSION", it states:

> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women
> and individuals who identify as women whose governing documents do not
> discriminate in membership selection except by requiring good scholarship
> and ethical character. Please see Kappa's Position Statements on
> Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC
> member organization. The NPC Recruitment Eligibility (2020) policy states:
> "For the purposes of participation in Panhellenic recruitment, woman is
> defined as an individual who consistently lives and self-identifies as a
> woman. Each women's-only NPC member organization determines its own
> membership selection policies and procedures.

ECF No. 65 at 16. Plaintiffs assert that this statement cannot be considered a governing

document because it was not specifically voted on and it was only released two months

ahead of the convention. *Id.*

Kappa also has a set of "Standing Rules," which Plaintiffs implicitly argue are also

part of the governing documents because, like the Bylaws, the Rules can only be

amended by majority vote at a Biennial Convention. ECF No. 1-1 at 79. As relevant here,

the Rules provide guidance on membership selection. They state that (1) "All active

members of the chapter shall participate in membership selection unless excused in

writing by the designated chapter adviser"; (2) "All information concerning the

membership selection process is confidential and shall be kept within the chapter"; and

(3) "The electronic voting system selected by the Fraternity shall be used by the chapter"

ECF No. 1-1 at 55.

5

The Rules also provide an outline of the role of the Fraternity Council. The duties of the Council "shall include… Interpreting the Fraternity *Bylaws* and *Standing Rules*" as well as "Appointing Fraternity members to all volunteer positions within the Fraternity, filling vacancies that occur, and removing members from appointed positions, if deemed necessary, by a three-fourths vote", among other things. ECF No. 1-1 at 63. The Fraternity Council also has some role "authorizing" members for initiation:

> At least two weeks before initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

ECF No. 1-1 at 64.

Finally, there are various documents published by Kappa that Plaintiffs assert are *not* governing documents because they are not voted on by the members. Among these are Kappa "Policies," which, among other things, warn that "Any member who makes discriminatory, inflammatory or inappropriate actions based on… gender identity, [or] sexual orientation… shall be subject to dismissal or other disciplinary action." ECF No. 1-1 at 89. Kappa also publishes "Position Statements", which can be found on their "member portal." One such Statement clarifies Kappa's position on "individuals who identify as women":

> MEMBERSHIP SELECTION
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> SINGLE GENDER ORGANIZATIONS

> Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

ECF No. 1-1 at 127. Kappa also published and distributed a "Guide for Supporting Our LGBTQIA+ Members" in 2018, which states that the organization does not discriminate based on "gender identity", repeats the Membership Selection paragraph above, and provides twelve pages of advice on how to be respectful of gay and transgender Kappa members. ECF No. 1 at 103-114.

## B. **Admission of the Student**

Plaintiffs allege that several provisions of the governing documents were violated when the Wyoming Chapter admitted a transgender woman (who we will subsequently refer to as "the Student") as a member. The Student participated in formal sorority recruitment at the University of Wyoming in August of 2022. ECF No. 65 at 22. During this period, the Kappa Membership Chair for the Wyoming Chapter told sorority members, including Plaintiffs, that Kappa rules did not permit them to refuse transgender women. *Id.* at 22. The Student did not finish formal recruitment with Kappa, but afterwards reached out to the Membership Chair to pursue membership through the "continuous open bidding" process, which allows individuals to become members outside of formal recruitment. *Id.* at 23.[4]

---

[4] Kappa requires all chapters with low membership to use the process. ECF No. 65 at 23. The Wyoming Chapter, which was on probation from 2016 until 2022 because of low membership numbers, used this system. *Id.*

A-254

Plaintiffs allege a few "irregularities" during the Student's pre-voting recruitment process, although they do not specify violations of any specific governing documents. First, they allege that Kappa's alumnae advisors directed the chapter president and officers to recruit the Student to raise the profile of the Wyoming chapter. *Id*. Second, Plaintiffs allege that members did not receive sufficient notice of the Student's application, although they admit that her application was mentioned at a chapter meeting "well before the vote" and that a dinner was set up to meet the Student, as was customary during the COB process. *Id*. at 24.

Plaintiffs also contend that several "irregularities" occurred during the voting process. The first has to do with notice. The chapter's vote on the Student's application took place on Tuesday, September 20, 2022. ECF No. 65 at 24. The Wyoming Chapter requires all members to attend weekly Monday-evening Chapter meetings, unless they attended a Chapter Council meeting the day before. *Id*. Plaintiffs contend that the officers intentionally concealed, at the Sunday Chapter Council meeting, that the Student's application would be voted on that week. *Id*. at 25. Plaintiffs admit that members were so informed during the regular Monday meeting, however. *Id*.

Second, Plaintiffs allege that although "Fraternity rules prohibit discussion during the voting process" (without citing a specific rule or bylaw), several officers spoke before the vote on the Student was held. ECF No. 65 at 25. They advised members that they should only vote "no" based on the Student's personality, and that a "no" vote without having met the student was evidence of bigotry. *Id*. Plaintiffs contend, without foundation, that The Fraternity Council required the Chapter officers to advocate for the

8

Student and "hatched" a "plan" with the officers to intentionally limit the other members' opportunity to meet the Student. *Id*.

