No. 25-8058

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Hannah Holtmeier, et al.,

Plaintiffs-Appellants,

v.

Kappa Kappa Gamma Fraternity, et al.

Defendants-Appellees.

On Appeal from the United States District Court for the District of Wyoming,
No. 2:23-CV-00051-ABJ The Honorable Alan B. Johnson

BRIEF OF APPELLANTS (CORRECTED)

Jay R. Carson    (OH Bar No. 0068526)
WEGMAN HESSLER VALORE
6055 Rockside Woods Blvd. N., Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
E-mail:jrcarson@wegmanlaw.com

Angela M. Lavin    (OH Bar No. 0069604)
WEGMAN HESSLER VALORE
6055 Rockside Woods Blvd. N., Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
E-mail:amlavin@wegmanlaw.com

Sharon G. Ross    (OH Bar No. 0095354)
WEGMAN HESSLER VALORE
6055 Rockside Woods Blvd. N., Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
E-mail: sgross@wegmanlaw.com

Rick L. Koehmstedt, WY Bar No. 6-3101
KOEHMSTEDT LAW FIRM, LLC
1551 Three Crowns Drive, Suite 100
Casper, WY 82604
Telephone: (307) 333-1401
Email: rick@klflegalteam.com

*Counsel for Plaintiffs-Appellants*

November 25, 2025

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................ **iv**

**STATEMENT OF RELATED CASES**.................................................. **vii**

**JURISDICTION** ............................................................................... **1**

**ISSUES** ............................................................................................. **1**

**STATEMENT OF THE CASE** ......................................................... **2**

    **A. Factual Background** ............................................................... 2

        1. Kappa Kappa Gamma is a Single-Sex Organization Whose Founding Mission was to Unite and Support Women ................... 2

        2. Kappa Admits a Male Student to Membership. ............................ 5

        3. Kappa's Efforts to Amend the Organization's Governing Documents Without Proper Notice To, or a Vote by, The Membership. .................................................................................. 8

    **B. Procedural History** ..............................................................11

**SUMMARY OF ARGUMENT** .........................................................13

**STANDARD OF REVIEW** ..............................................................17

**ARGUMENT** ...................................................................................18

**I.**   **THE DISTRICT COURT ERRED IN FINDING THAT APPELLEES ARE PERMITTED TO DISAVOW KAPPA'S SINGLE SEX STATUS IN VIOLATION OF THE GOVERNING DOCUMENTS.** ....................18

    **A. The District Court Erred in Finding that the Non-Interference Rule Shields Appellees from Their Breach of the Governing Documents.** 18

        1. The District Court's Order Ignores the Fact that Fraternity Council Knew the Term "Woman" Did Not Include Individuals Who Identify as Women. ........................................................................22

        2. The Unauthorized Expansion of Membership Criteria Constitutes the Very Type of Conduct Which Should be Reviewed ................24

    **B. Kappa Does Not Have a First Amendment Right to Violate the Governing Documents** ........................................................................26

II.    THE DISTRICT COURT ERRED, AS A MATTER OF LAW, IN
       FINDING THAT THE APPELLEES DID NOT BREACH THEIR
       FIDUCIARY DUTIES TO KAPPA............................................................28

   A. The District Court's Interpretation of the Governing Documents is
      Contrary to Ohio Law..................................................................................28

      1. The Governing Documents are Contracts Which Must be
         Construed to Give Effect to the Intent of the Parties. ..................30

      2. The District Court Failed to Consider Relevant Authority in
         Interpreting Kappa's Bylaws and has Improperly Upheld
         Regulations That Violate Title IX..................................................33

      3. Appellants Sufficiently Pled Facts to Support Their Claim That
         Appellees Breached Their Fiduciary Duties and Exceeded Their
         Authority..........................................................................................38

   B. Appellants Pled Sufficient Facts to Support Their Remaining Claims
      for Breach of Fiduciary Duty.....................................................................39

      1. Appellants Sufficiently Established That Appellees Concealed
         Their Efforts to Disavow the Bylaws to Admit Transgender
         Women.............................................................................................39

      2. Appellees Disregarded Kappa's Duty to Protect the Freedom of
         Speech Under the Ohio Constitution. ............................................41

III.   THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS'
       CLAIMS FOR BREACH OF CONTRACT AND FRAUDULENT
       INDUCEMENT. .............................................................................................44

   A. Appellants Met the Threshold Requirement to Plead a Claim for
      Breach of Contract......................................................................................44

   B. Appellants Met the Threshold Requirement to Plead Fraudulent
      Inducement. ..................................................................................................45

   C. Appellants' Contract and Fraudulent Inducement Claims Were
      Raised for the First Time in the SAC and Should Not Have Been
      Dismissed With Prejudice...........................................................................48

IV.    CONCLUSION ..............................................................................................49

**CERTIFICATE OF SERVICE**............................................................................**50**

**ORAL ARGUMENT STATEMENT** ..............................................................**51**

**CERTIFICATE OF COMPLIANCE**..............................................................**52**

**CERTIFICATE OF DIGITAL SUBMISSION** ...........................................**53**

ATTACHMENT

    Order and Judgment, August 22,2025, U.S. District Court for the District of Wyoming No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson, Granting Defendants' Motion to Dismiss (ECF No. 66), Dismissing, With Prejudice, Plaintiffs' Second Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties (ECF No. 65). ECF Nos. 70 and 71

# TABLE OF AUTHORITIES

## CASES

*ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 692 N.E.2d 574 (Ohio 1998) ................ 46

*Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978) ..... 30, 32

*Arkansas v. United States Dep't of Educ.*, 742 F. Supp. 3d 919 (E.D. Mo. 2024) ............ 35

*Arnold v. Cleveland*, 67 Ohio St. 3d 35, 616 N.E. 2d 163 (1993) .................................. 41

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 17

*Bird v. Martinez-Ellis*, 582 F. Supp. 3d 909 (D. Wyo. 2022), <u>aff'd</u>, No. 22-8012, 2022 WL
17973581 (10th Cir. Dec. 28, 2022) ........................................................................... 20

*Blosser v. Enderlin*, 148 N.E. 393, paragraph two of the syllabus (Ohio Ct. App. 1925) 31

*Boy Scouts of America v. Dale,* 530 U.S. 640 (2000) ..................................................... 27

*Brereton v. Bountiful City Corp.*, 434 F3d 1213 (10th Cir. 2006) .................................. 48

*Browning v. Fraternal Ord. of Eagles, No. 1769*, 1986 WL 9644, at *1 (Ohio Ct. App.
Aug. 22, 1986) ............................................................................................................ 27

*Buchanan v. Shack*, 1995 WL 386938 (2nd Dist. June 28, 1995) .................................. 22

*Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, No. 4:24-CV-00461-O, 2025
WL 1782572, at *3 (N.D. Tex. Feb. 19, 2025) ........................................................... 35

*Carroll Weir Funeral Home v. Miller*, 2 Ohio St.2d 189, 207 N.E.2d 747 (1965) ........... 30

*Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10 ........ 45

*Cent. Funding, Inc. v. CompuServe Interactive Servs.*, 10th Dist. No. 02AP-972, 2003-
Ohio-5037, 2003 WL 22177226, ¶ 42 ........................................................................ 30

*DiPasquale v. Costas*, 2010-Ohio-832, ¶126-127, 926 N.E.2d 682 ............................... 45

*Fish v. Schwab,* 957 F.3d 1105 (10th Cir. 2020) ............................................................ 20

*Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 227 9 L.Ed.2d 222 (1962) ....................... 48

*Gajovski v. Gajovski*, 81 Ohio App. 3d 11, 610 N.E. 2d 431 (Ohio Ct. App. 1991) ......... 33

*Graham v. Drydock Coal Co.*, 1996-Ohio-393, ¶ 11, 76 Ohio St.3d 311, 667 N.E.2d 949
.................................................................................................................................... 32

*Griffith v. El Paso Cnty., Colorado*, 129 F.4th 790 (10th Cir. 2025) .............................. 40

*Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999-Ohio-
162, 714 N.E.2d 898 (1999) ....................................................................................... 30

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557
(1995) ......................................................................................................................... 27

*Internatl. Bhd. Of Elec. Workers, Local Union No. 8 v. Grominicki*, 745 N.E.2d 449 (Ohio
Ct. App. 2000) ....................................................................................................... 27, 28

*Jurenovich v. Trumbull Mem. Hosp.*, 2020-Ohio-2667, ¶¶ 12-13 (11th Dist.) ................ 30

iv

*KAM Dev., LLC v. Marco's Franchising, LLC*, No. 3:20-CV-2024, 2024 WL 87758, at *7 (N.D. Ohio Jan. 5, 2024) ............................................................................. 24

*Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.*, 397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485), 2018 WL 6305759 ........................................... 5

*Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio Sup. Ct. 1987) .................................. 30

*Kleemann v. Carriage Trace, Inc.,* Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43 ....................................................................................... 45

*Lough v. Varsity Bowl, Inc.,* 241 N.E. 61 (Ohio Sup. Ct. 1968) ..................................... 18

*Maas v. Maas*, 2020-Ohio-5160, ¶ 18, 161 N.E.3d 863 ................................................ 25

*Milkie v. Acad. of Med. of Toledo & Lucas Cnty.,* 246 N.E.2d 598 (Ohio Ct. App. 1969) 28

*Mobley v. McCormick*, 40 F.3d 337 (10th Cir. 1994) ..................................................... 17

*Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175 (1967) ................... 28

*Quintana* v. *Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022 (10th Cir. 2020) ............... 17

R*eyes v. Laborers' Int'l Union of N. Am.,* 464 F.2d 595 (10th Cir. 1972) ....................... 28

*Rowitz v. McClain,* 2019-Ohio-5438, ¶31, 38 N.E.3d 1241 (Ohio Ct. App. 2019) .... 33, 40

*Rutkowski v. United States Practical Shooting Association,* Case No. 2023 CV 01625, 2025 WL 1721792 (Ohio Ct. App. June 20, 2025) ............................................... 20, 21

*Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393 (9th Cir.1986) ........... 48

*Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 49 (Ohio Sup. Ct. 1992) ................ 31

*Singh v. Guru Gobind Singh Sikh Soc. of Cleveland*, 2014-Ohio-4844, ¶ 22 (8th Dist.).. 26

*Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010) .................................................................................................................. 17

*Stark v. Reliance Standard Life Insurance Company*, 142 F4th 1252 (10th Cir. 2025).... 17

*State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, 177 Ohio St. 3d 174, 251 N.E.3d 79, , *reconsideration denied*, 2024-Ohio-5647, 176 Ohio St. 3d 1433, 246 N.E.3d 564 ........................................................................................................... 42

*State v. Hensly*, 2023-Ohio-119, 2023 WL 195627, at *6 (Ohio Ct. App. Jan. 17, 2023) 24

*State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 14 ................... 41

*Tennesse v. Cardona,* 762 F. Supp. 3d 615 (E.D. Ky. 2025) ........................................... 31

*Tennessee v. Cardona*, 762 F. Supp. 3d at 621 (E.D.Ky 2025) ....................................... 34

*Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, 176 Ohio St.3d 505, 248 N.E.3d 196 ......................................................................................................... 31

*Tera, L.L.C.,* reconsideration denied, 2024-Ohio-2718, 174 Ohio St. 3d 1551, 238 N.E.3d 127 ....................................................................................................................... 32

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ............................................. 35

*Texas v. McMahon*, No. 24-10910, 2025 WL 2840825 (5th Cir. Apr. 23, 2025) .............. 35

*Thompson v. Cent. Ohio Cellular, Inc.* (1994), 93 Ohio App.3d 530 .............................. 24

*Ulliman v. Ohio High School Athletic Assn.*, 184 Ohio App. 52, 2009 Ohio 3756, ¶¶ 50-51, 919 NE2d 763 (Ohio Ct. App. 2000) ............................................................ 30, 44

*Wing Leasing, Inc. v. M & B Aviation, Inc.* (1988), 44 Ohio App.3d 178 ................. 25, 45

*Zalvin v. Ayers*, 157 N.E.3d 256, 2020 Ohio 4021 ¶22 (Ohio Ct. App. 2020) ........... 41, 45

## STATUTES

20 U.S.C. § 1681(a) ................................................................................................ 4

28 U.S.C. § 1291 .................................................................................................... 1

28 U.S.C. § 1332(a)(1) ........................................................................................... 1

Ohio Rev. Code Ann. § 9.05 ................................................................................... 33

Ohio Rev. Code Ann. § 1702.10 ...................................................................... 29, 36

Ohio Rev. Code Ann. § 1702.11(A)(2) .................................................................. 20

Ohio Rev. Code Ann. § 1702.12 ........................................................................... 22

Ohio Rev. Code Ann. § 1702.12(F)(9) ........................................................ 25, 36, 41

Ohio Rev. Code Ann. § 1702.30 ........................................................................... 41

## OTHER AUTHORITIES

89 Fed. Reg. 33474 (Apr. 29, 2024) ..................................................................... 34

Education Amendment Act of 1972, 20 U.S.C. §§ 1681–88 (2024).. 14, 29, 31, 33, 35, 36, 37, 40, 46

NPC Manual of Information ("NPC Manual"), 29th Ed., January 2025, at 21-22, https:/npcwomen.org.login/college-panhellenics/moi-resources/ (site last visited June 4, 2025) ................................................................................................... 37

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116–25 (2012) .......... 24

## RULES

FRCP 12(b)(6) ............................................................... 12, 13, 15, 16, 40, 46

## CONSTITUTIONAL PROVISIONS

Ohio Const., art. I, Section 11, .............................................................................. 41

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28.2(C)(3), Appellants state that there is one prior related appeal, *Westenbroek, et al. v. Kappa Kappa Gamma et al.*, Case No. 23-8065 (10th Cir.).

## JURISDICTION

Plaintiffs-Appellants ("Appellants"), Hannah Holtmeier, Allison Coghan, and Haley Rutsch, appeal from an order and judgement by the U.S. District Court for the District of Wyoming, which were entered August 22, 2025 and dismissed all of their claims with prejudice. App. Vol. 2 at 244, 245. The District Court had subject-matter jurisdiction (diversity of citizenship) over Appellants' claims under 28 U.S.C. § 1332(a)(1). In accordance with Federal Rule of Appellate Procedure 4(a), Appellants filed a timely notice of appeal with the District Court on September 17, 2025. App. Vol. 2 at 247. and a Notice of Appeal with the Tenth Circuit on September 18, 2025. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## ISSUES

1. Whether the District Court erred, as a matter of law, in finding that Ohio's Noninterference Rule and The First Amendment to the U.S. Constitution Shield Appellees from conduct that undermines Kappa's single sex status in violation of the sorority's governing documents.

2. Whether the District Court erred in finding that Appellants Claims for Breach of Fiduciary Duty (One) and Ultra Vires Acts (Count One) must be dismissed for failure to state a claim when

   i. The factual allegations in the complaint demonstrate that Appellees circumvented Kappa's single sex status in violation of the sorority's Governing Documents and Policies and then concealed their intentions to admit transgender members and retaliated against members who sought to protect Kappa's commitment to women by violating their obligations under Ohio's Constitutional protections for freedom of speech.

   ii. The District Court's review of the governing documents ignores applicable law and creates an ambiguity that must be resolved by a finder of fact.

3. Whether the District Court erred in dismissing Appellants' claims for breach of contract and fraudulent inducement for failure to state a claim and doing so with prejudice.

## STATEMENT OF THE CASE

### A. Factual Background

1. <u>Kappa Kappa Gamma is a Single-Sex Organization Whose Founding Mission was to Unite and Support Women</u>

Appellants were all students at the University of Wyoming and active members in the Gamma Omicron Chapter ("Wyoming Chapter") of Kappa Kappa Gamma Fraternity("Kappa") at the time of the events giving rise to this action. App. Vol. 2 at 92 (¶ 1). Kappa is a sorority founded in 1870 to bring the benefits of exclusively male Greek-letter fraternities to women.[1] *Id*. at 94 (¶ 14). Kappa is a non-profit corporation incorporated in Ohio. Id. at 93 (¶ 8), 101 (¶ 39). Defendants-Appellees Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettleman, Liz Wong, Kyle Donnelly, and Beth Black (collectively "Fraternity Council") served on Kappa's Fraternity Council at the time of the events giving rise to this case. *Id*. at 93 (¶ 9).

