**NO. 25-8058**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

**HANNAH HOLTMEIER, et al.,**
**Plaintiffs-Appellants**

**v.**

**KAPPA KAPPA GAMMA FRATERNITY, et al.,**
**Defendants-Appellees**

**On Appeal from the United States District Court**
**for the District of Wyoming, No. 2:23-CV-00051-ABJ**
**The Honorable Alan B. Johnson**

# BRIEF OF DEFENDANTS-APPELLEES KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, AND BETH BLACK

Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-5452
Facsimile: (614) 464-5452
E-mail: nmmclaughlin@vorys.com
bwdressel@vorys.com

Stuart R. Day (Wyoming Bar No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone: (307) 265-0700
Facsimile: (307) 266-2306
E-Mail: sday@wpdn.net

*Counsel for Defendants-Appellees*

**ORAL ARGUMENT NOT REQUESTED**

# RULE 26.1 DISCLOSURE STATEMENT

Kappa Kappa Gamma Fraternity ("Kappa") is a nonprofit corporation that does not have a parent corporation. No publicly held corporation owns more than 10% of Kappa Kappa Gamma Fraternity's stock.

# TABLE OF CONTENTS

Page


RULE 26.1 DISCLOSURE STATEMENT ........ ii

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED APPEALS ........ xii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........ 1

STATEMENT OF THE CASE ........ 2

A. Factual Background ........ 2

1. Kappa's Governance and Process for Membership Selection ........ 2

2. Appellants' Objection to Their Chapter's Selection of a New Member ........ 4

B. Procedural History ........ 5

SUMMARY OF THE ARGUMENT ........ 8

ARGUMENT ........ 11

A. The District Court Correctly Dismissed Appellants' Derivative Claims ........ 11

1. Kappa Is Entitled to Reasonably Interpret Its Own Governing Documents ........ 11

2. Fraternity Council's Interpretation of Kappa's Bylaws Was Reasonable ........ 14

a. Kappa's Bylaws Do Not Define the Term "Woman" ........ 14

b. Interpreting the Term "Woman" to Include Transgender Women is Reasonable ........ 16

c. Appellants Did Not Allege That an Exception to the Non-Interference Rule Applies ................................23

d. Appellants' Arguments Related to Recent Executive Orders, Title IX, Ohio Statutes, or the Ohio Constitution Do Not Alter the Analysis of the Derivative Claims ........................................................26

e. Appellants Cannot State a Derivative Claim Based on Alleged Retaliation Against Two of the Appellants ..................................................................29

f. Kappa's Standing Rules Defer to Fraternity Council's Interpretations, and Appellants Cannot Sidestep the Deference that Is Fatal to Their Claims by Re-Casting Their Derivative Claim as a Simple Breach-of-Contract Issue ..................................30

g. Declining to Defer to Kappa's Interpretation of Its Bylaws Would Undermine the Purposes of the Judicial Non-Intervention Doctrine and Ensnare Courts in Unnecessary Litigation ..................................31

h. Once Kappa Has Reasonably Interpreted Its Own Bylaws, a Court Dictating Whom It Can and Cannot Admit Would Violate the First Amendment.................................................................33

B. The District Court Correctly Dismissed Appellants' Claim for Breach of Contract.......................................................................36

C. The District Court Correctly Dismissed Appellants' Claim for Fraudulent Inducement..................................................................37

D. The District Court Properly Dismissed All Claims with Prejudice ..........................................................................39

E. The Court Should Deny Appellants' Motion to Certify Questions to the Ohio Supreme Court ..............................................40

1. The Timing of the Request to Certify Warrants Its Denial ......41

2. The Court Should Not Certify Appellants' Non-Interference Question ....................................................42

3. Appellants' Ohio Constitution Question Is Both Resolved and Immaterial to the Appeal ..............................................43

4. Ohio Legislation Concerning the Interpretation of Gender-Related Terms in the Ohio Revised Code Has No Bearing on This Case ....................................................45

CONCLUSION ........................................................................................ 46

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting)....19

*Am Nat'l Prop. & Cas. Co. v. Burns*, 922 F.3d 1045 (10th Cir. 2019)....41

*B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024)....18

*B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220 (S.D. W. Va. 2023)....18

*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907 (N.D. Ohio Sept. 25, 2023)....17

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).... 35, 36

*Brosz v. Fishman*, 99 F. Supp. 3d 776 (S.D. Ohio 2015)....24

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999)....31

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003)....29

*City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095 (Ohio 1981)....13

*Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036 (6th Cir. 2001)....20

*Croteau v. Olin Corp.*, 884 F.2d 45 (1st Cir. 1989)....42

*Defending Educ. v. Olentangy Loc. Dist. Bd. of Educ.*, 158 F.4th 732 (6th Cir. 2025) (en banc).... 19, 20

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 23-3630, 2025 U.S. App. LEXIS 29181 (6th Cir. 2025)....19

*Democratic Party of U.S. v. Wis.*, 450 U.S. 107 (1981)....35

*Drage v. Procter & Gamble*, 694 N.E.2d 479 (Ohio Ct. App. 1997) ....24

*Duke v. Smith*, 784 F. Supp. 865 (S.D. Fla. 1992) ....34

*Eastwood Mall v. Slanco*, 626 N.E.2d 59 (Ohio 1994) .... 28, 44, 45

*Elworthy v. First Tenn. Bank*, 391 P.3d 1113 (Wyo. 2017) ....38

*Finlay v. Duffy*, 94 N.E.2d 466 (Ohio Ct. App. 1950) ....13

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984 (M.D. Tenn. Jun. 22, 2023) ....20

*Halling v. Yovanovich*, 391 P.3d 611 (Wyo. 2017) ....37

*Harvey E. Yates Co. v. Powell*, 98 F.3d 1222 (10th Cir. 1996) ....42

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) .... 17, 21

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ....36

*Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67 (Ill. Ct. App. 2021) .... 17, 20

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995) .... 35, 36

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) ....17

*Koos v. Central Ohio Cellular*, 641 N.E.2d 265 (Ohio Ct. App. 1994) ....25

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker*, 365 B.R. 91 (S.D. Ohio Bkrupty. 2007) ....24

*Lough v. Varsity Bowl*, 243 N.E. 61 (Ohio 1968) ....13

*Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 216 N.E.3d 1 (Ohio Ct. App. 2023) ....37

*Maas v. Maas*, 161 N.E.3d 863 (Ohio Ct. App. 2020) ....22

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ....................................20

*Mortgage Elec. Registration Sys. v. Mosley*, 2010-Ohio-2886, 2010 Ohio App. LEXIS 2380 (Ohio Ct. App. 2010) ..................................38

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ....................................34

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707 (S.D. Ohio Jul. 28, 2023)....................................................... 18, 19

*Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213 (10th Cir. 2017) ....................................................................25

*Pehle v. Farm Bureau Life Ins. Co.*, No. 02-CV-112-J 2006 U.S. Dist. LEXIS 110948 (D. Wyo. 2006) ...........................................42

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 Ohio App. LEXIS 8855, 1978 WL 216074 (Ohio Ct. App. 1978)...............................12

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio Ct. App. 1991)....................................................................... 12, 14

*Qz'Etax v. Ortiz*, 170 F. App'x 551 (10th Cir. 2006)......................................17

*Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) ..............................................25

*Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822 (N.D. Ohio Jan. 6, 2010)................................12

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123 (10th Cir. 2011) .........................25

*Rutkowski v. United States Practical Shooting Association*, No. 2024 CA 00119, 2025 Ohio App. LEXIS 2127 (Ohio Ct. App. June 20, 2025).................................................................................23

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ..............................................................34

*State ex rel. Cincinnati Enquirer v. Bloom*, 251 N.E.3d 79 (Ohio 2024).............................................................................................28

*Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175 (Ohio Ct. App. 1989)......................................................................... 12, 13

*Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch 46*, 790 N.E.2d 370 (Ohio Mun. Ct. 2003)....................13

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021)....................17

*Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763 (Ohio Ct. App. 2009)....................13

*United States v. Burkley*, 513 F.3d 1183 (10th Cir. 2008)....................41

*United States v. Price*, 84 F.4th 738 (7th Cir. 2023)....................17

*Universal Drilling Co., LLC v. R&R Rig Serv., LLC*, 271 P.3d 987 (Wyo. 2012)....................38

*W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, 689 F. Supp. 3d 272 (S.D. W. Va. 2023)....................33

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166 (Ohio App. 1988)....................12

*Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-8065, 2024 U.S. App. LEXIS 14237 (10th Cir. June 12, 2024)....................6

*Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyom. Aug. 25, 2023).................... 5, 6, 18

*Westenbroek, et al. v. Kappa Kappa Gamma, et al.*, Case No. 23-8065 (10th Cir.).................... xii

*White v. Pitman*, 156 N.E.3d 1026 (Ohio Ct. App. 2020)....................39

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022)....................17

**Statutes**

20 U.S.C. § 1681 et seq.................... 26, 27, 28

26 U.S.C. § 501(a)....................27

Ohio Rev. Code Ann. § 9.05.................... 26, 46

Ohio Revised Code § 9.05 .................................................................. 26, 46

**Other Authorities**

Endocrine Society Guidelines.............................................................21

Executive Order 14168 ......................................................................26

F.P. Kruijver et al., Male-to-female transsexuals have female neuron numbers in a limbic nucleus, 85 J. CLINICAL ENDOCRINOLOGY & METABOLISM 2034 (2000) ....................................19

*Intersex*, CLEVELAND CLINIC (Jul. 23, 2023), https://my.clevelandclinic.org/health/articles/16324-intersex .............................19

Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending Conversion Practices and Saving Transgender Lives*, 136 HARV. L. REV. 1112 (2023)..........................................................................19

*Statement of Women's Rights and Gender Justice Organizations in Support of the Equality Act*, NAT'L ORG. FOR WOMEN, https://now.org/wp-content/uploads/2021/03/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf (Mar. 16, 2021) ..............................................................22

*Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People*, AM. ASS'N OF UNIV. WOMEN, https://www.aauw.org/app/uploads/2020/02/Statement-from-Womens-Organizations-Supporting-Full-and-Equal-Access-to-Participation-in-Athletics-for-Transgender-People-nsa.pdf ............................23

The Random House Dictionary of the English Language 564 (1973) (definition of "fraternity") ..............................................................27

Webster's Seventh New Collegiate Dictionary 332 (1967) (definition of "fraternity")..........................................................................27

*Women Demand: A Letter to Federal Elected Officials and Candidates from the Women's Community*, NAT'L WOMEN'S

LAW CENTER, https://nwlc.org/resource/women-demand-a-letter-to-federal-elected-officials-and-candidates-from-the-womens-community/; https://nwlc.org/wp-content/uploads/2020/09/Womens-Community-Transition-Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) ....................................................22

**Constitutional Provisions**

Ohio Constitution........................................................................... 28, 29, 44, 45

U.S. Const. amend. I ......................................................................... passim

## STATEMENT OF RELATED APPEALS

There is one prior related appeal in this matter, captioned *Westenbroek, et al. v. Kappa Kappa Gamma, et al.*, Case No. 23-8065 (10th Cir.). In the prior case, the parties briefed and argued the merits of the claims, but the Court ultimately dismissed the appeal for lack of appellate jurisdiction.

## **JURISDICTIONAL STATEMENT**

Appellees agree that this Court has jurisdiction over the present appeal.

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1. Whether, under Ohio law, a private organization has the right to reasonably interpret an undefined term in its own bylaws when its governing documents grant it that authority, and whether it has a First Amendment right to select its own members; or, alternatively, whether a federal court has the authority to interpret an undefined term in a private organization's bylaws and to determine whom that organization can and cannot admit to its membership, in the context of resolving a derivative lawsuit.

2. Whether the district court correctly dismissed Appellants' breach of contract claim with prejudice when Appellants did not identify a contractual provision that Appellees breached.

3. Whether the district court correctly dismissed Appellants' claim for fraud in the inducement with prejudice when Appellants did not allege that any Appellee made a material misrepresentation or failed to disclose a fact despite a legal obligation to do so.

## STATEMENT OF THE CASE

### A. Factual Background

1. Kappa's Governance and Process for Membership Selection

The undisputed facts necessary to decide this appeal are straightforward. Kappa Kappa Gamma Fraternity ("Kappa") is a nonprofit corporation incorporated under Ohio law. (App. Vol. II at 92 (¶8).) It is governed by a set of Bylaws and Standing Rules, each revised in 2022 prior to the membership initiation at issue in this case. (*Id.* at 91 (¶2).) Among other policies and procedures, those Bylaws set the criteria for membership in Kappa. (App. Vol. I at 89–90.) Per the Bylaws, one criteria for admission is that the candidate be a "woman." (*Id.*) The Bylaws do not define "woman" based on sex assigned at birth, chromosomal makeup, or any other genetic criteria. (*Id.* at 88–113.) The Bylaws do not define the term "woman" at all. (*Id.*)

Kappa's Standing Rules vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules." (*Id.* at 228.) Therefore, the Fraternity Council has the authority, as granted in Kappa's governing documents, to interpret any term that is not specifically defined. Fraternity Council has interpreted the term "woman" to include all people who identify as women. (*Id.* at 115.) This interpretation is reflected in policies, guides, position

statements, and FAQ documents issued by the Fraternity Council. (*Id.*; App. Vol. II at 103–04 (¶¶ 54–55).)

Kappa is made up of chapters at colleges and universities across North America and, per Kappa's Standing Rules, active chapter members are responsible for selecting the new members of their chapter. (App. Vol. I at 292.) "Each chapter of Kappa Kappa Gamma has the final choice of its own members." (*Id.*)

Kappa's Fraternity Council has no role in the selection process, neither endorsing potential members for selection nor overruling decisions of a collegiate chapter. The Standing Rules state that "[i]f the ***requirements for initiation*** have been fulfilled, Kappa Kappa Gamma Headquarters ***shall issue*** the authorization for initiation." (*Id.* at 178 (emphasis added).) The Requirements for Initiation stated in the Bylaws are as follows:

> A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated. In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

(*Id.* at 90.) Put differently, the only thing that headquarters is explicitly authorized to do is consider if a potential member fulfills the requirements for initiation. If

they do, headquarters must authorize the initiation because it is each chapter's decision whom to admit to their chapter.

2. Appellants' Objection to Their Chapter's Selection of a New Member

Appellants were members of Kappa's Gamma Omicron chapter in 2022. (App. Vol. II at 91 (¶ 1).) The Gamma Omicron chapter operates at the University of Wyoming, located in Laramie. (*Id.*) That fall, the chapter voted to admit a transgender woman (the "Student") as a member. (*Id.* (¶ 2).)

Appellants and other members of the chapter were upset that their peers voted to accept the Student as a Kappa member, so they retained counsel to dispute the chapter's decision to allow a transgender woman into its membership. (App. Vol. I at 287–89.) Counsel sent a letter detailing certain grievances related to the Student's admission to Kappa and to members of the Fraternity Council. (*Id.*) Counsel's communication stated objections to interpreting Kappa's Bylaws to allow for the admission of transgender women and raised some concerns with the chapter's election process. (*Id.*)

Kappa responded through its own outside counsel, explaining Kappa's policy of inclusion towards transgender women, informing Appellants' lawyers that membership decisions are made by the chapter, and noting that Kappa does not overrule decisions of a collegiate chapter because some members or alumnae disagree with a chapter's decision. (*Id.* at 128–30.) Counsel further indicated that

Kappa was unaware of the chapter violating the governing documents, but invited Appellants to identify any specific provisions they contend were not followed with regard to the Student's initiation. (*Id.* at 129.) Appellants' counsel never responded and did not identify any specific provisions that the Gamma Omicron chapter violated in Kappa's governing documents.[1] This litigation followed.

**B. Procedural History**

Appellants Holtmeier and Coghan, along with several other chapter members, filed a Complaint against Kappa, Rooney, the Kappa Kappa Gamma Building Co., and the Student on March 27, 2023, seeking to proceed anonymously. (*Id.* at 13–83.) Before any Defendant responded to the Complaint, the district court sua sponte denied the Plaintiffs' motion to proceed anonymously and a renewed motion to proceed anonymously. *See Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458, at *7 n.11 (D. Wyom. Aug. 25, 2023). Plaintiffs then filed an Amended Complaint asserting a derivative claim for breach of fiduciary duty; a breach-of-contract claim related

---

[1] As held by the district court, "Plaintiffs do not appear to have given Defendants notice of the voting-related violations that form the basis of one of their claims. Nor can we find any portion of the SAC or Plaintiffs' brief that claims that any demand of the Fraternity Council on this matter would have been futile. Plaintiffs therefore have not satisfied the demand futility requirement for their derivative claim based on the violations of Kappa's voting procedure, and that claims must be dismissed." (App. Vol. II at 226–27.) Appellants do not appeal this dismissal for failure to satisfy demand futility in their appeal.

to their housing contracts; a claim for tortious interference with contract; and a direct cause of action.[2] *Id.* at *8.