Third, Plaintiffs state that the vote on the Student's admittance was conducted using the wrong voting software – a Google Poll link instead of a software called Omega Recruit. *Id*. at 25. Their primary issue with the use of Google Poll is that the vote was not conducted "in secret" because members had to use their emails when signing in to vote. *Id*. at 27. Additionally, two Google Poll links were sent out because the first one was faulty. ECF No. 1-1 at 123. Plaintiffs do not allege that the second vote had a different overall outcome than the first, or even that the first vote was completed – they claim that the second link was sent out within thirty minutes. ECF No. 65 at 27-28. However, they do claim that three members changed their votes between the first and second votes because they "understood that the second vote would not be secret and they feared retribution." *Id*. at 28. Plaintiffs do not cite a Bylaw or Standing Rule that requires anonymity.[5]

Finally, Plaintiffs allege that only people present at the Monday Chapter meeting the day before the vote were allowed to vote, in violation of the Standing Rule requiring that "all active members" participate. *Id*. at 24. Specifically, Plaintiffs allege that Chapter officers "forbade" two members, Madeline Ramar and Grace Ann Choate, from voting because they had not attended the previous day's meeting. *Id*. at 26. Plaintiffs also state

---

[5] Anonymity appears to be required, according to the Wyoming Chapter's bylaws, for "Electronic Meetings." ECF No. 1-1 at 152. However, Plaintiffs do not allege that the Chapter bylaws are governing documents, nor that this was an electronic meeting – it appears to have been in person.

9

that officers roamed the halls of the Chapter's house instructing "some (but not all)"
members to vote. *Id.* at 27.

Plaintiffs assert that had these inconsistencies not occurred, the Student would
have lost the vote and not been admitted. *Id.* at 28. They further contend that the
Fraternity Council knew about these "irregularities and violations of Governing
Documents" and still approved of the Student's membership, which further violated the
governing documents. *Id.* at 29.

### D. Parties' communication after the vote

Plaintiffs made several efforts to let Kappa know that they were displeased about a
transgender woman joining their ranks. They and their parents raised concerns about the
Student's admittance in September and early October to the Executive Director of Kappa.
ECF No. 65 at 29. The Director responded that she had reviewed Plaintiffs' concerns but
that the national officers "believe proceeding with initiation is the appropriate next step."
*Id.* Plaintiffs allege that sorority officials encouraged members who disagreed with the
Student's admittance to resign if "their values were inconsistent with Kappa's values." *Id.*
At least three members did ultimately resign, while Plaintiff Hannah Holtmeier
transferred to the University of Nebraska. *Id.* Another member, Madeline Ramar, was
removed from her position as Finance Chair. *Id.* at 31.

Plaintiffs also wrote to the Fraternity Council through their lawyers in November,
stating that the Student should not be admitted because she is a "non-woman" and that
the Chapter President "conducted an illegal voting procedure" involving a non-secret
Google Poll and public pressure. ECF No. 1-1 at 123. Kappa's counsel responded, stating

10

that a woman need not be "biologically born as female" to be a woman and a Kappa member, and referred to Kappa's Position Statements and LGBTQIA+ Guide on the issue. ECF No. 65 at 33.

Unable to resolve the dispute to their satisfaction, Plaintiffs first filed suit in March of 2023. After two years of stop-and-start litigation, we now find ourselves addressing Defendants' second motion to dismiss, based on Plaintiffs' second amended complaint (SAC). We review each claim anew below.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

A-258

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ANALYSIS

### I.   Count One & Two: Fraternity Council's Breach of Fiduciary Duty

Plaintiffs allege, derivatively, that the Fraternity Council Defendants breached their fiduciary duty to Kappa in six ways: by (a) encouraging the Wyoming Chapter to admit a transgender woman in contravention of the governing documents; (b) concealing Kappa's efforts to admit a transgender woman; (c) unduly influencing Wyoming Chapter officers to disregard mandatory voting procedures; (d) disregarding "Kappa's duty" to "affirmatively protect" freedom of speech under the Ohio Constitution; (e) failing to "advocate for and seek to address issues of concern for members and women in general", per Kappa Bylaws; and (f) acting ultra vires. Each of these claims fail, though for different reasons.

We begin by reviewing relevant Ohio law. First, the Ohio Supreme Court defines a derivative claim as one that is:

> brought by a shareholder in the name of the corporation to enforce a corporate claim. Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of a corporation. A derivative action allows a shareholder to circumvent a board's refusal to bring a suit on a claim.

*Crosby v. Beam*, 47 Ohio St. 3d 105, 107, 548 N.E.2d 217, 219 (1989). Nonprofit members may file derivative claims under Ohio nonprofit-corporation law. *Carlson v. Rabkin*, 2003-Ohio-2071, ¶ 10, 152 Ohio App. 3d 672, 679, 789 N.E.2d 1122, 1127.

12

Plaintiffs face several hurdles in getting a derivative claim past the motion-to-dismiss stage, however. First, they must satisfy a procedural requirement called "demand futility." *Carlson,* 152 Ohio App. 3d at 679. Complaining members must

> (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort… and (3) show that they 'fairly and adequately' represent the interests of other shareholders 'similarly situated.'

*Id.* at 680. Alternately, complaining members may demonstrate that "the demand would have been futile… that the directors' minds are closed to argument." *Id.* (internal quotation mark removed). Members cannot rely on the fact that the directors are the ones being sued to prove futility – they must show that the directors "were conflicted or otherwise incapable of exercising reasonable business judgment." *In re Lubrizol S'holders Litig.*, 2017-Ohio-622, ¶ 37, 79 N.E.3d 579, 587.