Kappa's governing documents include Articles of Incorporation ("Articles"), Bylaws,[2] and Standing Rules (hereafter collectively referred to as "Governing

---

[1] Kappa is officially named a "fraternity" because its founding predated the common use of the term "sorority." It is now commonly known as a sorority.

[2] The Bylaw constitute Kappa's code of regulations. ECF 1 at 94, Bylaws, Art. XIX.

2

Documents"). Kappa also has official Policies, which are not governing documents, but serve as "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the … Articles of Incorporation and the Fraternity Bylaws and Standing Rules." App. Vol. 2 at 106 (¶ 62), Appl Vol. 1 at 251.  Kappa's Fraternity Council constitutes its board of directors. App. Vol. 2 at 101 (¶ 42).  All authority of the fraternity is exercised through the Fraternity Council. Appl Vol. 1 at 254.

The Articles and Bylaws can be amended only "by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention." App. Vol. 2 at 103 (¶ 47), ECF 1 at 95. The Standing Rules can be amended only through a similar process. App. Vol. 2 at 106 (¶ 60), Appl Vol. 1 at 244.

Since its founding, Kappa has held itself out as an organization of women whose purpose includes uniting women, advocating for women, and building a higher standard of womanhood.  App. Vol. 2 at 95 (¶ 18), 21-27; Appl Vol. 1 at 88 (emphasis added). To that end, Kappa's Governing Documents restrict membership to women. The Articles state that Kappa's purpose is "[t]o unite *women*, through membership, in a close bond of friendship." App. Vol. 2 at 102 (¶ 45), Appl Vol. 1 at 135.  The Bylaws not only provide that a "new member shall be a woman," but they also expressly preserve Kappa's legal right to have sex-based membership practices

under Title IX. App. Vol. 2 at 102 (¶¶ 48,49); ECF 1 at 88, 96-97, Art. V, Sec. 2.D.; *see also* 20 U.S.C. § 1681(a) (forbidding discrimination "on the basis of sex" in educational programs but exempting the "membership practices" of sororities). The Standing Rules describe the process of selecting new collegiate members and provides that initiated members may provide information about "qualified *women.*" App. Vol. 2 at 106 (¶ 58); Appl Vol. 1 at 220.  Neither the Founders nor any subsequent Kappa assembly found it necessary to define the term "woman." The Standing Rules also refer to potentially qualified "Alumnae," which by definition refers to a girl or woman who has attended or graduated from a school, college or university. App. Vol. 2 at 96 (¶ 24); *Oxford English Dictionary* (Dec. 2022), https://www.oed.com/search/dictionary/?scope=

Entries&q=alumnae (last visited Nov. 19, 2025).

Consistent with the membership criteria set out in the Governing Documents, Kappa's Policies make clear that Kappa is a "single sex" organization that restricts membership to women.  Policy III, for instance, prohibits Kappa members from participating in "auxiliary groups of a men's fraternities," or allowing men to have a recognized relationship with the Sorority or a chapter. App. Vol. 2 at 107 (¶ 64); App. Vol. 1 at 252.  As explained further in Section 2 of Policy III, "[t]he activities of such groups are not conducive to harmonious chapter operations and jeopardize [Kappa's] ***single-sex*** status." *Id.* (emphasis added) Policy VIII also explicitly forbids men from

participating in any Kappa recruitment events. App. Vol. 2 at 107(¶64); Appl Vol. 1 at 263 ("Men shall not participate in any Kappa recruitment events[.]"

The principles on which Kappa was founded and, which are expressly set forth in its Governing Documents – the preservation of single-sex environments for women – have proven beneficial for collegiate women. Indeed, Kappa once touted the benefits of single-sex environments for women.  Only seven years ago, in a lawsuit against Harvard University, Kappa defended its single-sex status and right to discriminate on the basis of sex under Title IX. App. Vol. 2 at 99, ¶ 34 (citing Complaint ¶ 93, *Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.*, 397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485), 2018 WL 6305759). Kappa and the plaintiffs asserted that women "in single-sex environments are more likely to develop higher academic, and socially competent, self-images" and cited the body of research demonstrating that graduates of women's colleges are more likely to be achievers and that "women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control." App. Vol. 2 at 99-100 (¶35), citing *Kappa Alpha Theta Fraternity* Complaint at 31-33.

2. Kappa Admits a Male Student to Membership.

In the Fall of 2022, Fraternity Council and the Wyoming chapter leadership implemented a plan that resulted in the Wyoming Chapter initiating a biological male

student as a member. App. Vol. 2 at 94 (¶ 10), 113 (¶ 83), 114 (¶ 94). To ensure the Student's admission, Appellees violated several Standing Rules throughout the admission process. First, Wyoming chapter leadership forced the Wyoming sisters, including the Appellants, to vote through a non-anonymous Google poll, even though the Standing Rules require all aspects of the member selection process to be confidential, to employ a secret ballot, and to use Kappa's approved electronic voting system. App. Vol. 2 at 116 (¶¶ 100-104); Appl Vol. 1 at 220, Section, 1.1.A. and 1.1.A.2; Appl Vol. 1 at 261-262, Policy VIII, Sec. 3.  Next, Standing Rules require that all members vote on admission of a new member unless excused by the chapter's alumnae adviser in writing, but "the chapter officers adopted the opposite policy" for the Student's vote, and "forbade Grace Ann Choate, Madeline Ramar, and other members who were not present at the chapter meeting on September 20, 2022 from participating in the membership vote," even though none of them had been excused. App. Vol. 2 at 115 (¶ 99).  And next, Wyoming chapter officials, after consultation with Kappa's leadership, interfered with the voting by improperly influencing votes by telling members that voting against the Student's admission was evidence of "bigotry" and violations of Kappa's policies and values.  App. Vol. 2 at 92(¶ 3), 114 (¶ 93).

On the night of the vote, two separate votes to approve the Student's membership were conducted.  Thirty minutes after the link to the Google Poll for

the first vote was sent to members, the chapter officers sent out a link to a second Google Poll which required voters to sign in with their email address. *Id.* at 116 (¶¶ 102, 103). The Google dashboard shows when each email address logs in, and it also records how the vote total changes. *Id.* (¶ 103). In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. *Id.* (¶ 104). When enough votes for the Student's membership had been secured, the voting stopped. *Id.* Without these steps to prevent some members from voting and pressuring other members to change their votes, the student would not have been admitted. *Id.* at 117-118 (¶¶ 105,106).

After the vote, several members, including Appellants, objected to the Student's membership as a violation of Kappa's Governing Documents and made their objections known to Fraternity Council. *Id.* at 118 (¶ 111). In response, the Appellees, Fraternity Council - through their representatives, advised the Appellants that, if they disagreed with the Student's membership, their values were inconsistent with Kappa's values, and they should resign their membership. *Id.*

Attempts to have the Wyoming chapter enforce the single-sex provisions of Kappa's Bylaws were met with hostility and retaliation. *Id.* at 118 (¶113), 120 (¶¶ 117-118, 121, 122). After Appellant Holtmeier continued to raise concerns about the Student's membership, she was brought in before a disciplinary hearing. *Id.*

7

(¶ 117). Chapter officers read prepared statements and provided her with material, including Kappa's "Guide for Supporting our LGTBQIA+ Members," (hereafter "The Guide") so Ms. Holtmeier could "educate" herself. *Id*. Ms. Holtmeier was threatened with further discipline if she did not agree that the Student – a biological male – is a woman or if she continued to challenge the validity of the vote on the Student's admission.  *Id*. (¶ 118).  Similarly, Madeline Ramar (a former plaintiff in this case) was removed from her position as the Wyoming Chapter Finance Chair because she opposed the Student's admission and signed onto the First Amended Complaint as a plaintiff.  *Id*. (¶ 121). At least one other member was threatened with discipline if she did not agree that the Student is a woman.  *Id*. (¶ 122).

3. <u>Kappa's Efforts to Amend the Organization's Governing Documents Without Proper Notice To, or a Vote by, The Membership.</u>

Despite the clear directives of Kappa's Governing Documents and its outward support for *single-sex* environments, Kappa's Fraternity Council actively took steps to disavow Kappa's 150-year mission without proper notice to or approval of the membership.  App. Vol. 2 at 122-123 (¶¶ 129-132).  Appellees' response to Appellants' pre-suit demands made clear that Kappa's leadership, including Fraternity Council, knowingly disregarded Kappa's Governing Documents. *Id*.  The letter from Kappa's counsel disclosed the existence of "Position Statements" and referred to the Guide.  App. Vol. 2 at 122 (¶ 129).

The Guide was created in 2018 and distributed to Kappa's workforce as a resource document. *Id*. at 124 (¶135). It is not a governing document and does not amend or modify Kappa's articles, bylaws or standing rules. *Id*. 124 (¶¶ 134,135). Position Statements are prepared by Fraternity staff, they are not presented to or approved by the membership. *Id*. 122 (¶ 130). They are merely uploaded to Kappa's online member portal, where they are stored with hundreds of other documents. *Id*. In 2021, Kappa staff posted a position statement, claiming Kappa "is a *single-gender* organization comprised of women and individuals who identify as women." *Id*. at 123 (¶ 132); App. Vol. 1 at 292. (emphasis added). This was a radical departure from its 150-year history.

Then in 2022, in advance of the Biennial Convention, Kappa issued "Bylaws and Standing Rules Revisions 2022: FAQs" which reiterated the description of Kappa as a single gender organization and stated that its membership comprises "women and individuals who identify as women." App. Vol. 2 at 104 (¶ 54), App. Vol. 1 at 213. These FAQs were never put to a vote of the membership. App. Vol. 2 at 105 (¶ 55).

But at the 2022 Biennial Convention, Kappa members approved a complete revision of the Bylaws that included, among too many changes to provide a comparison, two additions. First, Art.V., Sect. 2.D. included a new provision forbidding members from engaging in discrimination and describing Kappa as a

"single gender organization entitled to the benefits of the exemptions under Title IX of the Educational Amendments of 1972." App. Vol. 2 at 104 (¶ 50). Next, Art. XXIV, Sect. 2 was added to limit the process, which expressly requires proposed amendments to be reviewed and approved by Fraternity Council before they can be presented to the membership. App. Vol. 1 at 107. Neither of these provisions were addressed in the Bylaws Committee Report issued prior to the Convention. Fraternity Council never disclosed to the membership that the addition of Art. V. Sect. 2.D. was intended to undo 150 years of support and dedication to uniting women and to convert the organization to a co-ed sorority. App. Vol. 2 at 104 (¶ 52).

On November 4, 2022, counsel for Appellants wrote to Kappa urging it to pause the Student's admission on the grounds that it violated the sorority's bylaws and standing rules. App. Vol. 1 at 287. The letter also raised concerns that the Chapter President "conducted an illegal voting procedure" and held a one-sided dialogue with the members. *Id*. at 288.

Appellants ultimately filed suit after all efforts to ensure Kappa complied with its membership requirements were unsuccessful, and it was clear that Fraternity Council would not enforce the membership restrictions that guided Kappa throughout its 150-year history. See App. Vol. 2 at 122 (¶ 128).

**B. Procedural History**

The initial Verified Complaint in this case was filed on March 27, 2023. App. Vol. 1 at 13. At the time of filing, the plaintiffs sued on their own behalf and derivatively on behalf of Kappa. *Id.* In their Verified Complaint, Plaintiffs – Allison Coghan, Grace Choate, Madeline Ramar, Megan Kosar, Jaylyn Westenbroek, and Hannah Holtmeier – filed suit derivatively on behalf of Kappa, and asserted direct claims for breach of contract claim against Kappa Kappa Gamma Building Corp.[3] App. Vol. 1 at 76-80 (¶¶ 158-178). Appellants also named the Student. *Id.* at 9 (¶ 25).

On June 20, 2023, Defendants Rooney, Kappa, and Building Corp. moved to dismiss the First Amended Complaint in its entirety. *Id.* at 5. The District Court granted the motion on August 25, 2023, and dismissed the complaint without prejudice. *Id.* The plaintiffs filed a notice of appeal on September 25, 2023. *Id.* at 6. Thereafter, on June 12, 2024, this Court entered an Order and Judgment dismissing the appeal, and the case was returned to the Wyoming District Court on July 8, 2024. *Id.*, citing ECF 39.

On December 10, 2024, acting on its own initiative, the District Court set the case for hearing. App. Vol. 1 at 6-7. On February 28, 2025, the Kappa defendants

---

[3] The initial complaint named referred to the plaintiffs as Jane Does. App. Vol. 1 at 13. The First Amended Complaint filed on April 20, 2023 identifies the plaintiffs by name. App. Vol. 1 at 3.

filed a Motion for Deadline for Appellants to Amend Complaint or Motion to Convert to Dismissal With Prejudice. App. Vol. 2 at 31. On March 3, 2025, the Student filed a Motion to Dismiss, which was subsequently dismissed. App. Vol. 1 at 8. Appellants opposed the motions on March 14, 2025. App. Vol. 2 at 48,58. The Kappa defendants filed their reply on March 21, 2025. App. Vol. 2 at 69. On May 9, 2025, the District Court granted Kappa's motion and ordered the Appellants to file their amended pleading within 30 days thereof or face a "dismissal on the merits." App. Vol. 2 at 77. The Student's motion to dismiss was denied. App. Vol. 1 at 10.

On June 12, 2025, Appellants, Holtmeier, Coghan and Rutsch filed their Second Amended Verified Complaint ("SAC") asserting claims against Kappa and Fraternity Council but did not reassert claims against the Student or the Building Co. App. Vol. 2 at 90. Appellees filed a motion to dismiss under FRCP 12(b)(6) on June 26, 2025. *Id*. at 139-171. Appellants filed their opposition brief on July 10, 2025. *Id*. at 172-195. Appellees replied on July 17, 2025. App. Vol. 2 196. On August 22, 2025, the District Court entered an Order and judgement dismissing all of the claims

in Appellants' SAC with prejudice.[4]  App. Vol. 2 at 210, 245. Appellants timely filed their notice of appeal on September 17, 2025. App. Vol. 2 at 247.

### SUMMARY OF ARGUMENT

This appeal presents significant questions regarding the interpretation and enforcement of an organization's governing documents and the longstanding principles that have guided single-sex organizations, like Kappa for more than century. At its core, this case challenges whether, under Ohio law, a private organization, like Kappa, can fundamentally alter its membership criteria without the explicit consent of its members and in the face of contrary governing documents.

As this Court is aware, Kappa was founded in 1870 by six women who were part of a distinct minority among college students. From its inception, Kappa operated as a single-sex, women-only organization that was committed to supporting and promoting women.  For more than 150 years, Kappa, its Fraternity Council, and its members all knew and understood that membership was limited to women. Kappa's governing documents – its Bylaws, Articles, and Standing Rules – Policies

---

[4] The District Court's Order makes a passing reference to the dismissal of Appellees Maria Brown, Liz Wong and Beth Black. App. Vol. 2 at 225, FN.6. But neither the Conclusion of the Order nor the Judgment set forth any order or express determinations effecting such a determination. App. Vol. 2 at 244-245.  The SAC makes clear that they were members of Fraternity Counsel at the time of the events giving rise to the claims in this case. App. Vol. 2 at 92-93 (¶¶2,9). For all the reasons set forth herein, Appellants assert that their dismissal was improper under a FRCP 12(b)(6) analysis.

all reinforced Kappa's commitment to supporting women. And, since Congress passed the Education Amendment Act of 1972 ("Title IX"), Kappa has availed itself of the exemptions for single-sex organizations in order to preserve its status as an all-woman sorority.

Yet, in spite of Kappa's longstanding commitment to supporting and promoting women and defending its right to exist as a single-sex organization, Fraternity Council disregarded the clear and plain language in Kappa's Articles of Incorporation, Bylaws, Standing Rules and Policies limiting membership to women. Under the guise that the term "woman" was in need of interpretation, Appellees have attempted to expand membership from women to women *and* men "who identify as women." Rather than bring the issue to the membership for approval through the process for amending bylaws, articles, and standing rules, Appellees made these changes surreptitiously, simply setting out their expanded criteria in non-binding documents that were never approved by the membership.

Then, in 2022, Appellees presented a full revision of the Bylaws to the membership, containing a new bylaw which prohibits discriminatory conduct and states that the "single-gender nature" of the sorority is protected by Title IX. Relying on this new bylaw provision, the District Court claims that Kappa has properly expressed its intention to admit transgender women and it uses this finding as the

foundational basis from which to dismiss all the claims in the case. But, in doing so, the District Court fails to properly consider and apply relevant law.