The Defendants moved to dismiss the Amended Complaint. *Id.* at *2–3. The district court granted the motion to dismiss filed by Kappa, Rooney, and the Kappa Kappa Gamma Building Co. and dismissed all claims.[3] *Id.* Notably, however, the district court declined the Defendants' request to dismiss the case with prejudice. *Id.* at *43–44. Plaintiffs nevertheless appealed to this Court. *See Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-8065, 2024 U.S. App. LEXIS 14237 (10th Cir. June 12, 2024). Given that the case had been dismissed without prejudice and was therefore not a final appealable order, the Court dismissed the appeal for lack of appellate jurisdiction. *Id.*

Appellants filed the Second Amended Complaint—the operative complaint on this appeal—on June 12, 2025. (App. Vol. II at 89–137.) The Second Amended Complaint no longer named the Kappa Kappa Gamma Building Co. or the Student as defendants and added Appellees Brown, Campbell, Goettelman, Wong, Donnelly, and Black as Defendants. (*Id.*) The Second Amended Complaint asserted derivative claims for breach of fiduciary duty and ultra vires acts, a claim for breach of contract, and a claim for fraud in the inducement. (*Id.*)

---

[2] The Amended Complaint did not specify against which Defendants it was asserting each claim. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44 n.67.
[3] The district court dismissed the Student's motion to dismiss as moot. *Id.* at *3.

Appellees filed a Motion to Dismiss the Second Amended Complaint on June 26, 2025. (*Id.* at 138–69.) Appellees pointed out that Fraternity Council had a duty under the governing documents to interpret the Bylaws. (*Id.* at 153–54.) Appellees argued that the derivative claims, as the district court had recognized in dismissing the Amended Complaint, failed because Ohio law affords nonprofit organizations like Kappa deference to reasonably interpret their own governing documents and Kappa's interpretation that its Bylaws allow transgender women to join is reasonable. (*Id.* at 151–62) Appellees additionally argued that the federal courts stepping in to decide whom a private organization can and cannot admit as a member implicates First Amendment concerns and that Appellants had not properly exhausted their derivative claims under Rule 23.1. (*Id.*)

Appellees argued that the district court should dismiss the breach-of-contract claim because Appellants had not identified a contractual provision that any Appellee had breached. (*Id.* at 162–63.) Finally, Appellees sought dismissal of the fraud-in-the-inducement claim because Appellants had not alleged either an untrue representation by any Appellee or a failure to disclose a fact that an Appellee was under a legal obligation to disclose. (*Id.* at 163–65.) Appellees asked the Court to dismiss all claims with prejudice. (*Id.* at 167–68.)

Appellants responded to the Motion to Dismiss by arguing that Ohio law did not provide for deference to Kappa's interpretation of its governing documents

insofar as it was interpreting the meaning of the word "woman." (*Id.* at 177–81.) They further argued that their fraud-in-the-inducement and breach-of-contract claims were sufficiently supported by allegations in the Second Amended Complaint. (*Id.* at 183–87; 189–91.) Appellants' ***only*** argument that a dismissal should be without prejudice was that Appellees were estopped from arguing that further amendment to the Second Amended Complaint would be futile because some of the Appellees had argued that the prior appeal in this case should be dismissed because the district court had dismissed the Amended Complaint without prejudice. (*Id.* at 191–92.)

The district court granted the Motion to Dismiss and dismissed all claims with prejudice, noting it had "reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile." (*Id.* at 243.) This appeal followed. The same day they filed their opening brief in this appeal, Appellants also moved to certify three questions of law to the Ohio Supreme Court. (*See* Mot. to Certify, Doc. No. 17.) The Court issued an order referring the Motion to Certify to the merits panel. (Doc. No. 19.) As such, Appellees respond to the Motion below.

## SUMMARY OF THE ARGUMENT

Appellants are Kappa members who were dissatisfied with their chapter's vote to admit a transgender woman as a member in the fall of 2022. Since that

time, they have tried to leverage the litigation process to have the federal courts wrest control of Kappa—a private, nonprofit organization—from its members and member-elected leaders and, in doing so, impose Appellants' preferred gender-identity politics upon Kappa as a whole. Specifically, Appellants ask this Court to define the term "women," which all parties agree is undefined in Kappa's governing documents, to mean "biological female." But it is not the role of the courts to decide what is best for private organizations or to overrule the decisions of those organizations' elected leaders.

Appellants misapprehend the role of courts in policing the internal activities of private organizations. Ohio law, which governs the derivative claim, provides that private organizations have autonomy to reasonably interpret their bylaws. In fact, Kappa's own governing documents ***expressly*** give Kappa's Fraternity Council authority to interpret Kappa's Bylaws, and the Fraternity Council's interpretation of its Bylaws, which do not define the term in question, is reasonable.

Appellants' argument ***depends*** on the false premise that the term "woman" can only refer to an individual who is a "biological female." Although that is one interpretation of the term, it is not the only reasonable one. Courts, social science, and numerous other segments of society have adopted a broader, more inclusive definition of the term. Kappa's Fraternity Council, not bound by any Bylaw that

defines "woman" more restrictively, was free to inclusively define "woman" to include transgender women.

Differences of opinion on this inclusive definition—which will undoubtedly happen in an organization of over hundreds of thousands of members with diverse personal views—does not mean the definition is unreasonable; it only reflects disagreement. And disagreement alone is an insufficient basis to overturn a leadership decision through federal litigation. This Court need not make any decision about who is or is not a "woman." Under Ohio law, the only question is whether Kappa's Fraternity Council's definition of "women" to include transgender women is reasonable. Because it is, the Court should affirm the dismissal of Appellants' derivative claims.

The Court should also affirm the district court's dismissal of Appellants' claims for breach of contract and fraud in the inducement. The contract claim fails because Appellants do not identify a contractual provision that any Appellee breached. The fraud-in-the-inducement claim fails because it requires either a materially false statement or the failure to disclose a fact when under a legal obligation to disclose, and Appellants allege neither occurrence. Appellants' argument that the district court erred by dismissing these claims with prejudice and not giving them an opportunity to save these two claims through amendment fails, as evidenced by the fact that Appellants ***never*** made such an argument to the

district court and fail to explain to either the district court or this Court how they could address the deficiencies in these claims by amending the claims. Appellants' only argument concerning dismissal with prejudice was a procedural one that they do not raise to this Court.

Finally, the Court should deny Appellants' Motion to Certify. Appellants seek to certify the questions presented for the first time only after twice failing to persuade the district court of their position. Under this Court's precedent, the timing of the request to certify the questions strongly supports its denial. And even if Appellants were not making the request for the first time after failing to prevail on the merits, denial would still be appropriate. Ohio law is clear on the impact and scope of the non-interference rule. And the other two questions concerning Ohio law's definitions of gender and the Ohio Constitution's free-speech clause have no impact on the merits of this case.

## ARGUMENT

### A. The District Court Correctly Dismissed Appellants' Derivative Claims

#### 1. Kappa Is Entitled to Reasonably Interpret Its Own Governing Documents

Ohio law allows private, nonprofit organizations latitude to reasonably interpret their own governing documents. Ohio law recognizes that a private organization's right to interpret its own bylaws, rules, and regulations "is as sacred as the right to make them." *Stibora v. Greater Cleveland Bowling Ass'n*, 577

N.E.2d 1175, 1179 (Ohio Ct. App. 1989) (quotation omitted). Recognizing the organization's right to interpret its own documents, "[a]s a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at *13 (N.D. Ohio Jan. 6, 2010).

"Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein the members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991). Courts will only step in to disturb a private organization's interpretation of its own bylaws "when there has been some palpable violation of the constitution or laws of the corporation." *Redden*, 2010 U.S. Dist. LEXIS 822, at *14 (quoting *Powell v. Ashtabula Yacht Club*, No. 953, 1978 Ohio App. LEXIS 8855, 1978 WL 216074, at *4 (Ohio Ct. App. 1978)) (quotation marks omitted). Stated another way:

> [C]ourts will not assume to act in place of those authorized to interpret the constitution and by-laws of a voluntary association unless those upon whom the duty is placed acted in an arbitrary and unreasonable manner. This is also true with respect to the determination of all questions of policy and internal management.