Second, Plaintiffs must overcome the presumption that the board of directors of the organization they are suing acted in good faith. Under Ohio law, members may not initiate litigation just because they believe a board of directors has made a bad decision. Instead, they must show that the directors – here, the Fraternity Council – "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (2020). Good faith is, by law, assumed. *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 25, 694 N.E.2d 479, 483 (1997) ("All acts of a board of directors of an Ohio corporation are presumed to have been taken in good faith."); Ohio Rev. Code § 1701.59(D)(1) ("A director shall not be found to have violated the director's duties… unless it is proved by clear and convincing evidence that the director has not acted in

13

good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an ordinarily prudent person in a like position would use under similar circumstances.")

Third, Plaintiffs must show that the Fraternity Council has broken their constitution or bylaws, or committed fraud or colluded in some way. Ohio courts generally leave non-profit organizations to manage themselves unless they have broken their own internal laws. This is sometimes called the principle of judicial non-intervention:

> Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein the members have mutually agreed upon a charter or rules, the decision of the association itself is supreme. *See, generally*, 60 Ohio Jurisprudence 3d (1985), Insurance, Section 1555. In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by such association in accord with its own charter and rules made by the governing body must be accepted by courts of law.

*Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748, 600 N.E.2d 797, 802 (1991); *see also Strah v. Lake Cty. Humane Soc.*, 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud.").

If Plaintiffs cannot satisfy each of these requirements, their derivative claims must be dismissed.

      a. <u>Demand Futility</u>

Plaintiffs satisfied demand futility only for its dispute about Kappa's admittance of transgender women. To the extent that they allege independent claims about the voting

14

procedure used to admit her, regardless of her gender, the procedural requirements have not been met, and the relevant claims must be dismissed.

As articulated above, nonprofit corporation members must satisfy the procedural requirement of demand futility before filing a derivative suit. It is therefore Plaintiffs' burden, as a threshold issue, to show that they either articulated their demands to the Fraternity Council and failed, or that such a demand was futile. We note, however, that Plaintiffs' demands are really twofold. First, they believe that Kappa wrongly admitted a student that does not qualify as a "woman" as defined by the Bylaws. This dispute undergirds the vast majority of their claims. Second, Plaintiffs believe the Wyoming Chapter violated its own voting procedures in admitting her, regardless of gender. These are two independent accusations. As such, in order to satisfy this procedural requirement, Plaintiffs must show that the Fraternity Council was informed about and rejected each demand or that both demands were independently futile.

In our previous order, we held that Plaintiffs had satisfied the demand requirement for the first issue, the dispute over Kappa's admission of a transgender woman, because Plaintiffs provided evidence of their extended exchange on that topic with then-members of the Fraternity Council/then-defendants "Rooney, Executive Director Poole, and other Fraternity Council members", who are "the same officers who purportedly approved [the Student]." ECF No. 31 at 26. Generally speaking, the law-of-the-case doctrine would require us to apply the same holding here. *See Fish v. Schwab*, 957 F.3d 1105, 1139 (10th Cir. 2020) ("when a court rules on an issue of law, the ruling should continue to govern the same issues in subsequent stages in the same case") (citations omitted).

15

However, a complication arises here from the fact that since Plaintiffs' original complaint was filed, multiple rounds of new Fraternity Council members have been elected; as a result, the new Defendants are not all "the same officers who purportedly approved" the Student. While Defendant Mary Pat Rooney appears to have maintained her position on both the Council and on the list of defendants, Plaintiffs have replaced the other original defendants with six new Fraternity Council members. Three of these, Defendants allege, have already completed their stints on the Council and are no longer members. ECF No. 67 at 3 n.1.[6] Although Plaintiffs state that they "renewed their demands by letter" on the Friday before the Monday that the Second Amended Complaint was due to be filed, and that Kappa rejected the request on that Sunday (ECF No. 68 at 6 n.3), Defendants contend that such a flimsy attempt does not satisfy the requirements of futility.

The issue, as we see it, is whether the plaintiffs in a derivative suit must prove demand futility each time new directors (or here, Fraternity Council members) are elected. We hold that, at least in this situation, with regard to the dispute over the admittance of transgender women, no such action was required. "The weight of authority establishes that the futility of demand must be determined by looking at the positions of the parties when the derivative suit is initially filed." *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 26, 694 N.E.2d 479, 483 (1997). Plaintiffs previously satisfied this requirement with the prior Council. This case has been ongoing (*see generally* ECF No.

---

[6] Because Maria Brown, Liz Wong, and Beth Black are no longer members of the Fraternity Council (and Plaintiffs have not refuted this fact), they do not have the authority to grant the relief sought by Plaintiffs and shall be dismissed from this suit.

57) since then, and thus we assume new Council members were made aware of the dispute. Plaintiffs' allegations in this amended complaint are not so different from their original complaint that new Defendant Council members did not have notice of them. Therefore, demand futility has been met with regard to the issue of who may be considered a woman.

We next consider the accusation of violations of Kappa's voting procedure, which our prior Order did not discuss. Plaintiffs spend eight pages of their SAC, and several more in their opposition brief, detailing the ways in which they notified Defendants and Defendants' counsel of their issues with Kappa's interpretation of the word "woman." ECF No. 65 at 29-36; ECF No. 68 at 6. Only the briefest mention is made of voting "irregularities." We therefore turn to the documents in the record, in particular the letters exchanged between parties' counsel.

Here again, Plaintiffs' counsel's letter from November 4, 2022, focuses on the debate over the word "woman". Only at the end of the second page is the voting process mentioned: "Further, our clients are concerned that the decision process which has led to this unfortunate position was deeply flawed. The Chapter President… conducted an illegal voting procedure." ECF No. 1-1. at 123. The reasons mentioned for "illegality" are that the President held a one-sided dialogue before the vote and that

> in a blatant violation of the requirement for a secret ballot, the chapter members voted through a Google Poll tracked by email. This public vote was only after a first vote, earlier that evening, was so close that officers approached individual women and pressured them to change their vote claiming a 'faulty voting system' in Google forms.