The District Court was wrong to dismiss Appellants' claims. To begin with, in spite of the clear standards governing a court's review under FRCP 12(b)(6), it failed to construe the facts alleged in the SAC as true and to resolve all inferences in Appellants' favor. As a result, the District Court failed to properly consider the application of the bad-faith exception to Ohio's judicial non-interference doctrine. Further, it incorrectly applied the First Amendment even though none of the parties in this case are state actors, and Appellants are seeking to Kappa's stated membership criteria rather than excluded transgender women.

Addressing the legal barriers applied by District Court, a proper 12(b)(6) review of Appellants' SAC sufficiently states derivative claims that Appellees breached their duties of care, loyalty, and compliance; exceeded their authority under the governing documents and as a matter of Ohio law by attempting to expand membership criteria through a reinterpretation of the Bylaws; and retaliated against members who spoke out against this conduct, in violation of Ohio's constitutional protections for free speech. In dismissing Appellants claims for breach of fiduciary duty and ultra vires acts, the District Court's misstated Ohio constitutional law and disregarded established principles of contract interpretation. The District Court's Order also ignored relevant caselaw, holding that Kappa must maintain its single-

sex status or it loses its exemptions under Title and ceases to be a woman only organization.

Finally, the District Court's failure to conduct any review of the factual allegations in the SAC relative to Appellants' new claims for breach of contract and fraudulent inducement is improper. Defendants had contractual and fiduciary duties to Appellants to honor Kappa's governing documents and to disclose to members their intent to convert Kappa to a co-ed organization. They are liable to Appellants on these claims. But even if the District Court determined the allegations were not sufficient to plausibly state a claim, Appellants should have been given an opportunity to amend these new claims. The failure to do so and to set out the District Court's reason for failing to do so constitutes an abuse of discretion, and the dismissal should be overruled.

Ultimately, the District Court's dismissal of Appellants' claims is unsupported by a proper review of the allegations in the SAC under FRCP 12(b)(6), a proper interpretation of Kappa's governing documents and fraternity policies, and a proper application of Ohio law. Accordingly, this Court should reverse the judgment below and remand for further proceedings, ensuring that the rights of Appellants and other Kappa members and preserving Kappa's commitment to supporting and uniting women.

## STANDARD OF REVIEW

"The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Because the legal sufficiency of a complaint is a question of law, the Court reviews de novo a District Court's decision to grant a motion to dismiss under Rule 12(b)(6). *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010); *Stark v. Reliance Standard Life Insurance Company*, 142 F4th 1252, 1256 (10th Cir. 2025). The court must "accept as true all well-pleaded factual allegations in a complaint," view these allegations in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Smith*, 561 F.3d at 1097-1098.

A complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is because a court's role in deciding a motion filed under FRCP 12(b)(6) is only to determine whether the complaint "'is legally sufficient to state a claim for which relief may be granted.'" *Smith*, 561 F.3d at 1098 (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). Indeed, there is "a low bar" for overcoming a motion to dismiss. *Quintana* v. *Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). As this Court has explained, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is

17

very remote and unlikely,' " *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264, 1276 (10th Cir. 2023), quoting *Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal citations omitted.)

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN FINDING THAT APPELLEES ARE PERMITTED TO DISAVOW KAPPA'S SINGLE SEX STATUS IN VIOLATION OF THE GOVERNING DOCUMENTS.**

A. **The District Court Erred in Finding that the Non-Interference Rule Shields Appellees from Their Breach of the Governing Documents.**

In Ohio, the noninterference rule (sometimes referred to as the internal affairs rule) holds that courts "will not interfere with the quasi-judicial decisions of voluntary associations unless such decisions are alleged and shown to be the result of fraud, arbitrariness, or collusion." *Lough v. Varsity Bowl, Inc.,* 241 N.E. 61, 62 (Ohio Sup. Ct. 1968).

In the SAC, Appellants alleged, with particularity, the requirements for their derivative suit and how they meet those requirements. *See e.g.,* App. Vol. 2 at 130,133-34 (¶¶ 158-160, 171-178). More importantly, Appellants specifically alleged that Fraternity Council acted fraudulently, arbitrarily and in excess of their authority. The allegations in the SAC demonstrate that, for more than 150 years Kappa limited membership to women only. *Id.* at 95-96 (¶¶ 18-23). Appellants' SAC cites publications throughout Kappa's history demonstrating Kappa's commitment to a single-sex, all women's organization, including a 2002 article in which Kappa

18

described itself as a "single sex haven in a mainly coed campus environment." *Id*. at 97 (¶¶ 25-27). The SAC demonstrates that Kappa's Governing Documents and Fraternity Policies contain clear language referring to women, and using female references such as "alumna" and "alumnae." *Id.* at 102-103,106 (¶¶ 45, 48, 49, 63). The Policies, which are established to ensure consistency in carrying out the duties in the Governing Documents, make clear that Kappa is a single sex organization. See App. Vol. 1 at 253, Policy III (prohibiting affiliation with men's fraternities and male auxiliary groups), Policy VIII at 98 (prohibiting men from participating in Kappa recruitment events). In fact, Policy III, acknowledges that the reason for limiting association with male auxiliary groups because "such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status." *Id*. at 252.

The SAC also alleges that Appellees refused to enforce the Sorority's commitment to its single sex status. App. Vol. 2 at 118,121-122 (¶¶ 111-113,124-128). Instead, Fraternity Council has attempted to expand membership to "individuals who identify as women" through nonbinding, position statements that never distributed to the membership and have no force or effect on the Governing Documents. *Id*. at 104-105, 122-124 (¶¶ 54-55, 129-135). In the SAC, Appellants also assert, that through this conduct, Fraternity Counsel, violated its obligations under the Governing Documents, acted in bath faith, and caused Kappa to lose its

identity as an organization for women. *Id*. at 125, 129, 132, 134(¶¶ 138-140, 154,169, 183). And thus, Appellees have not only violated their duties of loyalty, care, and compliance, but they have breached their obligations as directors to exercise their authority within the purposes of Kappa's Articles. *Id*. at 132(¶¶166-169); Ohio Rev. Code Ann. §1702.11(A)(2).

The District Court was obliged to accept these factual allegations as true and view them in a light most favorable to the Appellants. *Bird v. Martinez-Ellis*, 582 F. Supp. 3d 909, 917 (D. Wyo. 2022), aff'd, No. 22-8012, 2022 WL 17973581 (10th Cir. Dec. 28, 2022), citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). But it did not. The District Court asserted that its prior ruling on this issue is still applicable despite clear factual allegations in the SAC that Appellees violated the Governing Documents and acted in bad faith.[5] ECF 70 at 19, 20.

The District Court's finding, here, also disregards relevant Ohio case law. Recently, in *Rutkowski v. United States Practical Shooting Association,* Case No. 2023 CV 01625, 2025 WL 1721792 (Ohio Ct. App. June 20, 2025), an Ohio appellate

---

[5] In support of its position, the District Court relied on the law of the case doctrine as articulated in *Fish v. Schwab,* 957 F.3d 1105 (10th Cir. 2020). The District Court's reliance on *Fish* is misplaced. That case addresses the circumstance where an appellate court enters a final decision in a prior stage of the case and clarifies that under this law of the case doctrine, "'the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.' " *Fish*, 975 F.3d at 1139. There was no final decision in this case, and the issue has not been addressed by this Court.

court considered application of the bad-faith exception to the non-interference rule at the motion to dismiss stage.  In that case, the plaintiff, a firearms enthusiast, was a member of the defendant, a nonprofit corporation which publishes rules and guidelines for shooting events across the country.  *Id*. at *1.  The plaintiff challenged the organization's decision to proceed with an event even though the guidelines for the event were inconsistent with state law.  *Id.* at 2.  Like the Appellants here, the plaintiff claimed that he raised his concerns to the organization, but that they were ignored. *Id.* After a local news station published a story about the issue, causing a sponsor to pull out of the event, the organization indefinitely suspended him from the organization. *Id.* The plaintiff filed suit claiming the suspension was in bad faith. *Id. The* court further found that the plaintiff pleaded facts that the organization 'actively encouraged' the organizations members to violate the state law and set out to punish the plaintiff who drew attention to the defendant's conduct. *Id.* at *4. The Ohio appellate court found that, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint set out facts that would entitle him to relief.  *Id.* The court further held that, under the facts of the complaint, the bad-faith exception to the general rule of non-interference with voluntary associations applied. *Id.*

　　Based upon the analysis and holding in *Rutkowski*, accepting the allegations in the SAC as true and drawing all reasonable inferences in favor of Appellants, the

SAC set forth allegations that would entitle Appellants to relief and were sufficient to meet the bad-faith exception of the non-interference rule. The District Court failure to address Fraternity Council's knowing and intentional efforts to violate the Governing Documents is contrary to law.

>    1.    The District Court's Order Ignores the Fact that Fraternity Council Knew the Term "Woman" Did Not Include Individuals Who Identify as Women.

The District Court's Order minimizes the significance of Fraternity Council's misconduct. Contrary to the District Court's findings, this case is not a "debate over the definition of the word 'woman'," and Appellees are not merely defining "an otherwise undefined term" or using their own definition of woman in the Governing Documents. See App. Vol. 2 at 228,230 (pp.19,21). They are attempting to make a legislative policy change through interpretation.  That is not the law in Ohio.

Rather, an organization is bound to honor its own Governing Documents.  *See* Ohio Rev. Code Ann. §1702.12. And, Ohio courts have held that an organization's decision must be consistent with own rules:

>    In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by such association ***in accord with its own charter and rules*** made by the governing body must be accepted by courts of law.

*Buchanan v. Shack*, 1995 WL 386938, *2 (2nd Dist. June 28, 1995)(*emphasis added*).

22

As noted above, Appellants' allegations establish that throughout its 150-year history, the references to women in the Governing Documents reinforced the biological meaning of the word. App. Vol. 2 at 97 (¶¶ 22-24). For instance, Kappa documents refer to members that graduated college as "alumnae" and "alumna" – using Latin endings that refer exclusively to females. *Id.*;[6] ECF 1, Attachment 4 at 123.  The Governing Documents also use references to "womanhood." App. Vol. 1, Bylaws, at 88; App. Vol. 1, Articles, at 135.

While Fraternity Council and the District Court may claim the Governing Documents did not define the term "women," the factual allegations in the SAC clearly establish that Appellees know what "woman" means.  In fact, Appellants have always known and understood that the term "woman" as used in the Governing Documents is distinguishable from an "individual who identifies as a woman." Kappa's Bylaws FAQs, Position Statement, and Guide for Supporting LGBTQIA+ Members each use the following language to define the Sorority's membership: "[Kappa] is a single-gender organization comprised of ***women and individuals who identify as women***…" App. Vol. 2 at 105,123 (¶¶ 54,132); App. Vol. 1, at 117, 214, 291. (emphasis added).  The word "and" is conjunctive; thus, when it is used "both of the words joined by 'and' must be satisfied'." *KAM Dev., LLC v. Marco's*

---

[6] There are 84 separate references to "alumnae" and "alumna" in the Bylaws, and 51 separate references to these terms in the Standing Rules. App. Vol. at 73-111, 218-244.

*Franchising, LLC*, No. 3:20-CV-2024, 2024 WL 87758, at *7 (N.D. Ohio Jan. 5, 2024) quoting *State v. Hensly*, 2023-Ohio-119, 2023 WL 195627, at *6 (Ohio Ct. App. Jan. 17, 2023)(citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116–25 (2012)).

Appellees chose the words used in these documents "in consultation with counsel." App. Vol. 1 at 214. And, when they did so, they made a clear distinction between what a "woman" is and what a "woman" is not. But, unlike the Governing Documents and Fraternity Policies, these documents were never put to the membership for approval; they were never incorporated into Kappa's Governing Documents and Policies; and they cannot alter the meaning of the Governing documents. App. Vol. 2 at 105,122-124 (¶¶ 55,130,133-136). Thus, the District Court's Order ignores these facts and minimizes Fraternity Councils' efforts to alter the Governing Documents through interpretation rather than through disclosure to and a vote of the membership as they are required to do. *Id*. at 103, 106 (¶ 47,60).

2.    <u>The Unauthorized Expansion of Membership Criteria Constitutes the Very Type of Conduct Which Should be Reviewed</u>

In Ohio, directors owe a fiduciary duty to the corporation and to the shareholders, collectively. *Thompson v. Cent. Ohio Cellular, Inc.* (1994), 93 Ohio App.3d 530, 540. This entails a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Wing Leasing, Inc. v. M & B Aviation,*

*Inc.* (1988), 44 Ohio App.3d 178, 181. *Maas v. Maas*, 2020-Ohio-5160, ¶ 18, 161 N.E.3d 863, 872.  The allegations in the SAC, which must be taken as true for purposes of Appellees' Motion, demonstrate that Fraternity Council had a duty to Kappa and its members to honor the Governing Documents and to act in good faith and in the best interests of the fraternity.  That duty includes an obligation to provide notice and transparency to the members when the organization seeks to make significant changes to its purpose or membership criteria. App. Vol. 2 at 131,132 (¶¶ 164, 165,169); Ohio Rev. Code Ann. §1702.12(F)(9); Ohio Rev. Code Ann.§1702.30. This is especially true here because Appellants have no other recourse to ensure that Kappa's 150-year mission is preserved.

In its opinion, the District Court concludes that Appellants have a remedy that they simply have chosen "not to use it." App. Vol. 2 at 237 (p. 28). Setting aside that nothing in the SAC would support such an inference, the statement ignores the very language of the Bylaws which would prevent the members from pursuing an amendment at the next convention.  At the 2022 Biennial Convention, the Bylaws were amended to include new criteria for amendments:

> Proposed amendments shall be submitted no later than six months prior to the date of the Convention and ***only amendments approved by Fraternity Council shall be submitted to the Convention for a vote***.

App. Vol. 1 at 106, Art. XXIV, Sect. 2.  Given the newly added language, the District Court's assertion thus prompts the question – If a Wyoming Chapter member

25

who sought to enforce the Governing Documents could be demoted from her position, because doing so constitutes a violation of the anti-discrimination Policy (*see* App. Vol. 2 at 240 (p.31)), how could Appellants reasonably expect Fraternity Council to approve a proposed amendment to confirm Kappa's single-sex status? App. Vol. 2 at 120 (¶ 121). The answer is simple - they can't. Absent court intervention to properly review the facts under the appropriate standard and review the Governing Documents under the correct law, Appellants have no other remedy. Indeed, Fraternity Council's decision to close the door to future amendments without their approval demonstrates exactly the type of collusion that would nullify the internal affairs rule. The Ohio courts have stepped up to address a violation of the corporation's bylaws or to provide declaratory relief interpreting those governing documents when asked to do so. *See, e.g., Singh v. Guru Gobind Singh Sikh Soc. of Cleveland*, 2014-Ohio-4844, ¶ 22 (8th Dist.)(granting declaratory judgment interpreting organization's procedures for amending bylaws.) The District Court should have done so here.

**B.    Kappa Does Not Have a First Amendment Right to Violate the Governing Documents**

Relying on the law of the case doctrine, the District Court also continues to apply its flawed analysis of the First Amendment's right to freedom of expressive association to shield Appellees from liability for their misconduct. App. Vol. 2 at 228 (p.19).

To begin with, the District Court ignores the specific allegations and request for relief in the SAC.  The SAC does not seek an order to exclude transgender members; instead, they seek to hold Kappa to honor the commitment already made to its membership – to provide a single sex organization that supports and unites women. *Id.* at 102,103(¶¶45, 48-49).   In this regard, the District Court's continued reliance on *Boy Scouts of America v. Dale,* 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) is misplaced. Those cases involved situations where the *government* attempted to use its authority to force an organization to accept a member the organization wanted to exclude. *Dale*, 530 U.S. at 656; *Hurley*, 515 U.S. at 575-76.