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166, at *17 (Ohio App. 1988) (finding that the union's construction of its own governing documents was reasonable and court would

defer to this interpretation) (citing *Finlay v. Duffy*, 94 N.E.2d 466, 469 (Ohio Ct. App. 1950)). The term "arbitrary" has been defined by the Supreme Court of Ohio as "without adequate determining principle . . . not governed by any fixed rules or standard." *Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763, 773 (Ohio Ct. App. 2009) (quoting *City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095, 1097 (Ohio 1981)) (internal quotation marks omitted).

When, as here, members are arguing that their interpretation of the bylaws is correct and the private organization's interpretation of the bylaws is incorrect, it "is not an issue to be decided by a court." *See Stibora*, 577 N.E.2d at 1179; *Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch 46*, 790 N.E.2d 370, 375 (Ohio Mun. Ct. 2003) (collecting cases holding courts should only step in if the voluntary organization's actions are "not just wrong, but also arbitrary and undertaken as a willful exercise of power").

Appellants' brief misstates the full scope of this doctrine. They quote *Lough v. Varsity Bowl, Inc.* for the proposition that the non-interference rule "holds that 'courts will not interfere with the quasi-judicial decisions of voluntary associations unless such decisions are alleged and shown to be the result of fraud, arbitrariness, or collusion.'" (Aplt. Br. at 18 (quoting *Lough v. Varsity Bowl*, 243 N.E. 61, 62 (Ohio 1968).) But other cases on this doctrine establish that courts defer to the decisions of nonprofit organizations. *See Putka*, 600 N.E.2d at 802

(holding that the decision of the association is supreme "in matters of policy, discipline or internal economy"). Other than asking the Court to certify the issue to the Ohio Supreme Court to potentially develop additional law on this issue, Appellants do not contest the doctrine's applicability absent an exception.

Kappa's interpretation of its Bylaws is entitled to the same deference Ohio courts have consistently afforded Ohio's voluntary organizations.

2. Fraternity Council's Interpretation of Kappa's Bylaws Was Reasonable

*a. Kappa's Bylaws Do Not Define the Term "Woman"*

Appellants do not dispute that Kappa's governing documents do not define the terms "woman" or "women." They further do not dispute that the governing documents assign to Fraternity Council the obligation to interpret the governing documents. (App. Vol. I at 228.) It is therefore undisputed that Fraternity Council was required by the governing documents to interpret the meaning of "woman" as it is used in the governing documents. Fraternity Council accordingly interpreted the term to be inclusive of transgender women.

Unable to identify a provision in a governing document that defines "woman" as they would prefer, Appellants resort to circular logic and irrelevant arguments to avoid discussing whether it was reasonable to interpret "woman" to include transgender women. For example, Appellants point to Kappa documents that refer to graduated members as "alumnae" or references to "womanhood" as

evidence that the governing documents have always "reinforced the biological meaning of the word." But those terms bear no relationship to the question of whether "women" only includes "biological women." (Aplt. Br. at 23.) And, under Fraternity Council's interpretation of "woman," those references would also describe the college student Appellants targeted with this litigation, who is now a graduate alumna.

Appellants also reference Kappa's history of advocacy for women and women's organizations as evidence that its governing documents confine membership to biological women. (*Id.* at 5.) Again, advocacy for women is not mutually exclusive with the idea that transgender women are not women. Kappa's prior advocacy is in no way inconsistent with recognizing transgender women are women and also worthy of protection and safe spaces.

Appellants' final argument that "woman" is not a term subject to interpretation is that "Appellees know what 'woman' means." (*Id.* at 23.) Their evidence on this point is a position statement which states that Kappa "is a single-gender organization comprised of women and individuals who identify as women." (*Id.*) As an initial matter, Appellants do not claim there is any legal requirement that Fraternity Council publish its interpretations of undefined terms, nor do any of the governing documents set forth such a requirement. Appellants also do not allege any confusion as to whether Fraternity Council has interpreted "women" to

include transgender women. Furthermore, Appellants concede that this position statement is not a governing document. (*Id.* at 24.) Ultimately, Kappa is governed by volunteers. They are not legislators, and they are not held to a statutory interpretation analysis in issuing position statements. An imprecisely worded position statement by a volunteer board is not a reason for a court to interfere with that board's governance of its organization.

Under the non-interference rule, once the undefined nature of the term "woman" is established, the question becomes whether Fraternity Council's interpretation of the term was reasonable.

*b. Interpreting the Term "Woman" to Include Transgender Women is Reasonable*

As the Court is likely aware, there is an ongoing and intense political debate over the rights and status of transgender people that spans several areas of society. The Court need not resolve that debate or decide who is or is not a woman to decide this case. It only needs to decide whether Kappa's Fraternity Council reasonably interpreted the term when the governing documents did not resolve the issue within the Kappa organization. Fraternity Council did exactly that.

Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older. *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023). Some courts have explicitly recognized that "[a] transgender woman ***is a woman*** who was assigned male at

birth." *Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio Sept. 25, 2023) (citation omitted) (emphasis added); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022) ("[t]ransgender men are men; transgender women are women"); *Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 81 (Ill. Ct. App. 2021) (finding a transgender woman "is female, just like the women who are permitted to use the women's bathroom. The only reason that [a transgender woman] is barred from using the women's bathroom is that she is a *transgender* woman, unlike the other women . . .") (emphasis in original)).

Many courts, including this one, have long referred to transgender women using she/her pronouns, which Appellants would reserve only for people assigned female at birth. *See, e.g.*, *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (using female pronouns to refer to party who was a transgender woman); *Hecox*, 79 F.4th 1009 (same); *United States v. Price*, 84 F.4th 738 (7th Cir. 2023) (same); *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) (same); *Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (same).

Other courts, including the district court its dismissal orders, have recognized that the question of who is a woman does not have a straightforward answer while declining to answer it definitively. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *4 ("the Court will not define 'woman' today"); (App. Vol. II at

230 (finding plaintiffs' own designated dictionary source does not agree there is only one common definition "and therefore we also remain unconvinced").); *Cf. B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220, 228 (S.D. W. Va. 2023) ("I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions"), rev'd, 98 F.4th 542 (4th Cir. 2024) (holding the state's classification in case concerning participation of transgender girls in school sports as applied to plaintiff was not substantially related to the state's articulated interest)).

Courts have also adopted expansive interpretations of "sex," which result in expansive definitions of "male" and "female." The Southern District of Ohio recognized that "biological markers" that compromise an individual's biological sex" may include "inter alia their organs, their chromosomes, their hormones, and their gender identity." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707, at *23 (S.D. Ohio Jul. 28, 2023). That court explained:

> [B]iological sex is not quite as binary as that definition presumes. Instead, the concept of "biological sex" encompasses a multitude of biological components (including gender identity) that often diverge in the same individual; for any given person, some of their biological markers may align with maleness while other markers align with femaleness . . . Sometimes, that divergence manifests in obvious physical ways: for example, in intersex individuals whose reproductive or sexual anatomy [do not] fit into an exclusively male or female

> (binary) sex classification . . . In others, the divergence in their biological components is still physical, but in less obvious or outwardly apparent ways . . . Simply put, it is not so simple to define "biological sex" as just male or female.

*Id.* at *22–*23 (citing *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 821–23 856–57 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting)); Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending Conversion Practices and Saving Transgender Lives*, 136 HARV. L. REV. 1112, 1117 (2023); *Intersex*, CLEVELAND CLINIC (Jul. 23, 2023), https://my.clevelandclinic.org/health/articles/16324-intersex; F.P. Kruijver et al., Male-to-female transsexuals have female neuron numbers in a limbic nucleus, 85 J. CLINICAL ENDOCRINOLOGY & METABOLISM 2034 (2000) (internal quotation marks omitted), rev'd, 158 F.4th 732 (6th Cir. 2025) (en banc)[4]).

---

[4] Though the en banc Sixth Circuit reversed the case on First Amendment grounds, the court recognized this was a political and social debate, with one side believing sex was immutable and determined at birth and many others holding a conflicting view that people can have a sense of gender that differs from biological sex. *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, No. 23-3630, 2025 U.S. App. LEXIS 29181, at *42–43 (6th Cir. 2025). The Sixth Circuit further recognized that this debate has been evident under the practices of the past two presidential administrations, which have changed course in their treatment of transgender individuals. *Id.* at *43–44. As articulated by the concurrence, the problem with the school district's policy was that, "The District chose a side in a hotly contested debate and tried to squelch the opposing viewpoint by imposing an ideological speech code. When it did so, it unlawfully discriminated based on viewpoint." *Id.* at *99. In recognizing the debate on these issues, the Sixth Circuit's decision further supports why a private organization's interpretation of women to be inclusive of transgender women is reasonable.