*Id*. The paragraph reiterates the lack of secrecy several times.

17

Defendants' counsel, in turn, responds in depth to the "woman" debate, and states

it is "unaware" of any further rules that had been broken. ECF No. 1 at 117. It further

requests that

> If there are specific provisions in any Kappa governing documents that you
> contend were not followed by Kappa, please identify what those specific
> provisions are, what governing documents they are contained within, and
> what actions of Kappa you contend are in violation of those specific
> provisions.

ECF No. 1 at 117. There is no evidence that Plaintiffs did so.

It is worth noting, in addition, that the allegations in Plaintiffs' SAC do not match

those in Plaintiffs' pre-lawsuit notice to Defendants. The SAC drops Plaintiffs' claim that

members were pressured into voting differently by the Chapter's officers. ECF No. 65 at

27 (stating instead that three members decided to change their votes when they realized

their votes would not be anonymous[7]). Instead, the SAC claims that Kappa violated its

Standing Rule that requires that all active members to participate in membership selection

unless excused. *Id.* at 26. Additionally, the SAC states that the use of Google Poll was

itself a violation of the Standing Rules because each chapter is required to use a Kappa-

approved voting platform called Omega Recruit.[8] *Id.* at 27.

In other words, Plaintiffs do not appear to have given Defendants notice of the

voting-related violations that form the basis of one of their claims. Nor can we find any

portion of the SAC or Plaintiffs' brief that claims that any demand of the Fraternity

---

[7] Although the SAC still complains that the vote was not secret, secrecy is not, in fact, required by any governing document.

[8] Upon the Court's independent review, no governing document actually references "Omega Recruit" – the governing documents merely state that each chapter "shall" use the electronic voting system selected by Kappa. ECF No. 1-1 at 55. No document, governing or not, states what that system is.

18

Council on this matter would have been futile. Plaintiffs therefore have not satisfied the demand futility requirement for their derivative claim based on the violations of Kappa's voting procedure, and that claim must be dismissed.

Having found that Plaintiffs satisfied the procedural requirements for their dispute about Kappa's definition of "woman", we spend the rest of this section evaluating those claims on their merits.

> b. <u>Breach accusations #1 and #5</u>: "encouraging, advocating for, attempting to unduly influence the Wyoming chapter members to support, and approving the Student's membership in direct contravention to the… Articles, Bylaws, Standing Rules and Policies," and failing to "advocate for and seek to address issues of concern for members and women in general."

We dive immediately into the parties' central dispute: the debate over the definition of the word "woman." Both the first and fifth allegations of breach of fiduciary duty largely rest on Plaintiffs' assertion that the Fraternity Council admitted a transgender woman in violation of Kappa's governing documents. When we ruled on this issue two years ago, we held that we could not impinge on Kappa's First Amendment right of expressive association to include transgender women, per *Boy Scouts of Am. V. Dale*, 530 U.S. 640 (2000). ECF No. 31 at 30. The law of the case doctrine dictates that we apply the same holding here, but even if that were not the case, we reach the same conclusion, independently, on the grounds that Ohio contract law allows Kappa to define "women" to include individuals who identify as women.

Our previous ruling on Kappa's authority to interpret its own Bylaws is still applicable here. As previously mentioned, the law-of-the-case doctrine holds that "when a court rules on an issue of law, the ruling 'should continue to govern the same issues in

subsequent stages in the same case.'" *Fish*, 957 F.3d at 1139 (quoting *Bishop v. Smith*, 760 F.3d 1070, 1082 (10th Cir. 2014)). Courts only deviate when presented with new evidence, new and contrary controlling authority, or when their previous decision was clearly erroneous. *Id.*

Plaintiffs do not present new evidence in their SAC, but they do argue a possible new authority: Executive Order 14168, issued this year, states that "women… shall mean adult… human females" and "female… means a person belonging, at conception, to the sex that produces the large reproductive cell." 2025-02090 (90 FR 8615). We are not entirely sure what this definition means, not having a degree in biology.[9] But even assuming this definition aligned with Plaintiffs', it only applies to the Executive Branch's interpretation of federal laws and administration policy. It is not relevant in the world of private contracts, which is where we currently find ourselves.

This leaves only the "clearly erroneous" exception. The brunt of Plaintiffs' opposition brief, although not explicitly labeled as such, argues that our previous decision on this issue was erroneous. They argue that the First Amendment right to associate does not apply here because they are not asking the Court to force Kappa to exclude

---

[9] And even if we did, it might not help, since biologists seem to agree that no determination of biological sex can exist "at conception." *See* Karen K. Siu, et. al., The cell biology of fertilization: Gamete attachment and fusion, J. Cell Biol. 220 (2021). The article states, in relevant part:

> The cells produced by the first few divisions of the fertilized egg are totipotent and capable of differentiating into any cell type, including germ cells. PGCs [primordial germ cells] originate within the primary ectoderm of the embryo and then migrate into the yolk sac. Between weeks 4 and 6, the PGCs migrate back into the posterior body wall of the embryo, where they stimulate cells of the adjacent coelomic epithelium and mesonephros to form primitive sex cords and induce the formation of the genital ridges and gonads. The sex (gonadal) cords surround the PGCs and give rise to the tissue that will nourish and regulate the development of the maturing sex cells (ovarian follicles in the female and Sertoli cells in the male).