The issues here do not involve a state actor. Here, Appellees, who serve as leaders of the sorority, are attempting to force Kappa to accept individuals that are excluded by its Governing Documents. Courts routinely resolved disputes over membership decisions and whether they are consistent with the organizations bylaws and rules. *See, e.g., Internatl. Bhd. Of Elec. Workers, Local Union No. 8 v. Grominicki*, 745 N.E.2d 449, 452–53 (Ohio Ct. App. 2000). (explaining that "[t]o determine when the union-member relationship terminated, we turn to the union's constitution"); *Browning v. Fraternal Ord. of Eagles, No. 1769*, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986) (unreported) (Ohio courts review an expulsion of a member of a fraternal society for "compliance with the constitution and bylaws of

27

the association"); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.,* 246 N.E.2d 598, 602 (Ohio Ct. App. 1969)(invalidating a member's expulsion from professional association). In such circumstances, the court's role is simply to enforce the organization's contracts. *Gromnicki*, 745 N.E.2d at 452–53 ("according to the United States Supreme Court, '[t]he court's role is but to enforce the contract'") (quoting *Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 182 (1967)); R*eyes v. Laborers' Int'l Union of N. Am.,* 464 F.2d 595, 597 (10th Cir. 1972) (affirming a member's suspension because the court was not "apprised of any provision of the Union constitution which was violated by [the plaintiff's] suspension.").

The enforcement of corporate requirements and obligations by a court does not interfere with or infringe an organization's First Amendment rights. The District Court's assertion to the contrary is simply wrong.

## II.    THE DISTRICT COURT ERRED, AS A MATTER OF LAW, IN FINDING THAT THE APPELLEES DID NOT BREACH THEIR FIDUCIARY DUTIES TO KAPPA.

### A.    The District Court's Interpretation of the Governing Documents is Contrary to Ohio Law.

The District Court's Opinion next claims that Appellants' claims for Breach of Fiduciary Duty and Ultra Vires Acts in Counts One and Two of the SAC must be dismissed because Appellees properly expanded Kappa's membership criteria to include "individuals who identify as women" and that it properly held itself out as

an organization of women "according to its own definition." App. Vol. 2 at 212, 229, 232, 235, 238, 241-243 (pp.3, 20, 23, 25, 29, 32-34). In reaching this conclusion, the District Court relied on a bylaw added to the Governing Documents at the 2022 Biennial Convention as evidence that Kappa openly defines women by their gender identity and not their "biological sex." *Id*. at 232. The 2022 bylaw reads as follows:

> Discrimination based on race, national origin, religion disability, age, sexual orientation or other class protected by local, state, provincial, or federal law shall be prohibited. The ***single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX*** of the Educational Amendments of 1972.

App. Vol 1 at 96-97, Bylaws, Art. V., Sec.2.D. (emphasis added.) The District Court then determined that the Appellees interpreted woman in accordance with the Governing Documents, so it has "no authority to review the dispute." App. Vol. 2 at 234 (p.25).

The District Court's interpretation disregards applicable law, including Ohio Rev. Code Ann. §1702.10, which requires the language employed in the 2022 bylaw is inconsistent with the rest of Kappa's Governing Documents, and violates the exemptions applicable to sororities under Title IX. Contrary to the District Court's findings, Appellees breached their fiduciary duties and engaged in ultra vires acts by expending membership beyond women to include men who identify as women in violation of the Governing Documents.

1.  <u>The Governing Documents are Contracts Which Must be Construed to Give Effect to the Intent of the Parties.</u>

"Constitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members." *Ulliman v. Ohio High School Athletic Assn.*, 184 Ohio App. 52, 62-63, 2009 Ohio 3756, ¶¶ 50-51, 919 NE2d 763,771 (Ohio Ct. App. 2000). "The construction of contracts is a matter of law." *Jurenovich v. Trumbull Mem. Hosp.*, 2020-Ohio-2667, ¶¶ 12-13 (11th Dist.)(citing *Cent. Funding, Inc. v. CompuServe Interactive Servs.*, 10th Dist. No. 02AP-972, 2003-Ohio-5037, 2003 WL 22177226, ¶ 42, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus.).  And the court's principal objective in construing a contract "is to ascertain and give effect to the intent of the parties." *Id.*, (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898 (1999)). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio Sup. Ct. 1987), paragraph one of the syllabus.  The Ohio Supreme Court has held that "[i]n interpreting a provision in a written contract, the words used should be read in context and given their usual and ordinary meaning." *Carroll Weir Funeral Home v. Miller,* 2 Ohio St.2d 189, 192, 207 N.E.2d 747, 749 (1965).

A court will not go beyond the agreement itself to interpret the intent of the parties unless the language used is unclear and ambiguous" *Blosser v. Enderlin*, 148

N.E. 393, paragraph two of the syllabus (Ohio Ct. App. 1925); *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio Sup. Ct. 1992). And in determining whether a contract's terms are ambiguous, courts will give "common words appearing in a written instrument . . . their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Shifrin* at 501-02.

Here, the common words appearing in the 2022 bylaw evidence a clear ambiguity, not only within the terms used in the bylaw itself but also when viewed in the context of the rest of Kappa's Governing Documents. Specifically, Kappa represents that it is a "single gender organization" and that its single gender nature is recognized as an exemption under Title IX of the Education Amendments. But the exemption under Title IX, as a matter of law, applies only to organizations composed of members of a single biological sex. *See Tennesse v. Cardona,* 762 F. Supp. 3d 615, 621 (E.D. Ky. 2025), *as_amended* (Jan. 10, 2025). Yet, the District Court failed to consider both the inconsistency within the bylaw and the import of such language on Kappa's Title IX status.

And, to the extent the District Court found that "single gender" meant gender identity, it renders the bylaw ambiguous and could have admitted extrinsic evidence ascertain its meaning. *See Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, 176 Ohio St.3d 505, 248 N.E.3d 196, quoting *Graham v. Drydock Coal Co.*,

1996-Ohio-393, ¶ 11, 76 Ohio St.3d 311, 667 N.E.2d 949. Admittedly, the District Court acknowledged that if it deemed the term "gender" in the Bylaws ambiguous, it could analyze parole evidence to determine the intent of the parties at the time the amendment was passed, but then merely identified the FAQs as the only source. ECF 70, FN 11.  The SAC cited provisions of then current sorority Policies restricting men from affiliating with Kappa members or participating in Kappa activities so as to not jeopardize its "single-sex status" as well as evidence throughout Kappa's 150-year history on which a fact finder could rely to ascertain the correct meaning of the amended bylaw. ECF 65 at ¶ 16, 18, 21, 23, 26, 27, 34, 63-64.

Nevertheless, to the extent the reference to Kappa as a "single gender" organization creates an ambiguity in the bylaws, "the resolution of an ambiguous term in a contract is a question of fact." *Tera, L.L.C.,* 2024-Ohio-1945, 176 Ohio St. 3d 505, 509, 248 N.E.3d 196, 201, reconsideration denied, 2024-Ohio-2718, 174 Ohio St. 3d 1551, 238 N.E.3d 127.  "If the language is ambiguous, the parties' alleged agreement requires interpretation and renders a Civ.R. 12(B)(6) dismissal improper." *Alexander Loc. Sch. Dist. Bd. of Educ. v. Vill. of Albany*, 2017-Ohio-8704, ¶ 38, 101 N.E.3d 21, 35 (Ohio Ct. App. 4th Dist. 2017). And the District Court's dismissal of Appellants' breach of fiduciary duty claim was improper on this ground alone. The ambiguity is even greater considering that Ohio Courts have frequently treated "gender" as synonymous with "sex."  *See Rowitz v. McClain,*

32

2019-Ohio-5438, ¶31, 38 N.E.3d 1241, 1255-56 (Ohio Ct. App. 2019); *Gajovski v. Gajovski*, 81 Ohio App. 3d 11, 13, 610 N.E. 2d 431, 433 (Ohio Ct. App. 1991), citing *In re Ladrach*, 32 Ohio Misc.2d 6, 10, 513 N.E.2d 828, 832 (Ohio Ct. App. 1987).

        2. <u>The District Court Failed to Consider Relevant Authority in Interpreting Kappa's Bylaws and has Improperly Upheld Regulations That Violate Title IX.</u>

The SAC also alleges that Fraternity Council's "interpretation" of woman violates Kappa's Title IX status. During the period between the filing of the First and Second Amended Verified Complaints, several courts were asked to consider and review language in Title IX of the 1972 Education Amendments. 20 U.S.C. § 1681(a)(6). The SAC expressly alleged that Kappa's interpretation of membership requirements is not only inconsistent with this authority but has made Kappa the subject of an investigation by the U.S. Department of Education Office of Civil Rights. ECF 65 at ¶140. The SAC also asserted that Kappa's interpretation was contrary to Executive Order 14168, which defined the terms "women," "woman," "girls" and "girl" using their biological classifications.[7] ECF 65 at ¶ 138. While the District Court took the opportunity to criticize and dismiss the Executive Order as

---

[7] The Ohio General Assembly recently followed suit. Ohio Rev. Code Ann. §9.05, which took effect on October 1, 2025, defines woman as an "adult female" and "female" as "a person belonging, at conception, to the sex that produce the large reproductive cell." The statute also clarifies that it is the policy of the State of Ohio to recognize two sexes, male and female, which are not interchangeable. Ohio Rev. Code Ann. §9.05(B).

inapplicable here, it completely ignored the application and relevance of the Title IX cases to Kappa's 2022 bylaw.

In *Tennessee v. Cardona*, 762 F. Supp. 3d at 621[8], the District Court for the Eastern District of Kentucky vacated the U.S. Department of Education's Final Rule which would have effected  changes to the regulations that implement Title IX, including the addition of discrimination "on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."[9] In determining that these changes exceeded the scope of the Department's authority, were arbitrary and capricious and unconstitutional, the court found nothing in the text of the statute to suggests that it applied to anything other than the disparate treatment of an "individual on the basis of the person's sex, i.e., male or female." *Cardona*, 762 F.Supp. 3d at 622.  It further reasoned that

> expanding the meaning of "on the basis of sex" to include "gender identity" turns Title IX on its head. While Title IX sought to level the playing field between men and women, it is rife with exceptions that allow males and females to be separated based on the enduring physical differences between the sexes. *See e.g.*, 20 U.S.C. §§ 1681(a)(3)-(9), 1686. … the *entire point* of Title IX is to prevent discrimination based on sex—throwing gender identity into the mix eviscerates the statute and renders it largely meaningless"

*Id.* at 624. (emphasis in original)

---

[8] Of note, Kappa's state of incorporation, Ohio, was a named plaintiff in this case.

[9] "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Final Rule"), 89 Fed. Reg. 33474 (Apr. 29, 2024).

Several other courts have also rejected the Department's attempt to broaden the scope of Title IX on similar grounds.  *See Texas v. Cardona*, 743 F. Supp. 3d 824, 876 (N.D. Tex. 2024), *appeal dismissed sub nom. Texas v. McMahon*, No. 24-10910, 2025 WL 2840825 (5th Cir. Apr. 23, 2025) ("the Department's expanded interpretation injects notions of self-professed and potentially ever-changing gender identity into "sex," rendering other provisions of Title IX meaningless."); *Arkansas v. United States Dep't of Educ.*, 742 F. Supp. 3d 919, 940–45 (E.D. Mo. 2024)(recognizing that the statute does not expressly prohibit discrimination on the basis of gender identity but makes certain exceptions for "sex-based differential treatment"); *Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, No. 4:24-CV-00461-O, 2025 WL 1782572, at *3 (N.D. Tex. Feb. 19, 2025).

The District Court failed, entirely, to consider the significant impact of these authorities when it summarily rejected, as arbitrary, Appellants' assertion that the reference to Title IX in this bylaw indicated it should be read as synonymous with "single sex."  See App. Vol. 2 at 232 (p.23).  Yet, these authorities have made it clear that the exceptions to Title IX are limited to "single sex" organizations.  Thus, if Kappa wishes to hold itself out as an organization that is entitled to those exemptions, it must be a *single sex* organization.  *See* 20 U.S.C. § 1681(a)(6)(excepting "a social fraternity or social sorority," "the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy

35

Scouts, Camp Fire Girls ... the membership of which has traditionally been limited to persons of *one sex* …")(emphasis added)

Simply put, Kappa could be a "single gender" organization or a single sex organization that meets the exceptions of Title IX, but it cannot be both. Thus, the District Court's reliance on the 2022 bylaw to support the notion that Fraternity Council's interpretation of its membership criteria must be include a man's gender identity rather than women's sex renders the bylaw as inconsistent with, and in violation of, Title IX and, therefore, Ohio law. *see* Ohio Rev. Code Ann. §1702.10 (corporation regulations must be consistent with law and articles); Ohio Rev. Code Ann. §1702.12(F)(9) (corporation can engage in conduct that is permitted by law). The District Court neglected to consider that the "single gender" language in the 2022 Bylaw could have been reasonably understood by Kappa members as including women who identify as men.

The cases clarifying the "single sex" nature of Title IX also demonstrate that the District Court erred in relying on the National Panhellenic Conference policy defining "woman" to include "an individual who consistently lives as self-identifies as a woman" as further support for its finding that the Governing Documents indicate an intent to include transgender women. App. Vol. 2 at 233 (p.24).[10] A review of the

---

[10] Of note, the references to Plaintiffs' Brief in Opposition relied upon by the District Court, do not exist. The document does not contain more than 24 pages. *See* App. Vol. 2 at 172.

NPC unanimous agreement cited in the SAC makes clear that the NPC also relies on the exemptions set forth in Title IX. It provides in relevant part:

> NPC member organizations exist as women's-only private social organizations. … The U.S. Congress has recognized that right by providing in Title IX of the Education Amendments of 1972 that the membership practices of social fraternities and sororities are excepted from the prohibition contained in Title IX against discrimination ***on the basis of sex*** in participation in educational programs or related activities (20 USC 1681) …

App. Vol. 2 at 127 (¶145), citing NPC Manual of Information ("NPC Manual"), 29th Ed., January 2025, at 21-22, https://npcwomen.org.login/college-panhellenics/moi-resources/ (site last visited June 4, 2025)[11](emphasis added). Even a cursory review of relevant case law related to the application of Title IX  and its exemptions applicable to Kappa would have demonstrated the glaring inconsistency created by expanding membership to include males who identify as women. Kappa's Title IX exemption from the prohibition on sex-based discrimination applies only to its membership decisions. If it admits any man, no matter how he identifies, Kappa could not then discriminate against other men in its membership decisions because the exemption that allows for sex discrimination would no longer apply. This injures the organization and is grounds for derivative relief. Yet, the District Court disregarded this entirely.

---

[11] The NPC manual describes the Unanimous Agreements as sitting at the top of a hierarchy of principles, with policies sitting below. *See* NPC Manual at pp.9,15.

3. <u>Appellants Sufficiently Pled Facts to Support Their Claim That Appellees Breached Their Fiduciary Duties and Exceeded Their Authority.</u>

As demonstrated above, the allegations in the SAC, which must be taken as true for purposes of the motion to dismiss, establish that Appellees owed a duty to Kappa and its members to honor the Governing Documents.   At a minimum, Appellees failed to disclose to the membership that in characterizing Kappa as a single gender organization, they intended to change the fundamental nature of the organization, and disavow the protections afforded to the organization under the Title IX exemption to discriminate based on sex only with regard to membership decisions. Appellants properly alleged facts demonstrating that Appellees failed to disclose that they unilaterally expanded the sorority's membership criteria and in doing so, exceeded their authority, failed to follow the Governing Documents, and failed to follow mandatory notice and voting procedures. App. Vol. 2 at 103-106, 116 ,122 ,125, 126, 128, 129, 131-133 (¶¶ 47, 52, 53, 55, 60, 100, 102, 127, 137, 149, 153, 165-167, 173-175.)  Accepting these facts as true, Appellants' plausibly asserted claims for breach of fiduciary duty and ultra vires, and the District Court erred in dismissing them.

**B.      Appellants Pled Sufficient Facts to Support Their Remaining Claims for Breach of Fiduciary Duty.**

      1.   <u>Appellants Sufficiently Established That Appellees Concealed Their Efforts to Disavow the Bylaws to Admit Transgender Women.</u>

As demonstrated above, Appellants also presented key factual allegations in the SAC demonstrating that Appellees, in fact, knew that references to "woman" in the Governing Documents were distinct from the category of individuals who identify as women. Appellees undertook efforts to expand the sorority's membership without properly amending the Governing Documents. To begin with, many of the non-governing documents on which they, and the District Court, rely as evidence of their disclosure efforts were not published to the membership. For instance, neither the Guide nor the Fraternity Position Statements were published to the membership and neither were presented to the membership for review prior to their implementation. App. Vol. 2 at 122 (¶¶ 129,130). The Guide was purely an internal resource, and the Position Statement was uploaded, without notice, to an online member portal with hundreds of other documents. *Id*. Indeed, Appellants were only made aware of these documents through Kappa's response to their Rule 23.1 demand. *Id*.