As explained by the Middle District of Tennessee:

> [S]ex can mean different things to different people and/or mean different things in different contexts, and the notion that there is only one definition of 'sex'—or only one sense in which the word 'sex' properly can be used—is patently wrongheaded.

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984, at *30 (M.D. Tenn. Jun. 22, 2023). That court further recognized that "male" and "female" can have meanings transcending mere external genitalia at birth and that a person may be able to switch between the two based on gender identity or changes in external genitalia. *Id.* at *32. And that a birth certificate designation of "male" or "female" is not a designation that is "immutable over a person's life, or applies to every context, or is the only possible way to think of the person's 'sex,' or is the person's '*true* sex.'" *Id.* at *53 (emphasis in original); see also *Hobby Lobby Stores*, 186 N.E.3d at 79 (recognizing gender identity can be a factor used in state legislation to determine "sex," and that "sex" is not an immutable condition or "eternally fixed").

Whether one's sex can be changed is "a topic which has been in the news on many occasions and 'has become an issue of contentious political . . . debate.'" *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001)) (internal quotation marks omitted). Appellants and the amici supporting their position plainly have

one view as to how policymakers in public and private realms should treat transgender women and girls. Specific to this case, they want transgender women banned from Kappa. They are undoubtedly joined in those views by others across the country. Others, including, apparently, a majority of the members of Kappa's Gamma Omicron chapter, feel differently.

The biological reality of sex and gender is complicated. *Hecox*, 79 F.4th at 1024. In *Hecox*, he Ninth Circuit has cited the Endocrine Society Guidelines, which recognize:

> The phrase 'biological sex' is an imprecise term that can cause confusion. A person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity. These attributes are not always aligned in the same direction.

*Id.* But, in a case involving a private organization's interpretation of its governing documents, the Court does not need to resolve those complicated questions and define what it means to be a woman. Instead, this Court only needs to decide whether Kappa, the Fraternity Council, interpreted its documents reasonably. "[A] difference of opinion does not rise to the level of a breach of fiduciary duty." *Maas v. Maas*, 161 N.E.3d 863, 879 (Ohio Ct. App. 2020). And interpreting the term "woman" in the same way as legislatures and courts that have touched on the question in other contexts was reasonable.

Appellants make a great deal of how Kappa's status as a women's organization bears on this case. So, as a final point, the Court can look to how other women's organizations and groups define "woman." Kappa's inclusive definition aligns with all other 25 sororities that are a part of the National Panhellenic Conference ("NPC"). (App. Vol. II at 271.) Numerous other private women's organizations have also defined "women" to include transgender women through their public statements.[5] Interpreting the term "women" in the same way as other NPC groups, women's colleges, and women's organizations is reasonable and reflects a "common understanding" of this term.

---

[5] *Statement of Women's Rights and Gender Justice Organizations in Support of the Equality Act*, NAT'L ORG. FOR WOMEN, https://now.org/wp-content/uploads/2021/03/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf (Mar. 16, 2021) (statement signed by over 80 organizations that "transgender girls and women are girls and women"); *Women Demand: A Letter to Federal Elected Officials and Candidates from the Women's Community*, NAT'L WOMEN'S LAW CENTER, https://nwlc.org/resource/women-demand-a-letter-to-federal-elected-officials-and-candidates-from-the-womens-community/; https://nwlc.org/wp-content/uploads/2020/09/Womens-Community-Transition-Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) (letter signed by more than 200 organizations; "we use the phrase 'women and girls' and explicitly note that this includes transgender women and girls"); *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People*, AM. ASS'N OF UNIV. WOMEN, https://www.aauw.org/app/uploads/2020/02/Statement-from-Womens-Organizations-Supporting-Full-and-Equal-Access-to-Participation-in-Athletics-for-Transgender-People-nsa.pdf (statement signed by 16 organizations stating that "[t]ransgender girls and transgender women are girls and women").

*c. Appellants Did Not Allege That an Exception to the Non-Interference Rule Applies*

Citing *Rutkowski v. United States Practical Shooting Association*, a recent appellate court decision in Ohio, Appellants argue that the district court failed to consider the "bad-faith exception to the non-interference rule." (Aplt. Br. at 20–22 (citing *Rutkowski v. United States Practical Shooting Association*, No. 2024 CA 00119, 2025 Ohio App. LEXIS 2127 (Ohio Ct. App. June 20, 2025)).) They further suggest the applicability of this doctrine in their Motion to Certify by stating that the Ohio Supreme Court should weigh in on the interplay between the non-interference doctrine and the "bad faith, ultra vires, and arbitrary exceptions." (Mot. to Certify at 8.)

In assessing a derivative suit for breach of fiduciary duty, "it is presumed that any action taken by a director[6] on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (citing *Drage v. Procter & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997)). When officers and directors perform their duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances," they have no liability.

[6] Ohio courts impose a similar common law fiduciary duty on officers as that imposed by the Ohio statute on directors. *Liquidating Tr. of the Amcast Unsecured*

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker*, 365 B.R. at 103.

Appellants argue that they "set forth allegations that would entitle [them] to relief and were sufficient to meet the bad-faith exception of the non-interference rule." (Aplt. Br. at 21–22.) At no point, however, do Appellants state what those allegations actually are. In the Second Amended Complaint itself, the only allegation of a lack of good faith is that Fraternity Council "conceal[ed] its decision-making." (App. Vol. II at 123–24 (¶ 137).) This allegation is based on Council's reference to a Guide for Supporting our LGBTQIA+ Members. (*Id.* at 121, 123–24 (¶¶ 129 and 137).) The allegation that Council "concealed" its interpretation is inconsistent with the rest of the Second Amended Complaint, which alleges that the Guide had been distributed in 2018 and that Fraternity Council had issued position statements that members could access stating its interpretation of who could join Kappa.[7] (*Id.* at 122–23 (¶¶ 131 and 135).)

---

*Creditor Liquidating Tr. v. Baker*, 365 B.R. 91, 103 (S.D. Ohio Bkrupty. 2007).

[7] To the extent Appellants attempt to allege that changes to the Bylaw amendment process "demonstrate[] exactly the type of collusion that would nullify the internal affairs rule" (Aplt. Br. at 26), the Court should disregard the argument as it was not raised below and "collusion" related to a procedural mechanism for amending governing documents was not alleged as a basis for the derivative claims in the Second Amended Complaint. *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1221 (10th Cir. 2017) (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011)) ("[w]hen a plaintiff raises a legal theory on appeal that was not raised in district court, we consider that theory forfeited").

Otherwise, the allegations cited in Appellants' brief concern the wisdom and impact of the Fraternity Council interpreting the word "woman" to include transgender women. Appellants alleged that the interpretation has caused Kappa to lose its character as a women's organization and exposed the organization to legal challenges.

But alleging a decision was unwise is not synonymous with alleging it was made in bad faith. In evaluating a director's compliance with a fiduciary's duty of care, "Ohio courts adhere to the 'business judgment rule,' and will not usually inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion," as courts recognize that "many important decisions are made under circumstances of uncertainty." *Koos v. Central Ohio Cellular*, 641 N.E.2d 265, 272 (Ohio Ct. App. 1994) (quoting *Radol v. Thomas*, 772 F.2d 244, 256 (6th Cir. 1985)) (internal quotation marks omitted).

Were disagreement with a decision made by the board of a nonprofit organization sufficient to allege bad faith, the non-interference rule would lose all practical effect, as disagreement with the decision will exist in any case where someone challenges a decision through a lawsuit. Plaintiffs have not alleged any sort of bad faith beyond not liking the decision or its impact. That is insufficient to allege bad faith such that the non-interference rule could plausibly not apply.

#### *d. Appellants' Arguments Related to Recent Executive Orders, Title IX, Ohio Statutes, or the Ohio Constitution Do Not Alter the Analysis of the Derivative Claims*

As they did below, Appellants attempt to bolster their derivative claims by arguing that interpreting the term "woman" to include transgender women in the governing documents of a private, nonprofit organization runs afoul of an Executive Order and a recently enacted Ohio statute while also exposing Kappa to loss of its Title IX exemptions. None of these arguments change the analysis.