*Id.*

20

transgender women, but rather that the Court *en*force the existing private contract, which in turn (they allege) forces the organization to exclude transgender women. ECF No. 68 at 17-18.

However, even when we adopt Plaintiffs' framing and apply Ohio contract law, we come to the same conclusion: Kappa's Bylaws and Standing Rules do not require Kappa to exclude transgender women. Kappa and its Fraternity Council have reasonably interpreted an otherwise undefined term in the organization's Bylaws. Kappa's Bylaws explicitly authorize the Fraternity Council to make these interpretations. Ohio law explicitly authorizes organizations to govern themselves and interpret their own bylaws, and it does not permit this Court to interfere with such organizations' internal policy decisions unless they have broken their own bylaws or committed fraud or collusion. In short, we are required to leave Kappa alone.

The parties' fundamental dispute is whether the undefined term "woman" in Kappa's Bylaws *must* be interpreted to exclude transgender women. Both parties agree that Kappa is an organization dedicated to women. Where they diverge is that Plaintiffs argue that the word woman can *only* be defined as exclusive of transgender women. "The words woman and women, as used in Kappa's Articles of Incorporation, Bylaws, Standing Rules, Policies….have always referred to adult female human beings. These words… have never referred to biological males who claim to be women", and therefore any "change" to the definition requires an amendment. ECF No. 65 at 7, 15-16.

Plaintiffs cannot support this assertion. First, there is no definition of the term anywhere in the governing documents. It is simply repeated a dozen times without further

clarification. Plaintiffs' next argument, that there is only one "ordinary meaning" of the term woman, is defied by Plaintiffs' own source. They point out, correctly, that courts must give "common words appearing in a written instrument… their ordinary meaning." ECF No. 68 at 15 (quoting *Shifrin v. Forest City Enterprises, Inc.,* 597 N.E.2d 499, 501 (Ohio Sup. Ct. 1992). They then cite Merriam-Webster's definition of woman as "an adult female person" as evidence that "woman" excludes transgender women. ECF No. 68 at 15. However, when we turned to the same source's definition of female, we find not one but seven definitions of the word. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/female. The first defines female as "of, relating to, or being the sex that typically has the capacity to bear young or produce eggs." *Id.* This would seem to conform to Plaintiffs' definition. However, the second definition is "having a gender identity that is the opposite of male" – which would include transgender women. *Id.* Plaintiffs' designated source does not appear to agree that only one common definition of "female", and therefore "woman", exists, and therefore we also remain unconvinced.

Third, Plaintiffs attempt to argue that the "intent of the parties" to limit "women" to only "biological females" is evident in various historical Kappa-produced texts, including Kappa songbooks referring to young maids, etc. The Court does not find any of the terms cited by Plaintiffs to show evidence of the intent of Kappa members to exclude transwomen. But even if it did, we could not consider it: external evidence of parties' intent is only admissible when "the language of a contract is unclear or ambiguous", and Plaintiffs rest their entire case on the argument that the term "woman" is not ambiguous –

22

that it can only have one, trans-exclusionary meaning. *DN Reynoldsburg, L.L.C. v. Maurices Inc.*, 2023-Ohio-3492, ¶ 26, 225 N.E.3d 454, 460. If we were to consider extrinsic evidence in this matter, it would conclusively show that *at the time Plaintiffs joined*, i.e. not in 1870, Kappa's well-publicized intent was to include transgender women. We discuss this in greater detail in the following section.

Independently, we find that within the governing documents themselves, there is more evidence that Kappa defines women by their gender and not their "biological sex." "Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enters., Inc.*, 1992-Ohio-28, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501. In June of 2022, at the Biennial Convention, Kappa members voted on and approved a new Bylaw provision that prohibits discrimination and explicitly used the term "single-gender", not "single-sex", to describe "Greek-letter social organizations."[10] ECF No. 1 at 84-85, 132. Arbitrarily, Plaintiffs assert that the reference to Title IX in this bylaw – the full sentence states "the single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under... Title IX" – somehow proves that the term "single-gender... must be read as synonymous with 'single-sex.'" ECF No. 65 at 15. This Court, however, must interpret a contract in a manner that "give[s] effect to the intent of the parties... [which] is presumed to reside in the language they chose to employ in the agreement." *Jurenovich v. Trumbull Mem'l Hosp.*, 2020-Ohio-2667, ¶ 13. We therefore

---

[10] Defendants note that "All 26 NPC [National Panhellenic Conference] sororities accept trans women into their memberships." ECF No. 69 at 11 n.3.

conclude Kappa meant exactly what it says, and that the sorority used "gender" instead of "sex" intentionally; to include all members whose gender identity is female.[11]

By contrast, Kappa's Bylaws do *not* reference a "single-sex" requirement. Plaintiffs try to convince this Court that such a phrase is implied, based on Kappa's previous advocacy for single-sex organizations. Plaintiffs point out that Article XV of Kappa's Bylaws state that "The Fraternity shall follow NPC [National Panhellenic Conference] Unanimous Agreements, policies, and procedures", and that one such Agreement states that "The women's sororities… shall defend their right to exist as single-sex organizations." ECF No. 1 at 93; ECF No. 68 at 38. However, Plaintiffs' argument that this would require Kappa to only admit "biological females" is defeated by a different NPC policy, which Kappa is also required by Bylaw to follow, and which unequivocally states that "woman is defined as an individual who consistently lives and self-identifies as a woman."[12] ECF No. 68 at 37. Read as a whole, this second policy more clearly indicates the intent of Kappa to include transgender women.