In addition, Appellees qualified the alleged single gender nature of the sorority with the following statement – "The single gender nature of Greek-letter social organizations is recognized by an exemption under the Educational Amendments to

Title IX." *See* App. Vol. 1, Bylaws, Art. V. Sect. 2.D. at 96-97 and Kappa Position Statement at 292. As explained above, the exemptions to Title IX do not, as a matter of law, apply to single gender organizations. Therefore, given that the language of the exemptions in Title IX explicitly applies to single-sex organizations, no member could reasonably interpret this qualifying language to mean that Kappa was anything other than a single-sex organization. *See* App. Vol. 2 at 104 (¶51).

Further, Appellees failed to make clear to the membership that the reference to Kappa's "single gender nature" in the 2022 amendment to the bylaws was intended to expand membership criteria to "individuals who identify as women." *Id*. (¶ 52); App. Vol. 1, Report of the Bylaws Committee, at 141. Indeed, for members not versed in the semantics of gender politics or case law governing Title IX, "single gender" and "single sex" are synonymous.[12] The Report of the Bylaws Committee makes no reference to the expansion of membership criteria. *Id.* Given the number of references to "women" in Kappa's Governing Documents and Policies, and

---

[12] Such an interpretation would not be unreasonable. *See Griffith v. El Paso Cnty., Colorado*, 129 F.4th 790, 837(10th Cir. 2025)(Tymkovich, J.,dissenting); (recognizing that "[h]istorically, 'gender' was used as a synonym, or at least cultural proxy, for 'sex'. Indeed, as the majority observes, courts' Equal Protection decisions—including the Supreme Court's—use the terms "sex" and "gender" interchangeably, although the majority understands the terms to refer to biological sex.") *See also Rowitz,* 2019-Ohio-5438, ¶31, 38 N.E.3d at 1255-56. At the very least this creates an ambiguity that requires fact finding and precludes a 12(b)(6) dismissal.

Kappa's reliance on the Title IX exemption, Fraternity Council's duty to act in good faith and in the fraternity's best interest required more than a passing reference to Kappa as a "single gender" organization. In Ohio, these duties include an obligation to provide notice and transparency – neither of which was present here. Ohio Rev. Code Ann. §1702.12(F)(9); Ohio Rev. Code Ann. §1702.30. *See also Zalvin v. Ayers*, 157 N.E.3d 256, 265, 2020 Ohio 4021 ¶22 (Ohio Ct. App. 2020) ("The duty of disclosure applies when a corporation seeks shareholder approval of fundamental changes.") Ohio law, applying basic good-faith requirements simply does not allow an organization to make such fundamental changes through linguistic sleight-of-hand.

### 2. Appellees Disregarded Kappa's Duty to Protect the Freedom of Speech Under the Ohio Constitution.

In rejecting Appellants' contention that Appellees disregarded their obligations to protect and honor the freedom of speech protected under the Ohio Constitution, the District Court incorrectly claimed that the Ohio Constitution only protects state actors. App. Vol. 2 at 239 (p.30). Again, the District Court has disregarded relevant, applicable law.

The Ohio Constitution is "a document of independent force." *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 14 (citing *Arnold v. Cleveland*, 67 Ohio St. 3d 35, 42, 616 N.E. 2d 163 (1993). Section 11, Article I of the Ohio Constitution guarantees that "[e]very citizen may freely speak, write, and

41

publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." In *State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, 177 Ohio St. 3d 174, 181, 251 N.E.3d 79, 88, *reconsideration denied*, 2024-Ohio-5647, 176 Ohio St. 3d 1433, 246 N.E.3d 564, the Ohio Supreme Court distinguished the Ohio's constitutional freedoms from the First Amendment to the U.S. Constitution. And, the Ohio Supreme Court cautioned against the type of lock-stepping reflected in the District Court's opinion (at ECF 70 at 30):

> But when we say that our state Constitution means whatever the United States Supreme Court says that the federal Constitution means, we ignore our obligation to the Ohio Constitution, and we delegate away our duty to say what the law is.

*Id*. at 184, 251 N.E.3d at 90. Based upon recent Ohio Supreme Court authority, the District Court's contention that Appellants were required to plead that Kappa was a state actor as may be required under the First Amendment, was improper.

Next, the District Court's finding that the retaliatory conduct alleged in the SAC was protected by the non-interference rule is incorrect. The facts alleged in the SAC demonstrate that Wyoming Chapter members faced retaliation because they sought to enforce valid provisions in the Governing Documents. App. Vol. 2 at 120 (¶¶ 117, 118, 121). To support its conclusion, as to Madeline Ramar only, the District Court relies on Policy III, Sect. (C)(2), which prohibits discrimination on the basis of "gender identity." App. Vol. 2 at 240 (p.31). But as explained further above,

42

Kappa's attempt to expand membership to permit transgender women is not legally supported. Therefore, Appellees' efforts to discipline members like Appellant Holtmeier and Madeline Ramar for carrying out their obligations to the organization and advocating to maintain Kappa's single-sex status is, at best, arbitrary and contrary to those provisions of the Governing Documents and Kappa Policies intended to preserve Kappa's single sex status. *See e.g.* App. Vol. 1, Bylaws Art. V, Sec. 1, at 96 (members "shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance and conduct."); Policy III, Sect. 2, at 253 ("The formation of male auxiliary groups, such as big brothers, is prohibited. The activities of such groups … jeopardize our single-sex status.")

Based upon the foregoing, the District Court erred in dismissing Appellants' claims for breach of fiduciary duty related to Appellee's conduct in concealing their efforts to disavow the Governing Documents, disregarding Kappa's duty to protect freedom of speech under the Ohio Constitution and failing to review Appellee's retaliatory conduct against Wyoming Chapter members opposed to the Student's admission to membership.

## III.  THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS' CLAIMS FOR BREACH OF CONTRACT AND FRAUDULENT INDUCEMENT.

This District Court also dismissed Appellants direct claims for breach of contract and fraudulent inducement based on its findings that Kappa's Governing Documents do not evidence an intent to exclude transgender women from membership. *See* App. Vol. 2 at 242-243 (pp. 33,34) (holding that "Kappa did not promise Plaintiffs a single-sex organization…" and that "…Kappa has never asserted that it does *not* accept transgender women.") As discussed further above, the District Court erred, as a matter of law, in reaching this conclusion.  Therefore, Appellants direct claims should not have been dismissed.  At a minimum, the District Court should have afforded Appellants an opportunity to amend their pleading to address these new claims.

### A.  Appellants Met the Threshold Requirement to Plead a Claim for Breach of Contract.

Count Three of the SAC alleges that Kappa and Fraternity Council breached their promise of "a single sex environment, committed to uniting and supporting women throughout their lifetime." App. Vol. 2 at 134 (¶¶ 181,182).   Kappa's Governing Documents serve as the contract between Kappa and its members. *Ulliman*, 184 Ohio App. at 62-62, 2009 Ohio 3756 at ¶ 50, 919 NE2d 771. The first purpose in the Articles and Bylaws state that Kappa was formed to "unite women, through membership, in a close bond of friendship..." *Id*. at 96,102 (¶¶ 21,45); Vol.

1 at 135.  The Bylaws also restrict membership to women only.  App. Vol. 2 at 103 (¶ 48).  Kappa's disregard of clear membership requirements constitutes a breach of its agreement with the members, including Appellants.

Based on its flawed analysis of the Governing Documents, the District Court found that "Kappa did not promise Plaintiffs a single-sex organization." *Id*. at 242 (p. 33).  For all the reasons discussed above, the District Court's interpretation of Kappa's Governing Documents is contrary to law.

**B.    Appellants Met the Threshold Requirement to Plead Fraudulent Inducement.**

Further, as noted above, the fiduciary relationship between a corporation's directors and both the corporation and its shareholders includes a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Zalvin*, 157 N.E.3d at 265; *Wing Leasing, Inc.*, 44 Ohio App.3d at 181, 542 N.E.2d 671. To that end, the SAC alleges that Appellees had an obligation to carry out their duties "in good faith." ECF 65 at¶42. *See also Kleemann v. Carriage Trace, Inc.*, Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43. By definition, "good faith" is "honesty in fact in the conduct or transaction concerned." *DiPasquale v. Costas*, 2010-Ohio-832, ¶126-127, 926 N.E.2d 682, 706-707, citing *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10 (citations omitted).

Here, the District Court dismissed Appellants' claim "for failure to identify a

false representation." App. Vol. 2 at 243 (p.34). To succeed on a claim for fraud in the inducement, a plaintiff must show that "the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 502, 692 N.E.2d 574, 578 (Ohio 1998). According to the District Court, "Kappa has never asserted that it does *not* accept transgender women." *Id*. (emphasis in original). Indeed, the District Court assumed, without any factual support, that at the time Appellants *joined* Kappa, it had fully disclosed its intent to include transgender women. *Id*. at 232(p.23). But for purposes of a 12(b)(6) analysis, the court must look to the factual allegations in the complaint and take those allegations as true. It is not for the District Court to simply assume facts not in the pleading simply to support its own conclusions.

Nevertheless, the SAC alleges that throughout its 150-year history, Kappa held itself out as an organization whose mission is to support and unite women. *Id*. at 96,102 (¶¶21,45). In 2002, Kappa published an article in which it described the benefits of membership and described itself as a "single sex haven." *Id*. at 97. Even after its 2022 bylaws amendment, Kappa held itself out as an organization protected by the exemptions (which as explained above are limited to single sex organizations) in Title IX. *Id*. at 105(¶¶50-51). Appellants, Hannah Holtmeier and Allison Coughan, were members of Kappa prior to the 2022 amendment – they had

to be members in order to vote on the Student's admission to the Wyoming Chapter. App. Vol. 1, Standing Rules, Sect. 1.1.A., at 220 ("Active members shall be responsible for selecting new members of their chapter.")

The SAC also establishes that prior to joining Kappa, Appellants and other prospective members were told that in joining the sorority they would have a lifetime of "sisterhood." App. Vol. 2 at 128 (¶¶ 147-148). The SAC also alleges that each Appellant "joined Kappa with the promise that they would be able to live and socialize in a single sex, all female environment. *Id.* at 129 (¶ 156). As noted above, the Position Statement and Guide were disclosed to Appellants after they complained about the student's admission to membership. *Id.* at 122-123 (¶¶ 126,129). And the Position statement was only available to members through the online *member* portal. *Id.* at 123 (¶ 130). Thus, Kappa never disclosed to Appellants that it accepted transgender members and never disclosed to Appellants that Fraternity Leadership concluded that a women need not "be biologically born as female." *Id.* at 122,128 (¶¶ 127, 149). *See also* App. Vol. 1 at 142.

The SAC sufficiently demonstrates that Appellants relied upon representations of Kappa, its Fraternity Council, and Chapter leadership that they were joining a community of *women*, not a community of women and men who identify as women. The representations of sisterhood and a women-only environment, and the omissions that Fraternity Council had deemed "women" to

47

include men who are not female was knowingly false and misleading. Accepting Appellants' allegations as true, they pled a plausible claim of fraud in the inducement.

### C. Appellants' Contract and Fraudulent Inducement Claims Were Raised for the First Time in the SAC and Should Not Have Been Dismissed With Prejudice.

In the SAC, Appellants assert, for the first time, their direct claims for breach of contract and fraudulent inducement. App. Vol. 2, SAC Counts Three and Four, at 134-136. Relying on its findings on Appellants' derivative claims, the District Court dismissed each of these claims with prejudice, without any reasoning and without leave to amend. *Id*. at 242-243 (p.33-34). Indeed, the District Court's Order appears not to even acknowledge the dismissal of these new claims in its order, stating "We have reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile." *Id*. at 245 (p.35).

Dismissal with prejudice and without leave to amend is not appropriate unless granting leave to amend would be futile. *Brereton v. Bountiful City Corp.*, 434 F3d 1213, 1219 (10th Cir. 2006). Further, the failure of a district court to articulate why the dismissal of these claims should be with prejudice instead of without prejudice may constitute an abuse of discretion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 227 9 L.Ed.2d 222 (1962); *see also Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

Here, the District Court's Opinion offers nothing to establish that leave to amend these two new claims would be futile and further offers no reason for its blanket dismissal with prejudice. Therefore, the District Court erred in dismissing these claims without leave to amend.

## IV.   CONCLUSION

The District Court dismissed Appellants' claims by applying the wrong Law and ignoring key facts alleged in the Second Amended Complaint. This Court should reverse the lower court's legal and factual errors and hold that Appellants have pleaded sufficient direct and derivative claims.

Dated: November 25, 2025                    Respectfully submitted,

> _/s/ Angela M. Lavin_
> Angela M. Lavin          (OH 0069604)
> Jay R. Carson            (OH 0068526)
> Sharon G. Ross           (OH 0095354)
> WEGMAN HESSLER VALORE
> 6055 Rockside Woods Blvd. N., Ste. 200
> Cleveland, Ohio 44131
> Telephone: (216) 642-3342
> Facsimile:  (216) 642-8826
> E-mail: amlavin@wegmanlaw.com
>         jrcarson@wegmanlaw.com
>         sgross@wegmanlaw.com
>
> And
>
> Rick L. Koehmstedt, WY Bar No. 6-3101
> KOEHMSTEDT LAW FIRM, LLC
> 1551 Three Crowns Drive, Suite 100
> Casper, WY 82604
> Telephone: (307) 333-1401
> Facsimile:  (307) 333-1348 fax
> Email: rick@klflegalteam.com

49

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing *Brief of Appellants (Corrected)* was filed electronically with the Court this 25th day of November 2025. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Angela M. Lavin
Angela M. Lavin          (OH 0069604)

*One of the Attorneys for Appellants*

## ORAL ARGUMENT STATEMENT

Plaintiffs-Appellants respectfully request oral argument because this case raises important issues about the applicable law to Appellants' derivative claims as well as the correct standards for assessing factual allegations regarding Appellants direct claims.

November 25, 2025                    */s/ Angela M. Lavin*
                                     Angela M. Lavin          (OH 0069604)

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this document:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(A) because, excluding those portions exempted by Fed. R. App. P. 32(f), it contains 11,913 words, as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared in a proportionally spaced typeface using Microsoft 365, in Times New Roman 14-point font.

Dated: November 25, 2025

                                    */s/ Angela M. Lavin*
                                    Angela M. Lavin        (OH 0069604)

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    If required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)    The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Sophos Endpoint, version 2025.2.1.709.0, most recently updated on November 24, 2025, and according to the program is free of viruses.

Dated: November 25, 2025

/s/ Angela M. Lavin
Angela M. Lavin      (OH 0069604)

## ATTACHMENT

Order and Judgment, August 22,2025, U.S. District Court for the District of Wyoming No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson, Granting Defendants' Motion to Dismiss (ECF No. 66), Dismissing, With Prejudice, Plaintiffs' Second Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties (ECF No. 65). ECF Nos. 70 and 71.

**FILED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

4:24 pm, 8/22/25

**Margaret Botkins
Clerk of Court**

| | |
|---|---|
| HANNAH HOLTMEIER, ALLISON COGHAN, and HALEY RUTSCH, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | |
| Plaintiffs, | |
| v. | Case No.  2:23-CV-51 |
| KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, BETH BLACK, and JANE DOES 1-4, | |
| Defendants, | |

## JUDGMENT

This matter comes before the Court on Defendants' *Motion to Dismiss* (ECF No. 66), filed on June 26, 2025. The Court has entered its *Order Granting Defendants' Motion to Dismiss* (ECF No. 70) finding that Plaintiffs' *Second Amended Complaint* (ECF No. 65) failed to adequately state a claim upon which relief could be granted.

The Court, therefore, **ORDERS, ADJUDGES, AND DECREES** that for the reasons stated in the Court's *Order*, Defendants' *Motion* is **GRANTED**. ECF No. 70. The Court further **ORDERS, ADJUDGES, AND DECREES** that for the reasons stated in the Court's *Order*, Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**. *Id.*

1

Dated this 22ᵈ day of August, 2025.

Alan B. Johnson
United States District Judge



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

HANNAH HOLTMEIER, ALLISON
COGHAN, and HALEY RUTSCH, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

        Plaintiffs,

VS.