Executive Order 14168 and Ohio Revised Code § 9.05 are similar in that both set forth how the federal or state government will interpret terms related to gender. *See* Exec. Order No. 14168; Ohio Rev. Code Ann. § 9.05. But, as the district court recognized, executive orders set forth the Executive Branch's interpretation of federal laws and administration policy. (App. Vol. II at 267.) And the new Ohio statute sets forth how certain terms contained elsewhere in Ohio's statutes are interpreted and explains that it is the policy of the state to recognize only two, unchangeable sexes. Neither the President's interpretation of federal law nor the state of Ohio's "policy" dictates that a private organization cannot interpret its own criteria for membership.

The Title IX arguments fare no better. Appellants spend almost five pages of their brief discussing Title IX, which is odd given that this is not a Title IX case, and Kappa is not a recipient of federal funds. Title IX regulations regarding

discrimination due to sex do not apply to the membership practices of social fraternities and sororities that are exempt from taxation under Internal Revenue Code of 1954, 26 U.S.C. § 501(a), the active membership of which consists primarily of students in attendance at institutions of higher education. 20 U.S.C. § 1681(a)(6)(A). There is no dispute that Kappa is a social fraternal organization.[8] Nothing in the "exemption" requires that a fraternity or sorority only admit individuals of one biological sex to maintain the exemption. *Id.* Indeed, nothing about sex is mentioned at all for social fraternities and sororities, unlike for some other exemptions. *Compare* 20 U.S.C.(a)(6)(A) *with* 28 U.S.C. 6(a)(B) (exempting voluntary youth service organizations "the membership of which has traditionally been limited to persons of one sex"). So long as an organization is a social fraternity or sorority, its membership practices are categorically exempt from Title IX, without regard to the gender makeup of its membership. Therefore, extending membership to transgender women does not impact Kappa's Title IX exemption.[9]

---

[8] Kappa legally is a "fraternity." *See Webster's Seventh New Collegiate Dictionary* 332 (1967) (defining fraternity at the time of Title IX's enactment generally as "a group of people associated or formally organized for a common purpose, interest, or pleasure"; and, in the university context, as "a student organization formed chiefly for social purposes having secret rites and a name consisting of Greek letters"); *see The Random House Dictionary of the English Language* 564 (1973) (offering as one definition of "fraternity" at the time of Title IX's enactment "any group or class of persons having common purposes, interests, etc.").

[9] Appellants place too much emphasis on the exclusion of one biological sex for the Title IX exemptions to apply. There are other organizations and institutions that are exempt from the statute that are not single sex. *See* 20 U.S.C.

Finally, the Ohio Constitution has no bearing on this claim. As Appellants acknowledge, no party to this case is a state actor. The Ohio Supreme Court has held that "the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment." *Eastwood Mall v. Slanco*, 626 N.E.2d 59, 61 (Ohio 1994) (rejecting argument that the Ohio Constitution prohibited a private shopping center from restricting free speech).

Appellants suggest that the Ohio Supreme Court may be open to revisiting that decision, citing *State ex rel. Cincinnati Enquirer v. Bloom*, 251 N.E.3d 79 (Ohio 2024), where the Ohio Supreme Court considered whether the Ohio Constitution's guarantee that judicial proceedings be open to the public was limited by First Amendment jurisprudence. *Id.* But it does not logically follow from the general proposition that the Ohio Constitution may be read more broadly than the First Amendment that the Ohio Constitution imposes an obligation on a private actor (Kappa) to "protect and honor the freedom of speech" of individuals who are not Ohio citizens (all the Plaintiffs). And Appellants offer no argument rooted in

---

§ 1681(a)(3)-(9). For example, the Boy Scouts did not remain exclusive to boys and began admitting girls, and the military academies began admitting women only a few years after Title IX was enacted, but both remained exempt from Title IX. This is because the law does not mandate that organizations or institutions remain "single-sex" to qualify for the exemption. As another example, educational institutions controlled by religious organizations also qualify for an exemption even though they are non-single sex. 20 U.S.C. § 1681(a)(3).

the text of the Ohio Constitution that it could be plausibly read to encompass such a right.

*e. Appellants Cannot State a Derivative Claim Based on Alleged Retaliation Against Two of the Appellants*

As another basis for their derivative claim, Appellants rely on alleged "retaliatory conduct" that some of them purportedly faced related to their positions regarding this case. (Aplt. Br. at 43.) These allegations cannot support a derivative claim for two reasons. First, a derivative claim is a claim for an injury to the organization as a whole. *Carlson v. Rabkin,* 789 N.E.2d 1122, 1126–27 (Ohio Ct. App. 2003). That two members may allege they felt retaliated against does not constitute an injury to Kappa as a whole.

Second, Appellants did not allege that the Appellees were in any way involved with the conduct they contend was retaliatory. In the portions of the Second Amended Complaint they cite, Appellants alleged that Appellant Holtmeier "was brought before a disciplinary hearing" where "[c]hapter officials read prepared statements they had discussed with Fraternity officials and provided her with material." (App. Vol. II at 119 (¶117).) They further allege that Holtmeier "was threatened with further discipline" if she did not agree that the transgender student the chapter voted to admit was a woman. (*Id.* (¶ 118).) As noted by the district court, Holtmeier was not disciplined, so this need not be considered. (*Id.* at 278.) For Appellant Ramar, Appellants alleged that she "was

removed from her position as the Wyoming Chapter Finance Chair." (*Id.* at 119 (¶ 121).) Like in the district court, Plaintiffs did not cite to any case law to show it is the court's duty to review due process in cases where a member is removed from an internal position but not ejected from the organization as a whole. More importantly, none of these complained of allegations relate to Fraternity Council or any Appellee, but instead, are Wyoming chapter actions. Therefore, because these were not actions of Fraternity Council or any Appellee and only apply to individuals, they are irrelevant to any derivative claim.

*f. Kappa's Standing Rules Defer to Fraternity Council's Interpretations, and Appellants Cannot Sidestep the Deference that Is Fatal to Their Claims by Re-Casting Their Derivative Claim as a Simple Breach-of-Contract Issue*

Kappa's Standing Rules require that Fraternity Council interpret undefined terms in the Bylaws. Specifically, the Standing Rules provide that Fraternity Council's duties include "Interpreting the Fraternity *Bylaws* and *Standing Rules*." (App. Vol. I at 228.) With the term "woman" undefined in the Bylaws, therefore, it is Fraternity Council that determines the meaning of the term under the Bylaws. Thus, the governing documents establish that it is Fraternity Council's role to interpret the Bylaws.

Appellants do not address the fact that the governing documents delegate questions of interpretation to Fraternity Council, instead they try to cast their derivative case as a contract dispute. Appellants urge the Court to treat Kappa's

Bylaws like a standard contract and allow the case to proceed so the parties can resolve ambiguities in the Bylaws through parol evidence, as they would in a contract case. This argument is nothing more than an end-run around the non-interference rule and the fact that Kappa's governing documents delegate interpretive questions to Fraternity Council.

Because Ohio law requires deference to organization's interpretation of their own documents ***and*** Kappa's governing documents explicitly delegate to Fraternity Council the obligation to interpret the Bylaws, standard contract rules do not apply to the interpretation of Kappa's Bylaws.

*g. Declining to Defer to Kappa's Interpretation of Its Bylaws Would Undermine the Purposes of the Judicial Non-Intervention Doctrine and Ensnare Courts in Unnecessary Litigation*

The United States District Court for the Western District of Texas succinctly described the rationale for judicial non-intervention: "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility." *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted). Appellants' position that the Court should not defer to Kappa's interpretation of its Bylaws defining membership criteria would confine private organizations and the courts to precisely this fate.

This irrational rule could just as easily apply to a claim for any of Fraternity Council's other interpretations of Bylaws, including membership criteria, so any disputed interpretation would arguably support a derivative claim for breach of fiduciary duty. For example, under Kappa's Bylaws, a member, among other requirements, must "[h]ave demonstrated integrity, respect, and regard for others and an appreciation of the worth of all individuals" and "[b]e willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules* and *Policies*." (App. 087.) The logical extension of Appellants' position is that any Kappa member could assert a legal claim for breach of fiduciary duty against Fraternity Council if she believed her chapter was admitting members who lacked integrity and Fraternity Council failed to prevent the members' initiation. The courts hearing the cases would not defer to Kappa's judgment, but instead, would judicially determine the meaning of "integrity" and who could be admitted under the courts' standards. Those same principles of judicial intervention in bylaw interpretations would apply to any nonprofit, private organization.