---

[11] We would reach the same conclusion if we considered the term ambiguous: analyzing parol evidence to evaluate the "intent of the parties" at the time that that amendment was passed, it is clear that Kappa intended it to include transgender members. The FAQs attached to this amendment, circulated among members two months before the Convention where the amendment passed, solidify that interpretation. ECF No. 1-1 at 49 ("Can nonbinary people join? Is this a chapter-by-chapter decision? Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection…").

[12] Plaintiffs' argument that because this policy is entitled "Panhellenic Recruitment Eligibility," it should only apply to recruitment, and not membership, is nonsensical. As Plaintiffs themselves note, "courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument." *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶10. The purpose of recruitment is to identify and vet new members. In this context, it would be "absurd" to read this policy as applying this definition of "woman" only to recruitment, but not membership.

Concluding, therefore, that at a minimum Kappa's governing documents do not require the exclusion of transgender women, we find that Kappa has not broken its Bylaws in admitting one such individual. Kappa Bylaws specifically authorize the Fraternity Council to "[i]nterpret… the Fraternity Bylaws and Standing Rules." ECF No. 6-1 at 119. The Fraternity Council issued several publications in advance of the fall 2022 recruitment season making its interpretation of the word woman – to include individuals who identify as women – abundantly clear. These include Position Statements "Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women"), FAQs ("woman is defined as an individual who consistently lives and self-identifies as a woman"), and a Guide for supporting LGBTQIA+ members. ECF No. 65 at 16, 34, 35.

Because Kappa has interpreted this term in accordance with its own governing documents, we have no authority to review the dispute. "As a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010 WL 107015, at \*5 (N.D. Ohio Jan. 6, 2010). The matter is not one open to judicial discretion:

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Stibora v. Greater Cleveland Bowling Assn.*, 63 Ohio App. 3d 107, 113, 577 N.E.2d 1175, 1179 (1989).

25

Exceptions to this rule are few, and none have been met here. "In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision… in accord with its own charter and rules made by the governing body must be accepted by the courts of law." *Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748 (1991); *see also Strah v. Lake Cty. Humane Soc.* 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud"). Plaintiffs argue that they have properly alleged that "Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior" because "the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was [a] single-sex organization…" (ECF No. 68 at 12-13).

These allegations are conclusory and contradicted by their own evidence. First, as is clear from the proceeding paragraphs, Defendants have not acted in excess of Kappa's corporate powers. Second, Defendants have not committed fraud because Plaintiffs cannot point to a concealment or false representation of a fact. *See Schmitz v. Natl. Collegiate Athletic Assn.*, 2016-Ohio-8041, ¶ 56, 67 N.E.3d 852, 868. The previously mentioned Position Statements, distributed LGBTQIA+ Guide, and sorority-wide vote and approval of the 2022 Bylaw amendment describing the Kappa as "single-gender", not "single-sex", show that Kappa never concealed the fact that transgender women for membership. Third, Plaintiffs' conclusory allegation that the Fraternity Council hatched a plan with the Wyoming Chapter to admit a transgender student is not evidence of collusion. In Ohio courts, the term generally refers to an agreement by multiple entities to

commit fraud or other misrepresentation. *See State ex rel. Dolle v. Miller*, 18 Ohio Dec.

218, 221 (Ohio Com. Pl. 1907), aff'd, 1907 WL 1152 (Ohio Cir. Ct. Dec. 28, 1907)

(considering a charge of "collusion among bidders to distribute territory, to keep prices

up and make the city pay more than it properly should"). As previously stated, none of

the Defendants misrepresented that the sorority was open to admitting transgender

women. Therefore, no collusion could have occurred based on these facts.

Finally, Plaintiffs' breach of fiduciary duty claim could also be interpreted as

implicitly arguing that, whether or not Kappa's rules *allowed* it to admit transgender

women, doing so was a "reckless" decision because it resulted in several women leaving

the sorority. *See* ECF No. 65 at 41, 43. However, this is precisely the type of decision-

making that has long been protected by the business-judgment rule: the decisions made

by boards of directors are insulated from judicial review as long as they are made in good

faith and with the best interests of the organization in mind. *Kleemann v. Carriage Trace,

Inc.*, 2007-Ohio-4209, ¶ 51. While Plaintiffs certainly show that they and other Kappa

members disagree with the Fraternity Council's decision to admit transgender women,

they do not allege facts that show that the Fraternity Council took any actions for any

reason other than what it believed was in the best interest of the organization. Plaintiffs

simply disagree with the Fraternity Council's assessment of what those interests were.

Nor have Plaintiffs shown that the Fraternity Council acted without "the care that

ordinarily prudent persons in like positions would use under similar circumstances" or act

with "reckless disregard." *Id.* at ¶ 56, 57. Indeed, the evidence provided *by Plaintiffs*

clearly shows that great care went into the decision. *See, e.g.,* ECF No. 1-1 at 49

(regarding the explicit policy of allowing non-binary people and "individuals who identify as women" to join, the organization stated "We have conferred with legal counsel as well as NPC on DEI-related updates to Fraternity documents. We are confident that these changes would hold up if contested in a court of law."); *id.* ("Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued… We want to be as inclusive of all members as we can be.").