KAPPA KAPPA GAMMA
FRATERNITY, MARY PAT ROONEY,
MARIA BROWN, NANCY
CAMPBELL, BARB GOETTELMAN,
LIZ WONG, KYLE DONNELLY, BETH
BLACK, and JANE DOES 1-4,

        Defendants,

Case No. 23-CV-51

---

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 66)

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss* (ECF

No. 66), filed on June 26, 2025. Plaintiffs responded in opposition on July 10th (ECF No.

68), and Defendants replied on July 17th (ECF No. 69). Having considered all of the

relevant materials, we hereby **GRANT** Defendants' motion.

### BACKGROUND

The facts of this case are well known to the parties at this point, almost two and a

half years after this suit was initially filed. In the fall of 2022, a chapter of the Kappa

Kappa Gamma Fraternity ("Kappa") located at the University of Wyoming voted to accept, and later initiated, a transgender woman as a member of the sorority.[1] In March of 2023, seven then-current members of the sorority filed the original complaint in this case, asserting a breach of contract claim, a tortious-interference claim, and a direct cause of action against the admitted student, Kappa, and the Fraternity Council president. *See generally* ECF No. 1. We dismissed that complaint without prejudice on the grounds that the sorority was free, as a private organization, to define the word "woman" in its bylaws however it wanted, and therefore the sorority was not contractually obligated to reject transwomen members. ECF No. 31 at 26, 33. Plaintiffs appealed our dismissal to the Tenth Circuit, which denied it on jurisdictional grounds. ECF No. 39. Plaintiffs eventually filed this Second Amended Complaint (SAC) in June of this year. ECF No. 65.

The SAC recounts many of the same facts as the previous complaint, though this time it alleges four slightly different claims. Plaintiffs first allege a set of derivative claims against Kappa's Fraternity Council, who act as the organization's board of directors[2], for various breaches of their fiduciary duties. They also directly allege that

---

[1] Parties use both the terms "sorority" and "fraternity" to refer to Kappa. For the sake of consistency and comprehensibility, will use the term "sorority" when referring to the organization, except where Kappa is referred to as a fraternity in Bylaws and other quoted text.
[2] Ohio nonprofit law states that "'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated." Ohio Rev. Code Ann. §§ 1702.0l(K). Article IX of Kappa's Bylaws states that

    all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving
    hereunder shall have the power, authority and responsibilities of and shall perform the functions provided
    for directors under the Ohio Nonprofit Corporation Law.

ECF No. 1 at 146.

2

Kappa breached its contract with Plaintiffs and that the Fraternity Council fraudulently induced members to join the organization.

Having considered the issues presented (again), we find that the majority of the claims must be dismissed on the grounds that this Court still may not interfere with Kappa's contractually valid interpretation of its own Bylaws. Nothing in the Bylaws or the Standing Rules requires Kappa to narrowly define the words "women" or "woman" to include only those individuals born with a certain set of reproductive organs, particularly when even the dictionary cited by Plaintiffs offers a more expansive definition. Nor has Kappa or the Fraternity Council concealed this definition from its members: in fact, it has published and distributed multiple texts clarifying the issue. Finally, to the extent that Plaintiffs meant to articulate independent claims of breach of contract regarding the voting procedure used when the transgender woman was admitted, they have not shown that any resulting damages surpass the amount in controversy required to maintain federal jurisdiction.

## A. Relevant Governing Documents of Kappa

All of Plaintiffs' claims are based on Kappa's alleged violations of the contract between the organization and its members. We therefore begin by examining the basis and content of that contract. Kappa is a non-profit corporation organized in Ohio, and therefore it is subject to that state's laws. ECF No. 65 at 12. In Ohio, an organization's governing documents includes its constitution and bylaws, both of which serve as a contract between the organization and its members. *Ulliman v. Ohio High Sch. Athletic*

3

*Assn.*, 184 Ohio App. 3d 52, 62 (2009). We therefore turn to these documents to understand the basis of the contract.

We first identify the relevant portions of Kappa's Articles of Incorporation, which Plaintiffs implicitly argue is akin to a "constitution." Here, Kappa states that its "purpose" is to "unite women", "build[] higher standards of womanhood", "advocate for and seek to address issues of concern for members and women in general", and "provide opportunities for engagement throughout the lives of alumnae". ECF No. 65 at 13. The Articles permit local chapters to recruit and vote on new members "in accordance with [Sorority] standards and procedures." *Id.* at 14.

Next, we examine Kappa's Bylaws. The Bylaws state that a new member "shall be a woman", and the word "woman" is repeated several times in the "Qualifications" section. *Id.* Article IV also states that "Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures." ECF No. 1 at 81. Additionally, at the June 2022 Biennial Convention, Kappa members approved[3] a new Bylaw forbidding Kappa members from engaging in discrimination, while also recognizing that the "single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under... Title IX". ECF No. 65 at 15.

Although not officially a Bylaw, Kappa issued a document to members entitled "Bylaws and Standing Rules Revision 2022" about two months before the Convention.

---

[3] Bylaws may only be amended by a two-thirds majority vote at Kappa's biennial convention, and the exact content of any proposed amendment must be shared with members three months beforehand. ECF No. 65 at 14.

ECF No. 65 at 15. In the FAQs section, under "DIVERSITY, EQUITY AND

INCLUSION", it states:

> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

ECF No. 65 at 16. Plaintiffs assert that this statement cannot be considered a governing

document because it was not specifically voted on and it was only released two months

ahead of the convention. *Id.*

Kappa also has a set of "Standing Rules," which Plaintiffs implicitly argue are also

part of the governing documents because, like the Bylaws, the Rules can only be

amended by majority vote at a Biennial Convention. ECF No. 1-1 at 79. As relevant here,

the Rules provide guidance on membership selection. They state that (1) "All active

members of the chapter shall participate in membership selection unless excused in

writing by the designated chapter adviser"; (2) "All information concerning the

membership selection process is confidential and shall be kept within the chapter"; and

(3) "The electronic voting system selected by the Fraternity shall be used by the chapter"

ECF No. 1-1 at 55.

The Rules also provide an outline of the role of the Fraternity Council. The duties of the Council "shall include... Interpreting the Fraternity *Bylaws* and *Standing Rules*" as well as "Appointing Fraternity members to all volunteer positions within the Fraternity, filling vacancies that occur, and removing members from appointed positions, if deemed necessary, by a three-fourths vote", among other things. ECF No. 1-1 at 63. The Fraternity Council also has some role "authorizing" members for initiation:

> At least two weeks before initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

ECF No. 1-1 at 64.

Finally, there are various documents published by Kappa that Plaintiffs assert are *not* governing documents because they are not voted on by the members. Among these are Kappa "Policies," which, among other things, warn that "Any member who makes discriminatory, inflammatory or inappropriate actions based on... gender identity, [or] sexual orientation... shall be subject to dismissal or other disciplinary action." ECF No. 1-1 at 89. Kappa also publishes "Position Statements", which can be found on their "member portal." One such Statement clarifies Kappa's position on "individuals who identify as women":

> MEMBERSHIP SELECTION
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> SINGLE GENDER ORGANIZATIONS

> Kappa Kappa Gamma is a private, nonprofit organization for women
> founded in 1870. The single-gender nature of our organization is essential to
> the mission and purpose of Kappa Kappa Gamma and its chapters and
> alumnae associations. The right to limit membership in the Fraternity to
> women is protected by the U.S. Constitution.

ECF No. 1-1 at 127. Kappa also published and distributed a "Guide for Supporting Our

LGBTQIA+ Members" in 2018, which states that the organization does not discriminate

based on "gender identity", repeats the Membership Selection paragraph above, and

provides twelve pages of advice on how to be respectful of gay and transgender Kappa

members. ECF No. 1 at 103-114.

B. **Admission of the Student**

Plaintiffs allege that several provisions of the governing documents were violated

when the Wyoming Chapter admitted a transgender woman (who we will subsequently

refer to as "the Student") as a member. The Student participated in formal sorority

recruitment at the University of Wyoming in August of 2022. ECF No. 65 at 22. During

this period, the Kappa Membership Chair for the Wyoming Chapter told sorority

members, including Plaintiffs, that Kappa rules did not permit them to refuse transgender

women. *Id.* at 22. The Student did not finish formal recruitment with Kappa, but

afterwards reached out to the Membership Chair to pursue membership through the

"continuous open bidding" process, which allows individuals to become members outside

of formal recruitment. *Id.* at 23.[4]

---

[4] Kappa requires all chapters with low membership to use the process. ECF No. 65 at 23. The Wyoming Chapter, which was on probation from 2016 until 2022 because of low membership numbers, used this system. *Id.*

Plaintiffs allege a few "irregularities" during the Student's pre-voting recruitment process, although they do not specify violations of any specific governing documents. First, they allege that Kappa's alumnae advisors directed the chapter president and officers to recruit the Student to raise the profile of the Wyoming chapter. *Id.* Second, Plaintiffs allege that members did not receive sufficient notice of the Student's application, although they admit that her application was mentioned at a chapter meeting "well before the vote" and that a dinner was set up to meet the Student, as was customary during the COB process. *Id.* at 24.

Plaintiffs also contend that several "irregularities" occurred during the voting process. The first has to do with notice. The chapter's vote on the Student's application took place on Tuesday, September 20, 2022. ECF No. 65 at 24. The Wyoming Chapter requires all members to attend weekly Monday-evening Chapter meetings, unless they attended a Chapter Council meeting the day before. *Id.* Plaintiffs contend that the officers intentionally concealed, at the Sunday Chapter Council meeting, that the Student's application would be voted on that week. *Id.* at 25. Plaintiffs admit that members were so informed during the regular Monday meeting, however. *Id.*

Second, Plaintiffs allege that although "Fraternity rules prohibit discussion during the voting process" (without citing a specific rule or bylaw), several officers spoke before the vote on the Student was held. ECF No. 65 at 25. They advised members that they should only vote "no" based on the Student's personality, and that a "no" vote without having met the student was evidence of bigotry. *Id.* Plaintiffs contend, without foundation, that The Fraternity Council required the Chapter officers to advocate for the

8

Student and "hatched" a "plan" with the officers to intentionally limit the other members'
opportunity to meet the Student. *Id.*

Third, Plaintiffs state that the vote on the Student's admittance was conducted
using the wrong voting software – a Google Poll link instead of a software called Omega
Recruit. *Id.* at 25. Their primary issue with the use of Google Poll is that the vote was not
conducted "in secret" because members had to use their emails when signing in to vote.
*Id.* at 27. Additionally, two Google Poll links were sent out because the first one was
faulty. ECF No. 1-1 at 123. Plaintiffs do not allege that the second vote had a different
overall outcome than the first, or even that the first vote was completed – they claim that
the second link was sent out within thirty minutes. ECF No. 65 at 27-28. However, they
do claim that three members changed their votes between the first and second votes
because they "understood that the second vote would not be secret and they feared
retribution." *Id.* at 28. Plaintiffs do not cite a Bylaw or Standing Rule that requires
anonymity.[5]

Finally, Plaintiffs allege that only people present at the Monday Chapter meeting
the day before the vote were allowed to vote, in violation of the Standing Rule requiring
that "all active members" participate. *Id.* at 24. Specifically, Plaintiffs allege that Chapter
officers "forbade" two members, Madeline Ramar and Grace Ann Choate, from voting
because they had not attended the previous day's meeting. *Id.* at 26. Plaintiffs also state

---

[5] Anonymity appears to be required, according to the Wyoming Chapter's bylaws, for "Electronic Meetings." ECF
No. 1-1 at 152. However, Plaintiffs do not allege that the Chapter bylaws are governing documents, nor that this was
an electronic meeting – it appears to have been in person.

that officers roamed the halls of the Chapter's house instructing "some (but not all)" members to vote. *Id.* at 27.

Plaintiffs assert that had these inconsistencies not occurred, the Student would have lost the vote and not been admitted. *Id.* at 28. They further contend that the Fraternity Council knew about these "irregularities and violations of Governing Documents" and still approved of the Student's membership, which further violated the governing documents. *Id.* at 29.

### D. Parties' communication after the vote

Plaintiffs made several efforts to let Kappa know that they were displeased about a transgender woman joining their ranks. They and their parents raised concerns about the Student's admittance in September and early October to the Executive Director of Kappa. ECF No. 65 at 29. The Director responded that she had reviewed Plaintiffs' concerns but that the national officers "believe proceeding with initiation is the appropriate next step." *Id.* Plaintiffs allege that sorority officials encouraged members who disagreed with the Student's admittance to resign if "their values were inconsistent with Kappa's values." *Id.* At least three members did ultimately resign, while Plaintiff Hannah Holtmeier transferred to the University of Nebraska. *Id.* Another member, Madeline Ramar, was removed from her position as Finance Chair. *Id.* at 31.

Plaintiffs also wrote to the Fraternity Council through their lawyers in November, stating that the Student should not be admitted because she is a "non-woman" and that the Chapter President "conducted an illegal voting procedure" involving a non-secret Google Poll and public pressure. ECF No. 1-1 at 123. Kappa's counsel responded, stating

10

that a woman need not be "biologically born as female" to be a woman and a Kappa member, and referred to Kappa's Position Statements and LGBTQIA+ Guide on the issue. ECF No. 65 at 33.

Unable to resolve the dispute to their satisfaction, Plaintiffs first filed suit in March of 2023. After two years of stop-and-start litigation, we now find ourselves addressing Defendants' second motion to dismiss, based on Plaintiffs' second amended complaint (SAC). We review each claim anew below.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ANALYSIS

### I.     Count One & Two: Fraternity Council's Breach of Fiduciary Duty

Plaintiffs allege, derivatively, that the Fraternity Council Defendants breached their fiduciary duty to Kappa in six ways: by (a) encouraging the Wyoming Chapter to admit a transgender woman in contravention of the governing documents; (b) concealing Kappa's efforts to admit a transgender woman; (c) unduly influencing Wyoming Chapter officers to disregard mandatory voting procedures; (d) disregarding "Kappa's duty" to "affirmatively protect" freedom of speech under the Ohio Constitution; (e) failing to "advocate for and seek to address issues of concern for members and women in general", per Kappa Bylaws; and (f) acting ultra vires. Each of these claims fail, though for different reasons.

We begin by reviewing relevant Ohio law. First, the Ohio Supreme Court defines a derivative claim as one that is:

> brought by a shareholder in the name of the corporation to enforce a corporate claim. Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of a corporation. A derivative action allows a shareholder to circumvent a board's refusal to bring a suit on a claim.

*Crosby v. Beam*, 47 Ohio St. 3d 105, 107, 548 N.E.2d 217, 219 (1989). Nonprofit members may file derivative claims under Ohio nonprofit-corporation law. *Carlson v. Rabkin*, 2003-Ohio-2071, ¶ 10, 152 Ohio App. 3d 672, 679, 789 N.E.2d 1122, 1127.

12

Plaintiffs face several hurdles in getting a derivative claim past the motion-to-dismiss stage, however. First, they must satisfy a procedural requirement called "demand futility." *Carlson,* 152 Ohio App. 3d at 679. Complaining members must

> (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort… and (3) show that they 'fairly and adequately' represent the interests of other shareholders 'similarly situated.'

*Id.* at 680. Alternately, complaining members may demonstrate that "the demand would have been futile… that the directors' minds are closed to argument." *Id.* (internal quotation mark removed). Members cannot rely on the fact that the directors are the ones being sued to prove futility – they must show that the directors "were conflicted or otherwise incapable of exercising reasonable business judgment." *In re Lubrizol S'holders Litig.,* 2017-Ohio-622, ¶ 37, 79 N.E.3d 579, 587.

Second, Plaintiffs must overcome the presumption that the board of directors of the organization they are suing acted in good faith. Under Ohio law, members may not initiate litigation just because they believe a board of directors has made a bad decision. Instead, they must show that the directors – here, the Fraternity Council – "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (2020). Good faith is, by law, assumed. *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 25, 694 N.E.2d 479, 483 (1997) ("All acts of a board of directors of an Ohio corporation are presumed to have been taken in good faith."); Ohio Rev. Code § 1701.59(D)(1) ("A director shall not be found to have violated the director's duties… unless it is proved by clear and convincing evidence that the director has not acted in

13

good faith, in a manner the director reasonably believes to be in or not opposed to the

best interests of the corporation, or with the care that an ordinarily prudent person in a

like position would use under similar circumstances.")