Litigation stemming from a novel judicial non-deference rule to bylaw interpretation, simply because it is advanced as a derivative claim for breach of fiduciary duty, would overwhelm courts, nonprofit private organizations, and their members. Nonprofits are often governed by boards of volunteers with minimal resources, and dragging these organizations into endless litigation over policy

decisions or interpretations of bylaws threatens their very survival. This underscores why Ohio law requires only that private organizations make reasonable interpretations of their own governing documents and that courts otherwise refrain from interfering in the governance of private entities.

*h. Once Kappa Has Reasonably Interpreted Its Own Bylaws, a Court Dictating Whom It Can and Cannot Admit Would Violate the First Amendment*

The First Amendment right of a private organization to conduct itself as it sees fit and associate with members of its choosing is inherent in the judicial non-intervention doctrine. Although Appellees agree that litigants cannot use the First Amendment as a shield against meeting private contractual obligations, a court telling a private organization that it cannot reasonably interpret its own governing documents to select members it chooses to associate with would violate the First Amendment. "Interference with expressive associational rights is clearest when it involves matters concerning decisions about a group's membership." *W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, 689 F. Supp. 3d 272, 294 (S.D. W. Va. 2023). As discussed above, Kappa's governing documents allow for the admission of any transgender woman whom a chapter votes to accept. Thus, interference by this or any court in Kappa's decision to admit a transgender woman as a member because she is a transgender woman would violate the First Amendment.

Appellants argue that the case does not implicate the First Amendment because there is no state action. (Aplt. Br. 26–28.) But the Supreme Court has recognized that actions of courts constitute state actions. *See Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948); *see also Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992) (recognizing a court interferes with the First Amendment freedom of expression in "substitut[ing] its own judgment for that of the [p]arty"). In *New York Times v. Sullivan*, the Supreme Court protected First Amendment freedoms in a libel suit between private parties because, "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) (finding courts applied common law in a civil action between private parties and those court actions imposed invalid restrictions on private parties' First Amendment freedoms). This Court dictating Kappa's membership would implicate Kappa's First Amendment freedoms.

At its core, this is a case about who can and cannot join the membership of a private organization. Specifically, it is about whether Kappa can admit transgender women to its membership or not. The First Amendment confines those decisions to organizations and their members, not government actors like courts and legislatures. "Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Boy Scouts*

*of Am. v. Dale*, 530 U.S. 640, 658 (2000) (internal citations omitted). The Supreme Court recognized, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). "And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Democratic Party of U.S. v. Wis.*, 450 U.S. 107, 124 (1981).

First Amendment associational freedoms apply in the case of a private organization where members disagree about whom should be eligible for admission:

> [An organization's] speech or conduct may reflect the view of only a bare majority of the members, or even just the view of the members' delegate—such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an official position.

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (quoting *Dale*, 530 U.S. at 655) (internal quotation marks omitted).

Kappa's governing documents do not require exclusion of transgender women. Instead, they allow Kappa to admit "women." Forced exclusion could only occur if the Bylaws were amended to define "women" in a particular way—as

only people assigned female at birth. Appellants ask the Court to prohibit Kappa from admitting transgender women into its membership and expel any transgender women in Kappa from membership. But there is no reason to disallow Kappa to associate with transgender women as its members when its governing documents do not prohibit this. For the Court to force this exclusion of certain individuals from Kappa's membership, the Court would have to determine that "women" cannot be interpreted by a nonprofit private organization to include transgender women. This implicates the same First Amendment concerns as forcing the Boy Scouts of America to include gay scoutmasters, as was at issue in *Dale*, or forcing a privately organized parade to allow a group to march when the organizers did not agree with the message, as was at issue in *Hurley*.

**B. The District Court Correctly Dismissed Appellants' Claim for Breach of Contract**

From the Second Amended Complaint, it is not clear which Appellees the Appellants alleged breached a contract, the state law under which they assert the claim, or even the theory under which the breach occurred. Appellants spend little time in their brief before this Court attempting to clarify those issues. It appears that their theory for breach of contract is that Bylaws are a contract between an organization and their members and that the contract was breached when Fraternity Council interpreted the Bylaws to allow the admission of transgender women into Kappa.

In addition to the fact that, as discussed above, construing organizational bylaws as susceptible to breach-of-contract litigation whenever a member disagreed with an interpretation would undermine Ohio law's deference to organizations in interpreting their own governing documents, the Court can affirm because Appellants failed to make the basic allegations required under contract law.

Both Ohio and Wyoming law require proof that the defendant failed to perform on a promise made in a contract as an element of a breach-of-contract claim. *See Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 216 N.E.3d 1, 4 (Ohio Ct. App. 2023); *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo. 2017). As discussed throughout, there is no contractual promise to reject transgender women from membership. Absent such a provision, Appellants cannot allege a claim for breach of contract.

### C. The District Court Correctly Dismissed Appellants' Claim for Fraudulent Inducement

Appellants also have not plausibly alleged a claim for fraudulent inducement. Under Ohio law, a plaintiff succeeds in establishing a fraudulent-inducement claim by proving: "(1) a representation of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with utter disregard and recklessness, as to whether it is true or false, (4) with the intent of misleading another into relying upon the representation, (5) justifiable reliance

upon the representation, (6) and a resulting injury proximately caused by the reliance." *Mortgage Elec. Registration Sys. v. Mosley*, 2010-Ohio-2886, 2010 Ohio App. LEXIS 2380, at *20 (Ohio Ct. App. 2010). In Wyoming, a Plaintiff must show "(1) the defendant made a false representation intending to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff suffered damages in relying on the false representation." *Elworthy v. First Tenn. Bank*, 391 P.3d 1113, 1124 (Wyo. 2017).

This claim appears to stem from the false premise that an organization cannot both be an organization that supports women and one that admits transgender women. Appellants are of course entitled to disagree with Kappa's position on this issue, but that they joined an organization that sees things differently is not legally actionable. *See Universal Drilling Co., LLC v. R&R Rig Serv., LLC*, 271 P.3d 987, 997 (Wyo. 2012) ("any false representation must relate to a matter of fact rather than of opinion") (citation omitted).

Most of Appellants' argument on this claim concerns facts that they allege were not made known to them personally. Concealment of a fact can only form the basis of a fraudulent-inducement claim when there is a duty to disclose the fact concealed. *See White v. Pitman*, 156 N.E.3d 1026, 1033–34 (Ohio Ct. App. 2020). There is, however, no legal duty Kappa or the Fraternity Council had to make a disclosure to Plaintiffs that Kappa's policy allowed for admission of transgender

women as members. Kappa was clear that it allowed for admission of women. That Plaintiffs did not inquire if women included transgender women and chose to believe that women meant only biological women does not equate to concealment. Plaintiffs did not ever ask any member of Fraternity Council how "women" was interpreted, but instead, chose to believe it was in accordance with their personal interpretation; indeed, they do not allege they ever had any communications with any member of Fraternity Council. And even if there were such a duty, the Second Amended Complaint concedes the interpretation was published by Fraternity Council since at least 2018. (App. Vol. II at 123–24 (¶¶ 135–37).) Appellants also concede it was distributed to the Fraternity's workforce, the alumnae who direct chapter operations. (*Id.*)[10]

### D. The District Court Properly Dismissed All Claims with Prejudice

Appellants' argument that they should have been granted leave to amend for their breach-of-contract and fraudulent-inducement claims fails. Their position is only that these were "new claims" so they should get another chance to plead. There are several issues with this argument.

First, their First Amended Complaint included both a direct claim and a breach of contract claim, so they had already pleaded that claim. Second, they

---

[10] As noted by the district court, "Plaintiffs have pointed to no bylaw or statute that requires organizations to publicly clarify every term in every policy before a new member joins." (App. Vol. II at 237.)

never made such an argument to the district court. Responding to Appellees' request that dismissal be with prejudice, Appellants' only argument was that Appellees were estopped from seeking dismissal with prejudice by virtue of some Appellees moving to dismiss a premature appeal in this matter. (*Id.* at 191–92.) Appellants did not, however, otherwise argue that leave to amend would be appropriate. (*Id.*) Third, Appellants did not suggest to the district court how they would cure the legal deficiencies in these claims if they were granted leave to amend a third time. (*Id.*) Conversely, Appellees explained to the district court and in this briefing why any amendment would be futile. (*Id.* at 167–68.) Even in their appellate briefing, Appellants do not offer any argument as to why pleading a third time would allow them to cure the deficiencies in those claims.