The reality is that Plaintiffs do have a remedy here – they are simply choosing not to use it. Plaintiffs could advocate for a new amendment to the Bylaws, defining the word "woman" as they wish, which would restrain Kappa from choosing between various reasonable definitions of the term. Such amendments may only be passed every other year, at Kappa's Biennial Convention, but one such Convention occurred over the course of this lawsuit and another hypothetically will occur next year. If as many Kappa members are upset about the admission of transgender women members as Plaintiffs claim, this internal remedy should be more than sufficient to achieve their aims.

Plaintiffs have not shown that Kappa violated its governing documents by admitting a transgender woman, and therefore this claim must be dismissed.

      c.  <u>Breach accusation #2</u>: "actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity."

Plaintiffs do not allege sufficient facts to show that the Fraternity Council concealed its efforts to admit transgender women. Plaintiffs contend at a very general

level that Fraternity Council "concealed their disavowal and betrayal of Kappa's promises and obligations to women" by not disclosing to Plaintiffs that Kappa's definition of a "woman" "includes men identifying as women." ECF No. 65 at 39. However, Plaintiffs admit that at least one publication was available on the Kappa website (ECF No. 65 at 34) that addressed the issue of gender. They also admit that the Guide for Supporting our LGBTQIA+ Members "was distributed to the Fraternity's 'workforce' (alumnae who direct chapter operations) in about 2018." *Id.* at 35. Finally, Kappa's Policies specifically prohibit discrimination based on "gender identity". ECF No. 1-1 at 89. These documents show that Kappa publicly and openly defined "women" to include all individuals who identify as women. It may be true that those publications are not governing documents, but they certainly contradict any claims of concealment.

Furthermore, Plaintiffs have pointed to no bylaw or statute that requires organizations to publicly clarify every term in every policy before a new member joins. Even if they could, Plaintiffs themselves admit that the Wyoming Chapter's Membership Chair notified members during recruitment in the fall of 2022 that transgender women were eligible to join Kappa. ECF No. 65 at 22. There is simply no evidence that Defendants concealed or misrepresented their position on the matter.

> d. Breach accusation #3: "unduly influencing Wyoming chapter officers to disregard mandatory voting procedures employed in the Student's selection process."

Plaintiffs do not provide any facts that support this allegation. As Plaintiffs themselves admit, "National Fraternity representatives usually have little involvement in member selection until after chapter members have voted." ECF No. 65 at 28. Plaintiffs

do not describe a single instance of any member of the Fraternity Council conversing with Chapter officers, on any topic, before the September 20th vote occurred. Instead, Plaintiffs make the conclusory claim that they "believe officers were told by the Fraternity Council" to advocate for the Student's admission. However, even this contention does not mention specific voting procedures. Additionally, Plaintiffs have not satisfied the demand futility requirement for this claim under Ohio law, as discussed earlier in this opinion. *See supra* Section I (a).

e. Breach accusation #4: "disregarding Kappa's duty, as an Ohio citizen, to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution by retaliating against members who challenged the validity of the Student's membership."

Plaintiffs' allegations of retaliation fail because, first and foremost, the Ohio Constitution only protects against state actors, and Plaintiffs have not alleged that Kappa is a state actor. *See Herring v. Adkins, 2008-Ohio-7082*, ¶ 9, 150 Ohio Misc. 2d 13, 19, 902 N.E.2d 93, 98 ("the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment") (citing *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222, 626 N.E.2d 59). Secondly, Plaintiffs' claim fails because, as previously mentioned, Ohio law holds that volunteer organizations may make their own disciplinary decisions, free of judicial review, as long as they do not violate due process and are not arbitrary, fraudulent, or the result of collusion.

Plaintiffs accuse the Fraternity Council of violating the Ohio Constitution's freedom of speech protections by "retaliating against members who challenged the validity of the Student's membership." ECF No. 65 at 43. Specifically, the SAC states

30

that Madeline Ramar was removed from her position as Wyoming Chapter Finance Chair because of her opposition to the Student's admission and her decision to sign on to the First Amended Complaint in this case. ECF No. 65 at 31.[13]

First, Ohio courts have specifically held that a voluntary organization's disciplinary actions are not violative of the Ohio constitution's free speech provisions. *See Putka*, 75 Ohio App. 3d at 746 (dismissing a claim that the Ohio Constitution's free speech provision was violated when plaintiff was expelled from voluntary organization for his speech).

Second, as Plaintiffs emphasize, the principle of judicial noninterference applies to "an organization's interests in '*questions of discipline*, or internal policy and management.'" ECF No. 68 at 8 (quoting *Stibora*, 63 Ohio App.3d at 113) (emphasis added). Here, Article V, Section 4 of the Wyoming Chapter's bylaws[14] describe the process of removing a chapter officer "for failing to adequately perform the duties of office, [or] failing to maintain Fraternity standards." ECF No. 1-1 at 148. The record does not provide the details of Kappa's decision to remove Ms. Ramar from her position, but this Court notes at least one sorority-wide Policy she conceivably violated: Policy III, Section C (2) states that "Any member who makes discriminatory, inflammatory, or inappropriate actions based on… gender identity… shall be subject to dismissal or other

_____

[13] The SAC also states that three Kappa members resigned of their own accord from the organization, a third member was "threatened with discipline", and a fourth, Plaintiff Hannah Holtmeier "continued to raise concerns about the Student's membership," for which she was "brought before a disciplinary hearing", provided with Kappa's "Guide for Supporting our LGBTQIA+ members" and "threatened with further discipline." ECF No. 65 at 31. None of these actions concluded in Kappa actually taking a disciplinary action – such as a probation or expulsion – so we do not consider them here. Even if we were to, however, the above principles would result in the same conclusion: dismissal of this claim.
[14] The Wyoming Chapter bylaws are distinct from Kappa Bylaws, which govern the organization as a whole.