Third, Plaintiffs must show that the Fraternity Council has broken their

constitution or bylaws, or committed fraud or colluded in some way. Ohio courts

generally leave non-profit organizations to manage themselves unless they have broken

their own internal laws. This is sometimes called the principle of judicial non-

intervention:

> Generally speaking, in matters of policy, discipline or internal economy of a
> voluntary association, wherein the members have mutually agreed upon a
> charter or rules, the decision of the association itself is supreme. *See,*
> *generally*, 60 Ohio Jurisprudence 3d (1985), Insurance, Section 1555. In the
> absence of mistake, fraud or management activity in excess of its corporate
> powers, a decision by such association in accord with its own charter and
> rules made by the governing body must be accepted by courts of law.

*Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748, 600 N.E.2d 797, 802

(1991); *see also Strah v. Lake Cty. Humane Soc.*, 90 Ohio App. 3d 822, 831 (1993)

("Courts will not interfere with the internal management of a corporation not for profit in

the absence of proof that the managing officers are acting in excess of their corporate

power, or that they are guilty of collusion or fraud.").

If Plaintiffs cannot satisfy each of these requirements, their derivative claims must

be dismissed.

    a.  <u>Demand Futility</u>

Plaintiffs satisfied demand futility only for its dispute about Kappa's admittance of

transgender women. To the extent that they allege independent claims about the voting

procedure used to admit her, regardless of her gender, the procedural requirements have not been met, and the relevant claims must be dismissed.

As articulated above, nonprofit corporation members must satisfy the procedural requirement of demand futility before filing a derivative suit. It is therefore Plaintiffs' burden, as a threshold issue, to show that they either articulated their demands to the Fraternity Council and failed, or that such a demand was futile. We note, however, that Plaintiffs' demands are really twofold. First, they believe that Kappa wrongly admitted a student that does not qualify as a "woman" as defined by the Bylaws. This dispute undergirds the vast majority of their claims. Second, Plaintiffs believe the Wyoming Chapter violated its own voting procedures in admitting her, regardless of gender. These are two independent accusations. As such, in order to satisfy this procedural requirement, Plaintiffs must show that the Fraternity Council was informed about and rejected each demand or that both demands were independently futile.

In our previous order, we held that Plaintiffs had satisfied the demand requirement for the first issue, the dispute over Kappa's admission of a transgender woman, because Plaintiffs provided evidence of their extended exchange on that topic with then-members of the Fraternity Council/then-defendants "Rooney, Executive Director Poole, and other Fraternity Council members", who are "the same officers who purportedly approved [the Student]." ECF No. 31 at 26. Generally speaking, the law-of-the-case doctrine would require us to apply the same holding here. *See Fish v. Schwab,* 957 F.3d 1105, 1139 (10th Cir. 2020) ("when a court rules on an issue of law, the ruling should continue to govern the same issues in subsequent stages in the same case") (citations omitted).

15

However, a complication arises here from the fact that since Plaintiffs' original complaint was filed, multiple rounds of new Fraternity Council members have been elected; as a result, the new Defendants are not all "the same officers who purportedly approved" the Student. While Defendant Mary Pat Rooney appears to have maintained her position on both the Council and on the list of defendants, Plaintiffs have replaced the other original defendants with six new Fraternity Council members. Three of these, Defendants allege, have already completed their stints on the Council and are no longer members. ECF No. 67 at 3 n.1.[6] Although Plaintiffs state that they "renewed their demands by letter" on the Friday before the Monday that the Second Amended Complaint was due to be filed, and that Kappa rejected the request on that Sunday (ECF No. 68 at 6 n.3), Defendants contend that such a flimsy attempt does not satisfy the requirements of futility.

The issue, as we see it, is whether the plaintiffs in a derivative suit must prove demand futility each time new directors (or here, Fraternity Council members) are elected. We hold that, at least in this situation, with regard to the dispute over the admittance of transgender women, no such action was required. "The weight of authority establishes that the futility of demand must be determined by looking at the positions of the parties when the derivative suit is initially filed." *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 26, 694 N.E.2d 479, 483 (1997). Plaintiffs previously satisfied this requirement with the prior Council. This case has been ongoing (*see generally* ECF No.

---

[6] Because Maria Brown, Liz Wong, and Beth Black are no longer members of the Fraternity Council (and Plaintiffs have not refuted this fact), they do not have the authority to grant the relief sought by Plaintiffs and shall be dismissed from this suit.

57) since then, and thus we assume new Council members were made aware of the dispute. Plaintiffs' allegations in this amended complaint are not so different from their original complaint that new Defendant Council members did not have notice of them. Therefore, demand futility has been met with regard to the issue of who may be considered a woman.

We next consider the accusation of violations of Kappa's voting procedure, which our prior Order did not discuss. Plaintiffs spend eight pages of their SAC, and several more in their opposition brief, detailing the ways in which they notified Defendants and Defendants' counsel of their issues with Kappa's interpretation of the word "woman." ECF No. 65 at 29-36; ECF No. 68 at 6. Only the briefest mention is made of voting "irregularities." We therefore turn to the documents in the record, in particular the letters exchanged between parties' counsel.

Here again, Plaintiffs' counsel's letter from November 4, 2022, focuses on the debate over the word "woman". Only at the end of the second page is the voting process mentioned: "Further, our clients are concerned that the decision process which has led to this unfortunate position was deeply flawed. The Chapter President... conducted an illegal voting procedure." ECF No. 1-1. at 123. The reasons mentioned for "illegality" are that the President held a one-sided dialogue before the vote and that

> in a blatant violation of the requirement for a secret ballot, the chapter members voted through a Google Poll tracked by email. This public vote was only after a first vote, earlier that evening, was so close that officers approached individual women and pressured them to change their vote claiming a 'faulty voting system' in Google forms.

*Id.* The paragraph reiterates the lack of secrecy several times.

17

Defendants' counsel, in turn, responds in depth to the "woman" debate, and states

it is "unaware" of any further rules that had been broken. ECF No. 1 at 117. It further

requests that

> If there are specific provisions in any Kappa governing documents that you
> contend were not followed by Kappa, please identify what those specific
> provisions are, what governing documents they are contained within, and
> what actions of Kappa you contend are in violation of those specific
> provisions.

ECF No. 1 at 117. There is no evidence that Plaintiffs did so.

It is worth noting, in addition, that the allegations in Plaintiffs' SAC do not match

those in Plaintiffs' pre-lawsuit notice to Defendants. The SAC drops Plaintiffs' claim that

members were pressured into voting differently by the Chapter's officers. ECF No. 65 at

27 (stating instead that three members decided to change their votes when they realized

their votes would not be anonymous[7]). Instead, the SAC claims that Kappa violated its

Standing Rule that requires that all active members to participate in membership selection

unless excused. *Id.* at 26. Additionally, the SAC states that the use of Google Poll was

itself a violation of the Standing Rules because each chapter is required to use a Kappa-

approved voting platform called Omega Recruit.[8] *Id.* at 27.

In other words, Plaintiffs do not appear to have given Defendants notice of the

voting-related violations that form the basis of one of their claims. Nor can we find any

portion of the SAC or Plaintiffs' brief that claims that any demand of the Fraternity

---

[7] Although the SAC still complains that the vote was not secret, secrecy is not, in fact, required by any governing document.

[8] Upon the Court's independent review, no governing document actually references "Omega Recruit" – the governing documents merely state that each chapter "shall" use the electronic voting system selected by Kappa. ECF No. 1-1 at 55. No document, governing or not, states what that system is.

Council on this matter would have been futile. Plaintiffs therefore have not satisfied the

demand futility requirement for their derivative claim based on the violations of Kappa's

voting procedure, and that claim must be dismissed.

Having found that Plaintiffs satisfied the procedural requirements for their dispute

about Kappa's definition of "woman", we spend the rest of this section evaluating those

claims on their merits.

> b. <u>Breach accusations #1 and #5</u>: "encouraging, advocating for, attempting to
> unduly influence the Wyoming chapter members to support, and approving
> the Student's membership in direct contravention to the... Articles, Bylaws,
> Standing Rules and Policies," and failing to "advocate for and seek to
> address issues of concern for members and women in general."

We dive immediately into the parties' central dispute: the debate over the

definition of the word "woman." Both the first and fifth allegations of breach of fiduciary

duty largely rest on Plaintiffs' assertion that the Fraternity Council admitted a transgender

woman in violation of Kappa's governing documents. When we ruled on this issue two

years ago, we held that we could not impinge on Kappa's First Amendment right of

expressive association to include transgender women, per *Boy Scouts of Am. V. Dale*, 530

U.S. 640 (2000). ECF No. 31 at 30. The law of the case doctrine dictates that we apply

the same holding here, but even if that were not the case, we reach the same conclusion,

independently, on the grounds that Ohio contract law allows Kappa to define "women" to

include individuals who identify as women.

Our previous ruling on Kappa's authority to interpret its own Bylaws is still

applicable here. As previously mentioned, the law-of-the-case doctrine holds that "when

a court rules on an issue of law, the ruling 'should continue to govern the same issues in

subsequent stages in the same case.'" *Fish*, 957 F.3d at 1139 (quoting *Bishop v. Smith*,

760 F.3d 1070, 1082 (10th Cir. 2014)). Courts only deviate when presented with new

evidence, new and contrary controlling authority, or when their previous decision was

clearly erroneous. *Id.*

Plaintiffs do not present new evidence in their SAC, but they do argue a possible

new authority: Executive Order 14168, issued this year, states that "women… shall mean

adult… human females" and "female… means a person belonging, at conception, to the

sex that produces the large reproductive cell." 2025-02090 (90 FR 8615). We are not

entirely sure what this definition means, not having a degree in biology.[9] But even

assuming this definition aligned with Plaintiffs', it only applies to the Executive Branch's

interpretation of federal laws and administration policy. It is not relevant in the world of

private contracts, which is where we currently find ourselves.

This leaves only the "clearly erroneous" exception. The brunt of Plaintiffs'

opposition brief, although not explicitly labeled as such, argues that our previous decision

on this issue was erroneous. They argue that the First Amendment right to associate does

not apply here because they are not asking the Court to force Kappa to exclude

---

[9] And even if we did, it might not help, since biologists seem to agree that no determination of biological sex can exist "at conception." *See* Karen K. Siu, et. al., The cell biology of fertilization: Gamete attachment and fusion, J. Cell Biol. 220 (2021). The article states, in relevant part:

> The cells produced by the first few divisions of the fertilized egg are totipotent and capable of differentiating into any cell type, including germ cells. PGCs [primordial germ cells] originate within the primary ectoderm of the embryo and then migrate into the yolk sac. Between weeks 4 and 6, the PGCs migrate back into the posterior body wall of the embryo, where they stimulate cells of the adjacent coelomic epithelium and mesonephros to form primitive sex cords and induce the formation of the genital ridges and gonads. The sex (gonadal) cords surround the PGCs and give rise to the tissue that will nourish and regulate the development of the maturing sex cells (ovarian follicles in the female and Sertoli cells in the male).

*Id.*

transgender women, but rather that the Court *en*force the existing private contract, which

in turn (they allege) forces the organization to exclude transgender women. ECF No. 68

at 17-18.

     However, even when we adopt Plaintiffs' framing and apply Ohio contract law,

we come to the same conclusion: Kappa's Bylaws and Standing Rules do not require

Kappa to exclude transgender women. Kappa and its Fraternity Council have reasonably

interpreted an otherwise undefined term in the organization's Bylaws. Kappa's Bylaws

explicitly authorize the Fraternity Council to make these interpretations. Ohio law

explicitly authorizes organizations to govern themselves and interpret their own bylaws,

and it does not permit this Court to interfere with such organizations' internal policy

decisions unless they have broken their own bylaws or committed fraud or collusion. In

short, we are required to leave Kappa alone.

     The parties' fundamental dispute is whether the undefined term "woman" in

Kappa's Bylaws *must* be interpreted to exclude transgender women. Both parties agree

that Kappa is an organization dedicated to women. Where they diverge is that Plaintiffs

argue that the word woman can *only* be defined as exclusive of transgender women. "The

words woman and women, as used in Kappa's Articles of Incorporation, Bylaws,

Standing Rules, Policies….have always referred to adult female human beings. These

words… have never referred to biological males who claim to be women", and therefore

any "change" to the definition requires an amendment. ECF No. 65 at 7, 15-16.

     Plaintiffs cannot support this assertion. First, there is no definition of the term

anywhere in the governing documents. It is simply repeated a dozen times without further

21

clarification. Plaintiffs' next argument, that there is only one "ordinary meaning" of the term woman, is defied by Plaintiffs' own source. They point out, correctly, that courts must give "common words appearing in a written instrument… their ordinary meaning." ECF No. 68 at 15 (quoting *Shifrin v. Forest City Enterprises, Inc.,* 597 N.E.2d 499, 501 (Ohio Sup. Ct. 1992). They then cite Merriam-Webster's definition of woman as "an adult female person" as evidence that "woman" excludes transgender women. ECF No. 68 at 15. However, when we turned to the same source's definition of female, we find not one but seven definitions of the word. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/female. The first defines female as "of, relating to, or being the sex that typically has the capacity to bear young or produce eggs." *Id.* This would seem to conform to Plaintiffs' definition. However, the second definition is "having a gender identity that is the opposite of male" – which would include transgender women. *Id.* Plaintiffs' designated source does not appear to agree that only one common definition of "female", and therefore "woman", exists, and therefore we also remain unconvinced.

Third, Plaintiffs attempt to argue that the "intent of the parties" to limit "women" to only "biological females" is evident in various historical Kappa-produced texts, including Kappa songbooks referring to young maids, etc. The Court does not find any of the terms cited by Plaintiffs to show evidence of the intent of Kappa members to exclude transwomen. But even if it did, we could not consider it: external evidence of parties' intent is only admissible when "the language of a contract is unclear or ambiguous", and Plaintiffs rest their entire case on the argument that the term "woman" is not ambiguous –

22

that it can only have one, trans-exclusionary meaning. *DN Reynoldsburg, L.L.C. v. Maurices Inc.*, 2023-Ohio-3492, ¶ 26, 225 N.E.3d 454, 460. If we were to consider extrinsic evidence in this matter, it would conclusively show that *at the time Plaintiffs joined*, i.e. not in 1870, Kappa's well-publicized intent was to include transgender women. We discuss this in greater detail in the following section.

Independently, we find that within the governing documents themselves, there is more evidence that Kappa defines women by their gender and not their "biological sex." "Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enters., Inc.*, 1992-Ohio-28, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501. In June of 2022, at the Biennial Convention, Kappa members voted on and approved a new Bylaw provision that prohibits discrimination and explicitly used the term "single-gender", not "single-sex", to describe "Greek-letter social organizations."[10] ECF No. 1 at 84-85, 132. Arbitrarily, Plaintiffs assert that the reference to Title IX in this bylaw – the full sentence states "the single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under... Title IX" – somehow proves that the term "single-gender... must be read as synonymous with 'single-sex.'" ECF No. 65 at 15. This Court, however, must interpret a contract in a manner that "give[s] effect to the intent of the parties... [which] is presumed to reside in the language they chose to employ in the agreement." *Jurenovich v. Trumbull Mem'l Hosp.*, 2020-Ohio-2667, ¶ 13. We therefore

---

[10] Defendants note that "All 26 NPC [National Panhellenic Conference] sororities accept trans women into their memberships." ECF No. 69 at 11 n.3.

conclude Kappa meant exactly what it says, and that the sorority used "gender" instead of "sex" intentionally; to include all members whose gender identity is female.[11]

By contrast, Kappa's Bylaws do *not* reference a "single-sex" requirement. Plaintiffs try to convince this Court that such a phrase is implied, based on Kappa's previous advocacy for single-sex organizations. Plaintiffs point out that Article XV of Kappa's Bylaws state that "The Fraternity shall follow NPC [National Panhellenic Conference] Unanimous Agreements, policies, and procedures", and that one such Agreement states that "The women's sororities... shall defend their right to exist as single-sex organizations." ECF No. 1 at 93; ECF No. 68 at 38. However, Plaintiffs' argument that this would require Kappa to only admit "biological females" is defeated by a different NPC policy, which Kappa is also required by Bylaw to follow, and which unequivocally states that "woman is defined as an individual who consistently lives and self-identifies as a woman."[12] ECF No. 68 at 37. Read as a whole, this second policy more clearly indicates the intent of Kappa to include transgender women.