Absent any argument before the district court or this Court that leave to amend could rescue either of these claims, the Court should affirm the district court's dismissal with prejudice.

### E. The Court Should Deny Appellants' Motion to Certify Questions to the Ohio Supreme Court

Along with their brief, Appellants moved this Court to certify three questions to the Ohio Supreme Court. None of the questions would be appropriately certified. Initially, Appellants waiting until after their position lost below to seek certification typically is a sufficient basis to deny the discretionary motion. And even if Appellants had not waited, none of the questions presented

for certification is necessary to resolve this case given the facts as alleged by Appellants.

1. The Timing of the Request to Certify Warrants Its Denial

Appellants did not seek certification of the presented questions below. Seeking certification for the first time on appeal "only after . . . fail[ing] to prevail on . . . interpretive arguments before the district court . . . strongly disinclines [this Court] to grant certification." *Am Nat'l Prop. & Cas. Co. v. Burns*, 922 F.3d 1045, 1052 (10th Cir. 2019) (citing *United States v. Burkley*, 513 F.3d 1183, 1187 (10th Cir. 2008)).

The issues presented in the Motion are not new ones that arose only after the district court's order. Indeed, these parties have litigated the applicability of the non-interference rule for over two-and-a-half years now. Appellants do not offer any explanation for their delay. Further, it is further relevant that it was Appellants who chose to litigate this matter in federal court. *See Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1229 n.6 (10th Cir. 1996) (holding that a request for certification from a party who had removed the case to federal court was "not well taken" because he had chosen to litigate in federal court). In that case, the Court cited a First Circuit case for the proposition that "[o]ne who chooses to litigate his state action in the federal forum . . . must ordinarily accept the federal court's reasonable interpretation of extant state law rather than seeking extensions via the

certification process." *Id.* (quoting *Croteau v. Olin Corp.*, 884 F.2d 45, 46 (1st Cir. 1989)).

The Court should not permit Appellants to file their claims in federal court, litigate in that court for over two-and-a-half years, and then move the litigation to the Ohio Supreme Court only after receiving a second negative decision from the federal district court. Notably, they did not raise certification before Judge Johnson at the district court, who has already recognized that certification to a state court is not a tool for forum shopping to have "another bite at the apple by attempting to circumvent" an adverse federal court decision. *See Pehle v. Farm Bureau Life Ins. Co.*, No. 02-CV-112-J 2006 U.S. Dist. LEXIS 110948, *4 (D. Wyo. 2006). But even without this procedural posture, the Motion would still fail on the merits.

2. <u>The Court Should Not Certify Appellants' Non-Interference Question</u>

Appellants' proposed question to certify to the Ohio Supreme Court on the non-interference rule is: "Can the board of an Ohio nonprofit corporation effectively amend its governing documents other than through a vote of the membership where the governing documents expressly require one?" (Mot. to Certify at 1.) As discussed throughout, Fraternity Council interpreting a term it was required to interpret does not amount to an amendment of the governing documents any more than it would have been an amendment for Council to have

interpreted the same term to only encompass "biological women," as Appellants would prefer. "Women" had to be interpreted one way or the other. This litigation resulted because Appellants disagree with the interpretation that Fraternity Council applied.

Moreover, there are sufficient Ohio cases to decide whether the governing body of a private, nonprofit organization is entitled to make interpretations that the organization's governing documents require it to make. Ohio cases have repeatedly held that courts should generally refrain from interfering in such decisions. And although Appellants presented only one "official" question for certification, their Motion makes clear that they seek to ask the Ohio Supreme Court to resolve multiple case-specific questions about this case. This Court has the authority needed to resolve the various non-interference questions Appellants ask to present to the Ohio Supreme Court.

3. Appellants' Ohio Constitution Question Is Both Resolved and Immaterial to the Appeal

Appellants, none of whom are Ohio citizens, also seek to certify the question of whether the Ohio Constitution's free-speech provisions protect members in a voluntary organization from "retaliatory termination of membership."[11] Certification of this question is inappropriate both because the Ohio Supreme

[11] Further, a question about "retaliatory termination of membership" has no relation to this case, where no Appellant alleges her membership in Kappa was terminated.

Court has already rejected Appellants' position and because Appellants do not present a colorable argument that the Supreme Court could reach a holding that would impact this case.

First, as mentioned above, current Ohio Supreme Court precedent is that the Ohio Constitution does not provide a free-speech right enforceable against private actors. *See Eastwood Mall*, 626 N.E.2d at 61. Appellants argue that, because the court decided *Eastwood Mall* by relying on First Amendment cases and has since indicated a willingness to read Ohio's Constitution to provide different protections than the First Amendment, this Court should send this case to Ohio to see if the Supreme Court might overrule its prior precedent. Speculation that a court might overturn currently binding precedent is not a compelling basis to certify a question.

And even if the Ohio Supreme Court had not already resolved this question, Appellants would still lack a basis for certification. Their entire argument is that the Ohio Constitution could contain broader speech protections than does the First Amendment and that the Ohio Supreme Court has been willing to consider such arguments. Notably, Appellants do not actually advance an argument that the text of the Ohio Constitution could be plausibly read to impose upon a private organization a general obligation to "protect free speech" that can be enforced privately by non-Ohioans.

That revolutionary argument goes far beyond what the dissent in *Eastwood Mall* proposed, which was that people have a right to free speech on private property that is effectively public as they would on public property. *Eastwood Mall*, 626 N.E.2d at 66 (Wright, J., dissenting) ("I am persuaded . . . that state constitutional rights may be enforceable against private entities based on the extent of the public use of the private property").

Without any argument as to how the Ohio Supreme Court could not only overturn *Eastwood Mall* but also create a robust, first-of-its-kind, private right to avoid consequences for speech within a private organization—enforceable by both Ohioans and non-Ohioans—there is no reason to certify this question.

4. Ohio Legislation Concerning the Interpretation of Gender-Related Terms in the Ohio Revised Code Has No Bearing on This Case

Appellants' final proposed question for certification is: "How do Ohio Courts interpret the term 'woman' and 'gender' as used in Kappa's Governing Documents in light of Ohio case law and recent legislative guidance?" Again, this question is immaterial to the case before the Court.

As discussed above, the statute Appellants cite is one that concerns how terms are defined within the Ohio Revised Code. *See* Ohio Rev. Code Ann. § 9.05. It does not address how any term is defined within the governing documents of a private organization. The governing documents of a private nonprofit organization—just like those of every private for-profit corporation in Ohio—are

in no way impacted by statements of the Ohio General Assembly about the policy of the state of Ohio. How an Ohio court might interpret the terms in an Ohio statute is irrelevant to the questions here. Kappa is a national nonprofit organization that determines its own policies and is run by a volunteer board who governs in the best interests of Kappa's members nationally. The government of the state of Ohio is led by elected officials with differing interests in governing the citizens of the state. The Court should deny certification on each of these issues.

## CONCLUSION

The district court correctly dismissed this case, recognizing that courts have a limited role to play in the governance of private, voluntary organizations. Kappa reasonably interpreted its Bylaws to permit chapters to induct transgender women as members. Appellants' objection to their chapter having done so does not give rise to a legal claim. Appellees accordingly respectfully ask that the Court affirm the District Court's dismissal of Appellants' claims.

Dated: December 26, 2025

Respectfully Submitted,

*/s/ Brian W. Dressel*
Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-5452
Facsimile: (614) 464-5452
E-mail: nmmclaughlin@vorys.com
bwdressel@vorys.com

Stuart R. Day (Wyoming Bar No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone: (307) 265-0700
Facsimile: (307) 266-2306
E-Mail: sday@wpdn.net

*Counsel for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify as follows:

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). Excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), the brief contains 11,090 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Brian W. Dressel*
Brian W. Dressel

# CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

All required privacy redactions have been made to this document, and with the exception of those redactions, every document submitted in digital form is an exact copy of the written document filed with the clerk. Said document has been scanned for viruses with Trend Micro Apex One Antivirus, version 20.665.00 (last updated December 26, 2025), and according to that program is free of viruses.

*/s/ Brian W. Dressel*
Brian W. Dressel