31

disciplinary action." ECF No. 1-1 at 89. In any case, there are no allegations in the SAC that Ms. Ramar's removal was "inconsistent with due process" or the result of "arbitrariness, fraud, or collusion", and therefore it "will not be reviewed by the courts." *Lough v. Varsity Bowl, Inc.*, 16 Ohio St. 2d 153, 155, 243 N.E.2d 61, 63 (1968). Nor have Plaintiffs cited any caselaw to show that it is the Court's duty to review due process in cases where a member is removed from an internal position but not ejected from the organization as a whole.

Plaintiffs have not sufficiently pled a breach of fiduciary duty based on the Ohio Constitution. We therefore dismiss this claim.

   f. <u>Breach #6</u>: the Fraternity Council "exceeded its authority to act" and "failed
      to conduct Kappa's affairs as set forth in its Bylaws."

This claim is duplicative of the above claims as it is based on Plaintiffs' assertion that admitting a transgender woman was a violation of Kappa's commitment to only admit "biological females." This limitation, we have held, does not exist, and therefore this claim must also be dismissed.

**II.    Count Three: Breach of Contract**

Plaintiffs' breach of contract claim is based on their assertion that "Plaintiffs… agreed to join Kappa [and] pay membership dues… in exchange for the promise of participating in a single-sex organization committed to uniting and supporting women throughout their lifetimes." ECF No. 65 at 45. The Defendants allegedly breached the "contract" created by Kappa's Bylaws and Standing Rules when it "compel[led] the Wyoming Chapter members to admit the Student." *Id.*

32

Assuming the basis of the "breach" is that Kappa admitted a transgender woman, this claim must be dismissed. We first note that Plaintiffs did not specify *which* Bylaws and Standing Rules it was referring to in this claim. Because they did not, we conclude that the rules that Plaintiffs refer to are those that limit Fraternity membership to "women," based on the alleged promise of a single-sex organization. As we have previously stated, Kappa did not promise Plaintiffs a single-sex organization, nor did they violate any of their Bylaws or Standing Rules in admitting a transgender woman.

We also consider whether Plaintiffs could be referring to a violation of voting procedures. We find this unlikely because the remedy for such a breach would not align with Plaintiffs' requested relief (that Kappa expel all members that are not "biological women" on the basis that they are not women, etc.), and the matter is not mentioned in Plaintiffs' opposition brief or the breach allegation articulated at the end of their SAC. However, even if it was, the SAC does not contain sufficient facts to support the claim. The SAC alleges that Defendants encouraged the recruitment of the Student and advised Chapter officers on the discipline of members who opposed Kappa's inclusion of transgender women, but it does *not* allege that Defendants compelled – or even suggested – any violation of any voting Bylaw or Standing Rule. Based on the record, the vote appeared to be managed entirely by the Wyoming Chapter, without any involvement from the Fraternity Council or any other officer outside of the Chapter.

For all of these reasons, Plaintiffs have failed to articulate a claim for breach of contract that would survive in federal court. We therefore dismiss these claims.

## III.   Count Four: Fraud in the Inducement

33

Plaintiffs' claim for fraud in the inducement must be dismissed for failure to identify a false representation. Plaintiffs allege that Kappa fraudulently induced Plaintiffs to join the Fraternity by failing to disclose that "men could become Kappas" and holding "itself out as an organization of women." ECF No. 65 at 46. In order to state a claim for fraudulent inducement, Plaintiffs must show that Defendants made "a representation of fact… falsely, with knowledge of its falsity, or with utter disregard and recklessness[] as to whether it is true or false", among other things. *Mortg. Elec. Registration Sys., Inc. v. Mosley*, 2010-Ohio-2886, ¶ 31. Plaintiffs' claim fails because they cannot point to any statement by Kappa that was false: Kappa has never asserted that it does *not* accept transgender women. As we previously stated and as Plaintiffs admit, Kappa and the Fraternity Council published multiple public documents defining "women" to include individuals who identify as women, as the Student does. Therefore, Kappa may hold itself has an organization of women because it *is* an organization of women, according to its own definition.

Plaintiffs have not identified any false representations made by Defendants; therefore, their claim for fraud in the inducement must be dismissed.[15]

---

[15] To the extent that Plaintiffs assert this claim against Kappa based on the actions of the Wyoming Chapter officers at the time of the vote, we also find that Plaintiffs do not provide sufficient evidence to state a claim. In their SAC, Plaintiffs state that the Wyoming Chapter's Membership Chair and other Chapter officers "intentionally concealed the fact that the Student's candidacy would be presented for vote" at the secondary, Sunday night Chapter meeting. ECF No. 65 at 24-25. However, the Student's application and the date of the vote was announced at the primary, Monday-night Chapter meeting. *Id.* at 25. Plaintiffs cannot point to any bylaw, rule, or policy that states that applicant votes must be announced at the Sunday night meeting, nor that doing so was irregular in any way. Nor have they identified a false statement made by any Wyoming Chapter official.

## CONCLUSION

Having considered the written submissions, the applicable law, and being otherwise fully advised, **IT IS HEREBY ORDERED** that Defendant's *Motion to Dismiss* (ECF No. 66) is **GRANTED**. **IT IS FURTHER ORDERED** that Plaintiffs' *Second Amended Complaint* (ECF No. 65) is **DISMISSED WITH PREJUDICE.** We have reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile.

Dated this 22ᵈ day of August, 2025.

Alan B. Johnson
United States District Judge