---

[11] We would reach the same conclusion if we considered the term ambiguous: analyzing parol evidence to evaluate the "intent of the parties" at the time that that amendment was passed, it is clear that Kappa intended it to include transgender members. The FAQs attached to this amendment, circulated among members two months before the Convention where the amendment passed, solidify that interpretation. ECF No. 1-1 at 49 ("Can nonbinary people join? Is this a chapter-by-chapter decision? Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection...").

[12] Plaintiffs' argument that because this policy is entitled "Panhellenic Recruitment Eligibility," it should only apply to recruitment, and not membership, is nonsensical. As Plaintiffs themselves note, "courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument." *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶10. The purpose of recruitment is to identify and vet new members. In this context, it would be "absurd" to read this policy as applying this definition of "woman" only to recruitment, but not membership.

Concluding, therefore, that at a minimum Kappa's governing documents do not require the exclusion of transgender women, we find that Kappa has not broken its Bylaws in admitting one such individual. Kappa Bylaws specifically authorize the Fraternity Council to "[i]nterpret... the Fraternity Bylaws and Standing Rules." ECF No. 6-1 at 119. The Fraternity Council issued several publications in advance of the fall 2022 recruitment season making its interpretation of the word woman – to include individuals who identify as women – abundantly clear. These include Position Statements "Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women"), FAQs ("woman is defined as an individual who consistently lives and self-identifies as a woman"), and a Guide for supporting LGBTQIA+ members. ECF No. 65 at 16, 34, 35.

Because Kappa has interpreted this term in accordance with its own governing documents, we have no authority to review the dispute. "As a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). The matter is not one open to judicial discretion:

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Stibora v. Greater Cleveland Bowling Assn.*, 63 Ohio App. 3d 107, 113, 577 N.E.2d 1175, 1179 (1989).

25

Exceptions to this rule are few, and none have been met here. "In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision… in accord with its own charter and rules made by the governing body must be accepted by the courts of law." *Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748 (1991); *see also Strah v. Lake Cty. Humane Soc.* 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud"). Plaintiffs argue that they have properly alleged that "Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior" because "the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was [a] single-sex organization…" (ECF No. 68 at 12-13).

These allegations are conclusory and contradicted by their own evidence. First, as is clear from the proceeding paragraphs, Defendants have not acted in excess of Kappa's corporate powers. Second, Defendants have not committed fraud because Plaintiffs cannot point to a concealment or false representation of a fact. *See Schmitz v. Natl. Collegiate Athletic Assn.*, 2016-Ohio-8041, ¶ 56, 67 N.E.3d 852, 868. The previously mentioned Position Statements, distributed LGBTQIA+ Guide, and sorority-wide vote and approval of the 2022 Bylaw amendment describing the Kappa as "single-gender", not "single-sex", show that Kappa never concealed the fact that transgender women for membership. Third, Plaintiffs' conclusory allegation that the Fraternity Council hatched a plan with the Wyoming Chapter to admit a transgender student is not evidence of collusion. In Ohio courts, the term generally refers to an agreement by multiple entities to

26

commit fraud or other misrepresentation. *See State ex rel. Dolle v. Miller*, 18 Ohio Dec.

218, 221 (Ohio Com. Pl. 1907), aff'd, 1907 WL 1152 (Ohio Cir. Ct. Dec. 28, 1907)

(considering a charge of "collusion among bidders to distribute territory, to keep prices

up and make the city pay more than it properly should"). As previously stated, none of

the Defendants misrepresented that the sorority was open to admitting transgender

women. Therefore, no collusion could have occurred based on these facts.

Finally, Plaintiffs' breach of fiduciary duty claim could also be interpreted as

implicitly arguing that, whether or not Kappa's rules *allowed* it to admit transgender

women, doing so was a "reckless" decision because it resulted in several women leaving

the sorority. *See* ECF No. 65 at 41, 43. However, this is precisely the type of decision-

making that has long been protected by the business-judgment rule: the decisions made

by boards of directors are insulated from judicial review as long as they are made in good

faith and with the best interests of the organization in mind. *Kleemann v. Carriage Trace,

Inc.*, 2007-Ohio-4209, ¶ 51. While Plaintiffs certainly show that they and other Kappa

members disagree with the Fraternity Council's decision to admit transgender women,

they do not allege facts that show that the Fraternity Council took any actions for any

reason other than what it believed was in the best interest of the organization. Plaintiffs

simply disagree with the Fraternity Council's assessment of what those interests were.

Nor have Plaintiffs shown that the Fraternity Council acted without "the care that

ordinarily prudent persons in like positions would use under similar circumstances" or act

with "reckless disregard." *Id.* at ¶ 56, 57. Indeed, the evidence provided *by Plaintiffs*

clearly shows that great care went into the decision. *See, e.g.,* ECF No. 1-1 at 49

(regarding the explicit policy of allowing non-binary people and "individuals who identify as women" to join, the organization stated "We have conferred with legal counsel as well as NPC on DEI-related updates to Fraternity documents. We are confident that these changes would hold up if contested in a court of law."); *id.* ("Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued… We want to be as inclusive of all members as we can be.").

The reality is that Plaintiffs do have a remedy here – they are simply choosing not to use it. Plaintiffs could advocate for a new amendment to the Bylaws, defining the word "woman" as they wish, which would restrain Kappa from choosing between various reasonable definitions of the term. Such amendments may only be passed every other year, at Kappa's Biennial Convention, but one such Convention occurred over the course of this lawsuit and another hypothetically will occur next year. If as many Kappa members are upset about the admission of transgender women members as Plaintiffs claim, this internal remedy should be more than sufficient to achieve their aims.

Plaintiffs have not shown that Kappa violated its governing documents by admitting a transgender woman, and therefore this claim must be dismissed.

      c.  <u>Breach accusation #2</u>: "actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity."

Plaintiffs do not allege sufficient facts to show that the Fraternity Council concealed its efforts to admit transgender women. Plaintiffs contend at a very general

28

level that Fraternity Council "concealed their disavowal and betrayal of Kappa's

promises and obligations to women" by not disclosing to Plaintiffs that Kappa's

definition of a "woman" "includes men identifying as women." ECF No. 65 at 39.

However, Plaintiffs admit that at least one publication was available on the Kappa

website (ECF No. 65 at 34) that addressed the issue of gender. They also admit that the

Guide for Supporting our LGBTQIA+ Members "was distributed to the Fraternity's

'workforce' (alumnae who direct chapter operations) in about 2018." *Id.* at 35. Finally,

Kappa's Policies specifically prohibit discrimination based on "gender identity". ECF

No. 1-1 at 89. These documents show that Kappa publicly and openly defined "women"

to include all individuals who identify as women. It may be true that those publications

are not governing documents, but they certainly contradict any claims of concealment.

Furthermore, Plaintiffs have pointed to no bylaw or statute that requires

organizations to publicly clarify every term in every policy before a new member joins.

Even if they could, Plaintiffs themselves admit that the Wyoming Chapter's Membership

Chair notified members during recruitment in the fall of 2022 that transgender women

were eligible to join Kappa. ECF No. 65 at 22. There is simply no evidence that

Defendants concealed or misrepresented their position on the matter.

> d.  Breach accusation #3: "unduly influencing Wyoming chapter officers to
> disregard mandatory voting procedures employed in the Student's selection
> process."

Plaintiffs do not provide any facts that support this allegation. As Plaintiffs

themselves admit, "National Fraternity representatives usually have little involvement in

member selection until after chapter members have voted." ECF No. 65 at 28. Plaintiffs

do not describe a single instance of any member of the Fraternity Council conversing

with Chapter officers, on any topic, before the September 20th vote occurred. Instead,

Plaintiffs make the conclusory claim that they "believe officers were told by the

Fraternity Council" to advocate for the Student's admission. However, even this

contention does not mention specific voting procedures. Additionally, Plaintiffs have not

satisfied the demand futility requirement for this claim under Ohio law, as discussed

earlier in this opinion. *See supra* Section I (a).

> e. Breach accusation #4: "disregarding Kappa's duty, as an Ohio citizen, to
> affirmatively protect and honor the freedom of speech protected under the
> Ohio Constitution by retaliating against members who challenged the
> validity of the Student's membership."

Plaintiffs' allegations of retaliation fail because, first and foremost, the Ohio

Constitution only protects against state actors, and Plaintiffs have not alleged that Kappa

is a state actor. *See Herring v. Adkins, 2008-Ohio-7082*, ¶ 9, 150 Ohio Misc. 2d 13, 19,

902 N.E.2d 93, 98 ("the free speech guarantees accorded by the Ohio Constitution are no

broader than the First Amendment") (citing *Eastwood Mall, Inc. v. Slanco* (1994), 68

Ohio St.3d 221, 222, 626 N.E.2d 59). Secondly, Plaintiffs' claim fails because, as

previously mentioned, Ohio law holds that volunteer organizations may make their own

disciplinary decisions, free of judicial review, as long as they do not violate due process

and are not arbitrary, fraudulent, or the result of collusion.

Plaintiffs accuse the Fraternity Council of violating the Ohio Constitution's

freedom of speech protections by "retaliating against members who challenged the

validity of the Student's membership." ECF No. 65 at 43. Specifically, the SAC states

that Madeline Ramar was removed from her position as Wyoming Chapter Finance Chair

because of her opposition to the Student's admission and her decision to sign on to the

First Amended Complaint in this case. ECF No. 65 at 31.[13]

First, Ohio courts have specifically held that a voluntary organization's

disciplinary actions are not violative of the Ohio constitution's free speech provisions.

*See Putka*, 75 Ohio App. 3d at 746 (dismissing a claim that the Ohio Constitution's free

speech provision was violated when plaintiff was expelled from voluntary organization

for his speech).

Second, as Plaintiffs emphasize, the principle of judicial noninterference applies to

"an organization's interests in '*questions of discipline*, or internal policy and

management.'" ECF No. 68 at 8 (quoting *Stibora,* 63 Ohio App.3d at 113) (emphasis

added). Here, Article V, Section 4 of the Wyoming Chapter's bylaws[14] describe the

process of removing a chapter officer "for failing to adequately perform the duties of

office, [or] failing to maintain Fraternity standards." ECF No. 1-1 at 148. The record does

not provide the details of Kappa's decision to remove Ms. Ramar from her position, but

this Court notes at least one sorority-wide Policy she conceivably violated: Policy III,

Section C (2) states that "Any member who makes discriminatory, inflammatory, or

inappropriate actions based on... gender identity... shall be subject to dismissal or other

---

[13] The SAC also states that three Kappa members resigned of their own accord from the organization, a third member was "threatened with discipline", and a fourth, Plaintiff Hannah Holtmeier "continued to raise concerns about the Student's membership," for which she was "brought before a disciplinary hearing", provided with Kappa's "Guide for Supporting our LGBTQIA+ members" and "threatened with further discipline." ECF No. 65 at 31. None of these actions concluded in Kappa actually taking a disciplinary action – such as a probation or expulsion – so we do not consider them here. Even if we were to, however, the above principles would result in the same conclusion: dismissal of this claim.

[14] The Wyoming Chapter bylaws are distinct from Kappa Bylaws, which govern the organization as a whole.

disciplinary action." ECF No. 1-1 at 89. In any case, there are no allegations in the SAC

that Ms. Ramar's removal was "inconsistent with due process" or the result of

"arbitrariness, fraud, or collusion", and therefore it "will not be reviewed by the courts."

*Lough v. Varsity Bowl, Inc*., 16 Ohio St. 2d 153, 155, 243 N.E.2d 61, 63 (1968). Nor have

Plaintiffs cited any caselaw to show that it is the Court's duty to review due process in

cases where a member is removed from an internal position but not ejected from the

organization as a whole.

Plaintiffs have not sufficiently pled a breach of fiduciary duty based on the Ohio

Constitution. We therefore dismiss this claim.

> f.  Breach #6: the Fraternity Council "exceeded its authority to act" and "failed
>      to conduct Kappa's affairs as set forth in its Bylaws."

This claim is duplicative of the above claims as it is based on Plaintiffs' assertion

that admitting a transgender woman was a violation of Kappa's commitment to only

admit "biological females." This limitation, we have held, does not exist, and therefore

this claim must also be dismissed.

**II.    Count Three: Breach of Contract**

Plaintiffs' breach of contract claim is based on their assertion that "Plaintiffs…

agreed to join Kappa [and] pay membership dues… in exchange for the promise of

participating in a single-sex organization committed to uniting and supporting women

throughout their lifetimes." ECF No. 65 at 45. The Defendants allegedly breached the

"contract" created by Kappa's Bylaws and Standing Rules when it "compel[led] the

Wyoming Chapter members to admit the Student." *Id.*

Assuming the basis of the "breach" is that Kappa admitted a transgender woman, this claim must be dismissed. We first note that Plaintiffs did not specify *which* Bylaws and Standing Rules it was referring to in this claim. Because they did not, we conclude that the rules that Plaintiffs refer to are those that limit Fraternity membership to "women," based on the alleged promise of a single-sex organization. As we have previously stated, Kappa did not promise Plaintiffs a single-sex organization, nor did they violate any of their Bylaws or Standing Rules in admitting a transgender woman.

We also consider whether Plaintiffs could be referring to a violation of voting procedures. We find this unlikely because the remedy for such a breach would not align with Plaintiffs' requested relief (that Kappa expel all members that are not "biological women" on the basis that they are not women, etc.), and the matter is not mentioned in Plaintiffs' opposition brief or the breach allegation articulated at the end of their SAC. However, even if it was, the SAC does not contain sufficient facts to support the claim. The SAC alleges that Defendants encouraged the recruitment of the Student and advised Chapter officers on the discipline of members who opposed Kappa's inclusion of transgender women, but it does *not* allege that Defendants compelled – or even suggested – any violation of any voting Bylaw or Standing Rule. Based on the record, the vote appeared to be managed entirely by the Wyoming Chapter, without any involvement from the Fraternity Council or any other officer outside of the Chapter.

For all of these reasons, Plaintiffs have failed to articulate a claim for breach of contract that would survive in federal court. We therefore dismiss these claims.

### III.    Count Four: Fraud in the Inducement

33

Plaintiffs' claim for fraud in the inducement must be dismissed for failure to identify a false representation. Plaintiffs allege that Kappa fraudulently induced Plaintiffs to join the Fraternity by failing to disclose that "men could become Kappas" and holding "itself out as an organization of women." ECF No. 65 at 46. In order to state a claim for fraudulent inducement, Plaintiffs must show that Defendants made "a representation of fact… falsely, with knowledge of its falsity, or with utter disregard and recklessness[] as to whether it is true or false", among other things. *Mortg. Elec. Registration Sys., Inc. v. Mosley*, 2010-Ohio-2886, ¶ 31.  Plaintiffs' claim fails because they cannot point to any statement by Kappa that was false: Kappa has never asserted that it does *not* accept transgender women. As we previously stated and as Plaintiffs admit, Kappa and the Fraternity Council published multiple public documents defining "women" to include individuals who identify as women, as the Student does. Therefore, Kappa may hold itself has an organization of women because it *is* an organization of women, according to its own definition.

Plaintiffs have not identified any false representations made by Defendants; therefore, their claim for fraud in the inducement must be dismissed.[15]

---

[15] To the extent that Plaintiffs assert this claim against Kappa based on the actions of the Wyoming Chapter officers at the time of the vote, we also find that Plaintiffs do not provide sufficient evidence to state a claim. In their SAC, Plaintiffs state that the Wyoming Chapter's Membership Chair and other Chapter officers "intentionally concealed the fact that the Student's candidacy would be presented for vote" at the secondary, Sunday night Chapter meeting. ECF No. 65 at 24-25. However, the Student's application and the date of the vote was announced at the primary, Monday-night Chapter meeting. *Id.* at 25. Plaintiffs cannot point to any bylaw, rule, or policy that states that applicant votes must be announced at the Sunday night meeting, nor that doing so was irregular in any way. Nor have they identified a false statement made by any Wyoming Chapter official.

## CONCLUSION

Having considered the written submissions, the applicable law, and being otherwise fully advised, **IT IS HEREBY ORDERED** that Defendant's *Motion to Dismiss* (ECF No. 66) is **GRANTED**. **IT IS FURTHER ORDERED** that Plaintiffs' *Second Amended Complaint* (ECF No. 65) is **DISMISSED WITH PREJUDICE.** We have reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile.

Dated this 22d day of August, 2025.

Alan B. Johnson
United States District Judge